CASE NO. 24-7532

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

### CITY AND COUNTY OF SAN FRANCISCO,

*Plaintiff-Appellee,*

**vs.**

### PORT OF OAKLAND,

*Defendant-Appellant.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE  NORTHERN DISTRICT OF CALIFORNIA
The Honorable Thomas S. Hixson, United States Magistrate Judge
Case No. 3:24-cv-02311-TSH

---

**EXCERPTS OF RECORD VOLUME 2 of 7**

---

Mary C. Richardson (Bar No. 208586)
Kimberly I. McIntyre (Bar No. 184648)
**PORT OF OAKLAND**
530 Water Street
Oakland, California  94607
Tel: (510) 627-1572 / (510) 627-1205

Eugene M. Pak (Bar No. 168699)
Angela Han (Bar No. 317137)
**FENNEMORE LLP**

1111 Broadway, 24th Floor
Oakland, California 94607
Tel: (510) 834-6600 / Fax: (510) 834-1928

Stephen C. Willey (Bar No. 209164)
Brandi B. Balanda (*Pro Hac Vice*)
**FENNEMORE CRAIG, P.C.**
1425 Fourth Avenue, Suite 800
Seattle, WA 98101-2272
Tel: (206) 749-0500 / Fax: (206) 749-0600

Timothy J. Berg
**FENNEMORE CRAIG, P.C.**
2394 E. Camelback Road, Suite 600
Phoenix, AZ 85016
Tel: (602) 916-5000 / Fax: (602) 916-5999

Therese Shanks
**FENNEMORE LLP**
7800 Rancharrah Parkway
Reno, NV 89511
Tel: (775) 788-2200 / Fax: (775) 786-1177

Attorneys for Defendant-Appellant Port of Oakland

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3    Before The Honorable Thomas S. Hixson, Magistrate Judge

4

5  CITY AND COUNTY OF SAN          )
   FRANCISCO,                      )
6                                  )
              Plaintiff,           )
7                                  )
   vs.                             )   No. C 24-02311-TSH
8                                  )
   CITY OF OAKLAND,                )
9                                  )
              Defendant.           )
10  _____ )

11                                 San Francisco, California
                                   Thursday, November 7, 2024
12

13   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
            RECORDING 1:12 - 2:54 = 102 MINUTES
14

15   APPEARANCES:

16   For Plaintiff:
                                   Cooley LLP
17                                 1333 Second Street
                                   Suite 400
18                                 Santa Monica, California
                                    90401
19                                 (310) 883-6400
                             BY:   BOBBY A. GHAJAR, ESQ.
20

21

22

23

24

25         (APPEARANCES CONTINUED ON NEXT PAGE)

```
                                                               2
 1  APPEARANCES (cont'd.)

 2  For Plaintiff:
                              Office of the City Attorney
 3                            City Hall
                              One Dr. Carlton B. Goodlett
 4                                Place
                              San Francisco, California
 5                                94102
                              (415) 554-4700
 6                        BY: YVONNE R. MERE, ESQ.
                          BY: JULIE VEIT, ESQ.
 7                        BY: CHRISTOPHER STUART, ESQ.

 8                            Cooley LLP
                              3175 Hanover Street
 9                            Palo Alto, California 94304
                              (650) 843-5000
10                        BY: JUDD D. LAUTER, ESQ.

11                            Cooley LLP
                              Three Embarcadero Center
12                            Twentieth Floor
                              San Francisco, California
13                                94111
                              (415) 693-2000
14                        BY: RYAN C. STEVENS, ESQ.

15  For Defendant:
                              Fennemore Craig, P.C.
16                            1425 Fourth Avenue
                              Suite 800
17                            Seattle, Washington 98101
                              (206) 749-0500
18                        BY: BRANDI B. BALANDA, ESQ.
                          BY: STEPHEN C. WILLEY, ESQ.
19
                              Fennemore Wendel
20                            1111 Broadway
                              Twenty-Fourth
21                            Oakland, California 94607
                              (510) 834-6600
22                        BY: EUGENE M. PAK, ESQ.

23

24

25            (APPEARANCES CONTINUED ON NEXT PAGE)
```

3

```
1   APPEARANCES:  (cont'd.)

2   For Defendant:
                            Port of Oakland
3                           530 Water Street
                            Oakland, California 94607
4                           (510) 627-1572
                       BY:  KIMBERLY I. MCINTYRE, ESQ.
5
                            Oakland City Attorney's
6                            Office
                            One Frank H. Ogawa Plaza
7                           Sixty Floor
                            Oakland, California 94612
8                           (510) 238-4483
                       BY:  CHRISTINA LUM, ESQ.
9
    Transcribed by:         Echo Reporting, Inc.
10                           Contracted Court Reporter/
                             Transcriber
11                          echoreporting@yahoo.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

1   <u>Thursday, November 7, 2024</u>                              <u>1:12 p.m.</u>

2                       P-R-O-C-E-E-D-I-N-G-S

3                           --oOo--

4           THE CLERK:  All right.  Good afternoon, everyone.

5   We are here in Civil Action 24-2311, City and County of San

6   Francisco versus the City of Oakland, the Honorable Thomas

7   S. Hixson presiding.

8       Counsel, just pull your microphones towards you, and

9   let's state your appearances.  Let's start with Plaintiff's

10  counsel.

11          MR. GHAJAR:  Thank you, your Honor.  Good

12  afternoon.  Bobby Ghajar from Cooley on behalf of the City

13  and County of San Francisco.  I have with me Yvonne Mere --

14  she's Deputy City Attorney for the City and County of San

15  Francisco -- in the audience, along with Christopher Stuart,

16  who's a Deputy City Attorney for the City and County of San

17  Francisco.

18          THE COURT:  Good afternoon.

19          MS. VEIT:  Hi.  Julie Veit, Airport General

20  Counsel with the City and County of San Francisco.

21          THE COURT:  Good afternoon.

22          MS. VEIT:  Good afternoon.

23          MR. LAUTER:  Judd Lauter, attorney at Cooley LLP,

24  also for the City and County of San Francisco.

25          THE COURT:  Good afternoon.

5

1        MR. STEVENS:  Good afternoon, your Honor.  Ryan
2  Stevens from Cooley, also on behalf of the city and county
3  of San Francisco.

4        THE COURT:  Good afternoon.

5        MS. BALANDA:  Good afternoon, your Honor.  Brandi
6  Balanda of Fennemore for the Port of Oakland.

7        THE COURT:  Good afternoon.

8        MR. WILLEY:  Good afternoon, your Honor.  Stephen
9  Willey of Fennemore, also for the Port of Oakland.

10        THE COURT:  Good afternoon.

11        MR. PAK:  Eugene Pak from Fennemore for the Port
12  of Oakland.

13        THE COURT:  Good afternoon.

14        MS. MCINTYRE:  Good afternoon, your Honor.
15  Kimberly McIntyre, Deputy Port Attorney, on behalf of the
16  Port of Oakland.

17        THE COURT:  Good afternoon.

18        MS. LUM:  Good afternoon, your Honor.  Christina
19  Lum for the City of Oakland.

20        THE COURT:  Good afternoon.

21     So I've issued an order allocating time for argument on
22  each subject and between the parties, so first up is the
23  moving party, San Francisco, to discuss the merits of the
24  preliminary injunction motion, and I will leave it up to
25  counsel to decide if you would prefer to speak at the podium

*Echo Reporting, Inc.*

**ER-0043**

6

1  or if you prefer to stay at the counsel table.  It's

2  entirely up to you.  Whichever option you choose, please

3  make sure you're talking into a microphone.

4         MR. GHAJAR:  Your Honor, may I use this lectern?

5         THE COURT:  Yes.

6         MR. GHAJAR:  Thank you for your Honor's order.  I

7  think it made arranging for today's argument easier.  I'm

8  going to argue on behalf of the City and County of San

9  Francisco.  I'm going to refer to the City and County of San

10  Francisco as "San Francisco" for purposes of today's

11  argument.

12     I plan to handle the merits of the preliminary

13  injunction motion with assistance from Jeff Lauter.  My

14  colleague Ryan Stevens will handle the argument relating to

15  the City of Oakland's position that it is not a proper

16  party.

17     Oakland knows better.  We would not be here today if

18  Oakland had exercised some discretion, hired a trademark

19  attorney to conduct proper trademark clearance, and

20  respected San Francisco's longstanding trademark rights.  We

21  would not be here today if Oakland heeded warnings from its

22  residents, who were not only proud of their airport, and the

23  fact that it prominently bore Oakland's name, but point out

24  the obvious, "If you adopt 'San Francisco Bay Oakland

25  International Airport,' it will cause confusion."

7

1      We wouldn't be here today if Oakland had listened to
2 experts from the airline industry who wrote letters to
3 Oakland imploring it not to adopt the new name, and pointed
4 out the obvious, "If you change your name, it's going to
5 cause confusion," or if Oakland had listened to San
6 Francisco, which, upon learning of the new name, asked
7 Oakland to refrain from the name change over concerns of
8 confusion and over concerns about trampling San Francisco's
9 rights.

10     It was a bad idea for everyone, everyone but those who
11 run the Oakland Airport.  For those, they saw an
12 opportunity.  Their declarations, which I'll address later
13 today, talk about a need to change the name to highlight
14 Oakland Airport's proximity to San Francisco.

15     Respectfully, we all know, Oakland knows, how to tell
16 people where Oakland is, but Oakland didn't choose to run a
17 campaign educating people across the United States that
18 Oakland, California, is, quote, "located in the San
19 Francisco Bay," or, quote, "near the city of San Francisco,"
20 or "proximate to the San Francisco Bay."

21     They didn't need the new infringing trademark, and
22 their declarations don't establish that.  Instead, this is
23 about what certain decision makers at Oakland wanted.  It
24 adopted a new brand and identity that is dangerously and
25 confusingly similar to San Francisco's.

8

1       THE COURT:  Counsel, when I think about this

2  motion, it's helpful to me to think in terms of particular

3  theories of confusion that are recognized under statute and

4  case law, and in looking through San Francisco's papers, I

5  see three of them.  One is affiliation, another is initial

6  interest confusion, and another is point of sale confusion.

7  Do you believe there are additional particular theories of

8  confusion that you've advanced?

9       MR. GHAJAR:  I think those three are the primary

10  theories, and, as your Honor likely knows, we only need to

11  prevail on one of them to establish trademark infringement.

12     I would add to that that the confusion that we're

13  seeing goes both ways.  Because of the name change, as your

14  Honor saw in our declarations, travelers are showing up at

15  San Francisco International Airport intending to go to San

16  Francisco Bay Airport.  So that is a little bit unusual.

17  You don't see that in a traditional trademark infringement

18  case.  So it is an offshoot of those arguments.

19     I'd also tell the Court that non-purchaser confusion is

20  at issue in this case.  The Lanham Act protects, certainly,

21  against affiliation as to source -- sorry, confusion as to

22  source, mistaken affiliation, sponsorship, or approval, but

23  the type of confusion we're seeing is not just point of sale

24  or initial interest and affiliation.  We're seeing confusion

25  on behalf of those who influence decisions.

9

1     We're seeing confusion by and from those who
2 participate in the airport ecosystem. We're seeing
3 confusion from those who may assist people with travel,
4 family members, rideshare personnel, a friend giving another
5 friend a ride and typing something into Google Maps. The
6 type of confusion that we're seeing, we think, is plentiful,
7 and very unusual to have so much of, in so many different
8 forms, at this early stage in a case.

9     I want -- I appreciate the question. What struck me in
10 preparing for the hearing is that this injunction is
11 necessary for the reasons in our paper, and for an
12 additional one. In the absence of an injunction, Oakland's
13 infringing use, and likely those of its airline partners,
14 will multiply at a fast pace.

15     Right now it appears that the name change is in the
16 middle innings, to use a baseball metaphor. There's a sign
17 or two at Oakland Airport. There are plenty of references
18 to Oakland International Airport still at the airport. The
19 new trademark is on the Oakland web site and social media.
20 It's bled onto other web sites.

21     It's too big an airline to put in declarations saying
22 that they're not using the new name, but, just as with other
23 airline web sites' apps, third parties, third-party apps,
24 who haven't yet adopted the new name, that can change in an
25 instant.

10

1    And it would be surprising to us if the airlines,

2  including the two who submitted declarations on Oakland's

3  behalf, aren't watching to see what happens today before

4  they embark on a name change, because why would they do it

5  in the middle of this proceeding?  And that is -- we want to

6  prevent further proliferation, and San Francisco has tried

7  to get Oakland to do the right thing, and so today we're

8  here to ask the Court to put a stop to it.

9    Your Honor is familiar with the legal framework for

10  trademark infringement.  Does San Francisco own a valid

11  trademark?  Can it establish under ample precedent of the

12  Court the likelihood of success on the merits of its

13  infringement claim, and otherwise do its arguments raise,

14  quote, "serious questions" and the other injunction factors

15  weight in its favor?

16    I'll start with the first, walk through the Sleekcraft

17  "likelihood of confusion" factors, with the assistance of a

18  few slides, and conclude with a discussion of the remaining

19  PI factors.  The evidence showing a likelihood of confusion,

20  we submit, is overwhelming, especially in comparison to the

21  evidentiary records in other cases from this district

22  granting preliminary injunctions.

23    To start at the top, only one entity in the world owns

24  a U.S. trademark registration leading with "San Francisco"

25  and covering airport services.  Only one entity has operated

11

1 in Northern California for the last 50-plus years called

2 "San Francisco International Airport."  Only one entity is

3 known as "the San Francisco Airport."  Only one entity has

4 secondary meaning in San Francisco in connection with

5 airport services.  That entity is the city and county of San

6 Francisco, and for its trademark registration and common-law

7 rights to mean something, a neighboring airport cannot copy

8 that trademark and incorporate the entirety of it into its

9 own.

10      It's virtually unprecedented to have two different

11 owners operate competing airports with the same name.  It's

12 unprecedented to have two different owners operating

13 competing airports serving international travelers with

14 entire overlap between the senior owner's trademark and the

15 junior user's trademark.  We're unaware of a single case in

16 which a trademark and name with so much historical

17 significance and secondary meaning was taken by a competing

18 airport.

19      San Francisco's trademark, which is registered, is "San

20 Francisco International Airport."  It's unrebutted that that

21 registration is incontestable, which, by statute, means it's

22 conclusive evidence that the registration is valid, that the

23 mark is not descriptive, including geographically

24 descriptive -- it cannot be attacked on that basis -- that

25 the trademark functions as a source identifier for airport

12

1  services, and San Francisco owns that mark, and has the

2  exclusive right to use it, and comes straight from the

3  statute and from the Supreme Court's <u>Oregon Flag</u> (phonetic)

4  case.

5  So we don't believe there's any dispute as to the first

6  factor in the trademark infringement analysis, which brings

7  us to the <u>Sleekcraft</u> "likelihood of confusion" factors, and

8  first the strength of the mark, and if your Honor has any

9  questions about this, please feel free to jump in.

10  THE COURT:  For strength of the mark, I think your

11  position is that the mark is commercially strong, but not

12  conceptually strong.  Is that right?

13  MR. GHAJAR:  The mark is -- we are not arguing

14  it's conceptually strong.  Years ago, it started out as a

15  mark that is descriptive or suggestive, which the courts

16  find is conceptually weak.  A descriptive mark, including a

17  geographically descriptive mark, becomes strong over time.

18  I would respond to that question two different ways as

19  well, and that is, where a mark is incontestable, it is

20  conclusive evidence of its secondary meaning, and so it

21  satisfies the distinctiveness test, but here what we've put

22  into the record, we believe overwhelmingly, is evidence of

23  commercial strength, and in cases involving weak conceptual

24  marks, many courts have recognized a mark is strong even

25  where -- commercially, even where the conceptual strength is

13

1   not there.

2       And so we have an internationally renowned trademark, a

3   famous brand.  It represents a carefully cultivated

4   experience, built up at enormous expense.  It's been used

5   for 70 years.  San Francisco has been the only airport to

6   use the "San Francisco" and "San Francisco International

7   Airport" names as source identifiers in connection with

8   airports.

9       It appears before tens of millions of travelers

10  internationally who pass through the airport, on the web

11  site, in awards, press recognition, on Google Maps, Google

12  searches, on social media, on airline web sites, on travel

13  web sites, on hotel web sites, in unsolicited press.  It

14  appears on signage, the one on the 101 Freeway, as shown in

15  the slide, where thousands of travelers pass it every single

16  day going north and southbound on the 101 Freeway.

17      San Francisco's use and recognition turned a

18  geographically descriptive name into one with established

19  secondary meaning and commercial strength.  It deserves a

20  high degree of protection, especially as to uses in a

21  competitive field, i.e., another airport, and benchmarking

22  against authorities in our brief, and your Honor's decision

23  in Align v. Strauss, and by any objective measure, the

24  evidence, including marketing and sales figures and

25  accolades, establish that "San Francisco International

14

1  Airport" is a strong mark.

2       THE COURT:  From the evidence that the parties

3  submitted, it seems that the IATA code, "SFO," plays a

4  prominent part in the branding for the airport.  How, if at

5  all, is that relevant to an inquiry about the strength of

6  the mark?

7       MR. GHAJAR:  That was a -- it's a curious but

8  interesting argument.  That IATA code doesn't always appear

9  when third parties refer to the airport brands.  The IATA

10 code does not appear and isn't pronounced in radio ads.  The

11 IATA code isn't, and doesn't appear when people are

12 referring to the airport by the brand in conversations.  The

13 IATA code doesn't always appear in the materials as well.

14     And so the IATA code here -- another argument is that

15 we know what an IATA code is and what it means because of

16 our involvement in this case, but international travelers

17 don't.  There's no evidence that people outside of

18 California understand what an IATA code is or would know

19 that "OAK" is an IATA code for a different airport than the

20 San Francisco International Airport, and in some ways, and

21 when used with the new infringing name, it can exacerbate

22 the likelihood of confusion, because consumers will believe,

23 when they see these near-identical brands, and one says,

24 "OAK" at the end, and one says, "SFO" -- they might think

25 that there's some sort of sponsorship or affiliation between

15

1   the airports, and that doesn't -- is not, in fact, the case.

2       We've also cited, and I would refer the Court to,

3   decisions in which two brand owners used starkly different

4   logos, and courts, including Judge Illston in a recent case

5   involving the <u>MX v. Socios.com</u> mark, observed that logos

6   doesn't appear in marketing -- every piece of marketing

7   material, and they certainly don't appear spoken text, and

8   they don't appear in third parties' press referring to the

9   name.  And so even logos, powerful logos with

10  source-identifying capability, are not enough to negate or

11  mitigate the actual and likelihood of confusion.

12      We took the Court through some of the cases in our

13  briefing.  I'll touch upon a case that we think is highly

14  instructive here, the <u>North American</u> case, (indiscernible) a

15  slide.  There the benchmarks of strength were less than what

16  we've established in this case.  The <u>Coachella</u> case said a

17  geographic name for an area in California -- the Court

18  issued a preliminary injunction in that case, finding that

19  the trademark was strong.  We've included some metrics in

20  the slide for comparison purposes.

21      Next slide, please.

22      Another case.  This is a case out of the Central

23  District of California, from Judge Wright, finding that Mars

24  Advertising, not to be confused by (sic) Mars, the candy

25  company, was a strong mark in issuing a preliminary

16

1   injunction where the mark had been used for 50 years and had

2   household-name clients. We don't believe this is even

3   comparable to the showing in our case.

4        I want to move to -- and then your Honor's decision in

5   Align -- we won't repeat the facts, but we believe our

6   showing is strong in comparison, and then the Greater

7   Orlando case. This is a trademark trial of an Appeal Board

8   case. We believe this is highly instructive as well, and

9   the benchmarks of strength there were comparable to what

10  you've been shown in this case.

11       I'll go to the similarity or sort of relatedness of

12  services. This is a factor that didn't get a lot of

13  attention in Oakland's brief, and for good reason. It's not

14  a factor that favors them at all. To the contrary, here we

15  have competitor airports. They're the same exact services,

16  and there's no real dispute on this point, and I'll refer

17  the Court to a decision from the Northern District finding

18  that where services are directly competitive, a lesser

19  degree of similarity is required to show likelihood of

20  confusion, and here that factor certainly favors San

21  Francisco.

22       Next slide.

23       On similarity of marks, we've touched upon that with

24  our discussion about logos and IATA codes. Under the

25  governing case law, similarities must be weighed more

17

1 heavily than the differences, and Oakland cannot control

2 third parties and publications that refer to the infringing

3 mark, and those people wouldn't use the Oakland logo or the

4 IATA code, and we see that in some of the examples in our

5 papers and in the next slide, where you see use of the new

6 name either truncated, with the IATA code at the end, or not

7 appearing at all, and these are examples that are in our

8 briefing.

9        And so, because Oakland, and certainly San Francisco,

10 cannot control the way Oakland's infringing name appears,

11 this factor does weigh in the City's favor, and on the IATA

12 code issue, we see no evidence that the existence of them

13 affects consumer perception at all.

14            THE COURT:  I have a question about this.  The new

15 name for the Oakland Airport causes other companies to use

16 it, for example, Google Flights and Priceline.com.  In

17 looking at Ninth Circuit case law dealing with initial

18 interest confusion on the Internet, often there is -- the

19 defendant purchased an ad word that's the plaintiff's

20 trademark term, or the defendant is, you know, Amazon, the

21 entity that returns the list of searches.

22        Here I don't see any evidence -- I mean, it could be

23 true.  I just don't know of any evidence -- that the Oakland

24 Airport is purchasing the San Francisco trademark as an ad

25 word, and the Oakland Airport isn't delivering the search

18

1  results that Priceline or Google Flights would return.

2      So how does this situation, when adopting a new name

3  causes other web sites to use the name and return a search

4  result -- how does that fit into the case law about initial

5  interest confusion?

6          MR. GHAJAR:  I think it is certainly an important

7  piece of evidence.  It's a consequence of choosing a

8  confusing name and putting it out there, and it goes to the

9  issue of lack of control that I alluded to, and that's why

10 this is so dangerous.  The names are near identical, and for

11 Priceline and Google to then adopt it, incorporate it,

12 without an IATA code, with an IATA code, it is evidence of

13 similarity and of confusion.

14     Certainly it's not their fault.  It's not Google's

15 fault or Priceline's fault.  That's why it falls on Oakland.

16 The fault lies with Oakland for choosing such a similar

17 name, and the courts recognize that, in the Rearden case in

18 the Ninth Circuit, for example, recognizes that all sorts of

19 confusion may be relevant in assessing a likelihood of

20 confusion, including non-consumer confusion and different

21 types, and Rearden has a very nice discussion of that.

22     And so confusion that occurs because a company chooses

23 an infringing or confusing name, and then others proliferate

24 it, is relevant confusion.  It's confusion nonetheless.

25 It's confusion that would not have occurred, your Honor, but

19

1   for the Defendant's decision to adopt an infringing name.

2       And I think, in the interest of time, I will -- we've

3   talked a little bit about the similarity of marks, actual

4   confusion here.  I've read your Honor's decisions on

5   trademark cases, and your Honor is aware that actual

6   confusion evidence is actually very difficult to find, and

7   we've submitted quite a bit.

8       I would point the Court to confusion that we recently

9   uncovered, that happened after we filed our initial brief,

10  with the Andretta (phonetic) declaration at ECF 64.  That is

11  an example where an airline professional, person from the

12  airline Iceland Air, took a meeting with San Francisco Bay

13  Oakland Airport believing it was meeting with San Francisco

14  International Airport.

15      We have the traveler confusion in the daily operation

16  log that is attached to Mr. Schuler's (phonetic)

17  declaration -- or Mr. Yaeckel's (phonetic) declaration,

18  nearly two dozen examples, and that evidence tracks

19  instances where individuals have shown up at the San

20  Francisco Airport, having intended to go to the San

21  Francisco Bay Airport.

22      And our evidence is not exhaustive.  It can't be.  It's

23  only the people who took a moment to find one of the

24  information booths at our airport, wait to speak with

25  personnel, and then asked a question that indicated they

20

1  were confused.  Imagine how many people figure it out

2  themselves, don't figure it out, are frustrated, rushed,

3  harried, and have to go and drive a distance to get to the

4  airport that they intended to go to, but for the confusion.

5       And this relates only to confusion that's happening at

6  San Francisco Airport.  We don't know what's happening at

7  Oakland Airport, and that is concerning because, in

8  Oakland's papers, they submit declarations from Oakland

9  personnel, and my colleague can correct me if I'm wrong, but

10 you know what I didn't see in those declarations?  Any

11 evidence that Oakland made an effort to canvass people at

12 their airport to see what kind of confusion is happening or

13 not, i.e., the absence of confusion.

14      In a typical trademark case, a defendant will say,

15 "I've done an exhaustive search of X, Y, and Z, and we have

16 no evidence of confusion."  Now, that's not dispositive at

17 all in the actual confusion analysis, but at least the

18 defendant comes out and says that.  Oakland has not, and we

19 believe that, in conjunction with the lack of production in

20 response to public records requests on this very issue, it's

21 very telling.

22      And so, on the one hand, you have dozens of examples of

23 confusion in the form of traveler logs, travelers showing up

24 at our airport, social media commentary, geotagging, all

25 types of confusion that courts, from the Kiva case to

21

1 Ironhawk case, the Orlando case, even your Honor's decision

2 in Align, recognize as probative on confusion, particularly

3 at the preliminary injunction stage, and we have a survey as

4 well, and there's a lot of briefing on that. So I'm not

5 going to spend a lot of time on that. As needed, my

6 colleague, Judd Lauter, will address that.

7    I want to go to the other Sleekcraft factors, slide 18,

8 marketing channels. This is another factor that didn't get

9 a lot of discussion in Oakland's papers, and it's because it

10 overlaps completely here. These are competing airports who

11 advertised to the same customers. They appear in some of

12 the same rankings and publications. They promote themselves

13 through social media and through third-party publications.

14    The airports market and serve OTAs, the online travel

15 agencies, rideshare, nearby hotels, restaurants, and a host

16 of others. The marketing and trade channels directly

17 overlap in every way. We're not simply saying that, because

18 both parties have web sites, that there's overlap. We're

19 saying that, in every meaningful way, the marketing

20 channels, the trade channels, are identical. That, too,

21 weighs in favor of the likelihood of confusion, and isn't

22 contested.

23    Briefly on sophistication to degree of care, the law

24 doesn't only protect the most sophisticated. In fact, the

25 law protects the last sophisticated, and we can hypothesize

22

1  that some airfare costs $1,000, and, therefore, those people

2  wouldn't be confused.  First, I believe the evidence of

3  actual confusion shows that the cost of the airfare or

4  circumstances through which people deal with airports -- it

5  certainly hasn't mitigated confusion.

6      Second, I would also submit that airfare can be cheap,

7  and courts have found regularly that items that cost less

8  than $100 that can be bought on line particularly quickly

9  are not the type of purchases that lend itself to a high

10 degree of care.  And so we believe that this factor weighs

11 in our favor, and certainly does not weigh against the

12 likelihood of confusion.

13     On the issue of intent, I'll spent a minute on that.

14 Like actual confusion and likelihood of expansion, these are

15 not factors that a plaintiff needs to carry to establish a

16 PI.  Good faith is not a defense to trademark infringement.

17 But I would submit to your Honor that the intent factor is

18 meaningful here.

19     I asked earlier one question that came to mind, "Did

20 Oakland run a trademark diligence through outside trademark

21 counsel to understand whether the name San Francisco Bay was

22 available for use and registration?"  But I don't know that.

23 We may never know that.  But there are some telltale signs

24 of intent that is recognized by the courts as impactful on

25 this factor.

23

    There is no dispute that they were aware of San
Francisco's registered trademark and brand recognition.
Oakland had the same name for decades, Oakland International
Airport.  It used that as a trademark.  It registered it as
a trademark.  It took steps to establish that no one else
can use "Oakland" in connection with an airport, and this
name replaces it.  It's being used as a trademark.

    They haven't filed a new trademark application for the
new name, and I would posit that the reason is that, had
they done that, the USPTO would have rejected it, and they
didn't want that to happen during the pendency of these
proceedings.  There has been no effort by Oakland that we've
seen to track confusion, and utter silence in the
declarations about what they know and what efforts they've
made to uncover potential confusion at their airport, and we
believe --

        THE COURT:  Let me ask you, even if the new name
was a misguided decision, the port has submitted several
declarations saying that the underlying problem that we're
trying to solve for is that some airline travelers don't
know where Oakland is, and so, even if the new name is, in
effect, misleading, they're claiming that's what their goal
was, was to inform the public where the Oakland Airport is.
Is there reason to doubt that that was the problem they were
trying to solve?

24

1      MR. GHAJAR:  I think there's reason to doubt, but

2 it doesn't matter.  It doesn't matter because what they

3 intended, and their purported need, doesn't trump our

4 trademark rights.  It doesn't trump our incontestable

5 registration.  It doesn't negate the confusion and the

6 likelihood of confusion that's being caused.

7      So their purported need is, I would submit, your Honor,

8 entitled to little or no weight, and I referenced at the top

9 of the argument that if they wanted to educate people where

10 their airport was, the way to do it wasn't to change their

11 name to adopt our trademark.  They could say, as we've

12 noted, that their Oakland International Airport is located

13 in or around or near the Bay, the San Francisco Bay.  So

14 they didn't need to.  This is a way for them to create

15 confusion that inures to their benefit and to the detriment

16 of the City.

17      And so we believe that we have evidence on every

18 factor.  We believe that we have established irreparable

19 injury.  We're entitled to the presumption, provided that

20 we've made a showing, as we have, on the likelihood of

21 confusion factors.  We have evidence of irreparable injury,

22 or what good is a trademark and 70-plus years of cultivated

23 good will if another competing airport can adopt a

24 confusingly similar name, and cause so much confusion, and

25 hold our reputation in their hands?  What happens if there's

25

1  a survey that ranks Oakland's airport below, and people

2  think it's the San Francisco Airport?  There's so much

3  danger, and I address it in my rebuttal, of injury.

4      On the balance of equities, your Honor, I would close

5  by saying that Oakland really didn't defend on that

6  particular factor.  It says that if your Honor issues an

7  injunction, it will likely have to change the name

8  altogether, which it should.  It doesn't put in any evidence

9  of its investment, of the cost of changing, and so there's

10 no basis on the one side of the scale to find that the

11 balance of equities could or would weigh in Oakland's favor.

12      And, finally, as in every trademark case where there's

13 confusion and a likelihood of confusion, the public has an

14 interest in not being confused, and we believe we've shown

15 through myriad examples that that is happening, and we want

16 it to stop.

17          THE COURT:  Thank you, Counsel.

18      Let's hear San Francisco's argument concerning whether

19 the city of Oakland is a proper party to the motion.

20          MR. STEVENS:  Good afternoon, your Honor.  Ryan

21 Stevens from Cooley.

22      Now, the issue before the Court is actually not whether

23 the city of Oakland is a proper party.  Oakland concedes in

24 its brief that Oakland, acting by and through its Board of

25 Port Commissioners, is a proper party.  So, at a minimum,

26

1  the city of Oakland is a party to this dispute in some form

2  or another.  The question more specifically is whether there

3  are multiple Oaklands, and whether the other Oaklands,

4  Oakland by and through its city council or Oakland just

5  generally, have been improperly joined.

6       And I want to start by pointing out that, from San

7  Francisco's perspective, this whole issue is a sideshow

8  distraction.  The issue is, does Oakland infringe on San

9  Francisco's trademark?  And rather than confront that issue,

10 Oakland has instead created this distraction, which was

11 entirely of their making.

12      Now, if you turn back to ECF 1 and look at the City's

13 initially filed complaint, we sued Defendant City of

14 Oakland, acting by and through its port commissioners.  We

15 define that as the Defendant in the introduction, and then

16 again in paragraph eight of the complaint when listing the

17 parties, and the city of Oakland came to us and said, "No,

18 that's wrong," but that's the same party that Oakland's

19 brief now admits is a proper Defendant.

20      And so, at Oakland's urging, we changed the complaint.

21 We amended it.  We changed it to "Defendant City of Oakland

22 and Defendant Port of Oakland," a department of the city of

23 Oakland which operated the Oakland Airport, acting by and

24 through the Oakland Board of Port Commissioners.  Now, we

25 thought that was the end of this dispute, but Oakland came

27

1  back to us and said, "No, you have to dismiss the city of

2  Oakland completely."

3      And so, again, San Francisco sought to avoid motion

4  practice on this issue, and we offered a very reasonableness

5  stipulation to Oakland.  We said, "Agree that you will abide

6  by an injunction of this Court, and we will let you out of

7  this litigation," and that stipulation and that dialogue

8  with Oakland is set forth in the declaration of Christopher

9  Stuart.  That's at ECF 68.  Specifically, ECF 68-2 contains

10 the conversation with Oakland.  So all Oakland had to do was

11 stipulate that Oakland at large would abide by an injunction

12 issued by this Court.

13          THE COURT:  Well, let me ask you about that,

14 because I think that point goes to the issue I'm thinking

15 about, which is what, if any, are the practical implications

16 of this argument?  Suppose I issued a preliminary injunction

17 against the Port of Oakland.  Does that leave some necessary

18 personnel unenjoined?  In other words, are there people who

19 work for the city of Oakland, but not specifically for the

20 port department, who would need to do something to

21 effectuate a preliminary injunction?

22          MR. STEVENS:  Yes.  I mean, I think the Court is

23 cutting to the heart of the issue.  Why does this matter?

24          THE COURT:  That's the question.

25          MR. STEVENS:  And it matters -- San Francisco's

28

1 perspective is it only matters because Oakland thinks there
2 is something that they can do if only the port is bound, and
3 if they did not think that, there would have been no reason
4 to enter the offered stipulation.

5     You know, we don't want to sue the city of Oakland if
6 we don't have to. What we don't want to do is obtain a
7 favorable injunction and then have to go department by
8 department by department to enforce it. We want one order.

9     And the other thing I want to point out is, you know,
10 not only did they force us to amend the complaint, but
11 nowhere in the initial or the amended complaint did we sue
12 the city of Oakland acting by and through its city council,
13 which is what they moved to dismiss -- or, I'm sorry, "moved
14 to dismiss" isn't the quite (sic) nomenclature, but that is
15 what we're accused of doing. We just said, "The city of
16 Oakland," and they chose to interpret it that way, and so
17 they have really forced this issue on the Court, which has
18 caused us to wonder, what is it that they think they can do?

19     And it's especially confusing here because it's a
20 trademark dispute. If the Court finds that Oakland's new
21 name infringes, it infringes, and no Oakland, whether it's
22 the city council, the port, Oakland generally, gets to use
23 the infringing mark.

24     And so, you know, we've taken the position in our brief
25 that the Court may not even really need to decide this issue

29

1 today.  If the port enjoins the Port of Oakland, and anyone

2 acting in concert with the Port of Oakland, and anyone who

3 would take any steps to advertise, disseminate, promote this

4 infringing mark, then I think we're satisfied.  We don't

5 need the name.  We want the result.

6      And if you are inclined to reach the decision of

7 whether the city of Oakland generally should be dismissed, I

8 do just want to make a few quick points on why we disagree

9 with that, and the first is just simply that the port is a

10 division of Oakland.  It acts on behalf of Oakland.  The

11 port doesn't commit trademark infringement on behalf of the

12 port.  It does it on behalf of Oakland.

13      I want to briefly address the Thibodeaux case that

14 Oakland submitted by declaration.  The Westlaw cite is 2018

15 WL 4853299.  That was a fairly recent decision from Judge

16 Westmore, and there the plaintiff brought Clean Water Act

17 claims, and he brought them against the Port of Oakland, and

18 the city of Oakland moved to dismiss, alleging that he had

19 failed to join a mandatory party.

20      Judge Westmore denied that motion, and held it's really

21 up to the plaintiff who he wants to sue, but, if he wanted

22 to only sue the port, then he would be limited to recovering

23 damages for things that happened on port property.  I don't

24 read that as the same as saying that he couldn't have sued

25 the city generally for what the port did.  It just said, "If

30

1  you choose to sue the individual department, you only get to

2  go after that department."

3      The final point I want to make, briefly, is that

4  Oakland describes the port as an "agent," and that language

5  is taken from the California Supreme Court, the <u>Hogan</u> case.

6  It's a 1940 case, and we don't disagree that the port is an

7  agent.  We disagree that, because they're an agent, they

8  should be dismissed from the litigation.  I think it's

9  fairly standard black-letter law that the principal can be

10 liable for the act of the agent, and we've cited the

11 <u>Schertzer</u> case, 109 F.4th 1200.  It's a Ninth Circuit (sic),

12 2024, and it says:

13          "A principal who conducts an activity

14          through an agent is subject to liability

15          for harm to a third party caused by the

16          agent's conduct."

17     And here our argument is simply the port is the agent.

18 The agent harmed us by infringing on our mark, and the

19 principal, the city, is liable.

20     And with that, unless the Court has any questions, I

21 will yield the remainder of my time.

22          THE COURT:  Thank you, Counsel.

23          MR. STEVENS:  Thank you.

24          THE COURT:  Let's hear from the Port of Oakland

25 concerning the merits of the preliminary injunction motion.

31

1          MS. BALANDA:  Thank you, your Honor.  I have,

2    actually, an old-school handout rather than a PowerPoint.

3    May I approach?

4          THE COURT:  Have you provided it to the Plaintiff?

5          MS. BALANDA:  Yes.

6          THE COURT:  Okay.

7          MS. BALANDA:  Yes, your Honor, I have.

8          THE COURT:  Thank you.

9          MS. BALANDA:  Good afternoon, your Honor.  I want

10   to begin by stepping back for a moment.  SFO is asking the

11   Court for extraordinary relief at the outset of this case.

12   SFO is asking the Court to enter a preliminary injunction

13   not to preserve the status quo, but to require the port to

14   change the name of its airport, the ultimate relief it seeks

15   by final judgment, and its burden to obtain that relief is

16   incredibly high.

17       SFO's motion cannot be granted unless SFO makes a clear

18   showing, with substantial proof, that it's likely to win,

19   that the city of San Francisco will suffer irreparable harm

20   unless we change the name now, that the balance of equities

21   tips in their favor, and that the injunction is in the

22   public interest.  SFO does not come close to meeting its

23   burden.  Let's start with the merits.  SFO's claim is

24   that -- is about whether the full --

25          THE COURT:  First I have a factual question.

32

1          MS. BALANDA:  Sure.

2          THE COURT:  I understand that, before the name

3    change, the technical legal name of the airport was the

4    Metropolitan Oakland International Airport.  However, in

5    looking at the evidence, it seems that, in its branding, the

6    airport called itself the Oakland International Airport,

7    without the word "Metropolitan," even though that word was

8    part of the legal name of the airport.  Do you agree that,

9    before the name change, the Oakland Airport generally, in

10   its branding, didn't use the word "Metropolitan"?

11         MS. BALANDA:  Your Honor, I can't speak to the

12   branding that happened since the name was put into place.

13   1950 was when they started using "Metropolitan."  From what

14   I've seen, that's correct, your Honor.  I would agree with

15   that.  But, in terms of what else is out there in terms of

16   evidence -- and I think this just points out the prematurity

17   of SFO's motion.  There are dozens of these types of fact

18   issues for which we -- you know, discovery would be

19   informative.

20      So SFO's claim is whether the full name of the airport,

21   the San Francisco Bay Oakland International Airport, is

22   likely to cause consumer confusion.  There are two key legal

23   principles that must guide the Court's analysis here.

24   First, the Ninth Circuit has repeatedly said that trademark

25   infringement protects only against mistaken purchasing

33

1   decisions, not confusion generally.

2          THE COURT:  Well, doesn't it also protect against

3   false claims of affiliation or against initial interest

4   confusion?

5          MS. BALANDA:  Connected with purchasing decisions,

6   that's right.  The actual confusion at issue -- as a

7   consumer, you're consuming something.  It's purchasing.

8   It's tied to purchasing.  It's about the purchasing

9   decision.  And so that is a type of purchasing confusion,

10  and, in fact, in the Rearden case, the Ninth Circuit said,

11  "The analysis must remain focused upon confusion in the

12  marketplace, as opposed to generalized public confusion."

13       And as an initial matter, the direct consumers of

14  airport services are the airlines, who pay money to park

15  their airlines -- their airplanes -- at the gates, and the

16  businesses who lease space at the airport.  Airports are

17  really landlords for those businesses.  Those are the most

18  direct consumers of the airport services.

19       SFO presents zero argument and zero evidence that any

20  airline or business has mistakenly leased space from OAK,

21  thinking it's SFO or not run or affiliated with the city,

22  but if the Court accepts the premise of SFO's motion that

23  the consumers of airport services are airline passengers,

24  the purchasing decision regarding the use of airport

25  services is the buying of an airline ticket, and the vast

34

1 majority of those consumers search for and buy airline

2 tickets on line, and that's undisputed. So the Court's task

3 here is to evaluate the name San Francisco Bay Oakland

4 International Airport as consumers encounter it in the

5 real-world marketplace, as they make purchasing,

6 ticket-purchasing, decisions.

7     And, second, to evaluate the likelihood of confusion in

8 the relevant marketplace, the Court uses the <u>Sleekcraft</u>

9 factors, but not as a checklist. In fact, the Ninth Circuit

10 has repeatedly instructed against this approach, said it's

11 not supposed to be applied as a closed, rigid checklist,

12 and, in fact, depending on the facts of the case, only a few

13 of these factors may be relevant and informative, and

14 additional context or other variables might be crucial to

15 the analysis.

16        THE COURT: One of the arguments that the port has

17 emphasized is that the new name is intended to explain the

18 proximity of the airport to the San Francisco Bay, and I

19 have a question about that. I can understand why customers

20 would want to know that the Oakland Airport is near San

21 Francisco, or that it's in the San Francisco Bay area, but I

22 don't understand why airline customers would care about the

23 proximity of the airport to a body of water.

24     If you were renting a boat, then you would care that

25 the boat rental place is near the water, or, if you're using

35

1  the port's seaport, you would want to know that it's near

2  water, but I don't see why airline customers would care

3  whether the airport is near the bay or on the bay or a few

4  miles away from the bay.  But you do emphasize that argument

5  a number of times in the briefing, about the proximity to

6  the body of water, and so I'm wondering if you can shed some

7  light on why that would be of interest to airline customers.

8          MS. BALANDA:  Sure.  I think for two reasons.  I

9  think, one, "San Francisco Bay" defines a region as well.

10 So, when you talk about the San Francisco Bay and the body

11 of water, it's communicating an area, the San Francisco Bay

12 area, and also communicating that we're on the bay,

13 communicates to people to look where we're at, and you can

14 actually -- if you pull up a map, there's a lot you can

15 learn, for people not from this area, about where, exactly,

16 Oakland is in relation to other major area attractions and

17 destinations, by seeing where it's actually situated on the

18 bay.  So that's what I would say for that, your Honor.

19     So, Sleekcraft.  Thinking about these Sleekcraft

20 factors, again, the Ninth Circuit has said, "We need to

21 focus on what are the most important factors that's going to

22 actually illuminate the confusion inquiry here," and in

23 Network Automation, 638 F.3d 1137, the Ninth Circuit

24 actually reversed a District Court grant of a preliminary

25 injunction because it employed a rigid checklist approach

36

1  that resulted in the Court placing emphasis on the wrong

2  factors, and because the Court declined to consider the

3  context of what was shown on the screen, other than the text

4  of the advertisements themselves.

5      THE COURT:  I take it from the briefing that you

6  think the most important factor is the context in terms of

7  what customers see when they're in the process of booking a

8  flight.  Is that right?

9      MS. BALANDA:  That's correct.  And the sort of

10 oddness here about third parties, airlines being in sort of

11 control of how that information is displayed to airline

12 consumers, is because, again, the direct consumer of the

13 airport services is the airlines themselves, and the

14 businesses that rent space at the airlines.  So we're sort

15 of in this odd position of, well, then, the second-level

16 consumers for airline -- airport services are actually the

17 ones buying the flights from the airlines.

18    And so that's why you have sort of this middleman

19 approach, but, again, assuming that the consuming -- the

20 relevant consumer here are the consumers buying airline

21 tickets, then yes, that's the most important thing.  If

22 we're going to evaluate, "Is this name actually going to

23 cause confusion in their purchasing decision?," we've got to

24 look at what they see when they make their purchasing

25 decision.

37

1    So let's take a look at that, your Honor.  If you

2 could -- I have provided record excerpts here, and I just

3 want to walk through what a consumer actually sees when they

4 go to buy a flight.  So the first tab there is just --

5 you'll the Port of Oakland's web site.  Again, we maintain

6 the "I Fly OAK" branding, but that's again not where

7 consumers go to buy their flights.  Where they go is to

8 airline web sites, OTAs, flight aggregators.

9    So the first tab following that, Southwest Airlines.

10 Okay.  So we want to book a flight.  We're going to start to

11 type in the departure, "San Fran," and immediately it drops

12 down, and this, again, according to Southwest Airlines' own

13 testimony and spreadsheets from that declaration, three

14 options, cities, (indiscernible) coast.  Turn the page, you

15 get another drop-down menu, OAK to SEA, Oakland, California,

16 to Seattle/Tacoma, Washington, SFO to SEA, San Francisco,

17 SJC to SEA, San Jose to Seattle, alphabetical results.  Then

18 we turn the page.

19    Contrary to SFO's assertion, this is not something that

20 Southwest is doing because it's afraid that it's going to

21 implement an infringing mark.  That's just not true at all.

22 The reality of the marketplace is this is how airlines

23 display airports in regions that are (indiscernible) more

24 than (indiscernible).  So the next page in the booklet there

25 is Washington, D.C., area airports.  You start to type in

38

"Washington," and you get a drop-down of city names and references. Again, it's because consumers are booking flights to places, not because of an airport's brand.

Okay. And then you go to the next page, same thing, the Los Angeles area. A consumer starts to look for a flight to Los Angeles, and a drop-down menu appears, with airports identified by their city location and their three-letter code. Passengers may not know their called IATA codes, but I think there is a general familiarity.

When you're making a purchase, you can see the IATA code. It's listed. In every single piece of evidence in the record, on a screen that a consumer sees when they go to purchase a flight, search for a flight, the airports have the IATA code. And then you flip to the next page, and this is the mobile presentation from Southwest. Again, San Francisco-area airports, Los Angeles-area airports, Washington, D.C.-area airports listed, city names and code references.

And this is not unique to Southwest, so, the next tab, I'm going to go search on Alaska. I start to type in "San Francisco Bay Area," drop-down menu, city codes, city references, airport codes, and you turn the page, and you click on those flights, and it gives you a list, and what information does it show you? It shows you IATA codes, SEA to SFO, SEA to SJC.

39

         If you flip a few, there's a lot of options.  Flip a
few pages, now you have your trip summary, so now you're
getting closer to purchasing, and it shows you Seattle, SEA,
to San Francisco, SFO.  Now it moves to your cart, same
thing, city and IATA code references, and if you had
selected a flight to Oakland, Seattle to Oakland, Seattle to
Oakland, in your trip and in your cart.

         Next tab, Delta Airlines, same thing.  You start to
type in San Francisco, airline, gives you a drop-down with
codes, a three-letter SFO, SJC, OAK, and the city
references, and then the final tab, Booking.com, this is an
online travel agency.

         So, this one, they actually used the full airport
names, but, again, you see the IATA code, the three-letter
call letter codes, bolded, actually, is what this web site
does, but that's included, as well as the city reference.
Every single piece of evidence in the record that shows a
spreadsheet of what a consumer would actually see when they
start to search for and buy a flight includes this
contextual information, and it plainly dispels any
likelihood of confusion when going to book a flight about
where you're going or about which city the airport is
affiliated with.

         THE COURT:  What about the affiliation claim,
though?  Because you're talking about literal confusion of

40

1  OAK with SFO.  What about customers who know that the

2  Oakland Airport is a different airport from SFO?

3      For example, they have a flight to or from the Oakland

4  Airport, and so they know where they are.  They're in that

5  airport.  They meant to go there.  They're not mistaken

6  about that.  But they have a bad experience, and you saw

7  that San Francisco put in some of their evidence that SFO is

8  very highly rated and gets good consumer ratings, and they

9  say that the situation is different for the Oakland Airport.

10     What about San Francisco's argument that putting the

11 San Francisco mark in the name of the Oakland Airport could

12 cause confusion about ownership or association or

13 affiliation such that customers at the Oakland Airport might

14 think that that airport is associated with SFO?

15         MS. BALANDA:  So I would, I guess, disagree with

16 the premise, first, that we incorporated the mark into our

17 mark, and I'll get to that point later, but SFO has produced

18 no evidence that anyone purchased a ticket or decided to

19 purchase a ticket because they thought that our airport was

20 affiliated with SFO, or declined to purchase a ticket to SFO

21 because they thought it was affiliated with OAK, and,

22 therefore, it's, you know, a terrible place to fly.

23     And, in fact, the evidence in the record shows that,

24 since we changed our name back in May, SFO's routes have

25 increased.  Their passenger has increased over the same

*Echo Reporting, Inc.*

41

1 period of time last year, and they've received positive

2 press.  There's not one piece of evidence in the record that

3 there's any connection between the online opinion chatter or

4 the generalized confusion actually has translated to any

5 type of affiliation confusion evidence, your Honor.

6         THE COURT:  But how would we know?  Because, if

7 people are confused, and think that the Oakland Airport is

8 affiliated with the San Francisco International Airport --

9 if they think that, and that causes damage to the good will

10 of the San Francisco International Airport, they would just

11 have that opinion.

12     What would the evidence look like if there was that

13 confusion?  I don't see -- they wouldn't raise their hand

14 and say, "Oh, I was confused," because, remember, they don't

15 know that they're confused.  They would think there's an

16 affiliation, and not realize that it's untrue.

17         MS. BALANDA:  And then the argument is, those

18 consumers would not tickets to --

19         THE COURT:  I don't think that they need to trace

20 it through to the purchase of a different airline ticket.

21 It's definitely confusion in connection with the purchase of

22 a ticket, but the ticket is to or from the Oakland

23 International Airport.  The issue is damage to the good will

24 held by the holder of the mark from the mistaken belief of

25 affiliation.

42

1    I think that's the argument that San Francisco is

2  making, and I think the Andretta declaration, towards the

3  end, in the concluding paragraphs, spelled that out there,

4  but I just want to know what your response is to that.

5         MS. BALANDA:  Yes.  So, again, the type of sort of

6  affiliation evidence that they're talking about is people

7  posting on line.  It's so far removed from sort of an actual

8  admissible evidence in terms of opinions, and then I would

9  say, your Honor, there would --

10        THE COURT:  Well, that's the actual confusion

11 evidence, where they say people think that the two airports

12 are the same airport, or they get one confused with the

13 other.  The good will argument is that people understand

14 their different airports.  It's just, they think that by --

15 the City argues that Oakland has taken the City's mark and

16 put it in the name of their airport, and that San Francisco

17 loses control of its mark, and it's essentially with a

18 different -- somebody else's product that they believe is

19 not as good as their product.

20    And so that's the argument there, and I realize you

21 dispute every premise of that, but, if I were to look at it

22 that way, what's the response?  You seem to say that there

23 isn't any evidence of this type of confusion, but what is

24 the evidence that's missing?  If people have this mistaken

25 belief about affiliation, they would just have that belief.

43

1    I don't know that they would go around saying anything.

2            MS. BALANDA:  No, but it needs to be connected to

3    the purchasing decision, right?  I mean, trademark law

4    protects against mistaken purchasing decisions, and so there

5    would be evidence that there is some impact on the

6    purchasing decisions, and this is, again, entirely

7    speculative on this record, right?  And so that's what I

8    would say, your Honor, as to that.

9        Okay.  So, moving on to the next factor, so we have the

10   contacts.  We've actually looked at what consumers see when

11   they go to buy an airline ticket.  The degree of care that

12   consumers are going to be exercising when they do so is a

13   heightened degree of care, for three separate reasons.

14       First, we're really looking at Internet commerce, and

15   the Ninth Circuit has stated that the reasonable consumer

16   shopping on line is relatively sophisticated, and, in fact,

17   just about a week and a half ago or so, the Ninth Circuit,

18   in the Lerner and Rowe case, 2024 WL 4537915, the Ninth

19   Circuit reiterated online shoppers are, quote, "Typically

20   savvy enough to differentiate between search engine

21   results."

22       Second, airline tickets are expensive.  The record

23   evidence shows that the average ticket price for a domestic

24   flight to SFO is $444.  Yes, they selected one one-way fare,

25   which, I would argue, a restricted fare.  There's other --

44

1  that goes one way.  You're going to think extra careful
2  where you're going if you're buying a one-way ticket, where
3  you're going to end up.  But, even setting that aside,
4  they're expensive, and that warrants a heightened degree of
5  care.
6      And, third, buying an airline ticket does involve
7  considerations of factors beyond price.  That further
8  increases consumers' attention to where they may be going.
9  It is not like buying juice.  SFO argues this factor
10  actually weighs in its favor because, according to SFO,
11  reasonable consumers are neither careful nor discerning, ECF
12  35, at page 20, and instead are governed by general
13  impressions.
14     What's telling is that, to support its argument, SFO
15  cites Fleischmann Distilling, 314 F.2d 149.  It's a
16  60-year-old case about brewing beer, and it's about the
17  Black and White brand of beer and the Black and White Scotch
18  whisky brand, and the Court was talking about in that case
19  that the standard shouldn't be an expert who would be
20  parsing through who was brewing the beer, who was actually
21  owning the bottling, but instead your average consumer.
22     That case says nothing about the duty of care a
23  consumer would exercise in buying a flight, and, in fact,
24  the BNSF case we cited the Court discussed the level of care
25  that a commercial airline traveler would exercise, finding

45

1  it would be heightened, given the high price and other

2  considerations involved.

3          THE COURT:  Not only the price, but it's a travel

4  plan, so they have to go to the airport.  So it would matter

5  to them where it is, right?

6          MS. BALANDA:  Right.  Yes, your Honor.  And SFO

7  argues that the potential buyer class is, quote, "mixed,"

8  such that the Court should consider the most careless

9  potential consumers standard.  Well, that's not the law.

10      In the <u>Ford Motor</u> and <u>Brookfield</u> cases that they cite,

11  the Court was discussing a mixed buyer class, in the sense

12  of a class of professionals and ordinary consumers, and the

13  Court said in that case, "Yes, you wouldn't use the standard

14  applied to the industry professional.  You would use the

15  standard applied to the ordinary consumers."  There is no

16  standard that you would apply, a low standard of

17  carelessness, as SFO argues.

18      And we're not arguing to apply heightened standard

19  because our class of consumers -- again, in the first

20  instance, it's airlines and businesses that lease space in

21  the airport, and then, even accepting that it's purchasers

22  of airline tickets, we're saying they're ordinary consumers.

23  We're just saying that their standard of care is heightened

24  because these things are expensive, and you think about

25  where you're going when you buy a flight.

46

So let's turn to the evidence that SFO has presented. So SFO has not shown -- they've presented zero testimony from any airline, zero testimony from any consumer, zero testimony from any business that does business with SFO or OAK, no third-party testimony at all, zero evidence about leasing any spaces in the respective airports. Instead, what they've produced -- and, in fact, zero evidence regarding any actual purchasing decision, zero.

Instead, they present three things, first a handful of online posts and Reddit commentary, and, again, I just want to back up, and that first principle, right, where trademark law protects against consumer confusion regarding mistaken purchasing decisions, not generalized confusion. So there's a handful of opinion posts, Reddit commentary. Most of them are people's opinions about whether they like or hate the name change, and you can always find chatter on line about anything you want.

And, in fact, here SFO actually started a messaging public relations campaign at the outset, when they heard that the name change was going to happen, where the airport director, in an e-mail, instructed staff to, quote, "get more aggressive" on their confusion messaging on OAK on social media, and be pushing this out, liking it, repeating it, pushing this message. Even setting aside sort of the lack of foundation, hearsay, how attenuated we are from a

47

purchasing decision here, that evidence is not probative,
and, in fact, it's de minimis, and SFO doesn't address that
at all.

Even assuming all this stuff is real, even assuming
that they have found 30 people on line who have commented
about being confused about where they go, the number of
passengers who have gone through SFO between May and
September, some 20,000,000, that number is very, very small.
You can always find some level of -- base level of
confusion.  That's why the Ninth Circuit has recognized this
de minimis piece, and so all of that evidence, even if you
credit it all, is de minimis, and doesn't show actual
confusion.

The second thing that SFO offers is the log.  This is a
one-page paper with 23 lines that unidentified SFO
volunteers created for litigation, that purports to document
people who supposedly went to SFO instead of OAK for their
flight.  Again, it's de minimis, even if you credit all of
this, but let's set that aside.  There's entries with no
names, no contact information, flight numbers that don't
exist.  It's not reliable or probative of anything.

And they rely on <u>Kiva Health</u>, but, in that case,
actually, the Court denied the preliminary injunction, and
the plaintiff had also created a litigation log, and the
Court said it lacked trustworthiness because it's created

48

1   for litigation.  The Court viewed the log with skepticism,
2   said it was not entirely reliable, and rejected plaintiff's
3   argument that it weighed heavily in favor of confusion,
4   because it's not.
5        And then the last thing SFO offers is a statement from
6   its head of marketing saying she was at this industry
7   conference and an unnamed person from Iceland Air mixed up a
8   meeting invite.  She's testifying about what she thought
9   somebody else thought about being confused, and I think it's
10  even more telling that SFO does not submit a declaration
11  from that person explaining what they were confused about,
12  or how it relates at all to potential consumer confusion,
13  either with the airline or consumers, and it's about a
14  meeting invite.
15       So, again, your Honor, even if you get around these
16  major reliability issues, none of this evidence is about
17  actual consumer confusion on purchasing decisions, and,
18  regardless, it's de minimis.
19            THE COURT:  So I know you want the motion denied,
20  but what if I were to grant it?  An issue I need to think
21  about is to require the posting of a bond, and, if so, in
22  what amount.  Most of what's in front of me on the record is
23  Internet-based advertising, which that entails some expense
24  to change, but I don't think is all that expensive.  What
25  would be expensive or could be expensive is ripping down

49

1  physical signage and replacing it with something else.  I

2  imagine that that is more expensive than changing branding

3  on the web site.

4       San Francisco, you've heard in their argument, they

5  think that Oakland has not done much to roll out the new

6  airport name with physical signage at the airport, so I

7  guess their view would be that there's not much physical

8  signage that would need to be changed if there were an

9  injunction, but I wanted to give you an opportunity to

10 respond to that, to see if you think, "Yes, there are these

11 big expensive signs everywhere at the airport, and it really

12 would be expensive to change those."

13      What are your thoughts about that?

14           MS. BALANDA:  Yes.  There are physical signs that

15 the port has ordered.  They're not all installed yet, but

16 they have ordered them.  They would be expensive, and, your

17 Honor, if the Court is inclined to grant an injunction, we,

18 I believe, request in our briefings a note on briefing that

19 issue of the bond amount, your Honor, to get the evidence in

20 the record about those expenditures.  But yes, there are

21 signs.  We're not -- you know, you can't order these massive

22 physical signs, and they show up two days later.  There's

23 time.  So we order, pay, and that's all in the works.

24           THE COURT:  Thank you.

25           MS. BALANDA:  Okay.  So we've looked at the most

50

1  salient factors for the confusion analysis here, context,

2  how a consumer would actually move through their purchasing

3  decisions, as compared to what SFO has offered, which is

4  social media evidence that's de minimis of generalized

5  confusion.

6      And now let's talk about the other thing they offer,

7  which is a survey, and a survey can constitute

8  circumstantial evidence of actual confusion, but only if it

9  replicates the actual marketplace and the methodology is

10 sound.  SFO's survey is deeply flawed, and I won't get into

11 a lot of detail on this.  I think there's three main points.

12     I mean, this is discussed at length in the briefing,

13 but the stimuli was bad.  The full airport name was modified

14 and used for only one out of the three presentations.

15 Southwest Airlines testified that they would never do it

16 this way, where they displayed one airport in a different

17 way than the other airports.  She didn't do a test control

18 of all airport names before the change.  It doesn't show

19 consumers what they would see when they click through a "buy

20 a flight."

21     Second, the survey is under-inclusive.  She selectively

22 targets people from only 11 states, where potential

23 consumers are located across the country, and it doesn't

24 matter that the port has said it wants to have direct routes

25 from those states.  That's not a basis to narrow the survey

51

1  population in that way, and she cites no authority to

2  support that.

3      Even if you could get past all of that -- so SFO says

4  they have net confusion of over 20 percent.  No, they don't.

5  The survey is sort of like three kids stacked in a trench

6  coat.  When you open it up, what's really there?  Well, the

7  first is a question about the primary airport in the Bay

8  Area, which, on reply, they acknowledge doesn't tell us

9  anything about consumer confusion, and then they've got a

10 geographic confusion question, and that result is 9.4

11 percent, far lower than the amounts SFO have said are

12 required to be probative circumstantial evidence of

13 confusion.

14     And then they have a question on source confusion, and

15 that result is 12.4 percent, again below -- the cases SFO

16 relies upon require more than 15 percent.  They cite zero

17 authority for this proposition that you can sort of stack

18 together source confusion and geographic, and net out a

19 large percentage, and it's not even that large.  It's 18

20 percent.

21     So they're asking you to grant a preliminary injunction

22 based upon a survey that has nine point -- even setting

23 aside all of its flaws that is discussed in 60 pages of

24 competing expert opinion -- shows geographic confusion of

25 9.4 percent and source confusion of 12.4 percent.

52

1    They then argue, "Well, you should believe our survey,

2  because Oakland didn't prepare a survey."  Well, we don't

3  need to.  Theirs was bad, and, like I said, even if you

4  accept it all, the numbers are lower than what's required.

5  The fact we did not submit a competing survey does not

6  somehow transform Butler's (phonetic) unreliable, flawed

7  survey into reliable and probative evidence, and, in fact,

8  federal District Courts in California have routinely

9  afforded Butler's own surveys little to no weight, or

10 excluded them based upon the critiques of another expert or

11 argument alone, for example, the Theorem case, 2021 WL

12 5750238, Storage Cap Management, 2022 WL 6145532.

13   And so, your Honor, the survey, while it might be a lot

14 of paper, doesn't really offer probative information on

15 actual confusion that's relevant and reliable for the

16 Court's analysis.

17   Regarding the remaining factors, which, again, we don't

18 think are a central part of the analysis here, I'll address

19 them briefly.  So the names are not sufficiently similar,

20 and this actually weighs in our favor.  So similarity is

21 tested by evaluating the sight, sound, and meaning of the

22 mark in its entirety and as it's used in the marketplace.

23   SFO acknowledges this legal standard, but its argument

24 is this.  San Francisco International Airport and the San

25 Francisco Bay Oakland International Airport both, quote,

53

1   "lead with the words San Francisco."  Therefore, they're
2   confusingly similar.  Start saying, "San Francisco," stop.
3   Stop right there.  Close your eyes.  Don't read anything
4   else.

5       Well, the Ninth Circuit has rejected that exact
6   argument.  In Alpha Industries, 616 F.2d 440, the Court was
7   comparing the Alpha -- the trademark Alpha with the
8   trademark Alpha Steel.  The District Court had found they
9   were not sufficiently similar, and, on appeal, the plaintiff
10  argued, "Well, the Court should have looked at the lead
11  word, and the fact that the lead word was the same," and the
12  Ninth Circuit said, "No.  The marks are to be considered as
13  a whole, and as they're encountered in the marketplace."

14      On reply, SFO ignores this authority and says, "Okay.
15  Well, you can keep reading, but all of those other words
16  don't matter.  It's just tack-on words.  The 'bay' doesn't
17  matter."  Oakland's name starts with "San Francisco Bay."
18  As we all know, it's a specific geographic feature, the body
19  of water on which the airport actually sits, yet SFO argues
20  that "San Francisco Bay" and "San Francisco" are, quote, "a
21  distinction without a difference."

22      That's the basis of their similarity argument, ECF 61,
23  at 42, that it's, quote, "semantics,"  pretend the city is
24  the bay, the bay is the city.  Well, that's not the real
25  world.  It's like saying the Panama Canal means the same

54

1 thing as Panama City because they both start with "Panama."

2 That's just not true.

3         THE COURT:  Well, but I thought a few minutes ago

4 you acknowledged that the bay, as a body of water, is not so

5 much of importance to airline customers.  It was more "the

6 Bay" as a reference to the Bay Area that would be of

7 interest to customers.

8         MS. BALANDA:  Well, "the Bay" defines the region.

9 So "San Francisco Bay" is a meaningful geographic term.  It

10 connotes things beyond that.  It connotes the region.  It's

11 the body of water around which this metropolis area is

12 built.

13         THE COURT:  Well, but people don't -- like,

14 they're not going to kind of lay over at Oakland, you know,

15 go swimming in the bay.  What they want is an airport that's

16 in the Bay Area.  You've dropped the word "Area," I see, but

17 proximity to the water, I still don't see why that would be

18 of interest to an airline customer.  It's the Bay Area that

19 they are interested in.

20         MS. BALANDA:  Sure.  And, I mean, I guess "San

21 Francisco Bay Area" is also distinct from and different from

22 "San Francisco."  Those are three different things.  And so,

23 when you're looking at similarity, again, "San Francisco" is

24 different than "the San Francisco Bay," and perhaps "San

25 Francisco Bay Area," but that's not before the Court right

55

1  now.

2      The name before the Court is the "San Francisco Bay,

3  Oakland," and, contrary to SFO's assertion, we did not

4  incorporate the city's name.  We incorporated San -- we

5  replaced "Metropolitan" with "San Francisco Bay."

6      And not only does the airport's name begin with "San

7  Francisco Bay," it's then followed by "Oakland."  SFO

8  ignores this, too, but they do affirmatively argue that city

9  names are the, quote, "dominant components of the parties'

10 respective names," ECF 61, at note three, which only

11 reinforces that the name "San Francisco Bay Oakland

12 International Airport" contains meaningful

13 source-identifying differences from "San Francisco

14 International Airport."

15     The case SFO cites in its reply to support its position

16 highlights this distinction.  So they cited Detroit Athletic

17 Co., and in this case, the Court was examining the marks

18 Detroit Athletic Co. and Detroit Athletic Club, and there

19 the Court said, "Well, the extra words 'Club' and 'Co.' at

20 the end, those are generic words.  They don't import

21 meaning, and so those -- they're not likely to change the

22 overall commercial impression."

23     And that's not the situation here.  Our name starts

24 with a different geographic feature.  The "San Francisco

25 Bay" is followed by a different city name, "Oakland," which

56

1  SFO itself argues is source-identifying, and then ends with

2  "International Airport."

3      And then, finally, SFO acknowledges that context

4  surrounding the names can render them even more dissimilar,

5  for example, use with a house mark, and here the record

6  shows the port does consistently use "San Francisco Bay

7  Oakland International Airport" with its "I Fly OAK" logo and

8  branding on its web site, social media, Youtube, and the

9  like.

10     So the remaining Sleekcraft factors, again, do not

11 change the result.  They're not very informative.  We're not

12 paying attention -- it's not that we're not paying attention

13 to them, but the Ninth Circuit has said that marketing

14 channels that overlap, it's incorrect to afford to any

15 weight in favor of plaintiff when that's the case, such as

16 here, and same thing with potential expansion, that it's

17 incorrect to afford that weight where it's not informative,

18 and that's exactly what SFO is asking this Court to do.

19     And with respect to the accusations that -- the

20 speculation -- it's not founded on any evidence, and, in

21 fact, contradicts the record evidence -- that the port sort

22 of intended to copy San Francisco, or its mark, or its name,

23 is just not true.  The record evidence is strong on this

24 point, your Honor, about why the port changed the full name

25 of its airport, and I won't rehash that here.

57

So, then, turning -- in sum, your Honor, SFO has fallen far short to meet their heavy burden to show they're likely to prevail on the merits of their trademark infringement claim, and regarding irreparable harm, yes, if they had established likelihood to prevail, they would be entitled to a rebuttable presumption, which, is again, is rebuttable.

I submit they didn't meet that burden, but, regardless, the evidence in the record of what has happened since the port changed the name of the airport from the Metropolitan Oakland International Airport to the San Francisco Bay Oakland International Airport is this, zero evidence that SFO has lost any route, and instead the record shows it's gained routes, zero evidence in the record that passenger count has gone down. Instead, it's gone up, zero evidence about any purported economic impact to SFO.

All the press has been positive, not one negative comment about SFO, and not one comment linking Oakland to SFO in a negative way. Instead, you have a self-serving declaration from SFO's marketing executive saying she believes SFO will suffer reputational harm. That is insufficient to rebut the record evidence of SFO's positive performance since May, and we cited cases on this point in our opposition, your Honor.

And, finally, the balance of equities. Given the evidence in the record that SFO's reputation and economic

58

1  performance have improved since the port changed the name of

2  its airport, the balance of harm favors the port.  There has

3  been no harm to SFO, so the balance of equities cannot tip

4  in its favor, and we cited several cases on this point.

5  When the balance of equities -- the balance of equities

6  favors the Defendant when there's a lack of proof

7  quantifying harm that Plaintiff would suffer absent

8  preliminary relief.  I'll point to you pages 24 and 25, and

9  SFO completely ignores this on their reply.

10       And then, finally, on the public interest, SFO's entire

11  argument relies upon a finding that it's likely to win on

12  the merits, which it has not shown.

13       A lot of words here, a lot of paper, your Honor.

14  Here's the key, three things.  Trademark law is intended to

15  protect against mistaken purchasing decisions, not

16  generalized confusion.

17       Second, the Ninth Circuit has instructed courts are to

18  evaluate the likelihood of confusion regarding purchasing

19  decisions by focusing on the factors most important to that

20  analysis.

21       And, finally, we're here on a preliminary injunction.

22  SFO has a high burden of proof to make a clear showing that

23  it's likely to win its case, and SFO has not met that

24  burden.  Thank you, your Honor.

25            THE COURT:  All right.  Thank you, Counsel.

59

1     And now let's hear from the city of Oakland about

2  whether the city of Oakland is a proper party to the motion.

3         MS. LUM:  Good afternoon, your Honor.  Christina

4  Lum, Deputy City Attorney for the City of Oakland, acting by

5  and through the City Council.

6     That's really important here, your Honor, and our

7  opposition, which I won't go over again, it lays out that

8  the Port of Oakland, acting by and through the Board of Port

9  Commissioners, which is a separate legislative body -- that

10 the Port of Oakland has the exclusive control and

11 jurisdiction and power and authority over the airport, and

12 we cite the charter and the ordinance, and it's explicit.

13 The word "exclusive" is explicit throughout all of these

14 legal authorities.

15         THE COURT:  Let me ask you the same question I

16 asked the City of San Francisco.  Suppose I were to grant a

17 preliminary injunction.  To have it be fully implemented,

18 are there any city personnel who do not work for the port

19 who would need to do anything, meaning, if the injunction

20 goes only against the port, would I be missing any people?

21         MS. LUM:  No.  Your Honor, the charter does not

22 provide any means for the City Council to make the port, the

23 Board of Port Commissioners, do anything about the renaming.

24 I want to point out that -- so, in my brief, for example --

25 well, in this current motion for preliminary injunction, San

60

1  Francisco -- and in its complaint -- they point to the

2  resolution passed by the Board of Port Commissioners that

3  did the action of renaming.  That's the instrument.  That's

4  the legal operative thing that brought about the renaming,

5  and port resolutions, these resolutions are passed by the

6  Board of Port Commissioners only.

7       The charter says that the port has authority to do this

8  under Section 704.  It does not say that the City Council

9  has to approve this, and, further, Section 712 of the city

10  charter says that City Council cannot make contracts, buy or

11  sell, or do anything to the property that belongs to the

12  port or that is encompassed in the port.

13            THE COURT:  So, once the board of the port

14  approved the resolution, there wasn't any further action by

15  the City Council that was needed to give it effect, correct?

16            MS. LUM:  Correct.  Correct.  And so there's

17  nothing in the charter, or any law or ordinance, that

18  creates a legal process, any kind of process by which the

19  City Council can make the Board of Port Commissioners act

20  one way or the other, and San Francisco has not pointed to

21  any process out there that exists.  What can City Counsel do

22  to the Board of Port Commissioners to influence the renaming

23  of the Oakland Airport?

24       And I also want to address that San Francisco argued

25  that the port and the city of Oakland's separation is

61

strange, and that is just -- it's not unprecedented. I've

cited Hogan and Williams, which recognized that the port and

the city are separate entities, with separate legislative

bodies.

And then, in addition, I wanted to point out in my

brief, your Honor, Greyhound Lines, which recognized, for

example, the California Highway Patrol to be a department

that is separate and independent entity from the -- sorry --

California Highway Patrol and the -- let's see -- the

CalTrans, and even though they're under the same agency of

the Business Transportation Authority, the agency of the

state of California, they're two separate departments, but

they were recognized in Greyhound Lines to be independent

entities, your Honor, and different parties for that

lawsuit.

And then, as for the stipulation that San Francisco

referred to, that, I think, is a red herring, because that

stipulation would require the city of Oakland to claim some

kind of control over the airport and the airport renaming,

which is the whole point here.

We're arguing that we just don't have that authority,

and also just that, as to San Francisco's argument that the

city forced the issue, they served two of us, the port and

San Francisco, separately, and they know they served us

separately, and they named us separately, and then, even in

62

1  their complaint and their motion for summary judgment, they
2  acknowledge that it was the Board of Port Commissioners that
3  passed that resolution that they take issue with in this
4  litigation and in this motion for preliminary injunction.
5      So, in sum, the preliminary injunction here should not
6  be granted in respect to the city of Oakland acting by and
7  through the City Council, because we can't do anything.  San
8  Francisco specifically, they want to enjoin and prohibit the
9  use of the name in connection with any products and services
10 in connection with this airport, to promote it, advertise,
11 offer for sale, et cetera, and, as I mentioned before, the
12 charter just doesn't provide City Council the authority to
13 give them that relief, and, again, San Francisco hasn't
14 identified a process by which City Council can do that.
15         THE COURT:  If there were a monetary judgment --
16 and I realize that's not at issue today, but, if there were
17 a monetary judgment against the port, could that be
18 collected against other city assets?  Since that wasn't
19 raised by the briefing, you might say that you don't know,
20 which is fair enough, but I was just wondering.
21         MS. LUM:  I don't know the answer to that
22 hypothetical, your Honor.  I'd have to examine the charter
23 some more.  But, for a large part of what the charter says,
24 for example, the board does their own bonds, issues their
25 own bonds, and then they collect their own revenue.  We have

63

1 different, separate city employees and port employees,

2 separate. So, as a city employee myself, my understanding

3 is that the coffers are different.

4     Let's see. And I think San Francisco mentioned that

5 the charter allows for City Council members -- City Council

6 to remove a port commissioner, and that is (indiscernible)

7 what the charter says, but that's not the relief that City

8 Council -- San Francisco wants. They want to stop the

9 renaming. Even if City Council removed a member of the

10 Board of Port Commissioners, that doesn't get them the

11 relief they want.

12     And then, practically, as to what San Francisco wants

13 in this injunction, the City Council has not taken any

14 action to advertise or market the airport in this way that

15 San Francisco wants to enjoin us to, and San Francisco has

16 not pointed to any advertising material or anything that the

17 City Council has done, and, of course, the City Council

18 actions, it's all public record. So, if there were

19 evidence, I think they could have brought it.

20     And so, for these reasons, your Honor, this Court

21 should not grant this motion as to the city of Oakland

22 acting by and through City Council. This exercise would be

23 a waste of resources, and basically the city of Oakland

24 acting by and through City Council. We have no theoretical

25 or practical way to give San Francisco the relief that they

64

1   want.

2            THE COURT:  All right.  Thank you, Counsel.

3            MS. LUM:  Thank you.

4            MR. GHAJAR:  Thank you for the time, your Honor.

5            THE COURT:  The way I had structured it was San

6   Francisco's rebuttal on the city of Oakland issue, followed

7   by merits of preliminary injunction.  Are you --

8            MR. GHAJAR:  Sure.  I'll let Mr. Stevens

9   address --

10            THE COURT:  Okay.

11            MR. GHAJAR:  Thank you.

12            THE COURT:  Thank you.

13            MR. STEVENS:  Thank you, your Honor.  I think

14   there's just a few quick points I'd like to address.  The

15   first is control over the Port Commission.  The City Council

16   has control.  They can remove and appoint port

17   commissioners.  They need six votes to do it.  So I don't

18   think it's the case that they're completely removed.  If

19   they don't like what the port commissioners do, they can put

20   new port commissioners in.

21        And I wouldn't say that it's the case that we are

22   solely seeking to stop the name change.  You know, the name

23   has been changed.  We're seeking to change it back, and to

24   not continue to promote it, and there are people,

25   potentially, within the Oakland government that could do

*Echo Reporting, Inc.*

65

1  things to say, "Our airport is called this.  Call our

2  airport this."  Indeed, we have seen statements from the

3  mayor in support.

4       I want to touch briefly on the <u>Greyhound Lines</u> case

5  that counsel mentioned.  It's 213 Cal.App.4th 1129, and it's

6  correct that that case does recognize that CHP and CalTrans

7  are separate, but I think the most relevant point in the

8  case is the line -- and, excuse me, this is at page 1135 --

9  "Although the state is ultimately responsible for any torts

10 committed by its departments."  And I think the analogy here

11 is, you know, the CHP and CalTrans are different, but

12 they're departments of the state, who is ultimately liable,

13 and that's the relationship we see here between the port and

14 the city.

15      You asked about assets, and I can't answer your

16 specific question, but what I can point out is there is a

17 possibility of commingling of assets.  If the port has a

18 surplus of money, for example, if Air Plus (phonetic)

19 airline incomes increase dramatically, they can simply

20 transfer revenue to the city general fund, and that's 717(3)

21 of the city charter.

22      And so, with that, I'm prepared to submit, unless your

23 Honor has any further questions.

24           THE COURT:  I don't.  Thank you.

25           MR. STEVENS:  Thank you.

66

1           MR. GHAJAR:  One of the only new arguments I heard

2    from my colleague today that we did not have a chance to

3    address in our brief is the argument that Oakland believes

4    that the most important customers to it are its airlines and

5    businesses.  That's not something they had focused on

6    previously, nor did their survey expert testify in her

7    declaration that Ms. Butler's survey, which focused on 600

8    prospective travelers, focused on the wrong set of

9    customers.

10          Respectfully, that's a silly argument to make, because

11   they didn't re-brand their airport for the few airline

12   partners and restaurants already in the airport.  They did

13   it to draw an association to our airport (sic), to attract

14   more traffic, to attract more attention to the airport, and

15   that's what's happening.  The new name is drawing an

16   association between their airport and ours, not to the

17   proximity to the body of water.

18          We're not alleging confusion generally.  I'm well aware

19   of the case law that says that general public confusion is

20   not what the Lanham Act is concerned about, but that's not

21   what we've offered.  We've offered evidence of people being

22   confused between the two airports, not just having banter

23   about it, expressing their own stories about how they ended

24   up at the wrong airport.  The Lanham Act protects them, and

25   it protects us, and the good will in our 70-plus-year-old

67

brand.

THE COURT:  One line of question I had for the port was about the claim of association, and I posed the question of people who use the Oakland Airport, and they know that it is different from SFO, but they have a bad experience, and this is something that San -- that you raised in your moving papers -- and then they associate that with the San Francisco International Airport.  And one response the port had was to say that that's not confusion in connection with a purchasing decision.  Do you think that it is?

MR. GHAJAR:  It actually doesn't have to be. That's relevant confusion.  Countless cases have safeguarded brand owners' equity and good will over concerns just like that, and that's a concern that I expressed earlier in the argument.  We don't want their rankings, experiences consumers have at their airport, to reflect negatively on us, and that sort of affiliation and association is exactly what 1125 and 1114 under the Lanham Act, 15 U.S.C. 1114, 1125, protect against.

I would also submit to the Court that we don't want travelers, Uber drivers, people returning a rental car, ending up at the wrong airport due to name confusion. Courts routinely credit just a few instances such as that on a PI record, and here we have dozens.  We don't want people

68

1  affiliating our airports due to name confusion.  We don't

2  want people out of town or out of the country to fly to the

3  San Francisco Bay Airport, believing that they're going to

4  get on --

5          THE COURT:  Sorry.  Let me just back up to your

6  previous answer, to make sure I understood you.

7      Do you think that, if there's damage to the good will

8  behind the mark due to an implied association, and San

9  Francisco loses some control of its mark, the value of it

10  drops, the good will value drops because of implied

11  association -- do you think that is cognizable harm under

12  the Lanham Act even if there is no effect on airline ticket

13  sales?

14          MR. GHAJAR:  The answer is yes --

15          THE COURT:  Okay.  Thank you.

16          MR. GHAJAR:  -- and I believe that we demonstrated

17  that there is a likelihood that it has and will,

18  particularly if left unchecked, certainly result in

19  continued mistaken purchases to the wrong airport.  Why

20  else, your Honor, would people be ending up at the wrong

21  airport, and rushing to get to Oakland's airport, believing

22  they had booked a ticket to San Francisco International,

23  but, in fact, they had booked it to San Francisco Bay,

24  thinking it's the same airport?  And that's the type of

25  affiliation confusion that we want to avoid.

69

Moreover, your Honor said at the outset of the hearing -- there's another type of confusion that I didn't really hear addressed in my colleague's argument. That's initial interest confusion. The whole doctrine of initial interest confusion presupposes that there's not a purchase. So the Lanham Act is concerned with either people making and consummating a purchase mistakenly.

There's post-purchase confusion, there's pre-purchase confusion, and there's confusion on the part of people who influence decisions, and here it's too myopic, we would submit, to focus only on someone who goes on five web sites in the handout, and not the myriad others, and the OTA (phonetic) web sites, and to ignore that there are different ways that people are affected to then make purchasing decisions.

For example, when somebody does research, they go on Google. They search up "San Francisco Airport." They end up on Oakland's web site and they don't know the difference, because they don't know the Bay Area, and then they end up buying tickets to that airport. That type of confusion early on, in any step of the process, is actionable. The Lanham Act doesn't concern itself only when somebody has bought the wrong brand of car or the wrong airline ticket.

A few more words. Counsel suggested early in the argument that people may want to look up the San Francisco

70

1  Bay to see where it is, and that was perhaps an impetus

2  behind a name change.  If that was a concern or hypothesis,

3  those same people could just go on a map and search for the

4  city of Oakland.  So that didn't seem to be an argument that

5  really went anywhere.

6      Counsel confirmed something that I think is pretty

7  important.  The new name -- and your Honor alluded to

8  this -- replaced an old brand, the old source identifier.

9  This isn't just a brushed-aside name.  They're doing this

10  for a reason.  San Francisco Bay Oakland International

11  Airport is their new brand, and they want everybody to

12  associate that brand with them.  It's not just a buried name

13  that is not serving as a source identifier.  It is serving

14  the exact same purposes of their old registered trademark.

15      We, on the other hand, own "San Francisco" in

16  connection with an airport.  That's what our trademark

17  registration, which is incontestable, gives us.  I said it

18  earlier.  That registration is meaningless if Oakland can

19  adopt every word in our registered trademark in its new

20  name.

21      My colleague highlighted IATA codes.  I believe that

22  your Honor and I discussed that earlier, but what evidence

23  is there in Oakland's papers that consumers understood IATA

24  codes or that affects their understanding of whether one

25  airport is affiliated or associated with another?  It does

71

1  none.

2      And a brief word about the survey.  Ms. Butler's survey

3  is unrebutted by a contrary survey.  Doctor Scott (phonetic)

4  doesn't criticize Ms. Butler's bona fides, doesn't criticize

5  her first question, doesn't -- criticizes her stimuli, but,

6  your Honor, she designed the survey before Oakland had

7  rolled out the name.  She had to create a simulation of what

8  it might look like if the new name appeared on a drop-down

9  menu.

10      It doesn't matter if she had made up an airline.

11  That's what surveys do.  They try to simulate a real-world

12  simulation, and, at the time -- and she explains this in her

13  rebuttal declaration -- that is what she decided to do, and

14  she's done in other cases, and she's done it in another case

15  that's before your Honor, and that's in reply papers, and

16  that's the Wex case.

17      And I'll close with two points, one about the Wex case

18  and one about economic impact.  In the Wex case -- it's a

19  District of Maine decision from a few months ago -- the

20  Court enjoined HP, Hewlett Packard's, use of "HP Wex."  Now,

21  one would think that the powerful, famous HP brand and

22  branding that appear alongside the Wex name would dispel

23  confusion.  Not so.

24      Ms. Butler did a survey in that case, finding over 20

25  percent confusion.  The Court definitely credited that, and,

72

1  notwithstanding HP's arguments, much like Oakland's here,

2  that there were other indicia along and in the name that

3  should dispel confusion, the Court issued an injunction,

4  finding that when spoken in certain context the names are

5  "Wex."  The names are too similar.

6      And that's notwithstanding the fact that, in that case,

7  the consumers were highly sophisticated.  These were

8  software platforms.  They cost a lot of money, and you could

9  only consume them by going to those web sites.  It's not

10 like here, where you have OTAs and apps and whatnot.

11      And then, finally, there was a discussion about the

12 lack of, what I understood counsel to be arguing, an

13 economic impact on San Francisco.  Well, there will be a

14 time and place to assess that, but that's not what a PI is

15 about.  In fact, we're talking about incompensable harm.

16      We're talking about harm to our reputation and good

17 will that you can't put a price tag on, and before those

18 signs that apparently are on their way to Oakland Airport

19 that haven't been delivered are put up, and before other

20 airlines adopt this infringing name and create enough more

21 confusion, we ask that your Honor issue an injunction

22 preventing that from happening further.  Thank you.

23          THE COURT:  All right.  Thank you, Counsel.

24      The matter is submitted, and I will issue a written

25 order.

73

1          THE CLERK:  Thank you, everyone.  We're off the

2    record in this matter, and court is in recess.

3        (Proceedings adjourned at 2:54 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

74

1                    CERTIFICATE OF TRANSCRIBER

2

3      I certify that the foregoing is a true and correct

4 transcript, to the best of my ability, of the above pages of

5 the official electronic sound recording provided to me by

6 the U.S. District Court, Northern District of California, of

7 the proceedings taken on the date and time previously stated

8 in the above matter.

9      I further certify that I am neither counsel for,

10 related to, nor employed by any of the parties to the action

11 in which this hearing was taken; and, further, that I am not

12 financially nor otherwise interested in the outcome of the

13 action.

14

15

16

17         Echo Reporting, Inc., Transcriber

18            Saturday, November 9, 2024

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

1   COOLEY LLP
    BOBBY GHAJAR (198719)
2   JOHN HEMANN (165823)
    JUDD LAUTER (290945)
3   3 Embarcadero, 20th Floor
    San Francisco, California 94111-4004
4   Telephone:   (415) 693-2000
    Facsimile:    (415) 693-2222
5   Email: bghajar@cooley.com
          jhemann@cooley.com
6           jlauter@cooley.com

7   DAVID CHIU (189542)
    City Attorney
8   JESSE SMITH (122517)
    Chief Assistant City Attorney
9   YVONNE R. MERÉ (173594)
    Chief Deputy City Attorney
10   JULIE VEIT (209207)
    CHRISTOPHER STUART (262399)
11   Deputy City Attorneys
    City Hall
12   1 Dr. Carlton B. Goodlett Place
    San Francisco, California 94102-4682
13   Telephone:   (415) 554-4700
    Facsimile:    (415) 554-4757
14   Email: Cityattorney@sfcityatty.org
          Jesse.Smith@sfcityatty.org
15           Yvonne.Mere@sfcityatty.org
          Julie.Veit@sfcityatty.org
16           Christopher.Stuart@sfcityatty.org

17   Attorneys for Plaintiff and Counterclaim Defendant
    CITY AND COUNTY OF SAN FRANCISCO

18

19           UNITED STATES DISTRICT COURT

20           NORTHERN DISTRICT OF CALIFORNIA

21           SAN FRANCISCO DIVISION

22   CITY AND COUNTY OF SAN FRANCISCO,     Case No. 3:24-CV-02311-TSH

23           Plaintiff,     **SECOND DECLARATION OF JESSICA**
                      **WILLIAMS IN SUPPORT OF THE CITY'S**
24       v.                   **MOTION FOR PRELIMINARY INJUNCTION**

25   CITY OF OAKLAND AND PORT OF
    OAKLAND,
26
          Defendants.
27

28   AND RELATED COUNTERCLAIM

**J. WILLIAMS DECLARATION**
**CASE NO.: 3:24-CV-02311-TSH**

I, Jessica Williams, declare as follows:

1.    I am an associate with the law firm Cooley LLP, counsel for Plaintiff in this matter. I submit this declaration in connection with the City and County of San Francisco's Reply Brief in Support of Plaintiff City and County of San Francisco's Motion for Preliminary Injunction Enjoining Defendants.  I declare that the following is true to the best of my knowledge, information, and belief, and that if called upon to testify, I could and would testify to the following.

**Disclaimers in the Parties' Registrations**

2.    As stated in my previous declaration, in or around September 9, 2024, I conducted a search of the U.S. Patent & Trademark Office ("USPTO") records for information regarding the efforts of Defendants, City of Oakland and Port of Oakland, to register the OAKLAND INTERNATIONAL AIRPORT trademark.  A review of the registration certificate for this trademark, attached as Exhibit H to my previous declaration, shows that Oakland disclaimed trademark rights to the terms "INTERNATIONAL AIRPORT."   No disclaimer of "OAKLAND" is present in the registration.

3.    As stated in my previous declaration, in or around September 16, 2024, I conducted a search of the USPTO records for information regarding Plaintiff's application to register the SAN FRANCISCO INTERNATIONAL AIRPORT trademark. A review of the registration certificate for this trademark, attached as Exhibit E to my previous declaration, shows that Plaintiff likewise disclaimed rights in "INTERNATIONAL AIRPORT."  No disclaimer of "SAN FRANCISCO" is present in the registration.

**Additional Evidence of Consumer Confusion**

4.    In or around October 1, 2024, I reviewed the comments section of a video "San Francisco Bay Area or LA" comedian Joy Ofodu posted on Instagram on September 24, 2024.  In the video, Ofodu reacts to an offscreen voice informing her of the Oakland airport name change to "San Francisco Bay Oakland International Airport."  The caption to this video reads, in relevant part: "Sorry, it's still the Oakland airport 😊 do not have these international travelers landing out here, confused" and "ALT IMG: a woman, with a slight hint of angst underneath her aura, rules of her suitcase to an off screen attendant outside of What is still very much the Oakland airport."

Reviewing the comments to this post, I observed several instances of apparent consumer confusion either experienced or witnessed by a commentor. I captured a screenshot of the comments section and have attached the relevant excerpts hereto as **Exhibit DD**.

5.      For example, one Instagram user, @j_matteo, commented, ". . . Dreamforce just ended in San Francisco, with a number of people flying to the wrong airport as a result. . . ."

6.      Another Instagram user @lindsey514 wrote about witnessing others' confusion resulting from the name change: " . . . it's so confusing. I've already seen people missing their flight because they go to SFO 😵".

7.      An airline employee commented from their personal account, @najma_nejwa, to describe an experience with a customer who asked for their assistance checking a bag. Eventually, the user "had to use other means to find out in the end she's HEADING TO OAK which is Oakland not SFO San Francisco and I was like your [sic] heading to Oakland not sfo and she argued I was like you need to know it's called Oakland and there's already sfo so don't confuse me and go your way make sure you tell other agents Oakland not sfo to confuse us and your self and don't miss your flight as it will [sic] Oakland not SFO."

8.      Another user, @dr_tameka, did not appear to be personally confused, but commented about concerns over confusion by out-of-towners: "No, it needs to be Oakland, because out of town folks are often confused with San Francisco (SFO) and the new San Fran Oakland Airport (OAK)." This comment caught my attention as it demonstrates that even those familiar with the name change will not include the term "Bay" in reciting the new name.

9.      Commenting on their own confusion, user @chris.tine2011 wrote, "That's why I got so confused I I was like no, Oakland airport on google but it kept pulling up like that." This comment caught my attention as it appears to demonstrate a situation where it was only because of the person's familiarity with their destination that they knew to override the Google search result.

10.     User @empowers.souls comments about their apparent observation of confusion by ride share drivers: "**Crazy thing - ever since they changed it Uber & Lyfts have been going to the wrong airport**." (emphasis added).

11.     @danielphantOm wrote about the confusion of others: "Oh yeah the name change

1    that had a bunch of people wind up landing at the wrong airport lol".

2       12.    I also observed Instagram users discussing confusion in the comments section of

3    posts about the name change, too. For example, when @rootedrachelraeray wrote, "Nobody has

4    time for that long as [sic] name and they're going to confuse tourists into thinking they're in San

5    Francisco too. Watch 😣," to which user @velveteenvoyager responded, **"already happened a**

6    **few times!"** (emphasis added).

7       13.    Another user, @yodeleofficial, described their confusing experience in the

8    comments section: "They def doing too much. That's how I almost missed my flight going to the

9    wrong airport".

10       14.    User @Sabrina47lewis recalled some else's confusion, too: "Didn't somebody just

11    missed their plane because of the name change of the airport I went to the wrong airport".

12       15.    User @mankeme.nahui commented that, apparently because of the name change,

13    "This would explain why u went to the wrong fkn airport."

15       Executed on this 21st day of October, 2024, at Los Angeles, California.

17    _____
     Jessica Williams

# EXHIBIT DD



**URL**
https://www.instagram.com/reel/DATq1_Qvym0/?igsh=MzRlODBiNWFlZA%3D%3D
**Timestamp**
Tue Oct 01 2024 13:29:06 GMT-0700 (Pacific Daylight Time)



**URL**

https://www.instagram.com/reel/DATq1_Qvym0/?igsh=MzRlODBiNWFlZA%3D%3D

**Timestamp**

Tue Oct 01 2024 13:29:06 GMT-0700 (Pacific Daylight Time)



accident
1 like   Reply

j_matteo 3d
@travisoriginals I said this plan would backfire before it ever got approved, and
Dreamforce just ended in San Francisco, with a number of people flying to the wrong
airport as a result. It's like we have children in charge of important decisions like this. It's
just silly.

1 like   Reply

lanesplittinroadglide 3d
@insert_witty_handle_here I fly out of Oakland to avoid SFO, they don't need a name
change, they just need to advertise how easy it is to fly out of, like Sacramento.

2 likes   Reply

insert_witty_handle_here 3d
@lanesplittinroadglide Anyone who can fly out of OAK and chooses SFO likes pain

2 likes   Reply

joyofodu ✓ 3d
@insert_witty_handle_here 😂😂so accurate, screaming

Reply

_cameronbond 2d
@travisoriginals it's whippipo

Reply

tval_207 2d
@travisoriginals 🎉 AGREE

Reply

urbangemjewelry 2d
@wasnt_mee_k if only someone could have predicted this...oh wait we all did 😳

2 likes   Reply

lena.fosters 2d
@travisoriginals dumnnmn

Reply

blvk_divmonds 2d
@_englishman1122 I noticed that and thought I was trippin!! Whoever thought of this
dumb idea should be Benny hill'd every day!!!

1 like   Reply

blvk_divmonds 2d
@wasnt_mee_k they should change it back cuz we (the people) def didn't want it!!

1 like   Reply

_englishman1122 2d
@blvk_divmonds Pay attention during booking, so you don't select the wrong airport
😵

1 like   Reply

nohandouts_ken15 2d
@insert_witty_handle_here yeah but who wants to fly to Oakland they want to use sf
name but they city suck

Reply

**URL**
https://www.instagram.com/reel/DATq1_Qvym0/?igsh=MzRIODBiNWFIZA%3D%3D

**Timestamp**
Tue Oct 01 2024 13:29:06 GMT-0700 (Pacific Daylight Time)



**URL**

https://www.instagram.com/reel/DATq1_Qvym0/?igsh=MzRlODBiNWFlZA%3D%3D

**Timestamp**

Tue Oct 01 2024 13:29:06 GMT-0700 (Pacific Daylight Time)



**william_tha_conqueror** 3d
So is it also called San Francisco Bay San Jose airport?
Reply

**bowlernme** 3d
Isn't the airport code still OAK?
Reply

**anxarch** 3d
It's still literally "OAK" right?
Reply

**anxarch** 3d
🥇
Reply

**mr_gasper510** 3d
So San Francisco has 2 airports?
Reply

**clue78** 3d
OAK 4 ever
Reply

**jasonesports** 3d
WTF they didn't change it ahaha whatttt
Reply

**najma_nejwa** 3d
As I work with the airline a passenger said this I'm heading to San Francisco so can you check me I was like sure gimme your ID I pull up SFO flights on that day be hold I couldn't find the pax so I was like are you sure your in right date and right airline she said yes then I had to use other means to find out in the end she's HEADING TO OAK which is Oakland not SFO San Francisco and I was like your heading to Oakland not sfo and she argued I was like you need to know it's called Oakland and there's already sfo so don't confuse me and go your way make sure you tell other agents Oakland not sfo to confuse us and your self and don't miss your flight as it will Oakland not SFO. Bye we appreciate the business.
Reply

**jacalynjaci** 3d
Exactly it's the Oak Airport
Reply

**jasminfb** 3d
Facts, no one in the Town has time for that long ass title 🙄
Reply

**caligrrl** 3d
💯🤝Agreed
Reply

**mspeachz1** 3d
I had to go look that up . 🫣🫣🫣
Reply

**kaaaayylllaaaaa** 3d
@yourfavoriteaddiction
Reply

**URL**
https://www.instagram.com/reel/DATq1_Qvym0/?igsh=MzRlODBiNWFIZA%3D%3D

**Timestamp**
Tue Oct 01 2024 13:29:06 GMT-0700 (Pacific Daylight Time)

**bacin87** 2d
They're really changing the name hoping people will be confused and book Oakland airport to drive up traffic
Reply

**krys_lens** 2d
😊
Reply

**sumariati_gz** 2d
👏👏👏👏👏 yesss Oakland Airport!!!!!!!
Reply

**soul_finder87** 2d
So it's the Spirit Airlines airport??
Reply

**hopfluence_** 2d
Who cares Oakland is 👎
Reply

**itsyahboyeric**



Reply

**alexshelly_2000** 2d
I mean. Same thing with Fresno. We just call it the fresno airport 😂
Reply

**something.about.mary.888** 2d
Just like people call Anaheim the Los Angeles Anaheim Doyers.
Reply

**devalynrogers** 2d
Doesn't it exist in Oakland?
Reply

**dr_tameka** 2d
No, it needs to be Oakland, because out of town folks are often confused with San Francisco (SFO) and the new San Fran Oakland airport (OAK)
Reply

**lena fosters** 2d

**URL**
https://www.instagram.com/reel/DATq1_Qvym0/?igsh=MzRIODBiNWFIZA%3D%3D
**Timestamp**
Tue Oct 01 2024 13:29:06 GMT-0700 (Pacific Daylight Time)



**URL**
https://www.instagram.com/reel/DATq1_Qvym0/?igsh=MzRIODBiNWFIZA%3D%3D

**Timestamp**
Tue Oct 01 2024 13:29:06 GMT-0700 (Pacific Daylight Time)



**URL**

https://www.instagram.com/reel/DATq1_Qvym0/?igsh=MzRIODBiNWFIZA%3D%3D

**Timestamp**

Tue Oct 01 2024 13:29:06 GMT-0700 (Pacific Daylight Time)



**URL**

https://www.instagram.com/reel/DATq1_Qvym0/?igsh=MzRIODBiNWFIZA%3D%3D

**Timestamp**

Tue Oct 01 2024 13:29:06 GMT-0700 (Pacific Daylight Time)



**URL**
https://www.instagram.com/reel/DATq1_Qvym0/?igsh=MzRIODBiNWFIZA%3D%3D

**Timestamp**
Tue Oct 01 2024 13:29:06 GMT-0700 (Pacific Daylight Time)



**URL**

https://www.instagram.com/reel/DATq1_Qvym0/?igsh=MzRIODBiNWFIZA%3D%3D

**Timestamp**

Tue Oct 01 2024 13:29:06 GMT-0700 (Pacific Daylight Time)



**URL**
https://www.instagram.com/reel/DATq1_Qvym0/?igsh=MzRlODBiNWFlZA%3D%3D

**Timestamp**
Tue Oct 01 2024 13:29:06 GMT-0700 (Pacific Daylight Time)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>                 Plaintiff,<br><br>    vs.<br><br>CITY OF OAKLAND, AND PORT OF OAKLAND<br><br>               Defendant.<br>―――――――――――――――――――<br>CITY OF OAKLAND, A MUNICIPAL CORPORATION, ACTING BY AND THROUGH ITS BOARD OF PORT COMMISSIONERS (PORT OF OAKLAND),<br><br>               Counterclaimant,<br><br>    vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO<br><br>               Counterclaim Defendants. | Case No.: 3:24-cv-02311-TSH |

# REPLY REPORT OF SARAH BUTLER

# REPLY REPORT OF SARAH BUTLER

## Table of Contents

| | | |
|---|---|---|
| I. | QUALIFICATIONS | 3 |
| II. | DOCUMENTS REVIEWED | 3 |
| III. | SUMMARY OF OPINIONS | 3 |
| IV. | RESPONSE TO SCOTT DECLARATION | 5 |
| | A. The Survey Targeted the Relevant Universe of Consumers | 5 |
| | B. The Survey Tests Oakland International Airport's Use of "San Francisco Bay Oakland International Airport" in a Real World Setting | 12 |
| | C. The Survey Stimuli Are Realistic, Reflect the Marketplace, and Are Correctly Designed to Isolate the Impact of Oakland International Airport's Use of "San Francisco Bay Oakland International Airport" | 20 |
| | D. The Survey Questions Appropriately Measure Potential Confusion Associated with Oakland International Airport's Use of "San Francisco Bay Oakland International Airport" | 25 |
| V. | CONCLUSIONS | 28 |

ER-0131

# I.   QUALIFICATIONS

1.      I am the same Sarah Butler who submitted an expert report in this matter.[1]

2.      NERA is being compensated for my services in this matter at my standard rate of $825 per hour. Members of the staff at NERA have worked at my direction to assist me in this engagement. No part of my compensation or NERA's compensation depends on the outcome of this litigation. Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction.

# II.   DOCUMENTS REVIEWED

3.      As part of my work, I reviewed the declaration submitted by Dr. Carol A. Scott.[2] A list of the specific materials I reviewed and relied upon for this report can be found in **Exhibit B.**

# III.   SUMMARY OF OPINIONS

4.      In their response to Plaintiffs' Motion for Preliminary Injunction, Defendants hired Dr. Carol A. Scott to respond to my survey. Dr. Scott did not conduct her own survey. In her report, Dr. Scott mischaracterizes and misrepresents the survey I designed. Dr. Scott focuses much of her report on the population included in my survey and the particular versions of webpages shown to respondents. Dr. Scott claims my survey under-represents Oakland International Airport's "current" market and she bases this criticism on the state of residence for my survey respondents. While I did sample respondents from states that Oakland International Airport suggested it would target with its name change, respondents were not screened out on a basis of their current awareness of, or familiarity with, Oakland International Airport or San Francisco International

---

[1] Declaration of Sarah Butler in Support of the City's Motion for Preliminary Injunction, dated September 10, 2024 (hereinafter, *"Butler Declaration"*).

[2] Declaration of Dr. Carol A. Scott, dated October 8, 2024 (hereinafter, *"Scott Declaration"*).

Airport. In fact, I designed the survey to ensure that half of my respondents have previously traveled by air to Northern California (including those who have flown to San Francisco International Airport, Oakland International Airport, or both). Moreover, surveying both past and prospective purchasers is appropriate for a likelihood of confusion survey.[3] Dr. Scott presents no data to demonstrate that some other set of states would have yielded different results and ignores my data demonstrating that even consumers who have previously traveled to Northern California (again including those who have previously flown to Oakland International Airport and San Francisco International Airport) were confused by the name San Francisco Bay Oakland International Airport.

5.      Further, to ensure that my survey represented a range of possible ways in which consumers might encounter the name, I tested two different platforms which realistically depicted the appearance of "San Francisco Bay Oakland International Airport." While Dr. Scott does not generally take issue with showing respondents results from searches for flights to the Bay Area, Dr. Scott does criticizes the specific stimuli shown and argues that these platforms currently do not display (or would never display at all) Oakland International Airport's new name. But these arguments are irrelevant as my survey was not testing whether Southwest or Google Flights, specifically, cause consumers to be confused. My survey appropriately tested whether Oakland Airport's new name "San Francisco Bay Oakland International Airport," when appearing in a realistic manner, causes confusion. Respondents in my survey were shown realistic depictions of the name, similar to the manner in which names are displayed in other locations with multiple airports (e.g., New York or Washington, D.C.). Moreover, because Oakland International Airport

---

[3] Diamond, S. S. (2011). "Reference Guide on Survey Research," Reference Manual on Scientific Evidence, Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council, pp. 359-423 at p. 239.

only implemented the name change in early May of 2024,[4] it is impossible to know how precisely each website or platform will display the name.

6.      Dr. Scott also claims that asking respondents about the primary airport is inappropriate because it does not provide data as to the geographic location or identity of the airport. Of course, my survey includes a question to determine where respondents believe the San Francisco Bay Oakland International Airport is located and whether they believe this airport is the San Francisco International Airport. Dr. Scott ignores the fact that my survey demonstrates a net confusion rate of 18.5 percent without including results from the question about the "primary" airport.

7.      Finally, throughout her report, Dr. Scott offers numerous theories and hypotheses as to different rates of confusion, but she has no data to support these theories, has not conducted her own survey, and provides no evidence that any alternative set of questions or stimuli would have achieved different results. In total, Dr. Scott offers criticisms that incorrectly characterize the appropriate survey population and stimuli used in my survey, and she ignores data presented throughout my original report that contradict her conclusions.

8.      My detailed response to Dr. Scott is below.

## IV.   RESPONSE TO SCOTT DECLARATION

### A.    The Survey Targeted the Relevant Universe of Consumers

9.      Dr. Scott claims that my sample is under-inclusive and does not include markets that currently account for the largest number of Oakland passengers.[5] For a number of reasons, Dr.

---

[4] https://www.cnn.com/2024/05/10/travel/oakland-airport-name-lawsuit-san-francisco/index.html, last accessed October 21, 2024.

[5] *Scott Declaration*, ¶ 8.

5

Scott's criticisms are without merit, and she ignores facts and data relevant to the claims in this matter.

10.     First, Dr. Scott's criticism depends on the relevant survey population being that which encompasses Oakland International Airport's "current" markets. In this case, it was important to survey relevant consumers (i.e., those who have or will travel to Northern California by air) in areas where Oakland International Airport itself has suggested its name change will have an impact. Many documents indicate that Oakland International Airport's name change is driven by the desire to solicit passengers from markets it currently does not reach. For example, a March 2024 article by Aviation Week indicated that the name change is "part of efforts to increase geographic awareness among inbound travelers."[6] The article goes on to quote Oakland's mayor, who stated, "Considering a name modification to highlight our location within the vibrant San Francisco Bay Area could offer several benefits. ... Notably, it could support the airport's efforts to secure more direct flights to additional destinations, enhancing convenience for travelers and potentially boosting tourism in Oakland."[7] An April 2024 study commissioned by the Port of Oakland posed this information to local consumers about the reasons for a name change:

> Here is a bit more information. Oakland International Airport is limited in its ability to have airlines offer more flights to international and domestic destinations in the Midwest, the South, and the East Coast, despite demand from outbound Bay Area-based customers. This is due to a lack of demand from inbound passengers from other parts of the country. Many international and domestic passengers that don't live in the Bay Area are unfamiliar with Oakland International Airport and its location. Oakland International Airport has already lost flights and destinations because of this issue. A new name would allow Oakland International Airport to attract more passengers and add more domestic and international flights and destinations to the airport.[8]

---

[6] See, e.g., "Oakland Airport Seeks To Boost Inbound Traffic with Name Change," https://aviationweek.com/air-transport/airports-networks/oakland-airport-seeks-boost-inbound-traffic-name-change, last accessed October 21, 2024.

[7] *Ibid.*

[8] OAK-Branding-Survey-Key-Findings.pdf, p. 2, *emphasis added.*

11.     Press releases from the Port of Oakland indicated that the name change is intended to "boost inbound travelers' geographic awareness of the airport's location,"[9] and reported that the proposed name change was supported by research demonstrating Oakland International Airport's inability to sustain new routes due to travelers' "lack of geographic awareness."[10] The Port of Oakland's Agenda Report from April 11, 2024, described background reasoning for name change as follows:

> However, the further away travelers are from the San Francisco Bay Area region, the less familiar they are with OAK's geographic location and convenience of access to destinations throughout all Northern California.[11]

12.     These materials suggest that Oakland International Airport intended its name change to target individuals unfamiliar with Oakland and its location, and/or consumers who are in markets far from the Bay Area (e.g. Midwest, East Coast, the South). Therefore, despite Dr. Scott's claims that a survey of over 600 consumers from eleven states[12] represents only a "small portion of relevant consumers searching for flights to Northern California who potentially would be exposed to the new name during a search," comments from Oakland International Airport suggest that the name change is specifically directed to those who do not know Oakland and who have not traveled to the Bay Area.[13]

13.     Despite Oakland International Airport's targeting of consumers unfamiliar with the Bay Area, my survey did not target or seek to include only consumers unfamiliar with Oakland or its location. In fact, I designed the survey to ensure that half of my sampled respondents were

---

[9] 2024-03-29 Port Press Release.pdf.

[10] Agenda Report.pdf, p. 1.

[11] *Ibid.*

[12] This includes Washington, D.C.

[13] Dr. Scott does not demonstrate that consumers from Los Angeles or San Diego, for example, would use general search terms, such as "Bay Area" or "Northern California" when looking for flights.

7

ER-0136

consumers who have traveled to Northern California by air, including respondents who have flown into San Francisco International Airport and/or Oakland International Airport. As a result, the majority of respondents who have traveled to Northern California in my sample had flow to one or both of the airports in this matter and more than one quarter of my respondents indicated that they have flow into Oakland International Airport (27.5 percent). Therefore, while I collected data from respondents living in states that Oakland International Airport suggests it is targeting with its name change, I certainly did not limit my sample to consumers unfamiliar with Oakland or San Francisco.[14]

14.     Dr. Scott both mischaracterizes and misunderstands the sample of consumers in my survey. For example, she claims that my survey sample "excludes entirely 57% of the U.S. population." [15] But this data point is meaningless as it assumes (without foundation) that individuals in these states have all traveled or will travel by air to Northern California. In fact, less than half of the U.S. population *as a whole* has traveled by air in the last year and of course, not all of those travelers have visited Northern California.[16]

15.     Dr. Scott also suggests that my survey is unreliable because it excluded areas that she claims *currently* provide the "most passengers"[17] for Oakland International Airport. But areas such as Los Angeles, Las Vegas, and San Diego have had press coverage related to this litigation in a number of news outlets. It would be inappropriate to survey consumers who may have been

---

[14] Dr. Scott declares that the underserved markets presented in the Port of Oakland's PowerPoint file "41124 Presentation.pptx" refer to "certain airports with no non-stop flights to Oakland" (*Scott Declaration*, ¶ 11). While this may be the case, I did not sample individuals traveling from specific airports but rather screened for consumers in the state who have or will travel to Northern California. Oakland International Airport has non-stop flights from airports in many of these states included in my survey, including Texas, Illinois, and Louisiana, and non-stops flights servicing New York (Newark airport) and Washington, D.C. (BWI). https://www.iflyoak.com/fly/airlines-and-destinations/, last accessed October 21, 2024.

[15] *Scott Declaration*, ¶ 11.

[16] https://www.airlines.org/dataset/air-travelers-in-america-annual-survey/, last accessed October 21, 2024.

[17] *Scott Declaration*, ¶ 11. Dr. Scott provides no data to demonstrate what share of passengers come from the areas she has identified.

8

exposed to information about the lawsuit, as this may bias the results. For example, consumers in Los Angeles,[18] San Diego,[19] and Las Vegas[20] could have seen reports detailing the dispute in major newspapers and/or television.

16.    Dr. Scott ignores the fact that my sample did include survey respondents from Arizona,[21] and she presents no data to demonstrate that respondents from states such as South Carolina, Maryland, Connecticut, Kansas, or Virginia (not included in the survey and not specifically listed as targeted states by Oakland International Airport), would have differing impressions compared to respondents from North Carolina, Washington D.C., New York, Texas, Louisiana, Ohio, Michigan, Pennsylvania, Florida, or Illinois (all states identified as having a target market that were included in the survey).

17.    Dr. Scott further claims that my sample was "more geographically constrained" because 53 percent of my respondents came from one of three states: New York, Texas, and Florida.[22] Of course, the relative populations of these three states compared to states like North Carolina or Louisiana (also states included in the survey) are significantly larger and therefore would reasonably comprise a larger share of the sample. The relative population distributions (i.e., the population in sample compared to the population of the state 18 years and older) are shown in Table 1 below. These data demonstrate that it is reasonable for my sample to be more heavily weighted to the more populous states.

---

[18] https://kyma.com/news/california-news/2024/04/13/oakland-city-officials-vote-on-airports-name-change/, last accessed October 17, 2024; https://www.latimes.com/california/story/2024-04-18/san-francisco-sues-oakland-over-airport-name-change, last accessed October 18, 2024.

[19]  https://fox5sandiego.com/news/national-news/will-cause-confusion-san-francisco-airport-officials-push-back-against-oakland-airports-proposed-name-change/, last accessed October 17, 2024.

[20] https://www.8newsnow.com/news/national-news/will-cause-confusion-san-francisco-airport-officials-push-back-against-oakland-airports-proposed-name-change/, last accessed October 17, 2024.

[21] *Scott Declaration*, ¶ 11.

[22] *Scott Declaration*, ¶ 11.

ER-0138

**Table 1. Comparison of Survey Population to State Population**[23]

| State | Butler Survey | | 2023 Census Estimate | |
|---|---|---|---|---|
| | Count | Percent | Count | Percent |
| New York | 137 | 22.6% | 19,571,216 | 13.6% |
| Texas | 104 | 17.1% | 30,503,301 | 21.3% |
| Florida | 81 | 13.3% | 22,610,726 | 15.8% |
| Pennsylvania | 53 | 8.7% | 12,961,683 | 9.0% |
| Ohio | 52 | 8.6% | 11,785,935 | 8.2% |
| Illinois | 43 | 7.1% | 12,549,689 | 8.7% |
| North Carolina | 41 | 6.8% | 10,835,491 | 7.5% |
| Michigan | 37 | 6.1% | 10,037,261 | 7.0% |
| Arizona | 36 | 5.9% | 7,431,344 | 5.2% |
| Louisiana | 19 | 3.1% | 4,573,749 | 3.2% |
| District of Columbia | 4 | 0.7% | 678,972 | 0.5% |
| **Total Respondents** | **607** | **100.0%** | **143,539,367** | **100.0%** |

Source: NERA Airport Survey, May-June 2024; U.S. Census Bureau

18.    Dr. Scott focuses on the extent to which my sample included specific states and, without foundation or evidence, suggests that the results would have been different had I included other areas. At a minimum, Dr. Scott could have examined the rates of confusion for different geographic areas in my sample, but she did not.

19.    As noted above, my survey included consumers who have flown to Oakland International Airport and San Francisco International Airport (as well as other airports in Northern California). In her focus on state of residence, Dr. Scott further ignores the fact that my sample was comprised of a wide variety of travelers, including[24]:

- 59.5 percent men, 40.4 percent women;

- 45.8 percent ages 18 – 34, 41.5 percent ages 35 – 54, 12.7 percent 55 or older;

---

[23] The total 2023 population estimate from the U.S. Census Bureau was 334,914,895. The states included in our sample would have comprised 42.9 percent of the total U.S. population in 2023. See, https://www.statsamerica.org/sip/rank_list.aspx?rank_label=pop1, last accessed October 18, 2024.

[24] NERA Airport Survey, May-June 2024, presented in *Butler Declaration.*

10

**ER-0139**

- Respondents from the Northeast (31.3 percent), the Midwest (21.8 percent), the South (41.0 percent), and the West (5.9 percent).

- Consumers who travel for pleasure (61.4 percent) and those traveling for business and/or business and pleasure (38.3 percent);

- Individuals who would visit a tourist attraction (75.8 percent), rent a car (66.4 percent, or book a hotel room in San Francisco (59.3 percent);

- Infrequent travelers (every 6 months or less, 49.8 percent) and frequent travelers (3 to 4 times a year or more, 49.4 percent);

- Never traveled by air to Northern California (49.6 percent) and those who have traveled by air to Northern California previously (50.4 percent).

20.     Importantly. Dr. Scott ignores the fact that my data demonstrate that confusion rates exceed a net 15 percent for those who have previously traveled to Northern California by air (a net 17.4 percent) and those who are frequent travelers (a net 19.3 percent). These results are shown below in Tables 2 and 3, respectively, and were included in my original report.

**Table 2. Overall Confusion - Respondents Who Have Traveled to Northern California**

| Response | Has Traveled by Air to Northern California | | | | Net Percent |
|---|---|---|---|---|---|
| | Test | | Control | | |
| | Count | Percent | Count | Percent | |
| Confused[1] | 80 | 53.3% | 56 | 35.9% | 17.4% |
| **Total Respondents** | **150** | | **156** | | |

*S16. Have you traveled by air to Northern California in the past?*
*Q1. Where do you think the [San Francisco Bay] Oakland International Airport is located?*

*Q2. Do you think the [San Francisco Bay] Oakland International Airport is...?*
*Q3. Which of the following, if any, is the primary airport serving the San Francisco Bay Area*

Note: [1] Respondents are confused if they indicated San Francisco at Q1 OR selected "The same airport as the San Francisco International Airport" at Q2, OR selected "[San Francisco Bay] Oakland International Airport" at Q3.

Source: NERA Airport Survey, May-June 2024

11

**Table 3. Overall Confusion by Frequency of Travel**

| | Travels by Air '3-4 Times a Year' or More Often | | | | |
| | Test | | Control | | |
| Response | Count | Percent | Count | Percent | Net Percent |
|---|---|---|---|---|---|
| Confused[1] | 85 | 56.7% | 56 | 37.3% | 19.3% |
| **Total Respondents** | **150** | | **150** | | |

*S14. Approximately how often do you travel by air?*
*Q1. Where do you think the [San Francisco Bay] Oakland International Airport is located?*
*Q2. Do you think the [San Francisco Bay] Oakland International Airport is...?*
*Q3. Which of the following, if any, is the primary airport serving the San Francisco Bay Area?*

Note: [1] Respondents are confused if they indicated San Francisco at Q1 OR selected "The same airport as the San Francisco International Airport" at Q2, OR selected "[San Francisco Bay] Oakland International Airport" at Q3.

Source: NERA Airport Survey, May-June 2024

21.     Dr. Scott attempts to mischaracterize my survey population as under-representative by simply focusing on respondents' state of residence. She ignores the data which plainly demonstrate my survey encompassed a broad range of relevant consumers, including more than 50 percent of respondents who have traveled to Northern California by air before and 42.8 percent who have specifically flown into San Francisco International Airport, Oakland International Airport, or both of these airports.

## B.     The Survey Tests Oakland International Airport's Use of "San Francisco Bay Oakland International Airport" in a Real World Setting

22.     Dr. Scott claims my study lacks external validity because it (1) does not replicate how the Southwest or Google Flights pages appear currently; (2) does not allow respondents to look at additional webpages she believes to be relevant; and, (3) is only a test of confusion at one point in time. Dr. Scott's argument is without merit and does not align with the typical standards for establishing a likelihood of confusion. Furthermore, Dr. Scott could have tested some

alternative stimulus (at a different point in time) to evaluate whether there was difference in the rate of confusion, but she did not.

23.     As Dr. Scott herself notes, my survey was conducted within the first "30 days in which the new name was being rolled out to potential consumers."[25] While Dr. Scott suggests this fact undermines the reliability of my data (and it does not),[26] the timing of the survey and the posture of the litigation likely does play a role in how and the extent to which Oakland International Airport's new name appears on particular websites.

24.     As indicated in my initial report, I was hired prior to Oakland International Airport's name change and the survey data were collected between May 9th and June 8th, 2024.[27] At the time of the survey, it was unknown the exact manner in which Oakland International Airport's name would appear in any search or platform.[28] Of course, in general, surveys test consumer perception at a point in time, and while Dr. Scott has alleged the timing of my survey necessarily yields a higher rate of confusion which will decrease over time, she presents no data or evidence to support this conjecture.[29]  In fact, the contrary could easily occur.[30] Dr. Scott could

---

[25] *Scott Declaration*, ¶ 21.

[26] Dr. Scott cites to no authority or literature to support the claim that a likelihood of confusion can only be conducted when some specific or substantial period has passed after infringement.

[27] *Butler Declaration*, Exhibit A, ¶ 20.

[28] I understand that online search results are largely determined by parties other than the San Francisco and Oakland International Airports and likely depend on a variety of individualized factors (including what a consumer has searched for in the past, consumer profile data associated with them or their specific ISP address, etc.). Therefore, it is impossible, without additional evidence, to determine what a typical search would yield or how, given a particular set of searches, Oakland International Airport's new name would appear. While Dr. Scott has conducted eight searches, there is no evidence that her results would be typical or even representative.

[29] For example, Dr. Scott does not present a single respondent in the Control Group who indicated that they are not confused because they "had knowledge and prior experience with the prior airport name." (*Scott Declaration*, ¶ 21). Furthermore, it is entirely unclear why Dr. Scott believes such a response would somehow artificially "depress" confusion as any respondent who is aware of the difference and knows the Oakland International Airport would not, presumably, be confused in the Test Group.

[30] As noted by the Port of Oakland, the use of the name over time will have an impact. "Incorporating "San Francisco Bay" in a name that also maintains the name "Oakland" will, **over time**, increase the visibility of OAK flights when "San Francisco Bay Area" or similar terms are used in consumer online searches, aiding in the overall retention of flights and destinations." Agenda Report.pdf, *emphasis added*.

13

ER-0142

have conducted a survey months after I collected data to evaluate whether in fact, confusion has changed, but she did not.

25. Perhaps more importantly, Dr. Scott's focus on a limited set of search terms and a small set of specific search results is misguided. The survey I designed was not intended to evaluate whether the specific Southwest or Google Flights webpages cause consumers to be confused. Instead, and as was appropriate, the survey was designed to present consumers with a realistic stimulus in which the name San Francisco Bay Oakland International Airport could occur.

26. Dr. Scott seems to suggest that my survey is invalid because Southwest and other airlines serving Oakland International Airport do not currently,[31] and would not use the name San Francisco Bay Oakland International Airport on their websites.[32] As a simple matter, it would obviously be inappropriate to evaluate the extent to which the infringing name causes confusion by testing something *without* the new name. And while Dr. Scott may have been able to identify webpages where the name does not currently appear, her suggestion that carriers and their webpages will not display San Francisco Bay Oakland International Airport stands in contrast to Oakland International Airport's desire to use the name to increase awareness amongst potential customers. Furthermore, Dr. Scott presents no data or evidence to demonstrate that the pages she identifies in her Exhibit 5 are the primary or typical way in which consumers would book flights to the San Francisco Bay Area.

27. Moreover, contrary to Dr. Scott claims, Southwest does use the official airport name (not just the city and airport code) to identify a specific airport when a geographic area has more than one. For example, as shown in Figure 1 below, Southwest uses the airport name to

---

[31] It is entirely possible that the new Oakland International Airport name does not appear given carrier's and other third-party platform's awareness of the current litigation.

[32] *Scott Declaration*, ¶ 14.

14

distinguish *LaGuardia* Airport from the Long Island airport in New York. It also specifically identifies both *Dulles* and *Reagan National* when searching for flights to Washington, DC, and *Midway* and *O'Hare* Airports for flights to Chicago. See Figure 1 below.

**Figure 1. Examples of Southwest Airline's Use of Airport Names[33]**



---

[33] https://www.southwest.com/, last accessed October 21, 2024.

15

**ER-0144**



28.     Therefore, while Dr. Scott may be able to demonstrate that in the first 30 days, with pending litigation, Southwest has not used Oakland International Airport's new name, there is no indication that this will be the case going forward. Further, even assuming Southwest elected to only display the city and call letters, the Test (and Control stimulus) I created for the survey is appropriate for a number of reasons.

29.     Again, as explained above I was not testing whether Southwest, or Google Flights, or any other specific platform, is the cause of consumer confusion. In fact, all aspects of the platform are held constant between the Test and Control groups and the only thing being tested is Oakland International Airport's use of the name San Francisco Bay Oakland International Airport. When I designed and implemented my survey, the name change had only recently been made. Absent the ability to review all of the ways in which the name may be used in the future (for example in promotional materials, in advertisements for flight deals, on travel websites, etc.), I needed to provide consumers with a realistic example of how the new name might appear. Dr. Scott cites to no data or source indicating that a likelihood of confusion survey must test examples of the product or service when it does not use the mark, and she cites no data to demonstrate that

16

Oakland International Airport's new name will *only* ever appear with the full city name and call letters.

30.     Contrary to Dr. Scott's claim that my survey does not fairly represent the "current real world," my survey stimuli was carefully designed to display Oakland International Airport's use of the name in a real-world environment which included the at-issue name, the city, and the airport call letters. Specifically, my survey was designed to replicate real world consumer experiences in the following ways:

     a.   Only consumers who fly Southwest were shown Southwest's page. If a respondent indicated they would use some other airline, they were shown the Google Flights page;

     b.   Southwest lists three airports for a search for "san fran" including San Francisco, Oakland, and San Jose. All three of these airports were shown to respondents in both the Test Group and the Control Group;

     c.   On the second page shown to respondents in the Southwest search, each airport is listed first with the call letters in large font, followed by the city name, and the airport name is listed last;[34]

     d.   Currently, Southwest lists the airport name for the departing flight so it would not be improbable that the airport name would also be listed for the arrival airport.

     e.   As was shown in my survey, the Google Flights page lists the city name and then, if multiple airports, the names of the airports (Google Flights does not list the call letters).

---

[34] Dr. Scott incorrectly asserts that on the Southwest website "all airports only indicated by city names and airport codes." (*Scott Declaration*, ¶ 15). In fact, when there are multiple airports serving one metro area, Southwest always includes the airport name for the departing flight (see NY, DC, Chicago, Tampa, and Miami).

17

**ER-0146**

31.     In addition to the pages I tested, there are a number of other popular search engines that include the full airport name. For example, as shown below in Figure 2, Kayak and Expedia both list the airport name and city.

**Figure 2. Examples of Websites that Use the Airport Name When Booking Flights**

| Kayak[35] | Expedia[36] |
|---|---|
| New York | New York |



---

[35] https://www.kayak.com/, last accessed October 21, 2024.

[36] https://www.expedia.com/, last accessed October 21, 2024.

18



32.     Dr. Scott's assessment of additional webpages dispelling confusion is pure conjecture and is premised on the fact that currently Oakland International Airport's use of the new name does not appear on the additional pages she has captured.[37]

33.     Dr. Scott argues that had consumers been able to study the pages or had they been provided with additional information "it would be obvious that the airports are different."[38] But the survey tests whether consumers believe, based on the name, the San Francisco Bay Oakland International Airport is, or is related to, the San Francisco International Airport. Survey respondents are presented with additional information, including the name of the other airports, the call letters, the city, and the distance to San Francisco (in Google Flights). Dr. Scott assumes

---

[37] For examples of actual confusion, see Plaintiff City and County of San Francisco's Notice of Motion and Motion for Preliminary Injunction Enjoining Defendants; Memorandum of Points and Authorities in Support Thereof, *City and County of San Francisco v. City of Oakland and Port of Oakland*, United States District Court for the Northern District of California, Case No. 3:24-cv-02311-TSH, dated September 17, 2024, pp. 9 – 11.

[38] *Scott Declaration*, ¶ 20.

19

ER-0148

that consumers would necessarily view the two names as representing different locations because there are multiple flights and different call letters but has not tested this theory and presents no consumer evidence to support her claim. Indeed, Dr. Scott presents no evidence that consumers generally refer to airports or make travel plans or reservations by searching airport call letters.[39]

34.    Finally, Dr. Scott seems to suggest that identifying any rate of confusion would be difficult because consumers are "likely to be exposed to many types and sources of information."[40] Of course, consumers seeking to purchase many products or services may be exposed to all sorts of information prior to the survey. The fact that consumers have pre-existing beliefs is, in part, the purpose of the Control Group which can hold constant the extent to these beliefs (as opposed to the new name) are driving confusion. In this case, any respondent who believed that the Oakland International Airport was in San Francisco or is the same airport as San Francisco International Airport prior to the survey or based on some other set of information could indicate this in the Control. Furthermore, my survey tested two different forms of contextual information (Google Flights and Southwest) and included consumers who were more sophisticated in terms of travel frequency and flights to Northern California. In each circumstance (i.e., different stimuli or more "informed" populations), the net rates of confusion exceed 15 percent.

## C.    The Survey Stimuli Are Realistic, Reflect the Marketplace, and Are Correctly Designed to Isolate the Impact of Oakland International Airport's Use of "San Francisco Bay Oakland International Airport"

35.    Dr. Scott again mischaracterizes the survey design as one which is testing Southwest's or Google's platform rather than Oakland International Airport's use of the name San

---

[39] Oakland International Airport has indicated that its new name will ensure its airport appears when consumers search for "San Francisco Bay," not "OAK" or "SFO."

[40] *Scott Declaration*, ¶ 22.

Francisco Bay Oakland International Airport. As stated in my original report, and as readily depicted in the questionnaire, the name for Oakland International Airport (and not any other airport's name) is what the survey is intended to test.

36.    Dr. Scott argues that because the Test stimulus for the first page of the Southwest website included the at-issue name and the other airports listed did not, my survey violates the scientific principle of holding everything constant between the Test and Control groups. But this is precisely what the survey does – in the Test stimuli, the at-issue name is shown (along with the airport call letters) and in the Control stimuli it is not. It appears that Dr. Scott is suggesting that the Test and the Control should have included names for the other airports listed. Even if this were correct (which it is not), the inclusion of these additional names would be held constant between the Test and the Control and therefore any impact would be nullified.[41] Further, Dr. Scott's criticism ignores the fact that respondents are shown a second Southwest page in which the listing for each airport is identical in format. As shown below in Figure 3 (second Southwest page, Test Group), each flight listed includes the call letters, the city, and the airport name.

---

[41] Dr. Scott also suggests that the "highlighting" present on the Southwest page is problematic, but this is how Southwest uses highlighting on its actual site. Further, Dr. Scott hypothesizes that confusion in the control may be "too low" and the word "International" may cause consumers to associate OAK with SFO (*Scott Declaration*, FN 34). Again, Dr. Scott provides no data to support this conjecture. I understand that generally any airport with international flights includes "International" in its name, so it is unclear why consumers who travel by air would be confused by this word alone. Moreover, respondents in the Test and the Control were asked about the "San Francisco Bay Oakland International Airport" or "Oakland International Airport" respectively and therefore any potential confusion created solely by the appearance of the word "International" would be measured in the Control (and netted out of the final confusion estimates).

21

**ER-0150**

**Figure 3. Southwest Webpage Shown to Survey Respondents in Test Group**



37.     Of course, the difference between the first page of the Test and Control in the Southwest stimuli cannot be the element that explains confusion (as Dr. Scott seems to suggest), as the results from the Google Flights page also show confusion. In the Google Flights page, both airports in the Test and the Control include the full airport names (as well as the mileage to the city) and result in a net rate of confusion of 24.3 percent.

38.     Dr. Scott also takes issue with the format of the Google Flights webpage and indicates "For the Google Flights platform, the Butler Survey does not use the actual Google Flights webpages as they currently appear when one enters "San Fran" as the search term."[42] And while Dr. Scott claims she can generate a different set of results for Google Flights, the survey I designed provides a reasonable approximation of how multiple airports located in a similar geographic area appear on this platform.

39.     In designing my survey, I observed that often Google Flights lists airports located in close geographic proximity indented under a subheading, with information about the travel

---

[42] *Scott Declaration*, ¶ 16.

distance to the intended destination. For example, as shown below in Figure 4, when searching for a flight to New York, Google lists three airports under a subheading for "New York" (John F. Kennedy International Airport, LaGuardia Airport, and Newark Liberty International Airport). Notably, Newark Liberty International Airport, which is located in the state of New Jersey, is listed under the "New York" heading.

**Figure 4. Google Flight Search Result for "New York"[43]**



40.     There are a number of similar examples on Google Flights, including a search for "Washington" (shown below in Figure 5) which provides options for Ronald Reagan Washington National Airport and Dulles International Airport (both located in Virginia), and Baltimore/Washington International Thurgood Marshall Airport (located in Maryland).[44]

---

[43] https://www.google.com/travel/flights, last accessed October 21, 2024.

[44] Additional examples can be found in **Exhibit C**.

**Figure 5. Google Flight Search Results for "Washington"**



41.     In her report, Dr. Scott provides an example in which the Oakland airport (using the new name) appears after a Google search for "San Francisco."[45] Notably, conducting this same search now no longer shows the Oakland airport in any format, so it is unclear why Dr. Scott's search yielded the particular results it did, or how her results are typical if they no longer appear. In fact, the variability in how these search results appear demonstrates again why the correct test in this matter is not an evaluation of a particular platform or set of search results, but is a test which presents Oakland International Airport's use of the name "San Francisco Bay Oakland International Airport" in a realistic manner.

---

[45] Dr. Scott's example demonstrates that Google Flights would use the full airport name ("San Francisco Bay Oakland International Airport"), not just the city and airport code the airport, and that the Oakland airport listing would occur *side by side* with the San Francisco airport listing. This is consistent with what was tested in my survey.

ER-0153

42.     Dr. Scott seems to argue that not indenting the Oakland airport result and referencing "Alameda County" would dispel any potential confusion for respondents shown the Google Flights results page. First, Dr. Scott has not presented any examples from my data in which respondents indicate that the airport shown is located in the *county* of San Francisco. Further, Dr. Scott assumes that some set of consumers would know the county of each airport and including this information would provide necessary clarity.[46] Dr. Scott has no data to support this assertion and provides no indication as to why a county name would help travelers (particularly those who may be unfamiliar with the specific counties of the Bay Area) distinguish between Oakland International Airport and San Francisco International Airport or why this information would help consumers identify the actual San Francisco Airport.

### D.     The Survey Questions Appropriately Measure Potential Confusion Associated with Oakland International Airport's Use of "San Francisco Bay Oakland International Airport"

43.     Dr. Scott asserts that Question 3 in my survey, "Which of the following, if any, is the primary airport serving the San Francisco Bay Area?" is unreliable because it is "not directly related to the question of whether consumers would believe that they would be flying into the City of San Francisco or into SFO when they would actually be flying into Oakland if they chose the San Francisco Bay Oakland International Airport."[47] Of course, where the airport is located and whether consumers believe San Francisco Bay Oakland International Airport is the San Francisco Airport are addressed by Questions 1 and 2 of my survey. As noted in my original report, if I calculate confusion solely on these two questions, the net rate of confusion is 18.5 percent.[48]

---

[46] *Scott Declaration*, ¶ 34.

[47] *Scott Declaration*, ¶ 36.

[48] *Butler Declaration*, FN 49.

25

ER-0154

44.     Again, Dr. Scott offers completely unsupported conjectures as to how consumers may alternatively interpret "primary," including believing this term references the "most centrally located airport in the San Francisco Bay Area or the airport serving the largest portion of the entire San Francisco."[49] Dr. Scott entirely misses the point with this criticism. Any respondent selecting the airport listed as "primary" because they believe Oakland International Airport is centrally located or serves more local residents would indicate this response in the Control Group and would therefore be netted out of the confusion estimate. In other words, the question performs exactly as intended and measures the extent to which the name "San Francisco Bay Oakland International Airport" causes consumers to believe that this is the main or primary airport in Northern California. Responses based on pre-existing understandings or conceptions about which airport (San Francisco International Airport or Oakland International Airport) is primary are measured by the Control and are subtracted from the overall confusion estimate.

45.     Dr. Scott also suggests Question 3 is problematic because it is only asked of respondents who did not indicate that the San Francisco International Airport and San Francisco Bay Oakland International Airport are the same. While Dr. Scott suggests that I have speculated about consumer perceptions, this is not the case. In fact, my data demonstrate there are respondents who answer "unsure" in Q2 (whether San Francisco International Airport and San Francisco Bay Oakland International Airport are the same) who later indicate at Q3 that they believe San Francisco Bay Oakland International Airport is the primary airport.[50]

46.     Finally, Dr. Scott asserts that she can recalculate confusion based solely on the responses to Q1 and demonstrate that there is no confusion, but this is a wholly unreliable

---

[49] *Scott Declaration*, ¶ 36.

[50] See for example, Respondents 2239, 4122, 8945, 9906, 11488, 11788, 15565, 15759, and 21036.

26

analysis.[51] First, Dr. Scott incorrectly limits her recoding exercise to only the responses to the Google Flights stimulus, despite having no evidence that this presentation is the sole manner in which San Francisco Bay Oakland International Airport would appear. Moreover, simply relying on open-ended responses is problematic as the verbatim answers provided by respondents in Q1 are often not specific enough to determine precisely where they believe the airport is located.[52] For example, some respondents offer answers like "California" or "San Francisco Bay." One cannot determine that such respondents are not confused based on broad or vague answers.

47.    As noted in my original report, I conservatively coded the open-ended responses such that "only respondents who specifically stated that the airport was located in "San Francisco" were counted. Respondents who indicated the airport was located **near** San Francisco, or near the San Francisco Bay Area were categorized as 'Other.'"[53] While this yields a net rate of confusion of 9.4 percent, it underrepresents that actual rate of confusion because respondents who offered imprecise or broader descriptions were not counted. As shown in Table 4 below, there are many respondents who could have been confused at Q1 but were not counted as such because I had additional questions which allowed me to more precisely interpret their understandings. All of the respondents in Table 4 below were not counted as confused in my analysis of Q1 (and presumably

---

[51] Dr. Scott indicated that the coding scheme for Q1 was not produced. These data were not requested by counsel or Dr. Scott, and I have provided them as **Exhibit D**.

[52] "Open-ended and closed-ended questions may elicit very different responses. Most responses are less likely to be volunteered by respondents who are asked an open-ended question…" Diamond, S. S. (2011). "Reference Guide on Survey Research," Reference Manual on Scientific Evidence, Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council, pp. 359-423 at p. 392. See also, Bernstein, D.H. and Keller, B. P. (2022). "Survey Evidence in False Advertising Cases," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Second Edition*, edited by Diamond, S. S., and Swann, J. B., pp. 187-235 at p. 222; "Open-ended questions are appropriate to gauge consumers' initial reaction… but they may be insufficient to evaluate reactions to more specific or secondary messages, even if consumers generally perceive those messages."

[53] *Butler Declaration*, FN 48.

27

**ER-0156**

would not have been counted by Dr. Scott) but indicated that they believed San Francisco Bay Oakland International Airport is the same airport as SFO in the subsequent question.

**Table 4. Examples of Test Group Respondents Not Coded as "Confused" at Q1, But Who Indicated Confusion at Q2**

| Respondent ID | Stimulus Shown | Response at Q1 |
|---|---|---|
| 107 | Southwest | It is in San Francisco Oakland area |
| 2743 | Google Flights | in San Francisco, maybe just outside the city in between SF and Oakland |
| 2847 | Google Flights | Its located at the east of San Francisco. |
| 7883 | Google Flights | Just south of San Francisco off route 101 |
| 9845 | Google Flights | Near to the downtown |
| 10775 | Google Flights | Just outside of SF city |
| 11446 | Google Flights | south of san francisco |
| 11508 | Southwest | near san francisco bay area |
| 11691 | Southwest | San Francisco area airport |
| 11750 | Google Flights | North of the town |
| 19546 | Southwest | san Mateo county, california |

48.    Dr. Scott's "recoding" exercise is improperly limited to one stimulus (Google Flights) and relies wholly on coding that omits respondents who provide evidence of confusion in later questions. Unlike the analysis I conducted, Dr. Scott simply assumes that any respondent who indicated anything other than "San Francisco" (including those who said things like "San Francisco Bay" or "Northern California" or even "I'm not quite sure") would not be counted as confused. This is not an informative or reliable analysis.

## V.    CONCLUSIONS

49.    In total, Dr. Scott has offered a series of criticisms that mischaracterize and misrepresent the sample and survey I designed. Further, she offers a series of hypothetical conjectures about how some other set of consumers might respond to some other set of stimuli with some other set of questions. But Dr. Scott has not designed a survey or tested any of her

28

**ER-0157**

claims and provides no data, survey or otherwise, to support her assertions. Dr. Scott's criticisms about the relevant population of interest contradict numerous statements made by Oakland International Airport. Moreover, Dr. Scott ignores survey data that contradict her assumptions, including data demonstrating that: (1) consumers who travel frequently by air and those who have traveled by air to Northern California previously are also confused by the name; (2) consumers are confused regardless of whether the call letters are present or the airport's distance from San Francisco is provided; (3) and consumers are confused when asked where the airport is located and whether the San Francisco Bay Oakland International Airport is the San Francisco International Airport. My survey of 607 relevant consumers who have or are likely to fly to Northern California in the next year demonstrates that there is a substantial likelihood of confusion created by the name "San Francisco Bay Oakland International Airport," and consumers are likely to believe this airport is located in San Francisco, is the San Francisco International Airport, or is the primary airport serving San Francisco.

50.     My opinions and conclusions as expressed in this report are to a reasonable degree of professional and scientific certainty. My conclusions have been reached through the proper application of survey methods, and using standard methodologies relied upon by experts in the field of survey and market and consumer research. My opinions will continue to be informed by any additional material that becomes available to me. I reserve the right to update and or supplement my opinions if provided with additional information. I declare under penalty of perjury that the foregoing is true and correct.

_____

Sarah Butler, Senior Managing Director
October 22, 2024

# Exhibit A

ER-0159

**NERA**
Economic Consulting

**Sarah Butler**
Senior Managing Director

National Economic Research Associates, Inc
4 Embarcadero, Suite 400
San Francisco, CA 94111
+ 1 415 291 1000 Fax + 1 415 291 1010
Direct dial: + 1 415 291 1022
sarah.butler@nera.com
www.nera.com

# SARAH BUTLER, M.A.
## SENIOR MANAGING DIRECTOR

Ms. Butler is an expert in survey research, market research, sampling, and statistical analysis. She has applied her expertise in a wide range of litigation and strategic business cases. Her litigation and project experience includes survey research, market research, the design of samples, and the statistical and demographic analysis of large data files in a number of areas including:

Intellectual Property

- Trademark and Trade Dress Infringement: Design, analysis, and critique of surveys used to measure consumer confusion, secondary meaning, and dilution in trademark and trade design infringement cases.

- False and Misleading Advertising: Design, analysis and critique of surveys used to measure consumer perceptions and the materiality of advertising claims.

- Patent Infringement: Sample designs and surveys to the value of patented feature of a larger product and to establish rates at which infringing material exist in populations of products.

- Copyright infringement: Sampling plans and analysis of the rates of infringing material in populations of shared information (such as through websites or other sharing medium).

Mass Torts/Class Actions

- Conduct surveys and design samples providing evidence on issues of commonality and consumers' awareness of key documents or facts and reliance on representations.

- Analyze large databases of claims files to generate invoices, estimate future liabilities and calculate policy shares for insurer liabilities in asbestos, tobacco and pharmaceuticals.

- Design, analyze and critique surveys and sampling plans used to evaluate employment and promotion records. Review and design surveys for purposes of estimating key facts in labor

Sarah Butler

class actions including time to complete activities, exempt/nonexempt activities, and meal and rest break issues.

Antitrust

- Design, analysis and critique of surveys and other market research used as evidence of consumer purchasing and switching behavior in the areas of CPG, entertainment, automobiles, public transportation, sports and consumer electronics.

- Design, analysis and critique of surveys used to demonstrate consumer price sensitivities and willingness to pay.

Prior to joining NERA, Ms. Butler worked in market research, conducting survey research, focus groups and in-depth interviews.

## Education

**Temple University**
Applied Sociology, coursework, exams and dissertation proposal complete (2005).

**Temple University**
M.A. Sociology, (2000).

**Trinity College, Dublin Ireland**
M.Phil. (1997).

**Wellesley College**
B.A. Sociology and History (with honors). (1995).

## Professional Experience

July 2006 - Present      **Senior Consultant – Senior Managing Director**
NERA Economic Consulting
San Francisco, California, USA

Oct 2005 – May 2006      **Special Consultant**
NERA Economic Consulting
London, England

Jan 2003 – Oct 2005      **Senior Analyst - Consultant**
NERA Economic Consulting
Philadelphia, Pennsylvania, USA

Sarah Butler

| | |
|---|---|
| 2002 - 2003 | **Consultant**<br>Integrated Marketing Associates<br>Bryn Mawr, PA, USA |
| Oct 1998 - Jan 2002 | **Research Associate – Analyst**<br>NERA Economic Consulting<br>Philadelphia, Pennsylvania, USA |
| Sept 1998 – May 2003 | **Adjunct Professor**<br>Temple University<br>Philadelphia, Pennsylvania, USA |
| Jan 1997 – Feb 1998 | **Manager of Member Research**<br>Society for Neuroscience<br>Washington DC, USA |

## Expert Analysis and Testimony

<u>2024</u>

*Intellectual Property Matters*

<u>City and County of San Francisco* v. City of Oakland, and Port of Oakland.</u> United States District Court Northern District of California. *Expert Report.*

<u>Fluidmaster, Inc., v Danco, Inc.</u>* United States District Court Northern District of Texas Dallas Division. *Rebuttal Report.*

<u>In the Matter of H&R Block, Inc., HRB Digital LLC, HRB Tax Groups, Inc.</u> United States Federal Trade Commission, Washington DC. *Expert Report. Rebuttal Report. Deposition.*

<u>Punchbowl, Inc. v. AJ Press LLC.</u>* United States District Court Central District of California. *Expert Report.*

<u>SharkNinja Operating LLC and SharkNinja Sales Company v. Dyson Inc. and Dyson Technology Limited.</u>* United States District Court District of Massachusetts. *Expert Report. Deposition.*

<u>Applied Innovation, Inc. v. Lowery Corporation DBA Applied Innovation.</u>* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report.*

<u>Puma SE v. Zhang Kang.</u>* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report.*

Sarah Butler

<u>Headwater Research LLC v. Samsung Electronics Co. Ltd. and Samsung Electronics America, Inc.</u>* United States District Court Eastern District of Texas Marshall Division. *Rebuttal Report. Deposition.*

<u>CoStar Group, Inc. and Costar Realty Information, Inc.* v. Commercial Real Estate Exchange, Inc.</u> United States District Court Central District of California. *Rebuttal Report. Deposition.*

<u>Motiv Power Systems, Inc. v. Motive Technologies Inc.</u>* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report. Reply Report.*

<u>WEX Inc.* v. HP Inc. and Hewlett-Packard Development Company, L.P.</u> United States District Court District of Maine. *Declaration. Rebuttal Declaration.*

<u>Proximo Spirits, Inc.* v. Green Lake Brewing Co., LLC d/b/a Fremont Brewing Co,; and Does 1-10, inclusive.</u> United States District Court Central District of California, Western Division. *Expert Report.*

<u>Gesture Technology Partners, LLC v. Motorola Mobility LLC.</u>* United States District Court Northern District of Illinois, Eastern Division. *Rebuttal Report.*

<u>General Access Solutions, Ltd. v. Verizon Communications, Inc. et al.</u>* United States District Court Eastern District of Texas, Marshall Division. *Expert Report. Deposition.*

<u>Benefit Cosmetics, LLC v. e.l.f. Cosmetics, Inc.</u>* United States District Court Northern District of California, San Francisco Division. *Expert Report. Reply Report. Deposition. Trial Testimony.*

<u>Corephotonics, LTD v. Apple Inc.</u>* United States District Court Northern District of California. *Rebuttal Report. Deposition.*

<u>Nutramax Laboratories, Inc. and Nutramax Laboratories Veterinary Sciences, Inc. v. Zesty Paws LLC and Health and Happiness (H&H) US International Incorporated.</u>* United States District Court Middle District of Florida, Orlando Division. *Expert Report. Deposition. P.I. Testimony.*

<u>Blue Yonder Group, Inc.* v. Kinaxis Inc. and Kinaxis Corp.</u> United States District Court Northern District of Texas, Dallas Division. *Expert Report.*

<u>Puma SE, and Puma North America Inc. v. Brooks Sports, Inc.</u>* United States District Court Southern District of Indiana, Indianapolis Division. *Expert Report. Deposition.*

*Class Action Matters*

<u>Veronica Shirley, individually and on behalf of all others similarly situated v. Reynolds Consumer Products LLC.*</u> United States District Court Northern District of California. *Expert Report. Rebuttal Report.*

4

Sarah Butler

Tanysha Newman, individually and on behalf of all others similarly situated v. Bayer Corporation and Bayer Healthcare LLC.* United States District Court for the Southern District of New York. *Expert Report. Rebuttal Report. Deposition.*

Clark Alexandre, individually and on behalf of all others similarly situated v. Alcon Laboratories, Inc.* United States District Court for the Southern District of New York, White Plains Courthouse. *Expert Report.*

Jeffrey Albert Sjobring, on behalf of himself and all others similarly situated* v. First American Title Insurance Company, First American Title Company, and Does 1 – 500. Superior Court of the State of California in and for the County of Los Angeles. *Declaration. Deposition.*

Claudia Newton and Brandy Leandro v. R.C. Bigelow, Inc., and Does 1 through 10.* United States District Court Eastern District of New York. *Rebuttal Report.*

Miguel Frias, Jessica Avilez, and Roy Campbell, individually and behalf of all others similarly situated v. Mars Wrigley Confectionary US LLC.* United States District Court Southern District of New York. *Rebuttal Report.*

In RE: Marriott International Inc., Customer Data Security Breach Litigation. City of Chicago* v. Marriott International, Inc. and Starwood Hotels & Resorts Worldwide, LLC. United States District Court for the District of Maryland, Southern Division. *Expert Report. Rebuttal Report. Deposition.*

Edward Pistorio et al. v. FCA US LLC.* United States District Court Eastern District of Michigan. *Expert Report. Deposition.*

Cat Brooks and Rasheed Shabazz, individually and on behalf of all others similarly situated* v. Thompson Reuters Corporation. United States District Court for the Northern District of California, San Francisco Division. *Expert Report.*

Nicholas Usler, et al., v. Vital Farms, Inc., et al.* United States District Court for the Western District of Texas. *Expert Report.*

William Lessin and Carol Smalley et al., on behalf of themselves and all others similarly situated v. Ford Motor Company, a Delaware corporation; and Does 1 through 10 inclusive.* United States District Court, Southern District of California. *Expert Report. Deposition.*

*Other Matters*

Megan White, Jeronimo Aguilar, Loren Wayne Kidd, Lyric Nash, Nicollette Jones, and Odette Zapata* v. Sacramento Police Department; The City of Sacramento; Daniel Hahn, and Does 1 – 200 (the names and numbers of which are currently unknown). United States District Court, Eastern District of California, Sacramento Division. *Expert Report.*

Sarah Butler

2023

*Intellectual Property Matters*

SpaceTime3D, Inc. v. Apple Inc.* United States District Court Western District of Texas, Austin Division. *Expert Report. Deposition.*

PWNHealth, LLC d/b/a Everly Health Solutions v. Walgreen Co.* American Arbitration Association Case No. 01-22-0002-4919. *Rebuttal Report. Arbitration Testimony.*

Evolve Biosystems, Inc.; and the Regents of the University of California, a corporation* v. Abbott Laboratories. United States District Court for the Northern District of Illinois, Eastern Division. *Expert Report. Deposition.*

Lincare Holdings Inc. and Lincare Licensing Inc.* v. Doxo, Inc. United States District Court for the Middle District of Florida Tampa Division. *Expert Report. Deposition. Reply Report.*

Revelry Vintners, LLC, v. Mackay Restaurant Management Group, Inc., Fire & Vine Holdings, LLC, and Yellowhawk Resort WW, LLC.* United States District Court Eastern District of Washington at Spokane. *Rebuttal Report.*

Macy's IP Holdings, LLC,* v. Aroma360, LLC. United States District Court Southern District of New York. *Expert Report. Reply Report.*

Vans, Inc. and VF Outdoor, LLC, v. Walmart, Inc., The Doll Maker, LLC, and Trendy Trading, LLC.* United States District Court Central District Of California. *Rebuttal Report. Deposition.*

Smack Apparel Company v. Seattle Hockey Partners, LLC (dba Seattle Kraken), NHL Enterprises, LP, and National Hockey League.* United States District Court Western District of Washington. *Expert Report.*

Nike, Inc. v. StockX LLC.* United States District Court Southern District of New York. *Rebuttal Report. Deposition.*

Casa Tradición S.A. de C.V. v. Casa Azul Spirits, LLC.* United States District Court Southern District of Texas, Houston Division. *Rebuttal Report. Deposition. Trial Testimony.*

Tari Labs, LLC v. Lightning Labs, Inc.* United States District Court Northern District of California, San Francisco Division. *Expert Report.*

Edible IP, LLC and Edible Arrangements LLC* v. 1-800-Flowers.com, Inc. and 800-Flowers, Inc. United States District Court Northern District of Georgia Atlanta Division. *Expert Report. Rebuttal Report. Deposition.*

GOLO, LLC* v. Goli Nutrition Inc. United States District Court District of Delaware. *Expert Report. Reply Report. Deposition. Trial Testimony.*

Sarah Butler

NetEase, Inc., NetEase Information Technology Corporation, and Hong Kong NetEase Interactive Entertainment Limited, v. Krafton, Inc. and PUBG Santa Monica, Inc.* Superior Court of California, County of Alameda. *Expert Report. Reply Report. Deposition. Trial Testimony.*

*Class Action Matters*

Tamika Miller and Julianne Chuanroong, individually and on behalf of themselves, the general public, and those similarly situated, v. Travel Guard Group, Inc., AIG Travel, Inc., And National Union Fire Insurance Company of Pittsburgh, PA.* United States District Court for the Northern District of California. *Expert Report. Reply Declaration. Deposition.*

Bruce Puterbaugh v. Oorah, Inc,; Kars4Kids, LLC (Erroneously Sued Herein as Kars4Kids and J.O.Y. of Our Youth) and DOES 1-50.* United States District Court for the Central District of California. *Expert Report. Rebuttal Report. Deposition.*

Tammy La Barbera v. Olé Mexican Foods, Inc.* United States District Court for the Central District of California. *Rebuttal Report. Deposition.*

Tamara Moore, Greta Ervin, Raff Arando, Nichols Smith, Renee Edgren, and Cynthia Welton, on behalf of themselves and all others similarly situated, v. Mars Petcare US, Inc, Hill's Pet Nutrition, Inc., and Royal Canin USA, Inc.* United States District Court for the Northern District of California. *Expert Report.*

Tiffany Coleman, Keli Swann, and Heather Brooke, individually and on behalf of all others similarly situated, v. Britax Child Safety Inc.* United States District Court of South Carolina, Rock Hill Division. *Expert Report. Deposition.*

William Rushing and Elizabeth Perlin, individually and on behalf of all others similarly situated, v. Williams-Sonoma, Inc.* United States District Court for the Northern District of California, San Francisco Division. *Expert Report. Reply Report.*

Kevin Shenkman v. Tesla, Inc. and DOES 1 to 50, inclusive.* Superior Court of California, County of Alameda. *Expert Report. Deposition.*

*Other Matters*

Apple Inc.* v.  Masimo Corporation and Sound United, LLC; Ceracor Laboratories, Inc. United States District Court for the District of Delaware. *Rebuttal Report. Deposition.*

Hawaii Foodservice Alliance, LLC v. Meadow Gold Dairies Hawaii, LLC, Hollandia Dairy, Inc., Heritage Distributing Company (dba Ninth Avenue Foods), and Saputo Dairy Foods USA, LLC.* United States District Court for the District of Hawaii. *Rebuttal Report. Deposition.*

Moxie Pest Control* v. Kyle Nielsen, et.al. United States District Court for the District of Utah, Central Division. *Expert Report. Reply Report. Deposition.*

Sarah Butler

AliveCor, Inc. v. Apple Inc.* United States District Court Northern District of California. *Expert Report. Deposition.*

2022

*Intellectual Property Matters*

Sports Marketing Monterrey Group, LLC* v. Socios Services US Inc., and Mediarex Enterprises Limited. United States District Court for the Northern District of California, San Francisco Division. *Declaration. Reply Declaration.*

Xerox Corporation (USA) v. Fujifilm Business Innovation Corp. (formerly known as Fuji Xerox Co., Ltd.) (Japan).* International Court of Arbitration of the International Chamber of Commerce. *Expert Report.*

F21 OPCO, LLC* v. AIRWAIR INTERNATIONAL LTD. United States District Court for the Central District of California, Western Division. *Expert Report. Rebuttal Report. Deposition.*

Florida Virtual School v. K12 Inc., and K12 Florida LLC.* United States District Court Middle District of Florida Orlando Division. *Expert Report. Deposition.*

ImprimisRX, LLC* v OSRX, Inc.; Ocular Science, Inc., United States District Court Southern District of California. *Expert Report. Deposition.*

WSOU Investments, LLC d/b/a Brazos Licensing and Development v. Dell Technologies, Inc., Dell Inc., and EMC Corporation.* (Case No. 6:20-cv-473-ADA). United States District Court Western District of Texas Waco Division. *Expert Report. Deposition.*

Bluebonnet Internet Media Services, LLC* v. Pandora Media, LLC. United States District Court Western District of Texas Waco Division. *Expert Report.*

In re Application of Wine.com LLC.* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report.*

Bilt Technologies, Inc. v. BILT, Inc.* United States District Court for The Southern District of New York. *Expert Report. Rebuttal Report. Deposition.*

Sazerac Brands, LLC* v. Eagle Trace Brewing Company LLC. United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report.*

UV RML NL ASSETS LLC* v. Coulter Ventures LLC. United States District Court Central District of California. *Expert Report. Rebuttal Report.*

Tortilla Factory, LLC v. GT's Living Foods, LLC.* United States District Court for The Central District of California. *Expert Report. Trial Testimony.*

8

Sarah Butler

Sazerac Brands, LLC* v. Buffalo City Distillery, LLC. United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report. Deposition.*

Thrive Natural Care, Inc. v. Le-Vel Brands, LLC.* United States District Court Central District of California, Southern Division. *Expert Report. Deposition.*

Crystal Lagoons U.S. Corp and Crystal Lagoons Technologies, Inc. v. Desert Color Manager LLC, Desert Color St. George LLC, AJ Construction, Inc., Cole West Home LLC, Holmes Homes, Inc., Sullivan Homes LLC, and Pacific Aquascape International, Inc.* United States District Court District of Utah, Central Division. *Expert Report.*

Sazerac Brands, LLC,* v. Buffalo Chip Campground, LLC. United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report.*

Nichino America, Inc., v. Valent U.S.A., LLC.* United States District Court District of Delaware. *Expert Report. Reply Report. Deposition.*

Promotion in Motion Inc.,* v. The J.M. Smucker Company. United States District Court District of New Jersey. *Rebuttal Report.*

Chartwell Studio Inc., v. Team Impressions, Inc., and The Peel People, LLC.* United States District Court Northern District of Illinois Eastern Division. *Rebuttal Report. Deposition.*

Brooks Sports, Inc.* v. SPARC Group, LLC, Authentic Brands Group LLC, BB IPCO, LLC, BB OPCO, LLC., Simon Property Group, Inc., Simon Property Group, L.P. United States District Court Western District of Washington at Seattle. *Expert Report.*

Shanghai Zhenglang Technology Co., Ltd,* v. Mengku Technology Co., Ltd, and Qianan Li. United States District Court Eastern District Of New York. *Rebuttal Report.*

Harman International Industries, Inc.,* v. Jem Accessories, Inc. United States District Court for the Central District of California. *Expert Report.*

PepsiCo* v. Rockstar Industries, LLC. United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report.*

EBIN New York v. SIC Enterprise, Inc.* United States District Court Eastern District of New York. *Expert Report. Rebuttal Report. Deposition.*

Aqua Connect, Inc. and Strategic Technology Partners, LLC. v. TeamViewer US, LLC.* United States District Court District of Delaware. *Expert Report. Deposition. Trial Testimony.*

R80 LLC* v. Société des Produits Nestlé S.A., et al. United States District Court District of Maryland Southern Division. *Expert Report. Rebuttal Report.*

9

Sarah Butler

H&R Block, Inc.,* and HRB Innovations, Inc. v. Block, Inc. United States District Court Western District of Missouri. *Rebuttal Declaration. Reply Declaration. Expert Report.*

Vans, Inc. and VF Outdoor, LLC v. Walmart, Inc., The Doll Maker, Inc., and Trendy Trading, LLC.* United States District Court Central District of California Southern Division. *Declaration.*

Warner Bros. Entertainment Inc. v. Brian Biggs, Dawn Biggs, and Random Tuesday, Inc. *et al.*\* United States District Court Central District of California. *Expert Report. Deposition.*

*Class Action Matters*

Ann Kenney, individually v. Fruit of the Earth, Inc., CVS Pharmacy, Inc.* United States District Court Southern District of California. *Expert Report.*

Holly Blaine Vanzant, and Sherry Nevius, on behalf of themselves and all others similarly situated v. Hill's Pet Nutrition, Inc. and PetSmart, LLC.* United States District Court for the Northern District of Illinois. *Expert Report. Deposition.*

In re: National Football League Sunday Ticket Antitrust Litigation. United States District Court Central District of California. *Expert Report. Deposition. Rebuttal Report. Expert Report. Rebuttal Report. Deposition.*

Kimberly Banks and Carol Cantwell v. R.C. Bigelow, Inc., and Does 1 through 10.* United States District Court Central District of California. *Rebuttal Report. Deposition.*

Mocha Gunaratna and Renee Camenforte v. Dr. Dennis Gross Skincare, LLC.* United States District Court Central District of California. *Expert Report. Deposition.*

Paul Orshan, Christopher Endara, David Henderson, and Steven Neocleous, v. Apple Inc.* United States District Court Northern District of California. *Expert Report. Deposition.*

Elizabeth Maisel v. S. C. Johnson, Inc.* United States District Court Northern District of California. *Expert Report.*

*Other Matters*

United States ex rel. Terrence Barrett, and on behalf of various States* v. Allergan, Inc. United States District Court Central District of California. *Expert Report.*

Sarah Butler

2021

*Intellectual Property Matters*

Power Home Remodeling Group, LLC* v. Power Home Solar LLC d/b/a Powerhome Solar, also d/b/a Powerhome Solar & Roofing, also d/b/a Power Home Solar and Roofing. United States District Court Eastern District of Pennsylvania. *Expert Report.*

Honda Motor Co., LTD., v. Microsoft Corporation.* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report.*

Kaifi LLC v. T-Mobile US, Inc.; LAYER3 TV, Inc.; L3TV Dallas Cable System, LLC; METROPCS Texas, LLC; T-Mobile License LLC; T-Mobile USA, INC.; T-Mobile West LLC; T-Mobile West Tower LLC; IBSV LLC; Theory Mobile, Inc.; T-Mobile PCS Holdings LLC; T-Mobile Resources Corporation; and T-Mobile Subsidiary IV Corporation.* United States District Court Eastern District of Texas Marshall Division. *Expert Report. Deposition.*

Premier Specialty Brands LLC, d/b/a Kamado Joe v. Dansons US, LLC and Dansons, Inc. d/b/a Louisiana Grills.* United States District Court for the Northern District of Atlanta, Georgia Division. *Expert Report. Deposition.*

Crocs, Inc.* v. Effervescent, Inc. et. al. United States District Court for the District of Colorado. *Expert Report. Deposition.*

Theia Technologies LLC v. Theia Group, Inc. and Theia Holdings A, Inc.* United States District Court for the Eastern District of Pennsylvania. *Expert Report.*

Lambda Labs, Inc.* v. Lambda Inc.* United States District Court for the Northern District of California Oakland Division. *Expert Report.*

Storage Cap Management LP* v. Robarco, Inc. and SpareSpace Storage, LLC. United States District Court for the Southern District of Ohio Eastern Division. *Expert Report. Deposition.*

Clear Imaging Research, LLC v. Samsung Electronics Co. LTD and Samsung Electronics America.* *Expert Report. Deposition.*

Patagonia, Inc. and Patagonia Provisions, Inc. v. Anheuser-Busch, LLC dba Patagonia Brewing Co.* United States District Court for the Central District of California Western Division, Los Angeles. *Expert Report.*

In the Matter of Certain Audio Players and Controllers, Components Thereof, and Products Containing the Same. United States International Trade Commission, Washington DC. *Expert Report. Deposition. Trial Testimony.*

Vivint Inc.* v. Alarm.com. United States District Court for the District of Utah. *Expert Report. Deposition.*

Sarah Butler

*Class Action Matters*

Kristen Schertzer, Meagan Hicks, Brittany Covell* v. Bank of America, N.A., Cardtronics, Inc., FCTI, Inc., Cash Depot, Ltd. And DOES 1-50. United States District Court Southern District of California. *Expert Report. Deposition.*

Warren Gross, Deborah Levin, Shelby Cooper, and Edward Buchannan v. Vilore Foods Company, Inc., Arizona Canning Company, LLC.* United States District Court Southern District of California. *Expert Report. Rebuttal Report. Deposition.*

Scott and Rhonda Burnett, Ryan Hendrickson, Jerod Breit, Scott Trupiano, and Jeremy Keel v. The National Association of Realtors, Realogy Holdings Corp., Homeservices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, Re/Max LLC, and Keller Williams Realty, Inc.* United States District Court for the Western District of Missouri, Western Division. *Expert Report.*

In re: Marriott International, Inc., Customer Data Security Breach Litigation. United States District Court of Maryland, Southern Division. *Expert Report. Deposition.*

Christopher Julian et. al. v. TTE Technology, Inc., dba TCL North America.* United States District Court for the Northern District of California. *Expert Report.*

Kaylan Morris, et. al. v. Walmart Inc., f/k/a/ Wal-mart Stores Inc.* United States District Court, Northern District of Alabama, Southern Division. *Expert Report. Deposition. Class Certification Testimony.*

Ricardo R. Garcia, Duane K. Glover, Paul E. Jacobson, Gaetano Calise, Mykhalo I. Holovatyuk, Brian Garcia, Paul Thompson, and David Hartman* v. Volkswagen Group of America, Inc. a/k/a Audi of America, Inc. and Volkswagen Aktiengesellschaff. United States District Court for the Eastern District of Virginia, Alexandria Division. *Expert Report. Deposition.*

Charles Tillage and Joseph Loomis* v. Comcast Corporation and Comcast Cable Communications, LLC and Does 1-20. United States District Court for the Northern District of California, San Francisco Division. *Expert Report.*

Kathleen Ryan-Blaufuss, Cathleen Mills, and Khek Kuan v. Toyota Motor Corporation, Toyota Motor Sales, U.S.A., INC., and DOE Defendants 1-10.* United States District Court for the Central District of California, Western Division. *Expert Report. Deposition.*

H. Cristina Chen-Oster, Shanna Orlich, Allison Gamba, and Mary De Luis* v. Goldman Sachs & Co. and The Goldman Sachs Group, Inc. United States District Court for the Southern District of New York. *Expert Report. Deposition.*

Michael Testone, Collin Shanks, and Lamartine Pierre, et. al., v. Barlean's Organic Oils, LLC.* United States District Court Southern District of California. *Expert Report. Deposition.*

Sarah Butler

Susan Wang Rene Lee v. StubHub, Inc.* Superior Court of the State of California for the County of San Francisco. *Expert Report.*

Michael Madea and Rick Smith, et. al, v. Kennedy Endeavors, Inc.* United States District Court for the District of Hawai'i. *Expert Report. Deposition.*

Shelly Benson and Lisa Caparelli, et. al, v. Newell Brands, Inc.* United States District Court for the Northern District of Illinois. *Expert Report. Deposition.*

Thomas Bailey, et. al, v. Rite Aid Corporation.* United States District Court for the Northern District of California. *Expert Report. Deposition.*

2020

*Intellectual Property Matters*

What A Smoke, LLC v. Duracell U.S. Operations, Inc.* United States District Court District of New Jersey. *Expert Report. Deposition.*

Nirvana LLC v. Marc Jacobs International LLC.* United States District Court Central District of California. *Expert Report. Deposition.*

Girl Scouts of the United States of America* v. Boy Scouts of America. United States District Court Southern District of New York. *Expert Report. Deposition.*

American Dairy Queen Corporation v. W. B. Mason Co. Inc.* United States District Court for the District of Minnesota. *Expert Report. Deposition. Trial Testimony.*

Seven Networks, LLC v. Apple Inc.* United States District Court for the Eastern District of Texas Marshall Division. *Expert Report. Deposition.*

New NGC, Inc. d/b/a National Gypsum Company, NGC Industries, LLC, and National Gypsum Properties,* LLC v. Alpinebay, Inc. *Expert Report. Deposition. Trial Testimony.*

Glaxo Group Limited* v. Respirent Pharmaceuticals Co., LTD. United States District Court Southern District of New York. *Expert Report.*

Kaifi LLC v. AT&T Inc.; AT&T Corp.; AT&T Communications, LLC; AT&T Mobility, LLC; and AT&T Services, Inc.* United States District Court Eastern District of Texas Marshall Division. *Expert Report. Deposition.*

CFA Institute v. American Society of Pension Professionals & Actuaries, et. al.* United States District Court for the Western District of Virginia, Charlottesville Division. *Expert Report. Deposition.*

Sarah Butler

<u>Match Group LLC\* v. Bumble Trading Inc., Bumble Holding, LTD., Badoo Trading Limited, Magic Lab Co., Worldwide Vision Limited, Badoo Limited, Badoo Software Limited, and Badoo Technologies Limited.</u> United States District Court for the Western District of Texas, Waco Division. *Expert Report. Deposition.*

<u>ClearPlay, Inc. v. Dish Network, L.L.C. and Echostar Technologies, L.L.C.\*</u> United States District Court, District of Utah, Central Division. *Expert Report.*

*Class Action Matters*

<u>Vicky Maldonado, et. al., v. Apple, Inc.\*</u> United States District Court, Northern District of California, San Francisco Division. *Expert Report. Deposition.*

<u>Jason DeCarlo v. Costco Wholesale Corporation and MBNR.\*</u> United States District Court Southern District of California. *Expert Report.*

<u>Javier Cardenas et al., Plaintiffs v. Toyota Motor Corporation et al., Defendants.\*</u> United States District Court Southern District of Florida. *Expert Report. Deposition. Trial Testimony.*

<u>Brian Gozdenovich et al., v. AARP Inc., AARP Services, Inc., AARP Insurance Plan, UnitedHealth Group, Inc., and UnitedHealthCare Insurance Company.\*</u> United States District Court District of New Jersey. *Expert Report.*

<u>Barbara Lewis, et al., v. Rodan & Fields, LLC.\*</u> United States District Court Northern District of California Oakland Division. *Expert Report. Deposition.*

<u>Austin Rugg v. Johnson & Johnson Consumer Inc.\*</u> United States District Court Norther District of California San Jose Division. *Expert Report.*

<u>Caryn Gorzo, et al., v. Rodan & Fields, LLC.\*</u> The Superior Court of California County of San Francisco. *Expert Report.*

<u>Toya Edwards and Jamal Erakat, et al., v. Walmart, Inc.\*</u> United States District Court, Central District of California. *Expert Report. Deposition.*

<u>Ohio State Troopers Association, Inc., et al., & Miguel Porras v. Point Blank Enterprises, Inc.\*</u> United States District Court, Southern District of Florida. *Expert Report. Deposition.*

*Other Matters*

<u>TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Strum Foods, Inc.,\* v. Keurig Green Mountain, Inc.</u> United States District Court for the Southern District of New York. *Expert Reports. Deposition.*

<u>2019</u>

Sarah Butler

*Intellectual Property Matters*

Sazerac Brands, LLC* v. Bullshine Distillery, LLC. In the United States Patent and Trademark Office Before the Trademark and Trial Appeal Board. Opposition No. 91227653. *Expert Report. Deposition.*

X One* v. Uber Technologies, Inc. United States District Court Northern District of California. *Expert Report. Deposition.*

NIKE, Inc. v. Skechers U.S.A., Inc.* United States District Court, Central District of California. *Expert Report. Deposition.*

Vital Pharmaceuticals, Inc. v. Monster Energy Company and Reign Beverage Company, LLC.* United States District Court Southern District of Florida. *Expert Report. Deposition.*

Mahindra & Mahindra, Ltd. and Mahindra Automotive North America, Inc.* v. FCA US LLC. United States District Court, Eastern District of Michigan. *Expert Report. Deposition. ITC Trial Testimony.*

Rex Real Estate I, L.P., v. Rex Real Estate Exchange, Inc.* United States District Court for the Eastern District of Texas, Sherman Division. *Expert Report.*

adidas America, Inc., et al. v. Forever 21 Inc., et al.* United States District Court District of Oregon Portland Division. *Expert Report.*

Lodestar Anstalt v. Bacardi & Company Limited, Bacardi U.S.A., Inc., and Bacardi Limited.* United States District Court Central District of California, Western Division. *Expert Report. Deposition.*

*Class Action Matters*

Paul Stockinger et al. v. Toyota Motor Sales, U.S.A., Inc.* United States District Court Central District of California. *Expert Report. Deposition.*

Thomas Allegra, et. al.* v. Luxottica Retail North America, d/b/a LensCrafters, United States District Court, Eastern District of New York, Brooklyn Division. *Expert Report. Deposition.*

Collin Shanks v. Jarrow Formulas, Inc.* United States District Court Central District of California. *Expert Report.*

Crystal Hilsley vs. Ocean Spray Cranberries, Inc.*, Arnold Worldwide LLC. United States District Court Western District Southern District of California. *Expert Report. Deposition.*

Erin Allen et al. v. Conagra Foods Inc.* United States District Court Northern District of California San Francisco Division. *Expert Report. Deposition.*

Sarah Butler

Riley Johannessohn, Daniel C. Badilla, James Kelley, Ronald Krans, Kevin R. Wonders, William Bates, James Pinion* v. Polaris Industries, Inc. United States District Court District of Minnesota. *Expert Report. Deposition.*

*Other Matters*

In re: Windstream Holdings, Inc., et al., Debtors. Windstream Holdings Inc., et. al.* v. Charter Communications, Inc. and Charter Communications Operating, LLC. United States Bankruptcy Court, Southern District of New York. Chapter 11, Case No. 19-22312 (RDD). *Expert Report.*

Belcher Pharmaceuticals, LLC v. Hospira, Inc.* United States District Court for the Middle District of Florida, Tampa Division. *Expert Report. Deposition.*

State of Washington* v. TVI, INC., d/b/a Value Village. State of Washington King County Superior Court. *Expert Report. Deposition. Trial Testimony.*

Obagi Cosmeceuticals LLC* v. ZO Skin Health, Inc. and Zein E. Obagi, M.D. JAMS Arbitration Proceeding. *Expert Report. Deposition. Arbitration Testimony.*

James Pudlowski, Louis C. Cross, III, Gail Henry, Steve Henry v. St. Louis Rams, LLC, St. Louis Rams Partnership, ITB Football Company, LLC.* *Expert Report.*

People of the State of California vs. The Hertz Corporation, American Traffic Solutions, Inc., ATS Processing Services, L.L.C., American Traffic Solutions Consolidated, L.L.C., PlatePass, L.L.C.* *Deposition.*

2018

*Intellectual Property Matters*

Spangler Candy Company vs. Tootsie Roll Industries, LLC.* United States District Court Northern District of Ohio Western Division Toledo. *Expert Report. Deposition.*

American Automobile Association of Northern California, Nevada & Utah and A3 Mobility LLC v. General Motors LLC and Maven Drive LLC.* United States District Court Northern District of California San Jose Division. *Expert Report. Deposition.*

Merck & Co., Inc., and Merck Sharp & Dohme Corp. v. Merck KGaA*. United States District Court District of New Jersey. *Expert Report. Deposition.*

MZ Wallace Inc. v. Sue Fuller, d/b/a/ The Oliver Thomas, and Black Diamond Group, Inc.* United States District Court Southern District of New York. *Expert Report. Deposition.*

Newmark Realty Capital, Inc.* v. BCG Partners, Inc. United States District Court Northern District of California San Jose Division. *Expert Report. Deposition.*

Sarah Butler

Advice Interactive Group, LLC* v. Web.Com Group, Inc. United States District Court for the Middle District of Florida Jacksonville Division. *Expert Report. Deposition.*

Global Brand Holdings, LLC* v. Church & Dwight Co., Inc. United States District Court Southern District of New York. *Expert Report. Deposition.*

Forever 21, Inc.* v. Gucci America, Inc., and Guccio Gucci S.p.A. United States District Court Central District of California Western Division. *Expert Report. Deposition.*

Masterbuilt Manufacturing, LLC v. Wal-Mart Stores, Inc.* United States District Court for the Middle District of Georgia Columbus Division. *Expert Report. Deposition.*

Strategic Partners, Inc.* v. Koi Design, LLC. United States District Court Central District of California. *Expert Report.*

Hard Rock Café International (USA), Inc., and Tarsadia Hotels v. RockStar Hotels, Inc.* United States District Court for the Southern District of Florida Fort Lauderdale Division. *Expert Report.*

Ghostbed, Inc. and Werner Media Partners, LLC d/b/a Nature's Sleep, LLC v. Casper Sleep, Inc., Red Antler, LLC and ICS, Inc.* United States District Court for the Southern District of Florida. *Expert Report. Deposition.*

*Class Action Matters*

Kaylee Browning and Sarah Basile v. Unilever United States, Inc.* United States District Court Central District of California. *Expert Report. Deposition.*

Scott R. Bernard v. Public Power, LLC.* In the Circuit Court of Cook County, Illinois County Department, Chancery Division. *Expert Report.*

Kristian Zamber v. American Airlines, Inc.* United States District Court Southern District of Florida Miami Division. *Expert Report. Deposition.*

Thomas Blitz v. Monsanto Company.* United States District Court Western District of Wisconsin. *Expert Report. Deposition.*

*Other Matters*

State of Washington* v. Johnson & Johnson, Ethicon, Inc. Ethicon US, LLC. King County Superior Court State of Washington. *Expert Report.*

Steven A. Conner DPM, P.C. v. Optum 360, LLC.* United States District Court Eastern District of Pennsylvania. *Expert Report. Deposition.*

17

**ER-0176**

Sarah Butler

State of Washington* v. Comcast Cable Communications Management, LLC, et. al. State of Washington King County Superior Court. *Expert Report. Deposition. Trial Testimony.*

Josephine James Edwards v. Hearst Communications, Inc.* United States District Court for the Southern District of New York. *Expert Report. Deposition.*

2017

*Intellectual Property Matters*

Shelia Dashnaw, et. al. v. New Balance Athletics, Inc.* United States District Court Southern District of California. *Expert Report. Deposition.*

Tri-Union Seafoods, LLC v. Otis McAllister, Inc.* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. *Expert Report.*

Michael Kors, L.L.C.* v. Chunma USA, Inc. United States District Court Central District of California. *Expert Report. Deposition.*

Weems Industries, Inc. v. Plews, Inc.* United States District Court for Northern District of Iowa, Cedar Rapids Division. *Expert Report. Deposition.*

Mars Incorporated and Mars, Petcare US, Inc. v. The J. M. Smucker Company and Big Heart Pet, Inc.* United States District Court for the Eastern District of Virginia. *Expert Report. Deposition.*

Professional Liability Insurance Services, Inc. v. U.S. Risk, Inc. and Crystal Jacobs.* United States District Court for Western District of Texas, Austin Division. *Expert Report. Deposition.*

Luxe Hospitality Company, Inc.* v. SBE Entertainment Group.  United States District Court Central District of California. *Expert Report. Deposition.*

*Class Action Matters*

Martin Schneider, et. al. v. Chipotle Mexican Grill, Inc.* United States District Court Northern District of California. *Expert Report. Deposition.*

Trevor Singleton et. al. v. Fifth Generation, Inc. d/b/a Tito's Handmade Vodka.* United States District Court for the Northern District of New York. *Expert Report. Deposition.*

*Other Matters*

State of Arizona v. Volkswagen AG, et. al.* Superior Court of the State of Arizona – Maricopa County. *Expert Report.*

Sarah Butler

<u>ADT LLC, and ADT US Holdings, Inc., v. Vivint, Inc.</u>* United States District Court Southern District of Florida Palm Beach Division. *Expert Report. Deposition.*

\* Retaining party

## Publications and Presentations

NABE Panel – "Hypothetical Case for Challenge Panel: Using Surveys to Estimate the Value of Features in a Bundled Product." National Association for Business Economics Transfer Pricing Symposium, Washington, DC (July 2023).

"Examining the Confusion Survey Threshold in Trademark Cases." Debevoise and Plimpton Webinar, with David Bernstein and Christopher Ford (March 2022).

FDLI Panel – "Consumer Perceptions in Class Actions: Plaintiff Surveys, Defendant Surveys, and Everything in Between." Food and Drug Law Institute Food Advertising, Labeling, and Litigation Conference (September 2021).

"A tale of two cups: Acquired distinctiveness and survey evidence before the TTAB." (May-June 2020), with Healey Whitsett. *The Trademark Reporter.*

"Survey response bias and the 'privacy paradox': Evidence from a discrete choice experiment." (May, 2020), with Garrett Glasgow and Samantha Iyengar in *Applied Economics Letters.* DOI: 10.1080/13504851.2020.1770183.

NAD Panel – "Consumer Perception Survey Design Safeguards & Pitfalls." National Advertising Division Annual Meeting, New York, NY (September, 2019).

INTA Panel – "Surveys in the Brave New World: Designing and Using Survey Evidence in the Age of Online Shopping, Influencers and Hashtags." Annual Meeting, Boston MA (May, 2019).

"The value of non-personally identifiable information to consumers of online services: evidence from a discrete choice experiment," (2016) with Garrett Glasgow in *Applied Economics Letters*, DOI: 10.1080/13504851.2016.1197357.

"Using Survey Methods to Demonstrate the Value of Personal Information and Privacy" (May 2015) *Panel on Privacy, Security and IRBs – American Association for Public Opinion Research,* Annual Meeting, Hollywood Florida.

"Battle of the Experts—Deploying the Proper Scientific Methodology for Supporting or Challenging Claims" (March 13, 2015) invited panelist at the *Advanced Forum on Resolving & Litigating Advertising Disputes.*

"Effective Use of Surveys in Trademark Litigation," (August, 2014) *Knowledge Group Webinar.*

19

**ER-0178**

Sarah Butler

"The Use of Statistical Sampling Post-Duran," (August, 2014) *Law360*.

"The Value of Personal Information to Consumers of Online Services: Evidence from a Discrete Choice Experiment," (June 19, 2014). *National Economic Research, Inc.*

"An assessment of the nonmarket benefits of the Water Framework Directive for households in England and Wales," with Metcalfe, Baker, Andrews, Atkinson, Bateman, Carson, East, Gueron, Sheldon and Train in *Water Resources Research,* 48:W10516. (Paper awarded Editor's Choice Award for 2013).

ABA Webinar "The Use of Surveys in Advertising Substantiation" (June 23, 2011).

"Meeting the New Standards for Reasonable Royalties," (February, 2011) with Mario Lopez. *Law360.*

"Survey Evidence in False Advertising Cases," (Winter, 2010). *The Antitrust Trial Practice Newsletter.*

"The Use of Surveys in Litigation: Recent Trends," (April, 2010) with Kent Van Liere. National Economic Research Associates, Inc.

"Emerging Issues in the Use of Surveys in Trademark Infringement on the Web," with Kent Van Liere. Paper published in the *Advanced Trademark & Advertising Law Conference* proceedings, September 2007, Seattle, WA.

"An Analysis of the Hypothetical Situations in Willingness to Pay Studies." Paper presented at the July 2006 Thematic Seminar "Quality Criteria in Survey Research," hosted by World Association for Public Opinion Research, Lake Como, Italy.

"Use of Surveys in Intellectual Property Disputes," (2005) with Eugene P. Ericksen, in *Economic Approaches to Intellectual Property Policy, Litigation and Management Issues,* Gregory K. Leonard and Lauren J. Stiroh (eds.) National Economic Research Associates, Inc.

"Response Rate Standards: Lessons from the 2004 Presidential Polls." Paper presented at the 2005 Annual Meeting of American Association of Public Opinion Research, Miami Beach, FL.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, March 2004 Charlotte, NC.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, January 2004 San Diego, CA.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, June 2003, McLean, VA.

Sarah Butler

## Professional Associations

Member, American Association of Public Opinion Research and World Association for Public
Opinion Research, Member, American Statistical Association, Member, American Bar
Association, Intellectual Property Section, Member, International Trademark Association (INTA),
Reviewer for *Trademark Reporter*, Member, American Marketing Association.

# Exhibit B

ER-0181

## Exhibit B

## Materials Considered

### Court Documents

- Plaintiff City and County of San Francisco's Notice of Motion and Motion for Preliminary Injunction Enjoining Defendants; Memorandum of Points and Authorities in Support Thereof, *City and County of San Francisco v. City of Oakland and Port of Oakland*, United States District Court for the Northern District of California, Case No. 3:24-cv-02311-TSH, dated September 17, 2024.

### Expert Reports and Declarations

- Declaration of Dr. Carol A. Scott, dated October 8, 2024.

- Declaration of Sarah Butler in Support of the City's Motion for Preliminary Injunction, and accompanying exhibits, dated September 10, 2024.

### Survey Literature

- Diamond, S. S. (2011). "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council, pp. 359-423.

- Bernstein, D.H. and Keller, B. P. (2022). "Survey Evidence in False Advertising Cases," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Second Edition*, edited by Diamond, S. S., and Swann, J. B., pp. 187-235.

### Websites

- https: //www.8newsnow.com/news/national-news/will-cause-confusion-san-francisco-airport-officials-push-back-against-oakland-airports-proposed-name-change/

- https://aviationweek.com/air-transport/airports-networks/oakland-airport-seeks-boost-inbound-traffic-name-change

- https://fox5sandiego.com/news/national-news/will-cause-confusion-san-francisco-airport-officials-push-back-against-oakland-airports-proposed-name-change/

- https://kyma.com/news/california-news/2024/04/13/oakland-city-officials-vote-on-airports-name-change/

- https://www.airlines.org/dataset/air-travelers-in-america-annual-survey/

- https://www.cnn.com/2024/05/10/travel/oakland-airport-name-lawsuit-san-francisco/index.html

- https://www.expedia.com/

- https://www.google.com/travel/flights

1

- https://www.iflyoak.com/fly/airlines-and-destinations/

- https://www.kayak.com/

- https://www.latimes.com/california/story/2024-04-18/san-francisco-sues-oakland-over-airport-name-change

- https://www.southwest.com/

- https://www.statsamerica.org/sip/rank_list.aspx?rank_label=pop1

**Other Documents**

- 2024-03-29 Port Press Release.pdf

- Agenda Report.pdf

- OAK-Branding-Survey-Key-Findings.pdf

2

# Exhibit C

ER-0184

**Google Flight Search Result for "Houston"**



**Google Flight Search Result for "Miami"**



**Google Flight Search Result for "Chicago"**



**Google Flight Search Result for "Los Angeles"**



2

**Google Flight Search Result for "Phoenix"**



ER-0187

# Exhibit D

Data produced in native format.

1  BOBBY GHAJAR (198719)
   JUDD LAUTER (290945)
2  COOLEY LLP
   3 Embarcadero, 20th Floor
3  San Francisco, California 94111-4004
   Telephone:    (415) 693-2000
4  Facsimile:    (415) 693-2222
   Email: bghajar@cooley.com
5         jlauter@cooley.com

6  DAVID CHIU (189542)
   City Attorney
7  JESSE SMITH (122517)
   Chief Assistant City Attorney
8  YVONNE R. MERÉ (173594)
   Chief Deputy City Attorney
9  JULIE VEIT (209207)
   CHRISTOPHER STUART (262399)
10 Deputy City Attorneys
   City Hall
11 1 Dr. Carlton B. Goodlett Place
   San Francisco, California 94102-4682
12 Telephone:    (415) 554-4700
   Facsimile:    (415) 554-4757
13 Email: Cityattorney@sfcityatty.org
          Jesse.Smith@sfcityatty.org
14        Yvonne.Mere@sfcityatty.org
          Julie.Veit@sfcityatty.org
15        Christopher.Stuart@sfcityatty.org

16 Attorneys for Plaintiff and Counterclaim Defendant
   CITY AND COUNTY OF SAN FRANCISCO

17

18                  UNITED STATES DISTRICT COURT

19                 NORTHERN DISTRICT OF CALIFORNIA

20                      SAN FRANCISCO DIVISION

21 CITY AND COUNTY OF SAN FRANCISCO,    Case No. 3:24-CV-02311-TSH

22              Plaintiff,               **SECOND DECLARATION OF MELISSA
                                         ANDRETTA IN SUPPORT OF THE CITY'S
23        v.                             MOTION FOR PRELIMINARY INJUNCTION**

24 CITY OF OAKLAND AND PORT OF
   OAKLAND,
25
                Defendants.
26

27 AND RELATED COUNTERCLAIM

28

COOLEY LLP
ATTORNEYS AT LAW

M. ANDRETTA SECOND DECL. ISO CITY'S
MOTION FOR PRELIMINARY INJUNCTION
CASE NO.: 3:24-CV-02311-TSH
ER-0189

I, Melissa Tytko Andretta, declare as follows:

1.      I am the Director of Aviation Marketing & Development at San Francisco International Airport ("SFO").  I submit this declaration in connection with the City and County of San Francisco's Reply Brief In Support Of Plaintiff City And County Of San Francisco's Motion For Preliminary Injunction Enjoining Defendants.  I declare that the following is true to the best of my knowledge, information, and belief, and that if called upon to testify, I could and would testify to the following.

2.      I have extensive background in marketing within the aviation industry as Director of Aviation Marketing & Development at SFO and having worked in various marketing roles for Icelandair for over 12 years.  One of my primarily responsibilities at SFO is international marketing of the airport, which we commit approximately $1.4 million to annually.  In addition, while at Icelandair I was in charge of all marketing for the Americas and the UK & Ireland.

3.      I have reviewed the Port of Oakland's (the "Port" or "Oakland") Opposition to Plaintiff's Motion for Preliminary Injunction (the "Opposition") and supporting declarations.

4.      I was not surprised to see that declarations were submitted from individuals working for Southwest Airlines and Spirit Airlines.  Southwest Airlines and Spirit Airlines account for roughly 89% of seat capacity for flights in and out of the Oakland airport and have a close relationship with the airport.

5.      Several of the declarations submitted in support of the Opposition discuss that it is industry practice for IATA codes to be displayed with airport names on websites for OTAs, airlines, and ticketing aggregators. Based on my experience, however, these are far from the only contexts in which travelers encounter airport names. I identified several in my prior declaration, but there are many others, all of which inform travelers' understanding of airport names and identities.

6.      For example, a Google search for "San Francisco Bay Oakland International airport" returns results for the airport's website and Wikipedia page, neither of which display the OAK IATA code. The following is a true and correct screenshot of such a Google search.

COOLEY LLP
ATTORNEYS AT LAW

1

M. ANDRETTA SECOND DECL. ISO CITY'S
MOTION FOR PRELIMINARY INJUNCTION
CASE NO.: 3:24-CV-02311-TSH

ER 0190

1

2



3

4

5

6

7

8

9      7.     The Port's YouTube page for its airport also now displays the new name, and

10   without an IATA code.  The following is a true and correct screenshot of the Port's YouTube page.

11

12

13



14

15

16

17

18

19

20     8.     The Port's Yelp page for its airport also now displays the SAN FRANCISCO BAY

21   OAKLAND INTERNATIONAL AIRPORT trademark, and without an IATA code.  The following

22   is a true and correct screenshot of the Port's Yelp page for the Oakland airport.

23

24

25



26

27

28

(156 of 274), Page 156 of 274
Case: 24-7532, 02/06/2025, DktEntry: 11.3, Page 156 of 274
Case 3:24-cv-02311-TSH   Document 64   Filed 10/22/24   Page 4 of 5

9. I also conducted a search for the SAN FRANCISCO BAY OAKLAND INTERNATIONAL AIRPORT on Mapquest, a popular navigation website. The airport's name is again displayed without an IATA code. The following is a true and correct screenshot of a reference to the Oakland airport on the Mapquest website.



10. As an iPhone user, I regularly use Apple Maps, and recently noticed that searches for the Oakland airport return references to the SAN FRANCISCO BAY OAKLAND INTERNATIONAL AIRPORT without displaying the airport's IATA code. The following is a true and correct screenshot of a reference to the Oakland airport on Apple Maps.



COOLEY LLP
ATTORNEYS AT LAW

3

M. ANDRETTA SECOND DECL. ISO CITY'S
MOTION FOR PRELIMINARY INJUNCTION
CASE NO.: 3:24-CV-02311-TSH

ER-0192

11.     I recently learned of yet another incident in which the SAN FRANCISCO BAY OAKLAND INTERNATIONAL AIRPORT trademark resulted in confusion.  On October 6, 2024, I attended the Routes World Conference in Bharain.  This is the world's largest conference for airport aviation development teams to meet with airline network planning teams from around the world. While there, I spoke to a network planner from Icelandair, who informed me that she was looking forward to meeting with SFO on October 8, 2024.  We have met with Icelandair many times and expect them to make a return to California in 2029 when they have the aircraft to do so.  However, we hadn't requested a meeting with them for this Routes World.  When I shared with her that SFO had not requested a meeting with her airline, she looked up her meeting schedule and realized that she had accepted a meeting with the "San Francisco Bay Oakland International Airport" thinking she was scheduling a meeting with SFO. This individual is a sophisticated airline professional whose job it is to know the industry, and yet even she was confused by the Oakland airport's new name.

Executed on this 22th day of October, 2024 at San Francisco, California.

_Melissa Andretta_
Melissa Andretta

1  BOBBY GHAJAR (198719)
   JOHN HEMANN (165823)
2  JUDD LAUTER (290945)
   COOLEY LLP
3  3 Embarcardero, 20th Floor
   San Francisco, California 94111-4004
4  Telephone:    (415) 693-2000
   Facsimile:    (415) 693-2222
5  Email: bghajar@cooley.com
             jhemann@cooley.com
6            jlauter@cooley.com

7  DAVID CHIU (189542)
   City Attorney
8  JESSE SMITH (122517)
   Chief Assistant City Attorney
9  YVONNE R. MERÉ (173594)
   Chief Deputy City Attorney
10 JULIE VEIT (209207)
   CHRISTOPHER STUART (262399)
11 Deputy City Attorneys
   City Hall
12 1 Dr. Carlton B. Goodlett Place
   San Francisco, California 94102-4682
13 Telephone:    (415) 554-4700
   Facsimile:    (415) 554-4757
14 Email: Cityattorney@sfcityatty.org
             Jesse.Smith@sfcityatty.org
15           Yvonne.Mere@sfcityatty.org
             Julie.Veit@sfcityatty.org
16           Christopher.Stuart@sfcityatty.org

17 Attorneys for Plaintiff and Counterclaim Defendant
   CITY AND COUNTY OF SAN FRANCISCO
18

19            UNITED STATES DISTRICT COURT

20           NORTHERN DISTRICT OF CALIFORNIA

21             SAN FRANCISCO DIVISION

22 CITY AND COUNTY OF SAN FRANCISCO,        Case No. 3:24-CV-02311-TSH

23              Plaintiff,                  **SECOND DECLARATION OF CHRIS BIRCH
                                            IN SUPPORT OF THE CITY'S MOTION FOR
24        v.                                PRELIMINARY INJUNCTION**

25 CITY OF OAKLAND AND PORT OF
   OAKLAND,
26
                Defendants.
27

28 AND RELATED COUNTERCLAIM

COOLEY LLP
ATTORNEYS AT LAW

1    I, Christopher Birch, declare as follows:

2    1.    I am the Director, Guest Experience at San Francisco International

3    Airport ("SFO").  I submit this declaration in connection with the City and County of

4    San Francisco's Reply Brief In Support Of Plaintiff City And County Of San

5    Francisco's Motion For Preliminary Injunction Enjoining Defendants.  I declare that

6    the following is true to the best of my knowledge, information, and belief, and that if

7    called upon to testify, I could and would testify to the following.

8    2.    As discussed in my prior declaration, SFO has begun keeping a log of

9    individuals who have mistakenly shown up at SFO intending to depart from Oakland.

10   3.    In the weeks since the City filed its motion for preliminary injunction,

11   this has continued to occur, and 3 additional incidents have been logged. Attached

12   hereto as **Exhibit A** is a true and correct copy of the updated daily operation log that

13   we have been maintaining of these incidents.

14

15   I declare under penalty of perjury under the laws of the United States of

16   America that the foregoing is true and correct.

17

18   Executed on this 21ˢᵗ day of October 2024 at San Francisco, California.

19

20

21   _____
     Christopher Birch

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW

C. BIRCH DECLARATION
CASE NO.: 3:24-CV-02311-TSH

# EXHIBIT A

**SFO INFORMATION DESK – DAILY OPERATION LOG**

| | | | | |
|---|---|---|---|---|
| | | | **New OAK Aiport name caused confusion** | |
| | *Date* | *Passenger Name* | *Contact Information (phone or email)* | *Comments (Flight #; Destination;Departure Time)* |
| 1 | 6/18/2024 | Unknown | None | Spirit Airlnes - OAK/ONT |
| 2 | 6/18/2024 | Michelle F█ | (209) 616█ | Volaris Airlines |
| 3 | 6/18/2024 | Venancio G█ | (209) 509█ | Confirm# Y47793 / Dest: MLM/ ETD: 5:30PM |
| 4 | 6/24/2024 | Maria Joe F█ | None | Spirit |
| 5 | 6/25/2024 | Unknown | None | Dropped off at SFO but flying out of OAK |
| 6 | 7/1/2024 | Rashpiinder B█ | (209) 918█ | Unknown |
| 7 | 7/8/2024 | Erika G█ | (209) 626█ | Volaris Airlines / Out of OAK |
| 8 | 7/9/2024 | Ruel F█ | (702) 489█ | Dropped off at wrong airport |
| 9 | 7/12/2024 | Karla M█ | (844) 184█ | Final destination / Mexico |
| 10 | 7/29/2024 | Pty of two | pax was rushing, didn't have time to leave name | FLT# 4409 |
| 11 | 7/30/2024 | Tavin H█ | 702-809█ | Spirit Airlnes - OAK/SLC; ETD: 1402 |
| 12 | 8/3/2024 | Pty of two | too upset didn't have time to leave names | Spirit Airlnes - OAK/LAS |
| 13 | 8/4/2024 | Pty of one | None | Volaris Airlines |
| 14 | 8/21/2024 | Victor G█ | 310-408█ | (Spirit) NK1479/ Destination: San Diego |
| 15 | 8/22/2024 | Elijah F█ | 401-808█ | Unknown |
| 16 | 8/23/2024 | Pty of One | None | Dropped off by Uber to SFO but needed to go to SF Bay Oakland Airport |
| 17 | 9/3/2024 | Pty of One | None | Ran off too fast / Traveling on Spirit out of OAK |
| 18 | 9/5/2024 | Pty of two | None | Traveling on Spirit/ mistaken SFO for Oak |
| 19 | 9/14/2024 | Jordi A█ | ████████ | Traveling on Spirit out of OAK |
| 20 | 9/26/2024 | Unknown | None | Southwest from Oakland |
| 21 | 9/30/2024 | Pty of two | None | Spirit Airlines out of OAK / Pax were in rushed to leave didn't leave their info. |
| 22 | 10/2/24 | Maria N█ | None | Spirit flight #73 |
| 23 | 10/2/24 | Michel F█ | None | Spirit flight #73 |
| 24 | | | | |
| 25 | | | | |
| 26 | | | | |
| 27 | | | | |
| 28 | | | | |
| 29 | | | | |

ER-0197

1   BOBBY GHAJAR (198719)
     JUDD LAUTER (290945)
2   COOLEY LLP
     3 Embarcadero, 20th Floor
3   San Francisco, California 94111-4004
     Telephone:    (415) 693-2000
4   Facsimile:    (415) 693-2222
     Email: bghajar@cooley.com
5          jlauter@cooley.com

6   DAVID CHIU (189542)
     City Attorney
7   JESSE SMITH (122517)
     Chief Assistant City Attorney
8   YVONNE R. MERÉ (173594)
     Chief Deputy City Attorney
9   JULIE VEIT (209207)
     CHRISTOPHER STUART (262399)
10  Deputy City Attorneys
     City Hall
11  1 Dr. Carlton B. Goodlett Place
     San Francisco, California 94102-4682
12  Telephone:    (415) 554-4700
     Facsimile:    (415) 554-4757
13  Email: Cityattorney@sfcityatty.org
          Jesse.Smith@sfcityatty.org
14         Yvonne.Mere@sfcityatty.org
          Julie.Veit@sfcityatty.org
15        Christopher.Stuart@sfcityatty.org

16  Attorneys for Plaintiff and Counterclaim Defendant
     CITY AND COUNTY OF SAN FRANCISCO

17

18                 UNITED STATES DISTRICT COURT

19             NORTHERN DISTRICT OF CALIFORNIA

20                 SAN FRANCISCO DIVISION

| | |
|---|---|
| 21  CITY AND COUNTY OF SAN FRANCISCO, | Case No. 3:24-CV-02311-TSH |
| 22             Plaintiff, | **SECOND DECLARATION OF CHARLES SCHULER IN SUPPORT OF THE CITY'S MOTION FOR PRELIMINARY INJUNCTION** |
| 23         v. | |
| 24  CITY OF OAKLAND AND PORT OF OAKLAND, | |
| 25            Defendants. | |
| 26 | |
| 27  AND RELATED COUNTERCLAIM | |
| 28 | |

COOLEY LLP
ATTORNEYS AT LAW

I, Charles Schuler, declare as follows:

1.     I am the Director, Marketing & Communications, External Affairs at San Francisco International Airport ("SFO"). I submit this declaration in connection with the City and County of San Francisco's Reply Brief In Support Of Plaintiff City And County Of San Francisco's Motion For Preliminary Injunction Enjoining Defendants. I declare that the following is true to the best of my knowledge, information, and belief, and that if called upon to testify, I could and would testify to the following.

2.     I have a Master of Tourism Administration degree from George Washington University and have worked for most of my career in the air travel industry.

3.     I have been Director, Marketing & Communications, External Affairs for SFO for nearly fourteen years. Prior to that, I was a sales manager with Emirates Airline for one year, the Director, Strategy, Business Development & Planning – The Americas for Air New Zealand for five years and seven months, and had various roles and responsibilities for United Airlines, including sales, revenue management, and network planning during my nearly nine year tenure there. In total, I have nearly 30 years of experience working in the industry.

4.     From my years of experience working within the industry, and in particular in marketing roles, I am knowledgeable about how air travel and airports are marketed and promoted to build brand awareness, as well as how air travelers respond to marketing.

5.     I have reviewed the Port of Oakland's (the "Port") Opposition to Plaintiff's Motion for Preliminary Injunction, including the supporting declarations. Many statements made by the Port and its declarants about the Port's marketing under the SAN FRANCISCO BAY OAKLAND INTERNATIONAL AIRPORT trademark are misleading.

6.     Dr. Sabine Reim describes herself as specializing in "network strategies and route development." From an airport perspective, these are common industry terms that refer to _the ability to attract new airlines, new cities served and increase airline capacity on existing routes. In general, work in this area is usually part of an airport's proposal to airlines, and not directly related to consumer marketing or consumer behavior. From my experience, once an airline decides to operate a route, the consumer-facing promotional activations are usually handed from network

Cooley LLP
Attorneys at Law

1   planning to the respective sales and marketing teams of the airline, airport, and tourism partners.

2        7.    I concur with Dr. Reim that the vast majority of airfare bookings occur online. And

3   therefore how you are displayed online is important.

4        8.    Based on data that I have reviewed, most travelers who purchase airfare online use

5   OTAs as a resource. While some airline websites do not display airport names in their entireties,

6   or only inconsistently do so, many of the most popular OTA sites (e.g. booking.com, priceline.com,

7   and trip.com) display airport names in their entireties within search results. This is just one of the

8   many ways that consumers encounter airport names outside of the context of airline websites prior

9   to purchasing airfare.

10       9.    Based on my years of experience in marketing within the air travel industry,

11  travelers also become familiar with airport names prior to making purchases by encountering them

12  in advertising and other media such as news articles, and this background can inform traveler's

13  impressions of an airport. At SFO, we actively promote our airport's name, at times without an

14  IATA code, through advertising campaigns to raise brand awareness and highlight the benefits of

15  choosing us. These benefits include a wide range of destinations, a diverse selection of airlines,

16  convenience, top-tier services and amenities, local job opportunities, and our commitment to

17  sustainability initiatives. We would not do this if we did not believe that it has an impact on

18  travelers.

19       10.    As an example, we have been running audio advertisements for SFO on KQED, a

20  local radio station. These advertisements refer to "San Francisco International Airport" and do not

21  mention our IATA code. Notably, the Port runs similar advertisements on KQED. In each of the

22  recordings, the Port refers to its airport as SAN FRANCISCO BAY OAKLAND

23  INTERNATIONAL AIRPORT without any reference to the airport's IATA code. A true and

24  correct screenshot from tveyes.com, a media monitoring tool, is attached hereto as **Exhibit A**. This

25  screenshot displays relevant excerpts from the transcript of the Port's advertisements.

26       **11.**    Dr. Reim states that an airport's name "can be a useful tool for creating general

27  awareness of the airport's geographic location or of the area's ties to notable or accomplished

28  individuals." While this may be true, it is not the only, or even most important, role that airport

1   names play.  Our airport's name, SAN FRANCISCO INTERNATIONAL AIRPORT, is a brand.

2   Like any other brand, it embodies the goodwill that consumers associate with the services that we

3   provide.

4           12.     I have also reviewed the declarations of Jennifer Birdie and Piotr Rolek.  In their

5   declarations they describe how searches for destinations on the websites for Southwest Airlines and

6   Spirit Airlines do not display the full legal names of airports.  For example, on the Southwest

7   website, a search returns both the Oakland airport and SFO under the heading "San Francisco Area

8   Airports," while a search on Spirit, which does not have any routes at SFO, returns only "Oakland,

9   CA / San Francisco, CA AREA."  The Port suggest that because location is displayed on these

10  websites, rather than the airport name, that this lessens the risk of travelers being confused about

11  the relationship between the Oakland and San Francisco airports.  Based on my years of experience

12  in marketing within the industry, and in particular with respect to airport marketing, I strongly

13  disagree.  Because the airport names are not displayed on these websites, it is all the more

14  significant how airport names are displayed to travelers in other contexts.  Moreover, airport names

15  often correspond to city names, and typically an airport named after a city is owned and operated

16  by that city.  That is the case for SFO and, previously, the Port, but also for the airports in Chicago,

17  New York, Dallas, and so on.

18          13.     With the foregoing in mind, the search results on the Southwest and Spirit websites,

19  both of which feature references to "San Francisco," may only reinforce that there is a connection

20  between SFO and the Oakland airport that does not exist.  This is particularly true for the many

21  travelers unfamiliar with the region's different airports, their locations, and the distinct sources of

22  their operations.

23

24          Executed on this _22 nd_ day of October, 2024 at San Francisco, California.

25

26          _____

27          Charles Schuler

28

# EXHIBIT A

## OUTBOUND ADVERTISING – KQED

Support for KQED comes from San Francisco Bay Oakland International Airport offering 47 destinations across the USA, Hawaii and Mexico. Iflyoak.com



**KQED-FM (Radio) at 10/15/2024 11:30:02 AM**
Tuesday, October 15, 2024
KQED-FM (Radio)
San Francisco, CA

Add to Report ☐

**11:33:21 AM** that about 500 store closures will happen in its current fiscal year and should immediately help adjusted earnings and free up the cash flow. You're listening to here and now. Support for Kikid comes from San Francisco Bay **Oakland International Airport,** offering service to 47 destinations across the USA, Hawaii and Mexico. I flyoak.Comxfinity mobile customers can connect to wi-fi speeds up to a gig in millions of locations nationwide restrictions apply Xfinity Internet required actual wi-fi speeds vary, not



**KQED-FM (Radio) at 10/14/2024 11:30:01 PM**
Monday, October 14, 2024
KQED-FM (Radio)
San Francisco, CA

Add to Report ☐

**11:30:01 PM** San Francisco Bay, **Oakland International airport,** offering service to 47 destinations across the usa hawaii and mexico i fly a.com it's 11 30 hello with newsday from the bbc world service with victoria wounda and roba israel's ongoing offensive in northern gaza is threatening the tens of thousands of people living there in chad weeks of heavy rain have caused extensive flooding with more than 5 500 people dead senegal has a tive year economic plan to deliver what they called a diversified and resilient economy but first this news with the bbc

**ER-0203**

## INBOUND ADVERTISING – NPR's Snap Judgement



### WDDE 91.1 FM (Radio) at 10/14/2024 8:05:03 PM
Monday, October 14, 2024
WDDE 91.1 FM (Radio)
Philadelphia, PA

Add to Report ☐

**8:07:03 PM** Mrs Kathleen Carlson, who adopted snap judgment. Do you have a favorite program you'd like to adopt? Call us at 3000 200,702 12 or visit Delaware public org support for snap judgment comes from San Francisco Bay, *Oakland International Airport,* offering service to 47 destinations across the USA, Hawaii and Mexico. I fly A.COM. this show is supported by progressive insurance looking for a career you'll love with flexibility great pay and benefits and one of the country's top workplaces come join our



### 90.7 WMFE at 10/14/2024 7:05:03 PM
Monday, October 14, 2024
90.7 WMFE
Orlando, FL

Add to Report ☐

**7:06:59 PM** solution for businesses of all sizes to attract interview and hire candidates all from one platform. Learn more at indeed.com /NPR. Support for snap judgment comes from San Francisco Bay, *Oakland International Airport,* offering service to 47 destinations across the U, Sa, Hawaii, in Mexico, I fly a.com. this show is supported by progressive insurance looking for a career you'll love with flexibility great pay and benefits and one of the country's top workplaces come join our growing team go to progressive coom



### National Public Radio at 10/13/2024 9:05:02 PM
Sunday, October 13, 2024
National Public Radio
U.S. Cable

Add to Report ☐

**9:07:12 PM** private corporation funded by the American people, and the John s and James I. Knight Foundation helping NPR advance journalistic excellence in the digital age. Support for snap judgment comes from San Francisco Bay *Oakland International airport,* offering service to 47 destinations across the U, Sa, Hawaii, in Mexico, I fly oak com. This show is supported by progressive insurance, looking for a career you'll love with flexibility, great pay and benefits, and one of the country's top workplaces come join our growing



### KPCC-FM (Radio) at 10/13/2024 5:05:02 PM
Sunday, October 13, 2024
KPCC-FM (Radio)
Los Angeles, CA

Add to Report ☐

**5:06:34 PM** Other contributors include the Walton family Foundation, working to create access to opportunity for people and communities by tackling tough social and environmental problems. More information is at Walton family Foundation Dot Org. Support for snap judgment comes from San Francisco Bay *Oakland International Airport,* offering service to 47 destinations across the U. Sa, Hawaii, in Mexico, I fly. A.com. This show is supported by progressive insurance looking for a career you'll love with flexibility, great pay and benefits, and one of the country's top



### KJZZ 91.5 at 10/13/2024 5:05:02 PM
Sunday, October 13, 2024
KJZZ 91.5
Phoenix, AZ

Add to Report ☐

**5:06:14 PM** KJZZ. Support for snap judgment comes from San Francisco Bay *Oakland International airport,* offering service to 47 destinations across the USA, Hawaii and Mexico. I fly ok com. This show is supported by progressive insurance looking for a career you'll love with flexibility, great pay and benefits, and one of the country's top workplaces come join our growing team, go to progressive COOM, /careers and apply online today snap studio. So I'm just walking down the street minding my own business, bright, sunny day. I feel something hit me



### WVXU at 10/13/2024 5:05:03 PM
Sunday, October 13, 2024
WVXU
Cincinnati, OH

Add to Report ☐

**5:07:10 PM** for NPR comes from NPR stations. Other contributors include Corporation for public Broadcasting, a private corporation funded by the American people, and the John s and James L. Knight Foundation helping NPR advance journalistic excellence in the digital age. Support for snap judgment comes from San Francisco Bay *Oakland International airport,* offering service to 47 destinations across the USA, Hawaii in Mexico I fly a.com. this show is supported by progressive insurance looking for a career you'll love with flexibility



### KUOW-FM (Radio) at 10/13/2024 2:05:02 PM
Sunday, October 13, 2024
KUOW-FM (Radio)
Seattle, WA

Add to Report ☐

**2:06:24 PM** judgment comes from San Francisco Bay, *Oakland International Airport,* offering service to 47 destinations across the USA, Hawaii and Mexico. I fly ok com. This show is supported by progressive insurance looking for a career you'll love with flexibility, great pay and benefits, and one of the country's top workplaces come join our growing team, go to progressive do.comslash careers and apply online. Today snaps the I'm just walking down the street minding my own business, bright, sunny day. Then I feel something hit me on



### Capital Public Radio at 10/13/2024 1:06:00 PM
Sunday, October 13, 2024
Capital Public Radio
Sacramento, CA

Add to Report ☐

**1:07:17 PM** from San Francisco Bay *Oakland International airport,* offering service to 47 destinations across the USA, Hawaii and Mexico. I fly a.com. this show is supported by progressive insurance looking for a career you'll love with flexibility great pay and benefits and one of the country's top workplaces come join our growing team go to progressive coom /careers and apply online today snap studio so i'm just walking down the street minding my own business bright sunny day and i feel something hit me on the back of a head

ER-0205

COOLEY LLP
BOBBY GHAJAR (198719)
JOHN HEMANN (165823)
JUDD D. LAUTER (290945)
3 Embarcadero, 20th Floor
San Francisco, CA 94111-4004
Telephone:     (650) 843-5000
Email: bghajar@cooley.com
        jhemann@cooley.com
        jlauter@cooley.com

DAVID CHIU (189542)
City Attorney
JESSE SMITH (122517)
Chief Assistant City Attorney
YVONNE R. MERÉ (173594)
Chief Deputy City Attorney
JULIE VEIT (209207)
CHRISTOPHER STUART (262399)
Deputy City Attorneys
City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone:     (415) 554-4700
Facsimile:     (415) 554-4757
Email: Cityattorney@sfcityatty.org
        Jesse.Smith@sfcityatty.org
        Yvonne.Mere@sfcityatty.org
        Julie.Veit@sfcityatty.org
        Christopher.Stuart@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF OAKLAND AND PORT OF OAKLAND,<br><br>Defendants.<br><hr>AND RELATED COUNTERCLAIM | Case No. 3:24-cv-02311-TSH<br><br>**REPLY BRIEF IN SUPPORT OF PLAINTIFF CITY AND COUNTY OF SAN FRANCISCO'S MOTION FOR PRELIMINARY INJUNCTION ENJOINING DEFENDANTS**<br><br>Hearing Date: November 7, 2024<br>Time: 10:00 AM<br>Courtroom: E – 15th Floor<br>Trial Date: (None Set) |

REPLY BRIEF ISO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION
Case No. 3:24-cv-02311-TSH

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.   THE CITY ESTABLISHED THAT IT IS LIKELY TO SUCCEED ON THE
      MERITS ............................................................................................................... 2

    A.   Oakland Does Not Dispute the Validity and Priority of the SF Mark. ................. 2

    B.   The City Established that all *Sleekcraft* Factors Weigh in Its Favor. ..................... 2

        1.   The Parties' Marks Are Highly Similar. ................................................. 3

        2.   The City's Mark Is Unquestionably Strong ............................................ 6

        3.   Identical Services (Airports) Make Confusion Likely .............................. 8

        4.   Overlapping Marketing Channels Make Confusion Likely ....................... 8

        5.   Oakland's "Purchasing Care" Argument Does Not Change the
           Analysis ................................................................................................. 8

        6.   The City's Evidence of Actual Confusion Is Probative ............................ 9

        7.   The City's Survey Is Well-Designed and Confirms Confusion Is
           Likely .................................................................................................. 11

        8.   Oakland Ignored Objections and Infringed the SF Mark ......................... 12

        9.   Oakland's Likelihood of Expansion Makes Confusion Likely ................. 13

    C.   The Fair Use Doctrine is Inapplicable Here ........................................................ 13

    D.   Oakland Fails to Rebut the City's Presumption of Irreparable Harm ................... 14

    E.   The Public Interest Strongly Favors an Injunction .............................................. 14

    F.   The Balance of Hardships Strongly Favors an Injunction .................................... 14

III.  CONCLUSION ................................................................................................... 15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Allstate Ins. Co. v. Kia Motors Am., Inc.*,
   2017 U.S. Dist. LEXIS 211399 (C.D. Cal. Dec. 22, 2017) ..................................... 5

*Blue Bottle Coffee, LLC v. Liao*,
   2024 WL 2061259 (N.D. Cal. May 7, 2024) ..................................... 8

*BNSF Ry. Co. v. Float Alaska IP, LLC*,
   2023 WL 6783506 (C.D. Cal. Aug. 28, 2023) ..................................... 9

*Boldface Licensing+Branding v. By Lee Tillett, Inc.*,
   940 F. Supp. 2d 1178 (C.D. Cal. 2013) ..................................... 5, 9, 12

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*,
   174 F.3d 1036 (9th Cir. 1999)..................................... 2, 9, 13

*C21FC LLC v. NYC Vision Cap. Inc.*,
   2022 WL 2191934 (D. Ariz. June 17, 2022) ..................................... 15

*Cadence Design Sys. v. Avant! Corp.*,
   125 F.3d 824 (9th Cir.1997)..................................... 15

*Champion-Cain v. Macdonald*,
   2016 WL 7188242 (S.D. Cal. Dec. 12, 2016) ..................................... 15

*Charles Schwab & Co. v. Hibernia Bank*,
   665 F. Supp. 800 (N.D. Cal. 1987) ..................................... 6

*Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*,
   2020 WL 5199434 (N.D. Cal. Aug. 17, 2020)..................................... 14

*Coachella Music Festival, LLC v. Simms*,
   2018 WL 6074556 (C.D. Cal. Sept. 10, 2018)..................................... 7

*In re Detroit Athletic Co.*,
   903 F.3d 1297 (Fed. Cir. 2018)..................................... 3

*Fl. Int'l Univ. Bd. of Trs. v. Fl. Nat'l Univ., Inc.*,
   830 F.3d 1242 (11th Cir. 2016)..................................... 4

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
   314 F.2d 149 (9th Cir. 1963)..................................... 9

*Ford Motor Co. v. Summit Motor Prods., Inc.*,
   930 F.2d 277 (3d Cir. 1991)..................................... 9

*GoTo.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000)..................................... 4

1

**TABLE OF AUTHORITIES**
(continued)

2
                                                                                        **Page**

3
*Great W. Air, LLC v. Cirrus Design Corp.*,
4
    649 F. Supp. 3d 965 (D. Nev. 2023) ................................................................ 10

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*,
5
    736 F.3d 1239 (9th Cir. 2013)........................................................................... 11

6
*Humboldt Wholesale, Inc. v. Humboldt Nation Distrib., LLC*,
7
    2011 WL 6119149 (N.D. Cal. Dec. 8, 2011) .................................................... 13

*Idaho Golf Partners, Inc. v. Timberstone Mgmt., LLC*,
8
    2016 WL 4974944 (D. Idaho Sept. 16, 2016).................................................... 10

9
*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*,
10
    823 F.3d 153 (2d Cir. 2016)................................................................................ 3

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
11
    2 F.4th 1150 (9th Cir. 2021) ............................................................................. 10

12
*Kiva Health Brands LLC v. Kiva Brands Inc.*,
13
    402 F. Supp. 3d 877 (N.D. Cal. 2019) ........................................................ 11, 15

*N. Am. Aircoach Sys., Inc. v. N. Am. Aviation, Inc.*,
14
    231 F.2d 205 (9th Cir. 1955)........................................................................... 3, 7

15
*New Flyer Indus. Canada ULC v. Rugby Aviation, LLC*,
16
    405 F. Supp. 3d 886 (W.D. Wash. 2019) ........................................................... 9

*Nichino Am., Inc. v. Valent U.S.A. LLC*,
17
    44 F.4th 180 (3d Cir. 2022) .............................................................................. 14

18
*Nordstrom, Inc. v. NoMoreRack Retail Grp., Inc.*,
19
    2013 WL 1196948 (W.D. Wash. Mar. 25, 2013) .............................................. 10

*Perfumebay.com Inc. v. eBay Inc.*,
20
    506 F.3d 1165 (9th Cir. 2007)............................................................................ 9

21
*Pres. & Trs. Colby Coll. v. Colby Coll.-N.H.*,
22
    508 F.2d 804 (1st Cir. 1975) ............................................................................ 11

*Rearden LLC v. Rearden Com., Inc.*,
23
    683 F.3d 1190 (9th Cir. 2012)........................................................................ 5, 10

24
*Reflex Media, Inc. v. Chan*,
25
    2021 WL 5936912 (C.D. Cal. June 4, 2021) ...................................................... 8

*Schluter Sys., L.P. v. Telos Acquisition Co. 10, LLC*,
26
    2024 WL 1659898 (N.D. Cal. Apr. 16, 2024) .................................................... 9

27
*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
28
    846 F. Supp. 2d 1063 (N.D. Cal. 2012) ........................................................... 14

1

**TABLE OF AUTHORITIES**
(continued)

2                                                                                        **Page**

3    *Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*,
        2005 WL 701599 (N.D. Cal. Mar. 23, 2005) ......................................................... 15

4

5    *Triad Sys. Corp. v. Se. Express Co.*,
        64 F.3d 1330 (9th Cir. 1995) ............................................................................... 14

6    *Trouble v. Wet Seal, Inc.*,
        179 F. Supp. 2d 291 (S.D.N.Y. 2001) .................................................................. 10

7

8    *Truescents LLC v. Ride Skin Care Care, L.L.C.*,
        81 U.S.P.Q.2d 1334 (T.T.A.B. 2006) ................................................................... 13

9    *Vans, Inc. v. Walmart, Inc.*,
        2022 WL 1601530 (C.D. Cal. Mar. 31, 2022) ....................................... 7, 10, 11, 14

10

11   *WEX Inc. v. HP Inc.*,
        2024 WL 3358651 (D. Me. July 9, 2024) ........................................................ 7, 11

12   **Statutes**

13   15 U.S.C. § 1115(b)(4) ................................................................................................ 13

14   17 U.S.C. § 1117(c) .................................................................................................... 15

15   **Other Authorities**

16   Fed. R. Evid. 702 .......................................................................................................... 5

17   1 McCarthy on Trademarks and Unfair Competition § 11:46 (5th ed. 2024)............................. 13

18   3 McCarthy on Trademarks and Unfair Competition § 23:12 (5th ed. 2024)................................ 9

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

The Port of Oakland wants to make this case about its supposed "need" to convey to the world that its airport is located on the San Francisco Bay.  Oakland has many ways to inform travelers that its airport is proximate to San Francisco or the Bay.  It didn't *need* to adopt a new brand that mimics the City's incontestable SF Mark.  Nonetheless, over the objections from the City, the public, the airline and travel industry, and others, that is the path it chose.

Oakland's response tries to distract from established facts by contorting the law and presenting a narrow, inaccurate, and misleading narrative.  In particular, it improperly collapses the likelihood of confusion analysis into an assessment of how consumers purchase airfare on the websites of its two closest airline partners, Spirit and Southwest – both of which may have played a role in Oakland's adoption of the Infringing Mark *but have not yet used it*.  A fulsome examination of the marketplace and all relevant factors, however, overwhelmingly favors an injunction.

Oakland's analysis of **similarity of marks** is not credible—sidestepping black-letter law that similarities must be weighed more heavily than differences while ignoring that the Infringing Mark subsumes and frontloads the City's name, is often unaccompanied by an IATA code or logo, and, when spoken, sounds alike.  Oakland is dismissive of the undisputed fact that the parties offer **identical services** – a pivotal factor in the analysis that lessens the City's burden on the similarity of marks factor – and does the same with the **direct overlap in marketing channels** (OTAs, airlines, travel agencies, social media, travel and navigation apps, radio, national publications).

Oakland's response to the City's **evidence of strength** is a made-up legal theory that advertising, accolades, and unsolicited media attention don't count if they *also* display "SFO" or a logo, or merely refer to the City's mark in discussing SFO.  It cites no supporting decision, let alone one finding that a 7-decade old mark with a fraction of SFO's publicity and revenue is not strong.

To top it off, Oakland criticizes the City's survey showing over 20% net confusion while neglecting to conduct its own and asks the Court to ignore evidence **of actual confusion**.  Although the City needs none to prevail, this evidence is highly probative and, at this juncture, admissible.  Predictably, travelers have purchased tickets for flights to and arrived at the wrong airport and continue to do so.  Second Declaration of Chris Birch ("Birch II") ¶ 3.  Oakland doesn't care about

1   international travelers, non-native English speakers, and those from parts of the country who are

2   unaware that the Infringing Mark does not identify *the City's* airport.  The City does.[1]

3       The City has more than a "fair chance of success" on the merits.  Moreover, Oakland faces

4   no "**hardship**" to revert to the registered trademark it has used for decades, especially as its

5   Opposition confirms that the mark's rollout is far from complete.  And the City will suffer

6   **irreparable injury** if a rival airport is using a copycat name – the only other airport in the country

7   doing so – and threatening its goodwill and reputation, and control over its incontestable trademark.

8       The Court is urged to stop Oakland from using the Infringing Mark.

9   **II.    THE CITY ESTABLISHED THAT IT IS LIKELY TO SUCCEED ON THE MERITS**

10      **A.    Oakland Does Not Dispute the Validity and Priority of the SF Mark.**

11      The City established (Mot. 11–12), and Oakland effectively concedes, the validity of the SF

12  Mark.  The City's incontestable registration is conclusive proof that the mark is valid ***and*** has

13  secondary meaning (an admission that is also relevant to the strength of mark factor).  *Id.*

14      **B.    The City Established that all *Sleekcraft* Factors Weigh in Its Favor.**

15      The City properly applied all of the Ninth Circuit's *Sleekcraft* factors – consistent with how

16  courts have done in the myriad cases cited in its motion (Mot. 13–14, 22–23) and not in a "rigid"

17  and mechanistic manner.  Opp. 6.  Oakland's response compresses the likelihood of confusion

18  analysis into an evaluation of "context" (circularly defined as "what a reasonable consumer would

19  believe based upon what they see on the screen") and its narrow view of "consumer sophistication."

20  By focusing on this *subset* of two factors, Oakland glaringly ignores or downplays many

21  unfavorable facts and factors.  Oakland also construes "confusion" too narrowly to mean only

22  confusion about whether the Oakland airport *is* the San Francisco airport.  But cognizable confusion

23  includes both **initial interest confusion** (where a defendant's mark creates initial customer interest

24  even if no actual sale occurs as a result (*see Brookfield Communications, Inc. v. West Coast*

25  *Entertainment Corp.*, 174 F.3d 1036, 1063–64 (9th Cir. 1999)), and **confusion as to affiliation or**

26

27

28

---

[1] The City has amassed this preliminary record without Oakland's candor about confusion at Oakland's airport: Oakland *refuses* to meaningfully oblige the City's public records requests. Yakel Decl. ¶ 21. The record demonstrates that Oakland knew of the City's trademark, mimicked it, and ignored warning signs occurring at a frequency uncommon in a typical trademark case.  Mot. 6.

1   **sponsorship**. *See Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d

2   153, 161–62 (2d Cir. 2016) (error to consider only confusion as to source, and not confusion as to

3   sponsorship, affiliation or connection).  All such confusion is relevant here but ignored by Oakland.

### 1.    The Parties' Marks Are Highly Similar.

5          Under the applicable legal test, Oakland cannot credibly dispute that the parties' marks are

6   similar. Mot. 15-17. Both begin with "SAN FRANCISCO" and end with "INTERNATIONAL

7   AIRPORT".  Indeed, the Infringing Mark incorporates *every word* of the City's mark:

8          **SAN FRANCISCO INTERNATIONAL AIRPORT**

9          **SAN FRANCISCO** BAY OAKLAND **INTERNATIONAL AIRPORT**

10  The result is that the marks look alike, are pronounced alike, and share similar meanings; all the

11  more so when they are truncated.  Mot. 8.  SAN FRANCISCO is both the first element of the marks

12  read by consumers and the dominant one.[2]  *See In re Detroit Athletic Co.*, 903 F.3d 1297, 1303

13  (Fed. Cir. 2018).  The Infringing Mark's prominent use of SAN FRANCISCO is "particularly

14  significant because consumers typically notice [the initial two words of a mark] first," (*id.*) and also

15  because of the role that city names traditionally play within airport names as indicators of both the

16  airport's operator along with the location of the airport.  Second Decl. of Charles Schuler ("Schuler

17  II") ¶ 12; Andretta Decl. ¶ 24.  The City has enjoyed exclusive use of "SAN FRANCISCO" for

18  airport services for over 70 years.[3] *See N. Am. Aircoach Sys., Inc. v. N. Am. Aviation, Inc.*, 231 F.2d

19  205, 210 (9th Cir. 1955).  This makes Oakland's replication of the SF Mark even more confusing.

20         Oakland responds by overemphasizing the significance of the word "Bay" in its Infringing

21  Mark.  This is just another way of saying that the parties' marks are not *identical*, but that is not the

22  test.  The descriptive word "Bay" does not diminish irrefutable similarities.  *E.g.*, Williams II ¶ 8.

23         Oakland fares no better distinguishing the City's authorities.  It suggests that *Greater*

24  *Orlando Aviation Auth. v. Sanford Airport Auth.* is unpersuasive because it concerned two airports

---

25  [2] Further reinforcing this point, the parties were both required by the USPTO to disclaim rights in

26  "INTERNATIONAL AIRPORT" due to its descriptiveness and common use by others, but not

"OAKLAND" or "SAN FRANCISCO."  Second Declaration of Jessica Williams ("Williams II")

27  ¶¶ 2-3.  This indicates the USPTO regards city names as the dominant component of these marks.

[3] Oakland suggests that there are "thousands" of federally registered trademarks that "start with

28  'San Francisco'" (Opp. 15) but cites no evidence.  In any case, the relevant services are airports

and, prior to Oakland's infringement, only the City had used its name for airport services.

1    using the same city name, whereas Oakland is using "San Francisco Bay," not "San Francisco."

2    Opp. 17. This is a distinction without a difference. *Both marks lead with SAN FRANCISCO*. It

3    similarly argues that *Perfumebay.com Inc. v. eBay Inc.* is distinguishable because

4    "PERFUMEBAY" incorporated "EBAY," whereas Oakland merely "replaced… 'Metropolitan'"

5    with "San Francisco Bay." Opp. 17. This too is semantics. However Oakland spins its mark, it is

6    no less true that the *entire* SF Mark is subsumed within it – just like in *Perfumebay*. Mot. 17.

7         Meanwhile, the only new case cited by Oakland is factually distinguishable. In *Florida*

8    *Int'l University v. Florida Nat'l University*, the Eleventh Circuit affirmed that "Florida National

9    University" and "Florida International University" were dissimilar largely because the parties were

10   "in a field where so many competitors have names that appear and sound similar." 830 F.3d 1242,

11   1261 (11th Cir. 2016). Against a backdrop of many similar university names across the U.S., minor

12   differences between the parties' marks took on greater importance. Also, the marks were being

13   marketed to students and parents whom "generally spend a substantial amount of time and energy

14   learning about their options" before committing their educational future *and tens of thousands of*

15   *dollars* to a school. *Id.* Here, there was only *one* airport in the United States with "SAN

16   FRANCISCO" in its name prior to Oakland's infringement, and the degree of care exercised in

17   purchasing airfare is incomparable to a decision to attend a four-year college.

18        Oakland's brief suggests that examining the parties' marks in "context" is a separate factor

19   (Opp. 7-8), but it is part of the "similarity of marks" factor, which instructs that "marks must be

20   considered in their entirety and as they appear in the marketplace." *GoTo.com, Inc. v. Walt Disney*

21   *Co.*, 202 F.3d 1199, 1205–06 (9th Cir. 2000). Under the pretense of setting the record straight

22   regarding "the commercial context in which consumers actually search for and purchase flights,"

23   Oakland and its declarants conjecture that a combination of "IATA codes, city references or other

24   pertinent information" displayed on airline and OTA websites clearly "distinguish[] airport

25   choices." Opp. 8. This conclusion is based on an incomplete and misleading picture of the market.

26        To begin, Oakland's emphasis on the websites for Southwest and Spirit Airlines to the

27   exclusion of other market contexts is backwards. Neither website currently displays the Infringing

28   Mark – demonstrating that Oakland's top airline partners are smart enough not to use the mark, or

1    simply don't "need" it.  Moreover, most travelers today rely on OTAs as a resource when

2    purchasing airfare; and many of the most popular OTAs display the Infringing Mark in full.  Schuler

3    II ¶¶ 8.  This means that by the time these consumers arrive at an airline website, they will have

4    already encountered the Infringing Mark, to say nothing of other contexts in which the Infringing

5    Mark would have been displayed to them.

6         Travelers also become familiar with airport names prior to making purchases by

7    encountering them in advertising and other media such as news articles, and this background can

8    inform later purchasing decisions.  *Id*. ¶ 9.  In these contexts or aurally, logos or IATA codes often

9    are ***not*** conveyed at all.  *See id*. ¶ 9-10; Williams Decl. ¶¶ 14–15; Second Decl. of Melissa Andretta

10   ("Andretta II") ¶¶ 7–10.  *See Allstate Ins. Co. v. Kia Motors Am., Inc.*, 2017 U.S. Dist. LEXIS

11   211399, at *31–32 (C.D. Cal. 2017) (marks similar despite distinguishing logo because, among

12   other reasons, defendant has no "control over the way in which its dealers describe" its product);

13   *Boldface Licensing+Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1187 (C.D. Cal. 2013)

14   (KROMA and KHROMA BEAUTY BY KOURTNEY, KIM AND KHLOE similar because

15   KHROMA was often displayed, by itself, by third parties).  Of note, these conclusions are not

16   inconsistent with Oakland's Bridie, Rolek, and Reim declarations.[4]

17        Likewise, Oakland's reliance on its IATA code as distinguishing the parties' marks is

18   misplaced.  Opp. 17.  It presumes – without any evidence – that consumers (including out-of-state

19   or international travelers) recognize the "OAK" IATA code and know that the corresponding

20   airport (i) is not the San Francisco International Airport, and (ii) is not otherwise associated with

21   the City or its airport.  Also, as the City explained, in many contexts the IATA code is displayed

22   only after an airport's name, where it is less likely to be seen or make a commercial impression.

23   Mot. 17.  More generally, even where IATA codes have visible placement, the parties' word marks

24   remain overwhelmingly dominant.  *See, e.g.*, *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190,

25

26   [4] Oakland proffers these declarations as dispassionate, objective opinions about the parties' market.
     But each of the declarants is a self-interested player, Andretta II ¶ 4, and may have been involved
27   in Oakland's decision to adopt the Infringing Mark.  Moreover, although Dr. Reim is implicitly
     positioned as an aviation marketing "expert," she is not so qualified.  Fed. R. Evid. 702.  She
28   describes her focus as "service network strategies and route development," not consumer marketing
     or behavior, which is what is at issue here.  Schuler II ¶ 6.  Her opinions are not probative at all.

1212 (9th Cir. 2012) (surname "Rearden" was prominent in both marks despite distinct logos); *Charles Schwab & Co. v. Hibernia Bank*, 665 F. Supp. 800, 808–09 (N.D. Cal. 1987) (house mark insufficient to distinguish infringing sub-brand because it was downplayed in ads while the infringing mark was in bold). Oakland offers no evidence or argument to the contrary.

Oakland also suggests that city and region references on some airfare booking websites mitigate confusion risk. Opp. 7–8. In the present context, however, they exacerbate it. Mot. 21. A search for either party's airport on Southwest's website returns them both under the heading "San Francisco Area Airports," while Spirit's returns "Oakland, CA / San Francisco, CA AREA." Bridie ¶ 11; Rolek ¶ 17. For a consumer visiting these sites already having formed an impression of the Infringing Mark, these results (both which prominently feature references to "San Francisco") may reinforce that the Oakland airport is SFO or affiliated with SFO. Schuler II ¶ 12.

*Finally*, Oakland relegates to its declarations an argument that it is "common" for more than one airport within a region to share a city name, and thus, travelers might distinguish between them. Reim ¶¶ 17, 19; Bridie ¶ 6; Rolek ¶ 6. None of its evidence reflects actual consumer perception. Regardless, this argument is undermined by the facts. For example, O'Hare and Midway are both operated by the City of Chicago; Fort Worth and Love Field are both operated, in whole or in part, by the City of Dallas; and Dulles Airport and Ronald Reagan National are both operated by the federal government. Andretta ¶ 24. That is, the **source of these airports is the same**. Thus, confusion is heightened when two regional airports operated by different cities share the same city name because that is ***not*** the norm. Mot. 15–16 (discussing Orlando airports).

### 2.     The City's Mark Is Unquestionably Strong

Oakland fails to cite any case approximating a decades-old incontestable mark, supported by tens of millions in advertising, billions in revenue, and hundreds of millions of commercial impressions, in which a court did not conclude that a brand owner's mark was strong. Instead, Oakland introduces a strawman, misconstruing the Motion as arguing that the SF Mark is inherently distinctive. The City made no such argument. Instead, the City established that the SF Mark is strong by virtue of its significant *commercial* strength, secondary meaning (undisputed, *see* § II.A), and longstanding use. Mot. 12–14. Oakland also badly misconstrues the authorities cited in the

1    Motion.  It argues that both *Coachella Music* and *North American Aircoach* concerned inherently

2    distinctive trademarks that the courts found strong due to their conceptual strength.  Opp. 18–19.

3    This is the ***opposite*** of what those cases say.  *See N. Am. Aircoach*, 231 F.2d at 209–10 (explaining

4    that geographic names may "acquire a secondary or fanciful meaning" and become "strong," and

5    affirming  that "'North American' in connection with aviation means the plaintiff solely and

6    exclusively" due to commercial success and exclusive use); *Coachella Music Festival, LLC v.*

7    *Simms*, 2018 WL 6074556, at *4 (C.D. Cal. Sept. 10, 2018) (explaining that a "geographic location"

8    like Coachella "is generally a descriptive mark" but acquired secondary meaning and strength due

9    to substantial success, including $84M in sales).

10        The record concerning the strength of the SF Mark is even stronger than in those cases.

11   SFO is an award-winning and highly acclaimed airport that receives tens of millions of passengers

12   each year, all of whom encounter the SF Mark in some fashion.  Mot. 2-4; Schuler ¶¶ 8–9, 11–16.

13   The SF Mark is also the subject of millions of dollars in advertising (*id*. ¶ 12), is displayed in a

14   variety of commercial contexts (*id*. ¶¶ 14–16), and extensive unsolicited media attention (Williams

15   ¶¶ 3–5).  The SF Mark is undoubtedly widely recognized and, by one independent measure,

16   regularly ranks among the top 25 strongest airport brands.  Schuler ¶ 17.

17        Oakland responds to this evidence by arguing that the City's advertising shouldn't factor

18   into the SF Mark's strength because the City cannot isolate its spend on advertising that *only*

19   displays the SF Mark.  This nonsensical argument is unsupported by any legal authority.  Marketing

20   spend and accolades are proxies for consumer awareness of a mark.  So long as a mark is displayed

21   in advertising materials (*e.g*., Schuler ¶¶ 14–16), it contributes to that awareness, regardless of

22   whether other branding indicia (e.g., logos, taglines, etc.) are present.  *See Vans, Inc. v. Walmart,*

23   *Inc.*, 2022 WL 1601530, at *9 (C.D. Cal. Mar. 31, 2022) (granting injunction and finding strength

24   of trade dress weighed strongly in plaintiff's favor, noting its "tens of millions of dollars" on

25   advertising, notwithstanding defendant's criticism that ads were not specific to the trade dress);

26   *WEX Inc. v. HP Inc*., 2024 WL 3358651, at *29-30 (D. Me. July 9, 2024) (trademark strong due to

27   35 years of exclusive use and significant advertising spend).

28        Oakland also argues that references to the SF Mark in media publications are "rarely" in

1    isolation and generally refer to the airport as a location.  Opp. 19.  Because media attention is a

2    proxy for consumer awareness, courts routinely recognize that significant unsolicited media

3    attention is strong evidence of commercial strength; there is no separate requirement for a mark to

4    be displayed in a particular way so long as it appears.  *See, e.g.*, *Blue Bottle Coffee, LLC v. Liao*,

5    2024 WL 2061259, at *11-12 (N.D. Cal. May 7, 2024) (mark was strong because of, among other

6    things, it "received news and social media coverage"); *Reflex Media, Inc. v. Chan*, 2021 WL

7    5936912, at *6 (C.D. Cal. June 4, 2021) (brand with "millions of customers" and significant media

8    recognition regarded as strong) (collecting cases).  The SF Mark is ***strong***. *See* Mot. 12–14.

9    ### 3.    Identical Services (Airports) Make Confusion Likely

10   Oakland does not dispute that the parties are competitors and offer the same service.  Mot.

11   14-15.  Nor does it challenge caselaw directing that where services are identical, lesser showings

12   of similarity are required.  *Id.*  Instead, it seeks to minimize this by asking the Court to consider the

13   parties' competitive posture only in combination with other factors. Opp. 20.  Consistent with the

14   law, the City welcomes the Court to do so.  Oakland cannot wave away that the parties sell the

15   same services to the same customers, via the same marketing and sales channels.  The parties'

16   overlapping services weigh heavily in the City's favor.

17   ### 4.    Overlapping Marketing Channels Make Confusion Likely

18   Oakland also does not dispute that the parties share the same marketing channels.  Instead,

19   misapplying two decisions, Oakland argues that shared use of the internet for marketing is not

20   probative of confusion.  Opp. 20.  Here, however, the parties' airports are profiled in the *same*

21   publications, third-party websites, and apps, and on the same local radio station.  *See* Schuler II ¶

22   10.  This isn't a case in which the parties both merely "have websites."  This convergence of

23   marketing channels further heightens the risk of confusion and weighs heavily in the City's favor.

24   ### 5.    Oakland's "Purchasing Care" Argument Does Not Change the Analysis

25   Oakland attributes a heightened standard of care to air travelers, but this is unsupported by

26   the record and law.  The sophistication and depth of experience of air travelers varies widely and

27   includes both inexperienced and knowledgeable consumers. Mot. 20–21; Andretta ¶ 19. And while

28   travel is often planned carefully in advance, it is also often the result of spur of the moment decision

REPLY BRIEF ISO PRELIMINARY INJUNCTION
Case No. 3:24-cv-02311-TSH              8

1    making. *Id*. The law is clear that considerations of consumer care must account for the experiences

2    of *all* travelers. *Fleischmann Distilling Corp. v. Maier Brewing Co*., 314 F.2d 149, 156 (9th Cir.

3    1963); *Brookfield*, 174 F.3d at 1060. *See also Ford Motor Co. v. Summit Motor Prods., Inc.*, 930

4    F.2d 277, 293 (3d Cir. 1991) ("when a buyer class is mixed, the standard of care … will be equal

5    to that of the least sophisticated consumer in the class"). Here, the victims of Oakland's

6    infringement could just as easily include foreign travelers or those who buy a $49 one-way ticket;

7    book a $30 Uber ride; arrange for a car rental or car share; get a ride from a friend; or hastily book

8    a flight on an app. The record demonstrates the ease with which the consuming public has been

9    confused at this early stage (Mot. 17–18) and does not support any inference that victims' "degree

10   of care" would prevent confusion. Mot. 20-21. That is likely why many airlines and agencies voiced

11   concerns over the name change. *Id*. 6. "[G]iven the similarity of the parties' marks and relatedness

12   of the goods on which those marks appear, even purchasers exercising a high degree of care would

13   likely be confused, and some, in fact, have been confused." *Boldface*, 940 F. Supp. 2d at 1194.

14       Oakland's various authorities do not alter this conclusion. Opp. 9. It relies on one case,

15   which stands for the unremarkable observation that "there are many contexts in which it no longer

16   holds true" that internet shoppers are presumed to be unsophisticated. *Id.* All of its cited cases are

17   inapt or distinguishable.[5] Mot. 20–21. This factor weighs in favor of confusion – not against it.

18                    **6.    The City's Evidence of Actual Confusion Is Probative**

19       Actual confusion is difficult to adduce. "Persons who are truly confused will often never

20   be aware of the deception. Others who were confused and later learned of their deception will often

21   not bother to report the fact." 3 McCarthy on Trademarks and Unfair Competition § 23:12 (5th ed.

22   2024). The law requires a ***likelihood*** of confusion, *Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d

23   1165, 1176 (9th Cir. 2007). The City doesn't need any actual confusion evidence. Mot. 17–18.

24

25   [5] *Schluter Systems, L.P. v. Telos Acquisition Co. 10, LLC*, concerned online shoppers "who
     specialize in tile construction," *i.e.*, expert consumers. 2024 WL 1659898, at *11 (N.D. Cal. 2024).
26   *BNSF Ry. Co. v. Float Alaska IP, LLC*, indicated that, in selecting services from a freight railway
     and start-up airline, consumers are discerning of "quality of service and safety," but nevertheless
27   granted a preliminary injunction. 2023 WL 6783506, at *7, *11 (C.D. Cal. 2023). And *New Flyer
     Industries Canada ULC v. Rugby Aviation, LLC*, concerned a small airline that primarily served a
28   30-mile radius, and which required tickets to be purchased by phone. 405 F. Supp. 3d 886, 894
     (W.D. Wash. 2019). None of these decisions address the variable pricing and levels of care here.

Here, confused travelers, recognizing that they've purchased tickets to the wrong airport are likely to be in transit (and rushed to get to the right airport). They are unlikely to have a desire or time to report their confusion as they adjust their plans, and unlikely to communicate their confusion to airport personnel (as opposed to airlines) because the airport has little ability to help them. Other travelers who instead incorrectly assume that Oakland's airport is the same as or affiliated with SFO or the City are unlikely to register their mistaken view at all.

Thus, it is significant that the City already has meaningful evidence of ongoing confusion. **Oakland's response is to belittle it**. Multiple individuals have booked flights to one party's airport intending to travel to the other (Williams Exs. T-V; Williams II ¶¶ 4-15; Birch ¶¶ 6–7, Ex. A), including several known instances since the Motion was filed (Birch II ¶ 3). Evidence also includes travelers tagging the wrong airport on social media, and those directed to the wrong airport by digital assistants, navigation apps, and rideshare services, (Williams Exs. O, V–W; Williams II ¶¶ 4-15), and even airline professionals taking a meeting with the Oakland airport thinking it was SFO. Andretta II ¶ 11. These examples of confusion are entitled to weight, and even "non-consumer confusion can properly factor into the 'likelihood of confusion' inquiry," both as a proxy for consumer confusion and a contributor to it. *Rearden*, 683 F.3d at 1214–15; *see also Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1165–66 (9th Cir. 2021) (error to disregard declaration of plaintiff's CEO that he was asked about the affiliation between the parties). This is especially true at the preliminary injunction stage. *See* Mot. 18 (collecting cases); *Vans*, 2022 WL 1601530, at *11-12 (crediting, in part, three instances of online confusion).

Part of Oakland's attack is to argue that the evidence is inadmissible hearsay. Opp. 11.[6] But "the rules of evidence do not apply strictly to preliminary injunction proceedings" and

---

[6] Oakland's decisions on this issue are inapposite, including because they resulted from motions *in limine* following discovery or after a bench trial. *See, e.g.*, *Great W. Air, LLC v. Cirrus Design Corp.*, 649 F. Supp. 3d 965, 982 (D. Nev. 2023) (affirming finding at trial that evidence was limited relative to parties' 13 years of coexistence); *Idaho Golf Partners, Inc. v. Timberstone Mgmt., LLC*, 2016 WL 4974944, at *3 (D. Idaho Sept. 16, 2016) (motion *in limine*); *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 300 (S.D.N.Y. 2001) (similar). Only *Nordstrom, Inc. v. NoMoreRack Retail Group, Inc.* was decided on a motion for preliminary injunction, and it is distinguishable: over two years, there were a handful of examples of confusion comprised mostly of misdirected communications. 2013 WL 1196948, at *6-7 (W.D. Wash. Mar. 25, 2013). Here, Oakland has been using the Infringing Mark for a few months and traveler confusion is not a few errant emails.

prohibitions on hearsay are relaxed.  *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013).  Courts regularly credit actual confusion evidence like the City's at this stage.  *Vans*, 2022 WL 1601530, at *11.  Notably, in *Kiva Health Brands LLC v. Kiva Brands Inc.* (cited by Oakland), this Court held that a confusion log like the City's "is not hearsay" because it falls within the state of mind exception.  402 F. Supp. 3d 877, 895 (N.D. Cal. 2019) (collecting cases).  The log was even given weight notwithstanding that the plaintiff had conspicuously failed to "record any of the phone calls reflected in the log, it deleted all of the voicemails, and it did not retain any of the underlying emails."  *Id*.  No such indicia of unreliability are present here.  To the contrary, when the City became aware of confusion, it began recording information from willing travelers.  Birch ¶ 5.  The City's evidence of ongoing confusion—in different forms and forums— is "strong" evidence of a likelihood of confusion.  Mot. 10.

### 7.    The City's Survey Is Well-Designed and Confirms Confusion Is Likely

Courts routinely recognize, and Oakland does not dispute, that surveys showing net confusion rates above 15% are strong evidence of confusion.  Mot. 19 (collecting cases crediting surveys with 12.5+% confusion rates).  Accordingly, the Butler survey, which returned a net confusion rate above 20%, is highly probative.  *Vans*, 2022 WL 1601530, at *11 (granting injunction in part on survey showing 23.2% net confusion); *WEX*, 2024 WL 3358651, at *26-27 (granting preliminary injunction in part on survey by Sarah Butler showing 20.8% confusion).

Without doing its own survey – despite having the time and financial ability to do so (*id*. (noting lack of rebuttal survey)) – Oakland hired Dr. Scott to critique Butler's survey.  Her criticisms fall short and "do not remedy the lack of affirmative evidence to the contrary." *Pres. & Trs. Colby Coll. v. Colby Coll.-N.H.*, 508 F.2d 804, 809–10 (1st Cir. 1975) (reversing denial of injunction where defendant criticized survey without offering its own).

*First*, Dr. Scott claims that Butler's survey universe was selective and underinclusive, because it purportedly "excludes markets that currently account for the largest number of Oakland passengers."  Scott ¶ 8(i).  But this criticism implies that the only relevant consumers are in the Oakland airport's current market.  Butler II ¶¶ 4, 9-20.  Given that the stated purpose of the name change is to help grow the airport and expand its footprint, it was also important for the survey to

account for "areas where Oakland International Airport itself has suggested its name change may have an impact." *Id*. ¶ 10 and fn30. Moreover, it was appropriate for the survey not to target local geographic regions in which respondents were more likely to be familiar with the parties' dispute to avoid biasing results. *Id*. ¶ 15 and §IV.A. As Ms. Butler explains, "Dr. Scott presents no data to demonstrate that some other set of states would have yielded different results and ignores [] data demonstrating that even consumers who have previously traveled to Northern California were confused." *Id*. ¶¶ 4, 15-21. Dr. Scott's other criticisms of the Butler survey's universe are equally baseless. *See generally § IV.A (*¶¶ 17-21).

*Second*, Dr. Scott contends that the Butler survey failed to replicate real-world marketplace, and objects that Ms. Butler tested confusion at only one point in time. Scott ¶¶ 13–33. These criticisms have no merit: proper methodology required testing whether the name "San Francisco Bay Oakland International Airport when appearing in a realistic manner causes confusion." Butler II ¶¶ 5, 22-34. The Butler survey did so by showing uses consistent with how the marks have been and could be displayed. *Id*. And any survey is necessarily a snapshot of perceptions at a particular point in time. *Id*. ¶ 24.

*Third*, Dr. Scott takes issue with the format of one of Butler's questions ("which is the primary airport"), but Butler's results demonstrate a net confusion rate of over 18% *even without* it. *Id*. ¶ 43. Dr. Scott takes other swipes at the Butler survey, which are not called out in the Opposition, but these too are baseless. *Id*. ¶¶ 46-48. Overall, the Butler survey is a powerful indicator of likelihood of confusion, unrebutted by a contrary survey or Dr. Scott's flimsy and superficial criticisms. *Id*. ¶¶49-50 (explaining conclusions and Dr. Scott's failure to consider data).

### 8.    Oakland Ignored Objections and Infringed the SF Mark

Oakland says that it adopted the Infringing Mark with no intent to copy or deceive, but this is belied by the record. Oakland does not dispute that it had actual knowledge of the SF Mark, and that it pressed ahead with the Infringing Mark over objections from the City, multiple airlines, travel agencies, and others. Mot. 7–8, 21–22 (citing evidence). *See Boldface*, 940 F. Supp. 2d at 1195. Moreover, Oakland has been less than forthcoming with records requests inquiring about the name change, the City's trademark rights, and confusion occurring at Oakland. Yakel ¶ 21.

1   The Court may also infer bad faith from Oakland's decision to rebrand yet forego a trademark

2   application. The logical inference from this is that Oakland knew it may be sued and did not want

3   the USPTO to assess the SF Mark as confusingly similar.  On balance, this factor weighs in the

4   City's favor. Regardless, lack of intent cannot weigh against a likelihood of confusion.

5   **9.    Oakland's Likelihood of Expansion Makes Confusion Likely**

6   As explained (Mot. 22), this factor is "relatively unimportant where two companies already

7   compete to a significant extent."  *Brookfield*, 174 F.3d at 1060.  It should nevertheless carry some

8   weight here. Oakland's stated impetus for adopting the Infringing Mark is to attract more business

9   to its airport.  Opp. 4–5.  If Oakland succeeds in adding new routes or attracting new airlines, in

10  particular airlines with routes to SFO, this will only increase opportunities for confusion.

11  **C.    The Fair Use Doctrine is Inapplicable Here**

12  Oakland disingenuously argues that the doctrine of fair use insulates it from liability for

13  adopting the Infringing Mark.  Opp. 21.  Fair use is inapplicable here as a matter of law.  "The only

14  type of use which can qualify as a 'classic fair use' is use [] in a ***non-trademark*** sense. This is the

15  rule both at common law and under the Lanham Act." 1 McCarthy on Trademarks and Unfair

16  Competition § 11:46 (5th ed. 2024).[7]  *See* 15 U.S.C. § 1115(b)(4) (recognizing descriptive fair use

17  as a defense to infringement of an incontestable trademark only where the use is "*otherwise than*

18  *as a mark*" (emphasis added)).  This is illustrated in *Humboldt Wholesale, Inc. v. Humboldt Nation*

19  *Distribution, LLC*, where this Court considered on a motion to dismiss whether fair use could apply

20  to the defendants' use of the geographic descriptor "Humboldt" within a family of marks (e.g.,

21  "Humboldt Nation Distribution," "Humboldt Nutrients," etc.).  2011 WL 6119149, at *5 (N.D. Cal.

22  Dec. 8, 2011).  The Court concluded that it could **not**, explaining that "[f]air use only allows use of

23  another's mark where the use is otherwise than as a trade or service mark." *Id*. (quotations omitted).

24  This was so, even though the defendants were using the term "Humboldt" only "as part of" their

25  own trademarks, *i.e.*, in combination with other words.  *Id*.

26  Here, Oakland is using the terms "San Francisco" and "International Airport" as

27
28
---
[7] For this reason, the Trademark Trial and Appeal Board, which has a purview limited to issues of trademark registrability, will not entertain fair use claims even for components of marks. *See Truescents LLC v. Ride Skin Care Care, L.L.C.*, 81 U.S.P.Q.2d 1334, at *4 (T.T.A.B. 2006).

1    components of a trademark; indeed, they are using the Infringing Mark as a ***replacement*** for their

2    registered OAKLAND INTERNATIONAL AIRPORT mark.  Mot. 5. And that use is causing

3    confusion.  The defense of fair use is therefore unavailable to Oakland, and does not help it here.

4    ### D.    Oakland Fails to Rebut the City's Presumption of Irreparable Harm

5    Oakland agrees that the City is entitled to a presumption of irreparable harm upon a showing

6    of likelihood of success on the merits.  Opp. 22.  The City has done so.  To rebut the presumption,

7    Oakland was required to "introduce evidence sufficient for a reasonable factfinder to conclude that

8    the consumer confusion is unlikely to cause irreparable harm." *Nichino Am., Inc. v. Valent U.S.A.*

9    *LLC*, 44 F.4th 180, 186 (3d Cir. 2022).  It has not.  At most, Oakland argues that SFO has continued

10   to thrive and receive positive press despite the ongoing harm caused by the Infringing Mark and

11   risk of future reputational damage.  Opp. 22.  This argument does not meet its burden.

12   Still, the City detailed the immediate and irreparable harm to its reputation and goodwill.

13   Andretta ¶¶ 8, 27.  *See SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063, 1083

14   (N.D. Cal. 2012).  Every disgruntled, confused passenger that ends up at the wrong airport or

15   otherwise has an unsatisfactory experience at the Oakland airport jeopardizes the City's decades-

16   long effort to cultivate an award winning, world-class reputation around the globe. Schuler ¶¶ 8–9,

17   17; Andretta ¶¶ 8, 27.  The City's harm is not speculative or unfounded, as Oakland argues.  *See,*

18   *e.g., Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*, 2020 WL 5199434, at *8 (N.D. Cal. Aug. 17,

19   2020); *Vans,* 2022 WL 1601530, at *13 ("evidence of loss of market control, consumer confusion

20   [and survey evidence], and the poor quality of [defendant's] shoes is sufficient to establish" in light

21   of the presumption).

22   ### E.    The Public Interest Strongly Favors an Injunction

23   Oakland acknowledges that protecting the public from trademark infringement is in the

24   public interest.  Opp. 25. Its only response is that the City has failed to demonstrate a likelihood of

25   success on the merits or irreparable harm.  As discussed above, that argument fails.

26   ### F.    The Balance of Hardships Strongly Favors an Injunction

27   Oakland cannot complain of alleged harms "when properly forced to desist from its

28   infringing activities." *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995),

superseded on other grounds by 17 U.S.C. § 1117(c). Oakland's only purported hardship is that it will need to revert to its old name, and may, as a practical matter, be forced to scrap its plans for the Infringing Mark altogether. Opp. 24. **It should.** Oakland was well aware of the City's concerns before it forged ahead with rebranding, and has no legitimate interest in infringing the SF Mark. *Cf. Cadence Design Sys. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) (a knowing infringer "cannot complain of the harm" from being forced to stop infringement). While Oakland argues that courts have "routinely" rejected this argument, its authorities are distinguishable.[8]

Critically, Oakland provides scant ***evidence*** of hardship. It argues it will suffer "immediate and direct harm" because it "has invested considerable resources" in the Infringing Mark. Opp. 24. It provides no evidence quantifying its alleged investment or the cost of complying with an injunction and, once more, Oakland's cited cases (*id*. 24-25) provide no support for its position. It also speculates that, as a practical matter, an injunction might cause it to permanently scrap plans for the Infringing Mark. But the balance of hardships doesn't favor a defendant merely because it might capitulate if it loses the motion. If that were so, this factor would favor every defendant.

Oakland needs to go back to its registered trademark. It offers no argument that doing so would cause it to lose customers. Nor would it impact its main airline partners (Southwest and Spirit), who say they are ***not*** using the Infringing Mark. Balanced against the actual confusion and the City's interest in protecting its reputation and goodwill, the equities favor requiring Oakland to revert back to the name that, up until five months ago, it had used for decades.

## III.    CONCLUSION

For the foregoing reasons, the City respectfully requests that the Court enjoin Defendants and those acting in concert with them from using the Infringing Mark.

---

[8] In both *C21FC LLC v. NYC Vision Capital Inc.*, 2022 WL 2191934, at *9 (D. Ariz. June 17, 2022), and *Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*, 2005 WL 701599, at *13 (N.D. Cal. Mar. 23, 2005), the plaintiffs had failed to demonstrate a likelihood of success on the merits and there were facts indicating lack of harm. In the other cited cases, the courts credited the defendants' lack of intent to infringe. *Kiva*, 402 F. Supp. 3d at 899 (junior trademark user had used mark in good faith for 8 years); *Champion-Cain v. Macdonald*, 2016 WL 7188242, at *9 (S.D. Cal. Dec. 12, 2016) (less than three months before trial and no evidence of intent).

1    Dated: October 22, 2024                    COOLEY LLP

2

3                                               By:_____

4                                               Bobby A. Ghajar
                                                John Hemann
                                                Judd D. Lauter

5

6                                               Attorneys for Plaintiff
                                                CITY AND COUNTY OF
                                                SAN FRANCISCO

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY BRIEF ISO PRELIMINARY INJUNCTION
Case No. 3:24-cv-02311-TSH                    16

1   Mary C. Richardson (Bar No. 208586)
    Port Attorney
2   mrichrdson@portoakland.com
    Kimberly I. McIntyre (Bar No. 184648)
3   Deputy Port Attorney
    kmcintyre@portoakland.com
4   **PORT OF OAKLAND**
    530 Water Street
5   Oakland, California  94607
    Tel: (510) 627-1572 / (510) 627-1205
6
    Eugene M. Pak (Bar No. 168699)
7   epak@fennemorelaw.com
    **FENNEMORE WENDEL**
8   1111 Broadway, 24th Floor
    Oakland, California  94607
9   Tel: (510) 834-6600 / Fax: (510) 834-1928
10  Stephen C. Willey (Bar No. 209164)
    swilley@fennemorelaw.com
11  Brandi B. Balanda (*Pro Hac Vice*)
    bbalanda@fennemorelaw.com
12  Christopher J. Lindemeier (*Pro Hac Vice*)
    clindemeier@fennemorelaw.com
13  **FENNEMORE CRAIG, P.C.**
    1425 Fourth Avenue, Suite 800
14  Seattle, Washington  98101
    Tel: (206) 749-0500 / Fax: (206) 749-0500
15
    Attorneys for Defendant and Counterclaimant City of
16  Oakland, a municipal corporation, acting by and
    through its Board of Port Commissioners (Port of
17  Oakland)
18
19              UNITED STATES DISTRICT COURT
20              NORTHERN DISTRICT OF CALIFORNIA
21
22  CITY AND COUNTY OF SAN              Case No. 3:24-cv-02311-TSH
    FRANCISCO,
23                                      **DECLARATION OF DR. CAROL A.
                    Plaintiff,          SCOTT**
24
    v.                                  Date: November 7, 2024
25                                      Time: 10:00 AM
    CITY OF OAKLAND AND PORT OF         Courtroom: E – 15th Floor
26  OAKLAND,                            Trial Date: (None Set)
27                  Defendants.

CITY OF OAKLAND, A MUNICIPAL
CORPORATION, ACTING BY AND
THROUGH ITS BOARD OF PORT
COMMISSIONERS (PORT OF OAKLAND),

                 Counterclaimant,

v.

CITY AND COUNTY OF SAN
FRANCISCO,

                 Counterclaim Defendant.

     I, Carol A. Scott, declare as follows:

## I.       BACKGROUND AND QUALIFICATIONS

    1.     I am a Professor of Marketing Emeritus at the Anderson Graduate School of Management ("Anderson School") at UCLA and an expert in marketing strategy and consumer and market research. I hold a Ph.D. in Marketing from Northwestern University, where my minor field of study was Social Psychology. I also received a Master of Science in Management degree from Northwestern University and a Bachelor of Science in Business and History Education degree from the University of Texas at Austin. From 1986 through 1994, I held several administrative positions with the Anderson School, including Chairman of the Faculty and Associate Dean for Academic Affairs. I served as the faculty director of the Anderson School's Executive Program, a non-degree, certificate program for mid-level and senior managers, from 2009 through 2019, and I continue to teach in various executive education short courses for the Anderson School.

    2.     Over the past 40 years, I have taught courses on Marketing Strategy and Management, Consumer Behavior, Advertising, Distribution Strategy, and International Marketing to students in undergraduate and graduate education programs at UCLA, Stanford

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 2

CASE NO. 3:24-CV-02311-TSH

ER-0228

Business School, Harvard Business School, and Ohio State University. I also have published numerous journal articles, research reports, and book chapters on Consumer Behavior, Marketing Research, and other marketing topics, a complete list of which is included in my Curriculum Vitae, attached as Exhibit 1. I have served on the editorial boards of the *Journal of Marketing*, *Journal of Marketing Research*, and *Journal of Consumer Research*. I have been a member of the board of directors for Sizzler International, A-Fem Medical Corporation, Inc., and United Online, Inc.

3. I am also a founding partner at Crossfield Associates, a litigation analysis and support firm. I have more than 30 years of experience in providing expert marketing analysis and testimony in cases involving class certification, trademarks, copyrights, damages related to infringement of intellectual property, and other questions of marketing strategy, such as advertising, distribution, purchasing processes, and aspects of consumer behavior. My expertise includes the development of surveys to determine consumer perceptions and beliefs, the assessment of drivers of purchase, consumer perceptions of product features and advertising claims, factors that influence pricing products in the marketplace, and consumers' understanding of various marketing materials. A list of my recent testimony is attached as Exhibit 2.

4. In these assignments, I have used my doctoral level training, approximately 40 years of conducting and teaching various topics within the field of marketing, and my experience serving as a marketing expert on various boards of directors, to inform my work. Specifically, with respect to my assignment in this matter, I have had extensive doctoral level education in social and consumer psychology, which informs the determination of the methodology appropriate for particular research questions for the construction of surveys

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 3

CASE NO. 3:24-CV-02311-TSH

ER-0229

designed to investigate consumer attitudes, beliefs, and perceptions.  I have had extensive doctoral level education in the design, analysis, and interpretation of experiments designed to determine causal relations (*i.e.*, those studies that show test and control stimuli and observe reactions); have published research using this methodology in the most prestigious, peer-reviewed social psychological journals (*Journal of Personality and Social Psychology*, *Journal of Experimental Social Psychology*) and consumer behavior and marketing journals (*Journal of Consumer Research*, *Journal of Marketing Research*, *Journal of Behavioral Decision Making*); and have conducted many such studies for litigation in state and federal courts.  I also have had extensive doctoral level education in the design, analysis, and interpretation of consumer surveys that are used in experimental as well as non-experimental studies to investigate consumer attitudes, beliefs, and perceptions.  I have personally designed and implemented hundreds of consumer attitudinal surveys and experimental studies for litigation in state and federal courts.

5.      Documents considered in forming my opinions are cited herein and/or are listed in Exhibit 3.

## II.      SCOPE OF ASSIGNMENT

6.      I have been asked by counsel for the Port of Oakland ("Defendant") to evaluate and respond to the Expert Report of Sarah Butler, filed on behalf of Plaintiff City and County of San Francisco ("Plaintiff").[1]  In particular, I was asked to determine the degree to which the consumer survey conducted by Ms. Butler ("Butler Survey") provides a valid and reliable assessment of consumer confusion regarding the Port of Oakland's decision to change the name

---

[1] Expert Report of Sarah Butler, June 27, 2024, ("Butler Report").

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 4

CASE NO. 3:24-CV-02311-TSH

ER-0230

1    of its airport ("OAK") from "Metropolitan Oakland International Airport" to the "San

2    Francisco Bay Oakland International Airport" (the "New Name").

3

### III.    SUMMARY OF OPINIONS

4

5    7.    Based on my review of the Butler Report, the Butler Survey, and information

6    available to me at this time, I conclude that Ms. Butler provides no reliable basis to determine

7    the "extent to which Defendant Port of Oakland's use of 'San Francisco Bay Oakland

8    International Airport' rather than 'Oakland International Airport' is likely to cause confusion

9    with Plaintiff's 'San Francisco International Airport'… ."[2]  To the extent that the Butler Survey

10   itself can provide any useful data to answer this question, its results instead show that

11   consumers are *unlikely* to be confused by the use of the New Name.[3]

12

13   8.    Specifically:

14        i.    Skewed Survey Population: Ms. Butler's survey cannot reliably predict

15             consumer confusion in the real world because its sample was drawn from an

16             under-inclusive population that excludes markets that currently account for the

17             largest number of Oakland passengers.

18        ii.   Lack of External Validity—The Butler Survey Does Not Replicate the "Real

19             World": Because Ms. Butler's survey procedures do not correspond to key

20             features of the real-world context in which consumers would make judgments

21             and choices, the survey has no external validity.  The survey results thus cannot

22             be generalized to the real-world environment where, specifically, consumers

23

24

25   ---
[2] *Id.* at ¶16.

26
[3] I reserve the right to amend and/or change my opinions if additional information becomes
27   available that would warrant such amendments and/or changes.

1    would have more information relevant to their judgments and choices. The lack

2    of external validity renders the results of her confusion Question 2 in the survey

3    irrelevant.

4        iii.   <u>Lack of Internal Validity—A Causal Link between the New Name for OAK and</u>

5    <u>Any Confusion Observed Cannot Be Established</u>: Data for those viewing

6    modified depictions of Southwest Airlines' webpages must be disregarded

7    because the control group used for this setting cannot isolate the effects of

8    OAK's name change from other plausible factors. In addition, one of the three

9    measures of "confusion," i.e., "Which of the following airports, if any, is the

10   primary airport serving the San Francisco Bay Area?", is not tied to a relevant

11   definition of confusion, i.e., this question in the survey does not necessarily

12   measure confusion between the San Francisco International Airport and the San

13   Francisco Bay Oakland International Airport.

14       iv.   <u>Inadequate Level of Alleged (Net) Confusion for the Only Valid and Reliable</u>

15   <u>Measure of Consumer Confusion Relevant to Selecting and Purchasing a Flight</u>

16   <u>to "San Fran"</u>: No significant net confusion was found for those viewing

17   modified depictions of Google Flights webpages with respect to the only

18   potentially relevant and reliable confusion question in the survey, i.e., where do

consumers think the [San Francisco Bay] Oakland International Airport is located.[4]

## IV.    BASIS FOR OPINIONS

### A.    Background

9.      Ms. Butler stated that her assignment was "to design and conduct a survey to evaluate whether the Metropolitan Oakland International Airport's … decision to change its name to the 'San Francisco Bay Oakland International Airport' is likely to cause confusion amongst relevant consumers."[5]  To answer this question, Ms. Butler designed and fielded a consumer experimental survey that showed respondents one of two mock-ups of internet website pages.  Half of the respondents in the Butler Survey were asked to view mock-up depictions of webpages from one airline (Southwest Airlines), with the other half viewing mock-up depictions of a third-party flight search site (Google Flights). Each of these webpages ostensibly showed the initial process and some of the steps that consumers might take if they were searching for flights to Northern California with the search term "San Fran" while using the Southwest Airlines or the Google Flights website, as applicable.[6]  In each of these two groups, respondents were shown one of two mock-up depictions of the webpages, either a

_____

[4] The text in brackets ("San Francisco Bay") herein denotes the text that was added to the beginning of the "Oakland International Airport" text for those respondents in the Butler Survey's test group; in other words, the test group respondents saw the new name "San Francisco Bay Oakland International Airport."  In contrast, respondents in the control group were exposed to text representing the "old" name, namely, "Oakland International Airport" (without "San Francisco Bay" or the word "Metropolitan").

[5] Butler Report, ¶8, pp. 4-5.

[6] The Butler Report does not define what type of real-world consumer confusion is of interest, i.e., confusion amongst consumers with respect to what?

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 7

CASE NO. 3:24-CV-02311-TSH

ER-0233

1 "test" version which used the New Name for OAK or a "control" version which in some cases

2 used the "Oakland International Airport" name.[7]

3 10. The Respondents were then asked three questions that purport to measure

4 confusion: (Question 1) "Where do you think the [San Francisco Bay] Oakland International

5 Airport is located?" (an open-ended question); (Question 2) "Do you think the [San Francisco

6 Bay] Oakland International Airport is … The same airport as San Francisco International

7 Airport" or "A different airport from the San Francisco International Airport?"; and (Question

8 3) "Which of the following, if any, is the primary airport serving the San Francisco Bay Area?"

9

10 **B. Discussion**

11

12 **a. Opinion 1: Skewed Survey Population: Ms. Butler's survey cannot
reliably predict consumer confusion in the real world because its
sample was drawn from an under-inclusive population that excludes
markets that currently account for the largest number of Oakland
passengers.**

13

14

15

16 11. While Ms. Butler drew her survey's sample from a pool of consumers who

17 indicated that they are likely to book their own travel by air to Northern California in the next

18 year, Ms. Butler limited this pool to only those persons residing in one of ten (10) U.S. states

19 and the District of Columbia[8] that are reportedly "unserved" for OAK.[9] The Butler Report cites

20 a PowerPoint presentation as the source of this list of markets and airports but does not provide

21 any explanation or definition as to why these 11 locations were used. I have since been

22

23

24 [7] *Id.*, pp. 17-22 and at Exhibit F.

25 [8] These states were Arizona, Florida, Illinois, Louisiana, Michigan, New York, North Carolina, Ohio, Pennsylvania, and Texas, as well as the District of Columbia.

26 [9] "Ex 6 Met OAK Presentation," Port of Oakland PowerPoint file "41124 Presentation.pptx", as
27 cited in the Butler Report at footnote 19.

informed that "unserved markets," as used in the presentation, refers to certain airports with no non-stop flights to Oakland, [10] which Ms. Butler either did not know and/or failed to mention. This set of markets excludes entirely 57% of the U.S. population from her sample, and, in particular, excludes four of the five markets that provide the most passengers for OAK, i.e., Los Angeles (California), Las Vegas (Nevada), San Diego (California), and Phoenix (Arizona).[11],[12] The resulting sample was therefore even more geographically constrained; 53% of respondents who took the Butler survey resided in one of only *three* states (New York, Texas, and Florida).[13]

12.    The Butler Report fails to provide any rationale for the decision to sample only from this small number of "unserved" states.[14]  Standard practice for likelihood of confusion research is to select the market of the defendant that overlaps with that of the plaintiff, which in this case is potentially nationwide.[15]  By limiting the sample population to only these ten states and the District of Columbia, and excluding important markets like California, the Butler

---

[10] Conversation with counsel for Port of Oakland, October 5, 2024.

[11] "Estimates of the Total Resident Population and Resident Population Age 18 Years and Older for the United States, Regions, States, District of Columbia, and Puerto Rico: July 1, 2023 (SCPRC-EST2023-18+POP)," United States Census Bureau.

[12] Conversation with counsel for Port of Oakland, October 5, 2024.

[13] *See* Butler Report, Table 2, p. 23.

[14] A review of the PowerPoint presentation from which Ms. Butler obtained the list of "unserved" markets shows a total of 21 such markets in 12 U.S. states and the District of Columbia.  The pool of consumers from which the sample was drawn, however, did not include the states of two of these markets, i.e., Indiana and Massachusetts. The Butler Report provides no rationale for their exclusion.

[15] *See generally*  Barber, W G. & G. E. Yaquinto, "The Universe," in Shari S. Diamond and Jere B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Second Edition* (Diamond and Swann 2022), Chapter 3.

Survey samples only a small portion of relevant consumers searching for flights to Northern California who potentially would be exposed to the new name during a search for flights.[16] Thus, Ms. Butler's sample is severely under-inclusive of OAK's target market, one that can be better described as all consumers in the United States that are planning to travel to Northern California (or the San Francisco Bay Area), including those residing in California or other nearby locations that provide a large number of passengers for OAK and presumably have a greater familiarity with the Northern California/San Francisco Bay geographic area.[17] The findings of the Butler Survey thus cannot be used to provide a reliable estimate of the likelihood of confusion in the overall target market.

**b. Opinion 2: Lack of External Validity—The Butler Survey Does Not Replicate the "Real World": Because Ms. Butler's survey procedures do not correspond to key features of the real-world context in which consumers would make judgements and choices, the survey has no external validity. The survey results thus cannot be generalized to the real-world environment where, specifically, consumers would have more information relevant to their judgments and choices. The lack of external validity renders the results of her confusion Question 2 in the survey irrelevant.**

13. One of the most important factors in establishing the external validity[18] of a survey is the degree to which information that is present in the real world and relevant to the

_____

[16] Survey respondents are told to "imagine [they] were shopping for a flight to Northern California." Butler Report, ¶29, p. 15,

[17] Ms. Butler's sampling procedures required that half of her sample had "ever" flown to Northern California, but the recency of such travel is unknown. She also did not ask whether or not the respondent purchased that prior ticket for him/herself, or if it was purchased online.

[18] External validity is indicated by the degree to which the experimental setting replicates that of the real-world setting of interest.

judgment or decision being measured in the survey is also present in the survey environment.[19]
An examination of Ms. Butler's survey procedures clearly demonstrate that her survey does not
meet this requirement. Her study has no external validity, and thus the survey results cannot
serve as a reliable predictor of consumer decisions that would occur in the real world.[20]

2. **The Butler Study Does Not Use Stimuli That Represent the Current Real World.**

14. As a practical matter, the Butler survey does not replicate the real world because
neither Southwest Airlines nor the other six major domestic airlines that fly into and out of
OAK's use airport names on their webpages to identify the airport options.[21]

---

[19] *See* Simonson, Itamar and Ran Kivetz, "Demand Effects in Likelihood of Confusion
Surveys: the Importance of Marketplace Conditions," in Shari S. Diamond and Jere B. Swann
(eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, First Edition*,
Chapter 11, pp. 243-259. *See also* Shadish, William R., Thomas D. Cook, and Donald T.
Campbell, Experimental an44d Quasi-Experimental Designs for Generalized Causal Inference,
Houghton Mifflin Col, 2002 ("Cook and Campbell 2002").

[20] *Id.*

[21] See Exhibit 5. Alaska Airlines does not use the full airport name but instead lists
*abbreviated* airport names but does so along with city and state locations as well as airport
codes such as: "Oakland, CA (OAK – Oakland Intl.)" and "San Jose, CA (SJC – San Jose
Intl.)."

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 11

CASE NO. 3:24-CV-02311-TSH

ER-0237

15.    For the Southwest Airlines webpages, Ms. Butler created a test stimulus based on a hypothetical world in which Southwest uses an airport name for OAK in the pop-up menu of airport choices.[22]

Figure 1



The Southwest Airlines control webpages, however, do not reflect this hypothetical world of a changed Southwest Airlines policy, but instead remain in the current real world with no

---

[22] Strangely, in this hypothetical world created by Ms. Butler's Southwest Airlines test webpages, Southwest Airlines not only decides to change its long-standing policy of not using airport names (*see* Declaration of Jennifer Bridie, October 4, 2024), but it inexplicably does so only for OAK on the first pop-up menu that lists alternative airports for the San Francisco Bay Area (i.e., in contrast, SFO and SJC are still listed only by city and airport code).  The control webpage, however, does not enter the hypothetical world of a changed Southwest Airlines policy, but instead remains in the real world with no apparent changes from what Southwest Airlines actually shows on its website.

apparent changes from what Southwest Airlines actually shows on its website, i.e., all airports indicated only by city names and airport codes.

16.    For the Google Flights platform, the Butler Survey does not use the actual Google Flights webpages as they currently appear when one enters "San Fran" as the search term. At the present time, a search for flights to "San Fran" brings up a pop-up menu that includes the heading of "San Francisco, California/City in California," with only the "San Francisco International Airport SFO" and "11 mi to destination" indented under the heading. This is followed by a second heading of "San Francisco Bay Area, Region in California."  No listing for OAK is shown in the pop-up menu.  The only airport shown, other than SFO, is that of "San Francesco d'Assisi Airport PEG, International Airport in Italy."[23]  Ms. Butler does not explain what she based the survey's Google Flights' webpages on. Webpages for both platforms thus do not replicate the webpages in the real world, but instead "replicate" webpages, at best, in a hypothetical world that does not exist, and may never exist.

### 3.    The Butler Survey Does Not Show Respondents All Relevant Webpages

17.    The Butler Survey procedures also fail to show respondents all of the pages (and thus all of the information) that consumers would have to view in order to actually select and book a flight, the required precursor to going to or arriving at an unintended airport. Each additional page that consumers must view in order to actually purchase or book a flight contains additional cues that could alert a consumer as to the true identity and location of the airports. Had the respondents who were shown the mock-up depiction of a Southwest Airlines website, for example, been allowed to click on the downward arrow next to each airport listed

---

[23] Google Flights webpage accessed October 7, 2024. *See* Exhibit 4.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 13

CASE NO. 3:24-CV-02311-TSH

ER-0239

on one of the webpages they saw – which they would have had to do in order to see the available flights, select one, and then follow through to purchase a ticket – they would be exposed to further cues as to the locations of and the differences between the airports that would clearly indicate that each one is a different airport with a different airport code and with different flights available. An example of what a consumer would see on this further page is shown in Figure 2 (accessed October 7, 2024). The same is true for Google Flights stimuli, which shows only a single page that contains the menu of airport options that pops up when one types "San Fran" into the search bar. If a consumer were to click to view "All San Francisco Airports" a map of the area and airports would appear (Figure 3) (accessed October 7, 2024).

Figure 2



FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 14

CASE NO. 3:24-CV-02311-TSH

ER-0240

Figure 3

google.com/travel/explore?tfs=CBwQAxooEgoyMDI0LTExLTExagwIAxIIL20vMDJjbDFyD...
Google
Travel
Explore
Flights
Hotels
Vacation rentals
Round trip
1
Economy
Denver
San Francisco ...
Mon, Nov 11
Wed, Nov 13
All filters (1)
Flights only
Stops
About these results
San Francisco
Nonstop · 2 hr 50 min
$78
San Jose
1 stop · 2 hr 37 min
$103
Oakland
1 stop · 4 hr 50 min
$236
Concord
English (United States)
USD
Concord
Oakland
$236
San Francisco
$78
Oakland International Airport
San Francisco International Airport
SILICON VALLEY
San Jose
$103
Keyboard shortcuts
Map data ©2024 Google
Terms

#### 4. Respondents Are Not Allowed to View the Webpages and the Information in Them as They Would in the Real World.

18. In the real world, consumers would be looking at the relevant webpages when searching for an airport and/or flights and would be able to go back and review all of the information on the webpage when making judgments or purchasing decisions.

19. In the Butler Survey, however, those webpages were removed and the multiple, relevant cues on them were not available to respondents when they were asked about their judgments and beliefs. The lack of correspondence between the information available in the real world and the information available in the survey when forming judgments and beliefs makes the level of confusion observed in the Butler Survey an unreliable predictor of the

likelihood of confusion in the real world, i.e., we cannot say what level of confusion, if any, would occur in the real world.[24]  Further, respondents taking a survey rarely are as motivated and as focused as consumers who are actually trying to search for flights with the intention of making a purchase, making it even more important that cues that could easily be used in the real world be equally easy to use in the survey.[25]

20.     The effect of not replicating the information accessible in the real world when asking for judgments or opinions in the survey is seen in particular when considering responses to the second confusion question (Q2:  "Do you think the [San Francisco Bay] Oakland International Airport is the same airport as the San Francisco International Airport, a different airport from the San Francisco International Airport, or you don't know or are unsure?").  If one were looking at the webpages as one would in the real world when searching for and selecting an airport and a flight, it would be obvious that the airports are different—why would an airline or a search platform list two names or entries, two different airport codes (which was not included in the survey question) and different flights if the airports are really one and the

---

[24] For example, to the extent that respondents were not allowed to view the webpages as they were asked about their judgments and beliefs as they would be in the real world, any estimate of net confusion would be biased in a positive direction.

[25] *See* Allenby, Greg, Geraldine Fennell, Joel Huber, Thomas Eagle, Tim Gilbride, Dan Horsky, Jaehwan Kim, Peter Lenk, Rich Johnson, Eli Ofek, Bryan Orme, Thomas Otter, and Joan Walker, "Adjusting Choice Models to Better Predict Market Behavior," *Marketing Letters*, vol. 16, no. 3-4, Sixth Invitational Choice Symposium, December 2005 ("Allenby et al. 2005"), pp. 197-208.  *See also* Simonson, Itamar and Ran Kivetz, "Demand Effects in Likelihood of Confusion Surveys: the Importance of Marketplace Conditions," in Shari S. Diamond and Jere B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, First Edition,* Chapter 11, pp. 145-154.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 16

CASE NO. 3:24-CV-02311-TSH

ER-0242

same airport?[26]  Not only were the respondents in the Butler Survey unable to view the actual webpages when answering this question (which they may never have even considered without being asked in the survey), the question itself did not include the airport codes (e.g., OAK) for the airports which were shown on all of the survey webpages.  Seeing a different airport code for the two airports in the questions, as was done on the webpages, would have been a clear cue that the airports are not one and the same.

21.     Finally, the Butler Survey was conducted at only one point in time which is likely to inflate the level of "net" confusion observed, i.e., during the 30 days in which the new name was being rolled out to potential consumers.  At this point in time, consumers undoubtedly already had knowledge and prior experience with the prior airport name because it has been used and promoted in marketing materials for many years, thus lowering the level of any confusion observed in response to the control webpages not because of the name, per se, but because of a long history of use and promotional materials.  In the real world, the multiple cues typically provided in the context of a search for and selection of an airport and flight may preclude confusion even for a new, unfamiliar name.

22.     In summary, the results of the Butler Survey, and particularly the results of Question 2 in the survey, cannot be generalized to the real world in which consumers would

---

[26] For the Southwest Airlines <u>test</u> web pages, two cities and only one airport name (for OAK) are listed on the first page, and three airport names are listed on the second page.  For the Southwest Airlines <u>control</u> web pages, three cities, but no airport names are listed on either the first or second page.  For the Google Flights test and control pages, two airport names (for SFO and OAK) are listed.

have additional diagnostic information about each airport.[27,28] As a practical matter, it may be difficult to obtain a reliable estimate of the likelihood that consumers in the real world who would be confused by a change in the name of OAK because they are likely to be exposed to many types and sources of information. A study conducted by Ipsos in March 2023 found that three out of four air trips taken by Americans in 2022 were taken for personal reasons.[29] Of those flying for personal reasons, 70% of consumers in the Ipsos study said that they visit one or more airline mobile apps or websites to research options before making a purchase and 80% report consulting more than one "site/agencies/companies" before making a final purchase.

   a.    **Opinion 3:  Lack of Internal Validity—A Causal Link between the New Name for OAK and Any Confusion Observed Cannot Be Established: Data for those viewing modified depictions of Southwest Airlines webpages must be disregarded because the control group used for this setting cannot isolate the effects of Oakland's name change from other plausible factors.  A second**

---

[27] Notably, at present, the Southwest Airlines website, like other airline sites, generally does not include airport names, but instead uses city names and airport codes (e.g., SFO, OAK, SJC), which is what Ms. Butler used for the Southwest control webpages in her survey. (*See* the declaration of Jennifer Bridie, October 4, 2024).  In order to create stimuli for the test webpages for Southwest Airlines, however, Ms. Butler modified the actual first Southwest Airlines webpage by replacing the city name "Oakland, CA" with the airport name "San Francisco Bay Oakland International, CA" yet leaving the other alternative airports, i.e., SFO and SJC, identified by only their city names and airport codes.

[28] Using Google Flights, a consumer is also likely to be exposed to further cues about each airport they see if they use the site to find available flight options and purchase a ticket. Notably, however, at the present time, Google Flights does not even list OAK when a consumer types "San Fran" into the search bar, unlike the mock-up depiction of Google Flights used in the Butler Survey.  On October 7, 2024, however, I observed that the Google Flights website showed only San Francisco International Airport when using the search term "San Fran."  The site does not show "San Francisco Bay Oakland International Airport" or "Oakland International Airport" as an option even if the website may have done so in the past.  Further, only the Sacramento Airport is shown if the consumer enters "Northern California" as the search term.  See Exhibit 4.

[29] "Air Travelers in America:  Key Findings of a Survey Conducted by Ipsos" pp. 9, 13-14.

**aspect of internal validity is also violated because one of the measures, "What of the following [among a list of airport names including San Francisco Bay Oakland International Airport, San Francisco International Airport, San Jose Mineta International Airport and Something Else and Don't Know /unsure] is the primary airport serving the San Francisco Bay Area does not necessarily measure relevant confusion or imply that a 'confused' consumer would necessarily select and purchase a ticket to the wrong airport.**

23.     While external validity ensures that the results of the survey can be generalized to the real world context of interest, internal validity ensures that a causal nexus can be made between the feature of interest, here the airport name, and the construct of interest, here confusion as to which airport should be selected and purchased in order to go a preferred destination or location.  Without internal validity, the study construction cannot be used to draw a valid conclusion with respect to the effects of the variable of interest.

24.     Standard procedure to measure any increase in consumer confusion due to a new name for OAK would be to compare the level of confusion that occurs when respondents are shown a relevant real-world stimulus that uses the "old" name (i.e., a control stimulus) with the level of confusion that occurs when a separate group of respondents are shown a stimulus that is exactly the same except for the use of the "new" name (i.e., a test stimulus).[30]  If respondents are randomly assigned to see either the control or the test stimulus, and if there is no difference between the two stimuli shown except the difference in the name of the airport, then scientific principles allow one to attribute the difference in the levels of confusion to the change in the

---

[30] Standard and proper research practice would be to choose a control stimulus that is as close to the test stimulus as possible but alters or removes the allegedly infringing mark (*see* Diamond and Swann 2022, Chapter 9).  In the present case, the proper control to test any confusion by the change from the old name to the new name would have been to at least use the prior name used, "Oakland International Airport." [See Butler Expert Report, ¶40, p. 20.]

name.  Although Ms. Butler cites this scientific rule for the creation of an appropriate control group, she did not abide by it in creating the Southwest Airlines test and control groups.[31]  This can be seen by examining the different aspects of the test and control stimuli used in the Butler Survey.

**5.      Test and Control Stimuli Differed in Ways Other Than the Airport Name.**

25.      The Southwest Airlines test and control stimuli preclude the establishment of a causal relationship between the change in the airport name and any consumer confusion because they differ with respect to a feature, in addition to the different airport name, which may have affected the responses to the survey's confusion questions.  Thus, the effect of the different airport name cannot be isolated from the effect of this other feature.

26.      Specifically, the first Southwest Airlines webpage shown to all respondents showed a pop-up menu indicating that a respondent should choose between three San Francisco Bay Area airports after doing a search for flights to "San Fran."[32]  In the test condition, only OAK is identified by its full airport name as if it were a California city:  "San Francisco Bay Oakland International Airport, CA – OAK."[33]  The other two airports are listed using only the

---

[31] *See* Butler Expert Report, ¶40, p. 20:  [To establish causality, the control stimulus must be] "as close to the test stimulus as possible but alters or removes the allegedly infringing material."

[32] Prior to seeing any webpages, all respondents were told to "Please imagine you were shopping for a flight to Northern California.  On the next [few pages/page] you will be shown some information you might see if you were looking to purchase a flight."  After this, respondents were shown the first Southwest Airlines webpage as if the person searching has entered "San Fran" as the intended destination.  I can find nothing in the survey that would explain to the respondent why "San Fran" was the selected search term for Northern California flights, nor a reason why this change in terms was not made clear to the respondents.

[33] See Butler Expert Report, Exhibit F.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 20

CASE NO. 3:24-CV-02311-TSH

ER-0246

relevant cities' names, "San Francisco, CA – SFO" and "San Jose, CA – SJC" as is the current Southwest Airlines practice.  The letters "San Fran" were bolded for both the San Francisco airport and OAK entries.  The same webpage for the control group respondents did not include any airport names.  In addition, "San Fran" was highlighted only for the San Francisco, CA – SFO entry.

27.     Thus, the test webpage differs from the control webpage in that OAK is singled out for special emphasis, as well as for being designated by its airport name rather than by the name of the city only.  Any differences in responses to the test versus the control group, then, could be due to extra attention being drawn to OAK in the test stimuli.  In particular, the highlighting of "San Fran" in OAK listing along with suggesting that this is a city like the other airport listings (i.e., the use of a comma after the airport name followed by "CA") may have led respondents to indicate in the second survey confusion question that there is another airport located in San Francisco, CA.  The survey question itself also did not include the airport code for the San Francisco Bay Oakland International Airport, and thus did not include this important cue that was present in the test page.  In addition, singling out OAK for special attention – the only airport named – in particular could have caused respondents in the Southwest Airlines test condition to assume that it must be the main or "primary" airport for the San Francisco Bay Area (Question 3 of the survey).

**6.     The Control Does Not Measure Confusion Due to a Change in the Airport Name.**

28.     A second fatal problem with the Southwest Airlines control stimuli arises because the control is not consistent with Ms. Butler's hypothetical test condition.  Specifically, the control stimuli for the Southwest webpages did not adhere to Ms. Butler's "new" protocol

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 21

CASE NO. 3:24-CV-02311-TSH
ER-0247

of showing the airport name for OAK (whereby OAK would have been listed in the control as "Oakland International Airport – OAK"), but instead followed the current real-world protocol of using city name and code, and no airport names at all. To measure the difference in confusion specifically due to a change in the airport name, the control condition should have listed OAK with its prior name and airport code, just like Ms. Butler listed OAK with its New Name and airport code in the test webpages, to account for or control for any confusion the use of this "old" name might cause.[34]

29.    Thus, the findings for the Southwest Airlines website must be discarded as scientifically unsound because the test and control conditions differ in ways other than different airport names.

**7.    Google Flights Stimuli Are Also Problematic.**

30.    The control group for the Google Flights webpages may be similarly flawed but it is unclear what modifications Ms. Butler made to the actual Google Flights webpages.[35] Unlike the Southwest control stimuli, the Google Flights control stimulus does allow for a comparison of the use of the "new" name in the test condition versus the use of the "old" name in the control condition. However, it is unclear how Ms. Butler may have altered the actual Google Flights webpages. In particular, the way in which OAK is presented on the page as

---

[34] By using this control, Ms. Butler apparently assumes that no consumers are confused by the "old" OAK name, which is very unlikely. For example, some consumers might misread or be confused by the word "International" and the inclusion of "Oakland International" under the heading of "San Francisco Area Airports." Thus, the amount of confusion shown in Ms. Butler's control condition is likely to be too low.

[35] See Butler Expert Report, Exhibit F.

1   well as the name itself may have been changed, and the rationale for any change other than the

2   airport name would need to be justified.

3                                   Figure 4[36]



16          31.     As shown in Figure 4, the webpages used in Ms. Butler's experiment shows

18   OAK (i.e., either "San Francisco Bay Oakland International Airport" or "Oakland International

19   Airport") as well as the "San Francisco International Airport" indented under the heading "San

20   Francisco, California, USA" with a second line in smaller type of "U.S. County in California."

21   Next, a non-indented heading, "San Francisco Bay Area, California" with a second line reading

22   "Region in California" is listed.  This arrangement may have suggested to the respondent that

24   OAK is located in San Francisco County (which it is not) rather than in the greater San

26   ―――――――――――――――――
[36] The Butler Survey control condition for Google Flights was exactly the same, except that
27   OAK was instead listed as "Oakland International Airport."

Francisco Bay Area. Respondents who saw the control stimuli with the name "Oakland International" may have already known where and what this airport is, but test respondents are seeing something new and previously unheard of, and thus the heading under which the airport is listed could be a more important cue to them.

32. It is notable that this is not the way in which OAK was presented on the Google Flights webpage when I conducted the same search as the Butler survey in May 2024. The results of that search are shown in Exhibit 4. Specifically, when I searched Google Flights using the search term "San Fran", the new name ("San Francisco Bay Oakland International Airport") was shown, but it was not nested under "San Francisco, California" (the actual Google Flights webpage also included a second line in smaller type of "City in California" rather than "US County in California"). Instead, only "San Francisco International Airport" (with a second line of "11 miles to destination") was shown under that city heading. As seen in Exhibit 4, "San Francisco Bay Oakland International Airport" was listed, but not indented under any heading. It also was followed by a second line in smaller type reading, "International Airport located in Alameda County." It was listed immediately above an item which read "San Francisco Bay Area, California," with a second line in smaller type reading "Region in California."[37] The webpage that resulted from my search is important because it shows how Google Flights actually did display OAK at one point after its change of name.

33. Because Ms. Butler did not provide a screenshot of the actual Google Flights webpage that she used to create those stimuli (before she altered it, presumably with image

---

[37] The Google Flights webpage apparently has changed again and as of October 7, 2024 does not show a listing for OAK at all when the search term "San Fran" is typed in. This is presumably due to Google Flights also reverting to the old Oakland Airport name, rather than the New Name it previously used. *See* Exhibit 4.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 24

CASE NO. 3:24-CV-02311-TSH

ER-0250

1   editing software), I cannot determine whether she modified the formatting and placement of

2   OAK, whether she was modeling her stimuli on an actual Google Flights webpage, or whether

3   she created the Google Flights webpage in some other way. If Ms. Butler modified the

4   placement of OAK from what Google actually used, then her stimuli would not represent what

5   consumers actually saw in the real world and a rationale would need to be provided for this

6   deviation.

7

8   34.     While it could be argued that the placement of OAK in the Butler Survey was

9   the same for both test and control conditions and thus any differences in responses cannot be

10  due to a difference in placement between the two conditions, it is possible that responses to

11  "San Francisco Bay Oakland International" would be differentially affected by its placement

12  under the heading "San Francisco, California, USA/US County in California" as well as the

13  removal of the second line, "International Airport in Alameda County." The actual placement

14  and content of OAK entry may have provided such clear information about the location of

15  OAK that little confusion would be seen in either the test or the control conditions.

16

17  **Confusion Question 3 (regarding the "primary" airport serving the San Francisco
    Bay Area) is Ambiguous, Has Methodological Problems, and Is Not Clearly
    Related to Confusion About OAK.**

18

19  35.     I have previously explained why the second confusion question (regarding

20  whether the San Francisco Bay Oakland International Airport is the same airport as the San

21  Francisco International Airport) is flawed and cannot provide a reliable prediction of the level

22  of confusion in the real world. Question 3 ("Which of the following, if any, is the primary

23  airport serving the San Francisco Bay Area?") is also flawed from an internal validity

24  standpoint for two reasons: (1) it is not clear how respondents might have interpreted the term

25

26

27

"primary" [38] and (2) because it is not clear that the "wrong answer" with respect to which airport is the primary one for the San Francisco Bay Area indicates confusion as to where one would depart from and arrive at if consumers select the San Francisco Bay Oakland International Airport.

36.    First, Question 3 is not directly related to the question of whether consumers would believe that they would be flying into the City of San Francisco or into SFO when they would actually be flying into Oakland if they chose the San Francisco Bay Oakland International Airport.  Ms. Butler assumes that indicating the San Francisco Bay Oakland International Airport is the "wrong" or a "confused" answer because she assumes that all respondents define "primary" the same way that she intended, i.e., that "primary" means the airport that serves the largest number of passengers.  But the Butler Survey did not provide respondents with a definition of "primary," nor did Ms. Butler report any pre-test of Question 3 to ascertain respondents interpretation of the word "primary," i.e., one could think that the San Francisco Bay Oakland International Airport is the primary airport, but still understand clearly that it is not located in San Francisco and that it is not the San Francisco International Airport. If respondents interpret "primary," for example, as being the most centrally located airport in the San Francisco Bay Area or the airport serving the largest portion of the entire San Francisco

---

[38] Ms. Butler claims that the "right" answer is the San Francisco International Airport, because it is the "largest or primary airport serving the Bay Area" with "primary apparently meaning it offers the largest number of flights and seats scheduled for service" (Butler Report at ¶34). Since we do not know if Ms. Butler pre-tested this question, we do not know if this is how respondents understood the term "primary."  It is possible that respondents thought of the primary airport as the one most convenient to them, or the one that serves the largest geographical portion of the Bay Area. In this case, it is debatable as to which airport would be the correct answer.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 26

CASE NO. 3:24-CV-02311-TSH

ER-0252

Bay Area, then they may have believed that OAK, the "San Francisco Bay Oakland International Airport," is the appropriate choice and therefore selected it.

37.  Secondly this third question was only asked of those respondents who previously indicated that the [San Francisco Bay] Oakland International Airport is <u>not</u> the same airport as the San Francisco International Airport or were unsure, because Ms. Butler speculates that they may have really believed that the San Francisco Bay Oakland International Airport is SFO but they were unsure of the name "San Francisco International Airport."[39] This is only speculation, however, and in addition is inconsistent with the view expressed in Plaintiff's Motion for Preliminary Injunction that the name "San Francisco International Airport" has been in use and widely publicized in marketing materials for many years and is quite well known among consumers. [40]

38.  For all these reasons, the responses to the flawed Question 3 regarding the "primary" airport of the San Francisco Bay Area cannot be relied upon to ascertain or predict consumer confusion caused by the name change.  It does not necessary measure what the Report says it does, and thus it cannot establish any causal connection between the use of the New Name and consumer confusion.

39.  Thus, the findings for the Southwest Airlines website must be discarded as scientifically unsound because the test and control conditions differ in ways other than different airport names.  Further, the findings for Question 3 must also be discarded due to its methodological flaws.

---

[39] Butler Report, ¶34.
[40] Plaintiff City and County of San Francisco's Notice of Motion and Motion For Preliminary Injunction Enjoining Defendants; Memorandum of Points and Authorities In Support Thereof ("Motion for Preliminary Injunction"), September 17, 2024, pp. 12-24.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 27

CASE NO. 3:24-CV-02311-TSH

ER-0253

a.  **Opinion 4:  Inadequate Level of Alleged (Net) Confusion for the Only Valid and Reliable Measure of Consumer Confusion Relevant to Selecting and Purchasing a Flight to "San Fran": No significant net confusion was found for those viewing modified depictions of Google Flights webpages with respect to the only potentially relevant and reliable confusion question in the survey, i.e., where do consumers think the [San Francisco Bay] Oakland International Airport is located.**

40.  I have demonstrated previously that the responses to the Southwest Airlines pages must be disregarded not only because the pages failed to replicate the real-world consumer decision-making environment, but also because the lack of a scientifically valid control group for the Southwest Airlines portion of the survey prevents any possibility of a causal connection between any confusion observed in response to the New Name attributable to the change in the name of OAK.

41.  The portion of the survey involving Google Flights webpages also suffers from serious methodological flaws—most importantly the failure to replicate key features of the actual information environment in which consumers would search for and select airports and flights, and a failure to disclose what the actual Google Flights webpage used to create the control stimuli was.

42.  Regardless of these flaws, an analysis of the responses to the first open ended confusion question ("Where do you think the [TEST ONLY: San Francisco Bay] Oakland International Airport is located?") for those respondents viewing the Google Flights webpages may be instructive.[41]  If this analysis is performed, the resultant "net" percentage of confusion –

---

[41] As noted above, the resulting "net" confusion with respect to this question could also be a conservative measure, since to the extent that respondents were not allowed to view the webpages as they were asked about their judgments and beliefs as they would be in the real world, any estimate of net confusion would be biased in a positive direction.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 28

CASE NO. 3:24-CV-02311-TSH

ER-0254

approximately 5% – would instead indicate that an insignificant amount of consumers would be confused as to location of the San Francisco Bay Oakland International Airport.

43.     The geographic location question (Question 1) speaks to the situation of a traveler finding him/herself at OAK when he or she intended to go to the San Francisco International Airport, and it assesses whether the change in the name of the airport itself is likely to generate such confusion.  In addition, both the test and control stimuli contained very little information, other than the name of the airport, about the location of the airport, i.e., both the test and control stimuli included the "distance to the destination" of  San Francisco, CA county in very small type under the name of both the Oakland and the San Francisco airports. The stimuli, however, did show the airport code for each airline, but that code was not given in the question regarding the airport's location which might have decreased any confusion observed.  Finally, the location question was open-ended.  It was not a multiple-choice type of question in which the respondent is shown and asked to select from a list of possible answers. Instead, respondents were asked to write in, in their own words, where they thought OAK was located.

44.     The Butler Report does not provide the results for Question 1 (geographic question) for each website separately, i.e., for the Google Flights website versus the Southwest Airline website, nor did the report include a copy of the coding sheet which would indicate how each verbatim response to the location question was coded or categorized as indicating "San Francisco" or another location.  Nevertheless, I and members of my staff under my direction examined the verbatim responses given in response to Question 1 and categorized the responses in the manner that Ms. Butler indicates that she did, e.g., a response was coded as "San Francisco" only if the respondent specifically indicated San. Francisco.  References to San

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 29

CASE NO. 3:24-CV-02311-TSH

ER-0255

Francisco in broader terms were coded as "other." Using the resulting codes, I was able to determine that approximately 23% of respondents who saw the test Google Flights webpages using the New Name for OAK indicated that it is located in San Francisco versus 18% of respondents who saw the control Google Flights webpages using the "old" name. The resultant "net percentage" of confusion **is only 5%**, a level that would not generally be considered significant in legal proceedings.[42]

## V.    SUMMARY

45.     In summary, as shown in my analysis, the Butler survey cannot be used to predict the level of confusion that would result in the real world if OAK's name is changed to San Francisco Bay Oakland International Airport. It does not use a sample representative of OAK's entire target market, the survey stimuli do not represent the real world decision context, and the survey itself cannot establish a causal nexus between the change in OAK's name and any confusion amongst consumers. Only one of the three survey questions can be used as valid and reliable measures of confusion, and analysis of the only reliable data, i.e., that of the Google Flights platform, for the one reliable and valid consumer measure shows that consumers are unlikely to be confused by OAK's new name.

## VI.    COMPENSATION

46.     I am being compensated at my usual rate of $900 per hour for my work in this case. My opinions are based on information available to me at this time, and I reserve the right to amend and/or supplement them.

---

[42] *See* Butler Report at ¶10.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF DR. CAROL A. SCOTT - 30

CASE NO. 3:24-CV-02311-TSH

**ER-0256**

1    I declare under penalty of perjury under the laws of the United States of America that

2    the foregoing is true and correct.

3        Executed on this 8th day of October, 2024 at Calistoga, California.

4

5

6

7

8                                                      _Carol A. Scott_

9                                                      Carol Scott, Ph.D.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

# EXHIBIT 1

# CAROL A. SCOTT

Anderson Graduate School of Management
University of California                          1834 Park Blvd.
Los Angeles, California 90024                     Palo Alto, CA  94306
(310)  825-4458                                   (650) 473-9297
(310)  206-2019 (fax)                             (650) 473-9298 (fax)

## EDUCATION

| | |
|---|---|
| Ph. D. | Northwestern University, June 1975 |
| | Major Field:  Marketing |
| | Minor Field: Social Psychology |
| | |
| M.S. | Northwestern University, August 1972 |
| | Major:  Management |
| | |
| B.S. | University of Texas at Austin, December 1970 |
| | Major: Business and history education |
| | Graduated with highest honors |

## TEACHING EXPERIENCE

| | | |
|---|---|---|
| 1977 - present | **University of California, Los Angeles** | |
| | 2011- | Professor Emeritus of Marketing |
| | 1989-2011 | Professor of Marketing |
| | 1980-89 | Associate Professor of Marketing |
| | 1979-80 | Acting Associate Professor of Marketing |
| | 1978-79 | Assistant Professor of Marketing |
| | 1977-78 | Visiting Assistant Professor of Marketing |
| | | (on leave from The Ohio State University) |
| | | |
| 2009 | **Stanford University** | |
| | Visiting Professor of Marketing | |
| | | |
| 1985 - 1986 | **Harvard Business School** | |
| | Visiting Associate Professor, Business Administration | |
| | | |
| 1974 - 1978 | **The Ohio State University** | |
| | Assistant Professor of Marketing | |

## ACADEMIC ADMINISTRATIVE EXPERIENCE

1990 - 94     Chairman of the Faculty, Department (School) of Management
              Responsible for all matters pertaining to the approximately
              100 faculty FTE in the Anderson Graduate School of Management,
              a single department school, including: recruiting, retention,
              promotions, salary adjustments, scheduling and staffing of courses,
              and student and peer evaluation of teaching. Manage budget and
              process all appointments for temporary faculty.

1987 - 91     Associate Dean, Academic Affairs
1993 - 94     Act for the dean in his absence. Responsible for all academic
              degree programs and support services including: full-time, Fully
              Employed and Executive MBA Programs, Ph.D. and M.S.
              Programs, Management Communications Program, Management
              Field Studies Office, Computing Services Center, and all
              interdisciplinary study centers (e.g., Entrepreneurial Studies
              Center, Finance and Real Estate, International Business, etc.).

1986 - 87     Assistant Dean, MBA Curriculum & Policy
              Responsible for all academic policies pertaining to the full-time
              MBA Program. Coordinated a review of this program which
              resulted in revised core curriculum; implemented computerized
              bidding system for course enrollment.

## JOURNAL ARTICLES PUBLISHED

Robert A. Hansen and Carol A. Scott. Comments on attribution theory and advertiser
    credibility. *Journal of Marketing Research*, *13*, May 1976.

Carol A. Scott. Effects of trial and incentives on repeat purchase behavior. *Journal of
    Marketing Research*, *13*, August 1976.

Carol A. Scott. Modifying socially-conscious behavior: The foot-in-the-door technique.
    *Journal of Consumer Research*, *4*, December 1977.

Carol A. Scott and Richard F. Yalch. A test of the self-perception explanation of the
    effects of rewards on intrinsic interest. *Journal of Experimental Social
    Psychology*, *14*, January, 1978.

Carol A. Scott and Richard F. Yalch. Consumer response to initial product trial: A
    Bayesian analysis. *Journal of Consumer Research*, *7*, June 1980.

(225 of 274), Page 225 of 274
Case: 24-7532, 02/06/2025, DktEntry: 11.3, Page 225 of 274
Case 3:24-cv-02311-TSH   Document 59-1   Filed 10/08/24   Page 4 of 7

Alice M. Tybout and Carol A. Scott. Availability of well-defined internal knowledge and the attitude formation process: Information aggregation versus self-perception. *Journal of Personality and Social Psychology*, *44*, March 1983.

Deborah Roedder John, Carol A. Scott, and James R. Bettman. Sampling data for covariation assessment: The effect of prior beliefs on search patterns. *Journal of Consumer Research*, *13*, June 1986.

James R. Bettman, Deborah Roedder John, and Carol A. Scott. Covariation assessment by consumers. *Journal of Consumer Research, 13*, December, 1986.

James R. Bettman, Elizabeth H. Creyer, Deborah Roedder John, and Carol A. Scott. Covariation assessment in rank order data. *Behavioral Decision Making*, *1*, October-December, 1988, 239-254.

Aimee Drolet, Loraine Lau-Gesk, and Carol A. Scott. The Influence of Aging on Preferences for Sequences of Mixed Affective Events. *Journal of Behavioral Decision Making*, forthcoming.

Li Jiang, Aimee Drolet, and Carol A. Scott. Countering Embarrassment-Avoidance by Taking an Observer's Perspective. *Motivation and Emotion*, forthcoming.

## REPORTS, PRESENTATIONS, CHAPTERS IN BOOKS

Carol A. Scott, Decade of the Executive Woman, New York: Korn/Ferry, International, 1993.

Vicky L. Crittenden, Carol A. Scott, and Rowland T. Moriarty. The effects of prior product experience on organizational buying behavior. In Paul Anderson and Melanie Wallendorf eds.) *Advances In Consumer Research*, vol. 14, 1986.

James R. Bettman, Deborah Roedder, and Carol A. Scott. Consumers' assessment of covariation. In T. Kinnear (ed.), *Advances In Consumer Research*, vol. 11, 1983.

Carol A. Scott and Alice M. Tybout. Some indirect effects of case vs. base rate data on information processing strategies. In R. Bagozzi and A. M. Tybout (eds.), *Advances in Consumer Research*, 10, Association for Consumer Research, 1982. (Abstract).

Carol A. Scott. On using attribution theory to understand advertising effects. In A. Mitchell (ed), *Advances in Consumer Research*, 9, Association for Consumer Research, 1981.

Carol A. Scott and Alice M. Tybout. Theoretical perspectives on the impact of negative information: Does valence matter? Abstract published in K. Monroe (ed.), *Advances in Consumer Research*, 8, Association for Consumer Research, 1980

Carol A. Scott. Consumer satisfaction: Perspectives from self-perception theory. Paper presented at the American Psychological Association conference, Montreal, Canada, September, 1980.

Carol A. Scott. Forming beliefs from experience: Evidence from self-perception theory. In H. H. Kassarjian and T. S. Robertson (eds.), *Perspectives In Consumer Behavior*, 3rd edition, Scott, Foresman, 1981.

Alice M. Tybout and Carol A. Scott. Extending the self-perception explanation: The effect of cue salience on behavior. In W. L. Wilkie (ed.), *Advances in Consumer Research*, 6, Association for Consumer Research, 1979.

Carol A. Scott. Attribution theory in consumer research: Scope, issues, and contributions. Proceedings, American Marketing Association Fall Educators' Conference, S. Jain (ed.), 1978.

Carol A. Scott. The role of self-perception processes in consumer behavior: Interpreting one's own experiences. In Keith Hunt (ed.), *Advances in Consumer Research*, 5, Association for Consumer Research.

Robert A. Hansen and Carol A Scott. Alternative approaches to assessing the quality of self-report data. In Keith Hunt (ed.), *Advances in Consumer Research*, 5, Association for Consumer Research, 1978.

Robert A. Hansen and Carol A. Scott. Improving the representativeness of survey research: Some issues and unanswered questions. Proceedings, American Marketing Association Fall Educators' Conference, 1977.

Richard F. Yalch and Carol A. Scott. Effect of initial trial of a new product on attitude-behavior consistency. In W. D. Perreault, Jr. (ed.), *Advances in Consumer Research*, 4,   Association for Consumer Research, 1977.

Carol A. Scott, Researching the broadened concept of consumer behavior. In G. Zaltman and B. Sternthal (eds.), *Broadening the Concept of Consumer Behavior*. Association for Consumer Research monograph, 1975.

Brian Sternthal, Carol A. Scott, and Ruby Roy. Self-perception as a means of personal influence: The foot-in-the-door technique. In B. Anderson (ed.), *Advances in Consumer Research*, 3, Association for Consumer Research, 1975.

Carol A. Scott. Hendley distributors. Consumer behavior research case in Gerald Zaltman, Philip C. Burger, and Randall L. Schultz, *Cases in Marketing Research*, New York: Dryden Press, 1975.

**AWARDS**

1984        Outstanding Teacher of the Year, presented by MBA students at the
            Graduate School of Management, UCLA.


**GRANTS RECEIVED (non-university)**

New Roles for Corporate Communications. Grant received from the Marketing Science
        Institute (with James R. Bettman, Richard J. Lutz, and Barton A. Weitz),
        December 1980 - May 1981.


**SELECTED PROFESSIONAL ACTIVITIES**

Academic Advisory Council, Marketing Science Institute, 1987 to 1990

Editorial Boards:
        Journal of Marketing Research, December 1975 to July 1985
        Journal of Marketing, July 1978 to July 1986; January 1991 - August 1993
        Journal of Consumer Research, December 1980 -

Occasional reviewer, Journal of Personality and Social Psychology and Journal of
        Applied Psychology

Distinguished lecturer at University of Pennsylvania (1978), University of Washington
        (1979), University of Florida (1979), Berkeley/Stanford (1980), University of
        California, Santa Barbara (1982)

AMA Doctoral Dissertation Competition chairperson, 1985

Treasurer, Association for Consumer Research, 1980-81

Resident Faculty Member, American Marketing Association Doctoral Consortium,
        1979, 1980, 1983. Consortium speaker 1984, 1985, 1986

Program Committee, 1979 Annual Conference, Association for Consumer
        Research, Prof. Jerry Olson, chairman


**Consulting projects** for a number of profit, not-for-profit, and governmental
organizations in Ohio and California. Assignments have included strategic marketing
audits, development of strategic marketing plans, advertising planning consultation,
marketing research analysis and interpretation, and expert witness testimony preparation.
Member of the board of directors, Petco, Inc. (1989-1991), Sizzler International (1993-
1999), A-Fem Medical (1995-2003), Classmates Media (2007-2010), and United Online,

Inc. (2003-2016).  Co-founder of Crossfield Associates, LLC, a firm that provides expert marketing analysis for litigation as well as marketing strategy and research consulting services.


**PROFESSIONAL MEMBERSHIPS**

Association for Consumer Research


**COURSES TAUGHT**
Undergraduate (primarily at The Ohio State University)
     Consumer Behavior; Advertising
Masters' (primarily at UCLA)
     Consumer Behavior; Introductory Marketing; Advanced Marketing Management; Management of Distribution Channels; Global Marketing Management; Market Assessment; Marketing Strategy and Policy (Executive MBA Program)
Ph.D. (UCLA, Harvard, and Ohio State)
     Consumer Behavior Theory and Research
     Attribution Theory Research in Marketing
     Doctoral research paper supervision


**THESIS ADVISING**
Chair, Ph.D. Thesis Committee 6 students
Member, Ph.D. Thesis Committee - 9 students
Member, Masters Examining Committee (Ohio State) - 3 students


**RECENT COMMITTEE ASSIGNMENTS (UCLA only)**
Task Force on Women at Anderson, 2001 –
University Committee on Research, 1999-2001
    Chair, Faculty Grants Program
Dean Search Committee, 1997-1999
Executive Education Advisory Committee 1997 – 1999
MBA Admissions Committee 1997-99
Academic Staffing Committee 1997-98
Faculty Executive Committee, 1993 - 1997
Professional Educational Task Force (University), 1993-94
UCLA Child Care Services Advisory Board, 1990 - present; Chair, 1991 - 1993

# EXHIBIT 2

ER-0265

## Carol A. Scott
## Expert Testimony During the Past Four Years*

1.  Delta Air Lines, Inc. *vs.* Marriott International, Inc. – 2023. *Testimony in deposition (2023).*

    Conduct research to determine to what extent consumers are confused as to the source or affiliation of Counterclaim Defendant's "Delta Hotels by Marriott" brand, such that they mistakenly believe it is connected to Delta Air Lines.

2.  Kewazinga Corp. *vs.* Google LLC – 2022. *Testimony in deposition (2022).*

    Conduct research to determine whether a proposed removal of an animation effect in Google Street View would be an acceptable alternative or substitute for Google Street View that contains such an animation effect.

3.  Lontex Corporation *vs.* Nike, Inc. – 2020-2021. *Testimony in deposition (2020) and trial (2021).*

    Conduct research to determine the extent to which interest in purchasing certain NIKE apparel products is increased if those products are shown using "Cool Compression" in the product descriptions.

4.  Edwards Lifesciences Corporation *et al.* *vs.* Meril Life Sciences Pvt. Ltd. *et al.* – 2021. *Testimony in deposition (2021).*

    Conduct research to investigate which product claims in Defendants' advertising for its heart valve products would be important to potential customers, and to determine potential customers' expectations regarding any clinical research data that may have been done to support these claims.

5.  Justin Lytle and Christine Musthaler *vs.* Nutramax Laboratories, Inc. *et al.* – 2021. *Testimony in deposition (2021).*

    Conduct research to investigate various aspects of consumers' decision-making processes in their purchase of Nutramax's health supplement products for dogs. Also asked to assess the reliability and validity of Plaintiffs' expert's opinions regarding the importance of challenged statements that appear on the packaging of the products at issue.

6.  Andrea A. Williams and James Stewart *vs.* Apple Inc. – 2021. *Testimony in deposition (2021).*

    Conduct research to determine and analyze the decision process by which current and past users of Apple's iCloud Service came to subscribe to iCloud for a monthly fee. Also asked to assess whether or not Plaintiffs' expert's conjoint study provides a valid test of the Plaintiffs' central allegations.

7.  Hubert Hansen Intellectual Property Trust *et al. vs.* The Coca-Cola Company, Monster Beverage Corporation *et al.* – 2019-2020. *Testimony in deposition (2019) and trial (2020).*

    Rebut expert's opinions regarding the reliability of that expert's opinion regarding the importance of the Hubert Hansen name to the sale of Hansen's Natural juices and

---

* Underlined party indicates client

ER-0266

Hubert's Lemonade products.

8.  Kurin, Inc. *vs.* <u>Magnolia Medical Technologies, Inc.</u> – 2019.  *Testimony in deposition (2019).*

Evaluate the reliability and validity of Plaintiff's expert opinion that potential customers of a blood collection product are likely to be misled by statements that the product is "registered and listed" with the FDA.

9.  Anthony Belfiore *vs.* <u>Proctor & Gamble Company</u> – 2019.  *Testimony in hearing (2019).*

Rebut expert's opinions regarding the reliability of that expert's regression models to determine classwide economic damages for purchasers of adult wipes containing "flushable" claims.

10.  Brandi Price and Christine Chadwick *vs.* <u>L'Oréal USA, Inc.</u> *et al.* – 2019.  *Testimony in deposition (2019).*

Assess the content and structure of a survey that Plaintiffs' expert conducted to perform a conjoint analysis, and thus to determine whether that data can be used to make reliable and valid predictions of consumers' preferences for Defendants' shampoo products.

11.  Vivian Deveroux *et al. vs.* <u>Apple Inc.</u> – 2019.  *Testimony in deposition (2019).*

Conduct research to evaluate consumer perceptions of Apple's request for government-issued ID during a simulation of an Apple education discount transaction.

12.  Thomas Davidson *et al. vs.* <u>Apple Inc.</u> – 2019.  *Testimony in deposition* (2019).

Determine via consumer research whether or not a disclosure of the chance of a possible touchscreen issue would affect consumers' purchase decisions about an Apple iPhone.  Also asked to assess whether or not Plaintiffs' expert conducted a consumer survey in accordance with generally accepted standards of consumer research.

13.  <u>Lodestar Anstalt</u> *vs.* Bacardi & Company Limited *et al.* – 2019.  *Testimony in deposition (2019).*

Conduct research to determine whether a consumer study conducted by Defendants' expert provides a reliable estimate of the degree to which consumers believe that Plaintiff's products using the "Untamed" mark are made by, affiliated with, or licensed from the defendant.

14.  Suzanna Bowling *et al. vs.* <u>Johnson & Johnson and McNeil Nutritionals, LLC</u> – 2018.  *Testimony in deposition (2018).*

Conduct research to determine whether or not the "No Trans Fat" claim on packages of Benecol spread affect the likelihood that consumers would purchase the product or consumers' perceptions of health-related benefits of the product.  Also investigate

* Underlined party indicates client

2

ER-0267

and analyze the reasons why Benecol purchasers first purchased and continue to purchase the product.

15. Teresa Elward *et al. vs.* <u>Electrolux Home Products, Inc.</u> – 2018. *Testimony in deposition (2018).*

Evaluate the reliability and validity of methodology proposed by Plaintiffs' expert to calculate damages allegedly due to a putative class because of an alleged defect in the heating element in Frigidaire and Electrolux dishwashers.

16. Charlene Dzielak *et al. vs.* <u>Whirlpool Corporation</u> – 2016-2018. *Testimony in deposition (2018).*

Conduct research to determine what the Energy Star logo means to purchasers of washing machines, and whether or not there is any consistent understanding among consumers of the type and specific amount of savings they may expect to experience when purchasing a washer because it carries the Energy Star logo.

17. *In re* Dollar General Corp. Motor Oil Marketing and Sales Practices Litigation (Engaged by counsel for <u>Plaintiffs</u>)– 2018. *Testimony in deposition (2018).*

Conduct research to determine whether or not reasonable consumers would be misled about the suitability of Dollar General's store-branded motor oil for use in their vehicles, if such vehicles were model years 1989 or later, given DG Motor Oil labeling and placement in the store among more modern formulations of motor oil that are suitable for all vehicles.

.

# EXHIBIT 3

(234 of 274), Page 234 of 274
Case: 24-7532, 02/06/2025, DktEntry: 11.3, Page 234 of 274
Case 3:24-cv-02311-TSH   Document 59-3   Filed 10/08/24   Page 2 of 2

**Documents Considered**

First Amended Complaint For (1) Trademark Infringement (Lanham Act, 15 U.S.C. § 1114); (2) Unfair Competition/False Designation of Origin (Lanham Act, 15 U.S.C. § 1125(a)); (3) Common Law Trademark Infringement, May 3, 2024.

Answer to Complaint and Counterclaim of Defendant City of Oakland, A Municipal Corporation, Acting By and Through Its Board of Port Commissioners (Port Of Oakland), May 9, 2024.

Expert Report of Sarah Butler, June 27, 2024

"Estimates of the Total Resident Population and Resident Population Age 18 Years and Older for the United States, Regions, States, District of Columbia, and Puerto Rico: July 1, 2023 (SCPRC-EST2023-18+POP)," United States Census Bureau.

Air Travelers in America:  Key Findings of a Survey Conducted by Ipsos, 2023, A4A-Air-Travel-Survey-2023-Key-Findings.pdf

Barber, W G. & G. E. Yaquinto, "The Universe," in Shari S. Diamond and Jere B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, Second Edition* (Diamond and Swann 2022)

Simonson, Itamar and Ran Kivetz, "Demand Effects in Likelihood of Confusion Surveys: the Importance of Marketplace Conditions," in Shari S. Diamond and Jere B. Swann (eds.), *Trademark and Deceptive Advertising Surveys: Law, Science, and Design, First Edition,* Chapter 11, pp. 243-259.

Allenby, Greg, Geraldine Fennell, Joel Huber, Thomas Eagle, Tim Gilbride, Dan Horsky, Jaehwan Kim, Peter Lenk, Rich Johnson, Eli Ofek, Bryan Orme, Thomas Otter, and Joan Walker, "Adjusting Choice Models to Better Predict Market Behavior," *Marketing Letters*, vol. 16, no. 3-4, Sixth Invitational Choice Symposium, December 2005 ("Allenby et al. 2005").

"Ex 6 Met OAK Presentation," Port of Oakland PowerPoint file "41124 Presentation.pptx"

"Elevating the OAK brand and experience," Nov. 22, 2022, OAK Phase 1 Findings Readout_20221103.pptx

"BAY AREA ARC BOOKING LOCATIONS," YE 2024, Bay Area ARC Heat Maps YE 3Q2024 v4 (percentages).pptx

"BAY AREA ARC BOOKING LOCATIONS," for year ending March 2024, Bay Area ARC Heat Maps YE 3Q2024v3.pptx

"Top 20 bay area – international markets," Port of Oakland, Intl_markets.pptx

**ER-0270**

# EXHIBIT 4

(236 of 274), Page 236 of 274

Case: 24-7532, 02/06/2025, DktEntry: 11.3, Page 236 of 274
Case 3:24-cv-02311-TSH   Document 59-4   Filed 10/08/24   Page 2 of 3

Google Flights, Captured May 28, 2024



Case: 24-7532, 02/06/2025, DktEntry: 11.3, Page 237 of 274
Case 3:24-cv-02311-TSH   Document 59-4   Filed 10/08/24   Page 3 of 3

Google Flights, Captured October 7, 2024



ER-0273

# EXHIBIT 5

Alaska Airlines Website



ER-0275

Allegiant Airlines Website



ER-0276

(241 of 274), Page 241 of 274

Case: 24-7532, 02/06/2025, DktEntry: 11.3, Page 241 of 274
Case 3:24-cv-02311-TSH   Document 59-5   Filed 10/08/24   Page 4 of 8

Delta Airlines Website



Hawaiian Airlines Website



Southwest Airlines Website



Spirit Airlines Website



ER-0280

Sun Country Airlines Website



Mary C. Richardson (Bar No. 208586)
Port Attorney
mrichrdson@portoakland.com
Kimberly I. McIntyre (Bar No. 184648)
Deputy Port Attorney
kmcintyre@portoakland.com
**PORT OF OAKLAND**
530 Water Street
Oakland, California 94607
Tel: (510) 627-1572 / (510) 627-1205

Eugene M. Pak (Bar No. 168699)
epak@fennemorelaw.com
**FENNEMORE WENDEL**
1111 Broadway, 24th Floor
Oakland, California 94607
Tel: (510) 834-6600 / Fax: (510) 834-1928

Stephen C. Willey (Bar No. 209164)
swilley@fennemorelaw.com
Brandi B. Balanda (*Pro Hac Vice*)
bbalanda@fennemorelaw.com
Christopher J. Lindemeier (*Pro Hac Vice*)
clindemeier@fennemorelaw.com
**FENNEMORE CRAIG, P.C.**
1425 Fourth Avenue, Suite 800
Seattle, Washington 98101
Tel: (206) 749-0500 / Fax: (206) 749-0500

Attorneys for Defendant and Counterclaimant City of
Oakland, a municipal corporation, acting by and
through its Board of Port Commissioners (Port of
Oakland)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, | Case No. 3:24-cv-02311-TSH |
| Plaintiff, | **DECLARATION OF CHRISTOPHER LINDEMEIER** |
| v. | Date: November 7, 2024<br>Time: 10:00 AM |
| CITY OF OAKLAND AND PORT OF OAKLAND, | Courtroom: E – 15th Floor<br>Trial Date: (None Set) |
| Defendant. | |

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF CHRISTOPHER
LINDEMEIER - 1

CASE NO. 3:24-CV-02311-TSH

ER-0282

1

2  | CITY OF OAKLAND, A MUNICIPAL
3  | CORPORATION, ACTING BY AND
   | THROUGH ITS BOARD OF PORT
4  | COMMISSIONERS (PORT OF
   | OAKLAND),

5  |               Counterclaimant,

6  | v.

7  | CITY AND COUNTY OF SAN
   | FRANCISCO,
8

9  |               Counterclaim Defendant.

10      I, Christopher Lindemeier, declare as follows:

11      1.    I am over eighteen years of age and am competent to testify. I make this

12 declaration based on personal knowledge. I am an associate attorney at Fennemore Craig, P.C.,

13 counsel for the City of Oakland, a municipal corporation, acting by and through its Board of

14 Port Commissioners ("Port of Oakland" or "Port"), Defendant and Counterclaimant

15 ("Defendant") in the above-captioned matter.

16      2.    I have reviewed the Declaration of Jessica Williams in Support of Plaintiff's

17 Motion for Preliminary Injunction (ECF 36) and the exhibits appended thereto ("Williams

18 Declaration").

19      3.    Exhibits O through W of the Williams Declaration identify instances of alleged

20 actual confusion, taken from social media posts or online comments, in which consumers have

21 purportedly been confused by San Francisco Bay Oakland International Airport's ("Airport" or

22 "OAK") name, as alleged by Plaintiff and Counterclaim Defendant City and County of San

23 Francisco (the "City").

24      4.    In only two (2) of these instances did the post or comment suggest that actual

25 confusion could have taken place. These two instances are included in the Williams Declaration

26 as: (a) Exhibit O; and (b) the comment on page 4 of Exhibit U (regarding passengers who "don't

27

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF CHRISTOPHER
LINDEMEIER - 2

CASE NO. 3:24-CV-02311-TSH

ER-0283

1    speak English very well").  The other instances of alleged confusion proffered by the City did

2    not actually involve confusion and are addressed below.

3         5.    The highlighted comments by a poster named Steve Olsch on August 6, 2024 on

4    the Facebook page for OAK in <u>Exhibit P</u> of the Williams Declaration state his personal opinion

5    that the new name is confusing, not that he was actually confused.  The Facebook post  states

6    "*OAK is thrilled to announce that, just one month in, Viva Aerobus is expanding service from the*

7    *Bay Area to Monterrey, Nuevo Leon . . . Now that is how you #FlytheEastBayWay at OAK! . . .*"

8    Mr. Olsch initially commented "SFO/OAK?" and another person (Dina Austin) replies "Steve

9    Olsch it'S OAKLAND AIRPORT not SF[.]"  Olsch replies to Austin's response by posting:  "the

10   renaming of OAK is confusing. I think it's SFO..."  When he makes this statement on OAK's

11   Facebook page, he could not be actually confused as Ms. Austin had already clarified "it's

12   OAKLAND AIRPORT[.]"

13        6.    Moreover, twice **before** his August 6, 2024 comments, Mr. Olsch had already

14   been informed that "San Francisco Bay Oakland International Airport" was OAK's new name.

15   On October 8, 2024, I reviewed OAK's Facebook page and found multiple comments by Mr.

16   Olsch.  In a comment dated May 17, 2024, about three months before his August 6, 2024

17   comment, he comments "Is that SFO?" and another person responds: "No, it's Oakland.  You've

18   asked that before and have been answered."  See excerpt below.  The Facebook post that Olsch

19   commented on states: "*New charging outlets installed in Terminal 1! Charge up your devices*

20   *next time you #FlyTheEastBayWay using these sleek new charging units on our new gate*

21   *furniture. #iflyoak*."  Attached hereto as **Exhibit 1** is a true and correct copy of the Facebook post

22   and Mr. Olsch's comments from May 17, 2024, which may be found at the following web

23   address:

24   https://www.facebook.com/iflyoak/posts/pfbid021egLv8VH2wZX5heVSYYQcwW3Va2gocX

25   oJ8JvpR6DC1iK245Xg81SYSUgrBbDDXG8l

26

27

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF CHRISTOPHER
LINDEMEIER - 3

CASE NO. 3:24-CV-02311-TSH

ER-0284



7.      Similarly, in a June 26, 2024 post on OAK's same Facebook page stating: "*The first phase of OAK's Terminal Restroom Renovation Program has begun in Terminal 1! Our restrooms will be modernized for improved efficiency and passenger experience ...*"  Mr. Olsch comments "Good Job SFO!" and is again reminded "This is OAK not SFO[.]"  See excerpt below.  Attached hereto as **Exhibit 2** is a true and correct copy of the Facebook post and Mr. Olsch's comments from June 26, 2024, which may be found at the following web address:

https://www.facebook.com/iflyoak/posts/pfbid0nntAJsmFMmH4vJ71dTgMykQcME2oPUigM YNySBT5LL9iTzD1e2XySAFFjmb9LSbdl

8.      Exhibit Q of the Williams Declaration is a comment by a Jen Pilot on a July 19, 2024 post on OAK's same Facebook page in which she inquires if the Airport is "different" from SFO.  In response to this question, another commenter replies to her (which reply comment is missing from Exhibit Q to the Williams Declaration) and states that "San Francisco

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF CHRISTOPHER
LINDEMEIER - 4

CASE NO. 3:24-CV-02311-TSH

**ER-0285**

1  Bay Oakland International Airport known as 'OAK' is closer to UC Berkeley" as it is a 25

2  minute drive to UC Berkeley rather than the 39 minute drive from SFO.  See excerpt below.

3  Attached hereto as **Exhibit 3** is a true and correct copy of the July 19, 2024 Facebook post and

4  Ms. Pilot's comments from July 21-22, 2024, which may be found at the following web

5  address:

6  https://www.facebook.com/iflyoak/posts/pfbid0rzK61rhzXjpxSc6G3qDqMzrM6T3Gnq4VdaT

7  SAD6zCFNzACf1GkmLhvZnY3x82ChQl



18       9.     Exhibit R to the Williams Declaration comprises a handful of Instagram posts,

19  which do not include any statements of confusion or that anyone went to the "wrong" airport.

20  The commenter on the last Instagram post states "San Francisco keeps being San Francisco"

21  below the posted photo showing a sign for a yoga room at SFO (page 6 of Exhibit R).  It is unclear

22  why these Instagram posts were tagged with OAK's new name, but they do not constitute

23  instances of actual confusion.

24       10.    The SF Gate article included as Exhibit S to the Williams Declaration either states

25  opinions or repeats the purported instances of confusion already identified in SFO's confusion

26  log in Exhibit A of the Declaration of Chris Birch (ECF 38), which log is discussed in detail in

27  the Port's Opposition brief.

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF CHRISTOPHER
LINDEMEIER - 5

CASE NO. 3:24-CV-02311-TSH

ER-0286

11.     The comment in <u>Exhibit T</u> of the Williams Declaration by a "gruber" on the Threads social media platform states the opinion of "gruber" interpreting the actions of another individual whom "gruber" apparently does not know (referring to her as "a woman a few spots behind me" in line).  He speculates that the woman's boarding pass, which "gruber" does not indicate he actually read, confused her.  There is no indication of any actual confusion caused by the Airport's name.

12.     The first highlighted comment on the second page of <u>Exhibit V</u> to the Williams Declaration also does not show confusion caused by the Airport's new name.  An account named "n54_ftw" commented on an SF Gate article "Just dealt with this today.  Someone i know is flying into town tomorrow for the first time and accidentally went to sfo instead of Oakland." [sic]  It is not stated why this unidentified traveler went to SFO instead of OAK.  Moreover, if this unnamed traveler is flying into town "tomorrow" then it is not clear how the commenter could know that the traveler already "went" to SFO instead of OAK.  This is further discussed in the Port's Opposition brief.  The second highlighted comment on the third page of <u>Exhibit V</u> to the Williams Declaration states that the individual was *not* confused.  ("Good thing I looked at it carefully before I confirmed my ride …")

13.     The Williams Declaration states that <u>Exhibit W</u> consists of comments responding to a Facebook post about the same SF Gate article and that the comments "describe[] situations in which they or their friends and family were directed to the wrong airport by digital assistants and rideshare apps."  But this is not the case.  The first commenter does not state that she was directed by any digital assistant or rideshare app to any airport, or that the commenter booked a flight to or from the wrong airport.  The second commenter discusses trying to look for flights on Google (not a digital assistant or rideshare app) and that "Google was popping out flights from SFO and Oakland" so the commenter "looked closely before booking[,]" thereby indicating that the commenter was <u>not</u> confused at the time of purchasing a ticket.  While the third commenter states that she was at the "Oakland Airport 2 days ago and was confused by the name too" she does not indicate that the new name confused her such that she went to the wrong airport.  And

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF CHRISTOPHER
LINDEMEIER - 6

CASE NO. 3:24-CV-02311-TSH

ER-0287

1   she does not state that she used a digital assistant or rideshare app.  The fourth and final

2   commenter states that her sister left Sonoma and asked digital assistant Siri for directions to the

3   San Francisco airport and that "it started taking her to Oakland[,]" but the specific words or query

4   spoken to Siri are not identified, and the statement itself suggests that the <u>sister</u> was not actually

5   confused and did not go to OAK.

6         14.   On October 8, 2024, I asked the Siri application on my iPhone to "give me

7   directions to the San Francisco airport from Sonoma."  Siri then gave me directions to the "San

8   Francisco International Airport[.]"  Siri did <u>not</u> give the option of "San Francisco Bay Oakland

9   International Airport."

10         15.   I have reviewed the Declaration of Tiffany Yamasaki in Support of Defendant's

11   Opposition to Plaintiff's Motion for Preliminary Injunction and Exhibits 22 through 26 appended

12   thereto ("Yamasaki Declaration").  Based on the SFO Comparative Traffic Reports comprising

13   Exhibits 22 through 26 of the Yamasaki Declaration, the total number of passengers enplaned

14   and deplaned at SFO during the following months is as follows:

15                   September 2023:     4,317,296

16                   May 2024:     4,498,408

17                   June 2024:     4,647,504

18                   July 2024:     4,980,094

19                   August 2024:     4,851,557

20         16.   As of the date of this declaration, SFO's Comparative Traffic Report for

21   September 2024 has not yet been posted.  Accordingly, in my calculations herein, I rely on SFO's

22   September 2023 Comparative Traffic Report to estimate the total number of enplaned and

23   deplaned passengers at SFO during September 2024.

24         17.   While OAK's new name became effective on May 9, 2024, in my calculations

25   herein I have cut in half the total number of passengers enplaned and deplaned at SFO during

26   May 2024 to provide a conservative estimate (i.e., erring on the lower side) of the total number

27

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF CHRISTOPHER
LINDEMEIER - 7

CASE NO. 3:24-CV-02311-TSH

ER-0288

of passengers enplaned and deplaned at SFO from May 9, 2024 through May 31, 2024, amounting to 2,249,204 passengers.

18.     The sum of the number of passengers enplaned and deplaned at SFO during June, July, and August 2024 is 14,479,155.  Combined with the estimated total number of passengers enplaned and deplaned at SFO from May 9, 2024 through May 31, 2024 (2,249,204) and during September 2023 (4,317,296), the estimated total number of passengers enplaned and deplaned at SFO from the point of OAK's name change through September 30, 2024 equals 21,045,655.

19.     This means that the two (2) alleged instances of actual confusion proffered by the City constitutes 0.0000095% of the estimated total number of passengers enplaned and deplaned at SFO from the point of OAK's name change through September 30, 2024.

20.     Assuming *arguendo* that the City's confusion log is reliable evidence of actual confusion, the number of instances of actual confusion increases to seventeen (17), which constitutes 0.0000808% of the estimated total number of passengers enplaned and deplaned at SFO from the point of OAK's name change through September 30, 2024.

21.     Attached hereto as **Exhibit 4** is a true and correct copy of an SFO press release titled "SFO Applauds New United Airlines Service to Belize", dated June 28, 2024, which may be found at the following web address:

https://www.flysfo.com/about/media/press-releases/sfo-applauds-new-united-airlines-service-belize

22.     Attached hereto as **Exhibit 5** is a true and correct copy of an SFO press release titled "SFO Celebrates Alaska Airlines Announcement of Nonstop Service to Costa Rica", dated July 10, 2024, which may be found at the following web address:

https://www.flysfo.com/about/media/press-releases/sfo-celebrates-alaska-airlines-announcement-nonstop-service-costa-rica

23.     Attached hereto as **Exhibit 6** is a true and correct copy of an SFO press release titled "SFO Celebrates New Frontier Airlines Service to Palm Springs and Vail", dated October 1, 2024, which may be found at the following web address:

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF CHRISTOPHER
LINDEMEIER - 8

CASE NO. 3:24-CV-02311-TSH

ER-0289

1    https://www.flysfo.com/about/media/press-releases/sfo-celebrates-new-frontier-airlines-

2    service-palm-springs-and-vail

3        I declare under penalty of perjury under the laws of the United States of America that the

4    foregoing is true and correct.

5        Executed on this 8th day of October, 2024 at Seattle, Washington.

6

7                      By: *s/ Christopher Lindemeier*
                           Christopher Lindemeier

8                          Fennemore Craig, P.C.
                           1425 4th Ave., Suite 800

9                          Seattle, WA 98101
                           Email: clindemeier@fennemorelaw.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

FENNEMORE WENDEL
FENNEMORE CRAIG, P.C.
OAKLAND/SEATTLE

DECLARATION OF CHRISTOPHER
LINDEMEIER - 9

CASE NO. 3:24-CV-02311-TSH

ER-0290

# EXHIBIT 1





# EXHIBIT 2



# EXHIBIT 3





**Jen Pilot**
Hi, I have a travel question. Is this Airport different from "San Francisco International Airport?" Trying to book a flight in closer to UC Berkley from L.A. but only the above comes up. Grateful any guidance. Cheers. (I'm in Australia)

11w    Like    Reply



**Sal Godoy**
Jen Pilot yes, San Francisco Bay Oakland International Airport known as "OAK" is closer to UC Berkeley and that is a 25 minute drive. At SFO that is a 39 minute drive. So OAK is the closet airport and you don't need to cross two bridges to head to Berkeley like SFO. If you need to take public transportation from OAK to UC Berkeley, take BART using the people-mover system just in front of Terminal 1 at OAK. You get to your destination much quicker using this airport. OAK is easier and convenient when you want to get out of the airport fast to get to your destination. Including less fog delays unlike SFO. OAK is your choice.

11w    Like    Reply    Edited



**Jen Pilot**
**Sal Godoy** thank you. Excellent clarity & advice. Have a lovely day. Cheers.

11w    Like    Reply

ER-0298

# EXHIBIT 4

Immediate Release

# SFO Applauds New United Airlines Service to Belize

> **This content has not been updated in more than 90 days and may be outdated. Last edited: July 2nd, 2024.**

📅 **June 28, 2024**   San Francisco



SF-24-25

## SFO Applauds New United Airlines Service to Belize

*Largest airline at SFO to launch seasonal service to Belize City*

ER-0300



**SAN FRANCISCO** – June 28, 2024 – The San Francisco International Airport (SFO) celebrated an announcement today from the Belize Tourism Board detailing plans for United Airlines to launch seasonal nonstop service from SFO to Belize City, Belize starting December 21, 2024. The Airport's largest airline plans to offer one flight per week using Boeing 737 aircraft.

"We are excited to welcome nonstop United Airlines flights from SFO to Belize," said Airport Director Ivar C. Satero. "For Bay Area travelers seeking a warm-weather getaway this winter, United's new service will be a welcome addition to their wide range of destinations from SFO. We thank United for their commitment to SFO and are confident this new service will be a success."

## About San Francisco International Airport

SFO is committed to providing an extraordinary airport experience, with seamless access, thoughtful amenities, sustainable design and inspiring artwork and exhibits.

For up-to-the-minute departure and arrival information, airport maps and details on shopping, dining, cultural exhibitions, ground transportation and more, visit www.flysfo.com. Follow us on x.com/flysfo and facebook.com/flysfo.

ER-0301

Contact the Public Information Officer

# Doug Yakel

Public Information Officer

External Affairs Office

San Francisco International Airport

650.821.4000        Doug.Yakel@flysfo.com

**Sign Up to Receive Press Releases**

| Name | Email |
|------|-------|

Subscribe

# EXHIBIT 5

ER-0303

Immediate Release

# SFO Celebrates Alaska Airlines Announcement of Nonstop Service to Costa Rica

---

**This content has not been updated in more than 90 days and may be outdated. Last edited: July 10th, 2024.**

---

📅 July 10, 2024    San Francisco                                              🖨 

## SFO Celebrates Alaska Airlines Announcement of Nonstop Service to Costa Rica

### *Airline plans to launch nonstop flights to Liberia in December 2024*

**ER-0304**



**SAN FRANCISCO** – July 10, 2024 – The San Francisco International Airport (SFO) celebrated an announcement today from Alaska Airlines detailing plans to launch seasonal nonstop service from SFO to Liberia, Costa Rica starting December 21, 2024. Alaska plans to offer one flight per week to Daniel Oduber Quirós International Airport during the winter season using Boeing 737 aircraft.

"We are very excited to welcome nonstop Alaska Airlines flights from SFO to Costa Rica this December," said Airport Director Ivar C. Satero. "With this new service, Alaska is giving Bay Area travelers seamless access to a fantastic new warm-weather destination. We thank Alaska for their continued commitment to SFO and are confident this seasonal service will be a great success."

"We look forward to welcoming our guests onboard this winter on our new nonstop flight from San Francisco to Liberia, one of the most beautiful and vibrant destinations in Central America. This exciting new addition provides our guests with convenient connection to a destination we began flying to in 2015, and soon we'll connect even more West Coast guests with Costa Rica's Gold Coast when our service from SFO begins in December," said Kirsten Amrine, vice president of network planning and revenue management at Alaska Airlines. "Our guests can already begin taking advantage of an enhanced and premium travel experience when flying

Alaska from SFO with our new location at Harvey Milk Terminal 1, which provides modern and innovative touches from the moment they step foot into our lobby."

With Alaska's nonstop service to Liberia from SFO, the airline is reaffirming its position as the largest U.S. carrier between the West Coast and Latin America.

As of June 19th, 2024, Alaska Airlines operates all SFO flights from Harvey Milk Terminal 1.

## About San Francisco International Airport

SFO is committed to providing an extraordinary airport experience, with seamless access, thoughtful amenities, sustainable design and inspiring artwork and exhibits.

For up-to-the-minute departure and arrival information, airport maps and details on shopping, dining, cultural exhibitions, ground transportation and more, visit www.flysfo.com. Follow us on x.com/flysfo and facebook.com/flysfo

Contact the Public Information Officer

### Doug Yakel

Public Information Officer

External Affairs Office

San Francisco International Airport

650.821.4000      Doug.Yakel@flysfo.com

**Sign Up to Receive Press Releases**

| Name | Email |

Subscribe

ER-0306

# EXHIBIT 6

Immediate Release

# SFO Celebrates New Frontier Airlines Service to Palm Springs and Vail

📅 October 01, 2024    San Francisco  



## SFO Celebrates New Frontier Airlines Service to Palm Springs and Vail

### *Airline plans to add new nonstops in December 2024*

**SAN FRANCISCO** – October 1, 2024 – The San Francisco International Airport (SFO) celebrated an announcement today from Frontier Airlines detailing plans to launch new nonstop

ER-0308

flights from SFO to Palm Springs and Vail, Colorado in December 2024. Effective December 12th, Frontier will launch three flights per week to Palm Springs, operating on Tuesdays, Thursdays, and Sundays. On December 21st, Frontier will launch one flight per week, on Saturdays, to Vail, Colorado. All flights will operate using Airbus A320 aircraft. "We are very excited to welcome Frontier Airlines' new nonstop flights from SFO to Palm Springs and Vail this December," said Airport Director Ivar C. Satero. "With this new service, Frontier is giving Bay Area travelers fantastic new options for sun or snow this holiday season. We thank Frontier for their continued commitment to SFO and are confident this seasonal service will be a great success."

## About San Francisco International Airport

SFO is committed to providing an extraordinary airport experience, with seamless access, thoughtful amenities, sustainable design and inspiring artwork and exhibits. For up-to-the-minute departure and arrival information, airport maps and details on shopping, dining, cultural exhibitions, ground transportation and more, visit flysfo.com. Follow us on x.com/flysfo and facebook.com/flysfo.

Contact the Public Information Officer

### Doug Yakel

Public Information Officer

External Affairs Office

San Francisco International Airport

650.821.4000      Doug.Yakel@flysfo.com

**Sign Up to Receive Press Releases**

| Name | Email |

Subscribe