CASE NO. 24-7532

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

**CITY AND COUNTY OF SAN FRANCISCO,**

*Plaintiff-Appellee,*

**vs.**

**PORT OF OAKLAND,**

*Defendant-Appellant.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
The Honorable Thomas S. Hixson, United States Magistrate Judge
Case No. 3:24-cv-02311-TSH

---

**DEFENDANT/APPELLANT PORT OF OAKLAND'S OPENING BRIEF**

---

Mary C. Richardson (Bar No. 208586)
Kimberly I. McIntyre (Bar No. 184648)
**PORT OF OAKLAND**
530 Water Street
Oakland, California 94607
Tel: (510) 627-1572 / (510) 627-1205

Eugene M. Pak (Bar No. 168699)
Angela Han (Bar No. 317137)
**FENNEMORE LLP**
1111 Broadway, 24th Floor
Oakland, California 94607
Tel: (510) 834-6600 / Fax: (510) 834-1928

Stephen C. Willey (Bar No. 209164)
Brandi B. Balanda (*Pro Hac Vice*)
**FENNEMORE CRAIG, P.C.**
1425 Fourth Avenue, Suite 800
Seattle, WA  98101-2272
Tel: (206) 749-0500 / Fax: (206) 749-0600

Timothy J. Berg
**FENNEMORE CRAIG, P.C.**
2394 E. Camelback Road, Suite 600
Phoenix, AZ 85016
Tel: (602) 916-5000 / Fax: (602) 916-5999

Therese Shanks
**FENNEMORE LLP**
7800 Rancharrah Parkway
Reno, NV 89511
Tel: (775) 788-2200 / Fax: (775) 786-1177

Attorneys for Defendant-Appellant Port of Oakland

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................1

TABLE OF AUTHORITIES ........................................................3

I.    INTRODUCTION .............................................................1

II.    JURISDICTIONAL STATEMENT .......................................4

III.    STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................4

IV.    STATEMENT OF THE CASE .................................................5

    A.    Relevant Facts .........................................................5

        1.    Airports and the Marketplace for Airport Services .............5

        2.    The Port's Airport on San Francisco Bay ...........................9

        3.    The Recommendation to Incorporate OAK's Geographic Location into its Name ...........................................11

        4.    The City's Opposition Campaign and Lawsuit ...................12

    B.    The District Court's Preliminary Injunction Order ........................13

        1.    The City's Motion .................................................13

        2.    The Port's Opposition .............................................14

        3.    The City's Reply ..................................................16

        4.    The District Court's Order ......................................17

            a. The Merits ..............................................17

            b. Irreparable Harm ......................................19

            c. Balance of Harms and Public Interest ........................19

V.    SUMMARY OF ARGUMENT ...............................................20

VI.    APPELLANT'S ARGUMENT ...............................................24

A.    Standard of Review ........................................................................24

B.    The District Court Erred By Finding the City Is Likely to Prevail on a Trademark Infringement Claim for "Affiliation" Confusion.25

    1.    The District Court Erred in Its Legal Analysis of Affiliation Confusion ...........................................................25

        a. The District Court's Affiliation Finding Is Based Upon an Erroneous Similarity of Mark Analysis............25

        b. The District Court Misapplied the Consumer Care Factor ................................................................30

        c. The District Court's Analysis of Affiliation Confusion Contravenes the Bounds of Trademark Law.........32

    2.    The District Court's Affiliation Finding Is Based Upon an Erroneous Finding of Fact and Lacks Evidentiary Support 34

        a. The District Court Erroneously Relied Upon An Unsupported (And Incorrect) Assertion by SFO's Marketing Personnel About Airports Generally ...34

        b. The City Presented No Evidence To Support a Finding of Affiliation Confusion .......................................36

C.    The District Court Erred By Finding Irreparable Harm.................39

D.    The Balance of Equities Did Not Support an Injunction ..............46

VII.   CONCLUSION..........................................................................49

CERTIFICATE OF COMPLIANCE (FORM 8)...............................................52

# TABLE OF AUTHORITIES

## Cases

*Accuride Intern., Inc. v. Accuride Corp.*,
 871 F.2d 1531 (9th Cir. 1989) ................................................................33

*Alliance for the Wild Rockies v. Cottrell*,
 632 F.3d 1127 (9th Cir. 2011) ...............................................................25

*Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*,
 616 F.2d 440 (9th Cir. 1980)........................................ 20, 26, 27, 28, 38

*Am. Hosp. Supply Co. v. Hosp. Prods. Ltd.*,
 780 F.2d 589 (7th Cir. 1986).................................................................48

*AMF Inc. v. Sleekcraft Boats*,
 599 F.2d 341 (9th Cir. 1979)......................................................... 30, 31

*Barbaria v. Blinken*,
 87 F.4th 963 (9th Cir. 2023) .................................................................48

*Boardman v. Pac. Seafood Grp.*,
 822 F.3d 1011 (9th Cir. 2016) ...............................................................43

*Boe v. C.I.R.*,
 307 F.2d 339 (9th Cir. 1962).................................................................41

Bosley Med. Inst., Inc. v. Kremer,
 403 F.3d 672 (9th Cir. 2005)......................................................... 32, 33

*Cohn v. PetSmart, Inc.*,
 281 F.3d 837 (9th Cir. 2002).................................................................31

*CTIA – the Wireless Ass'n v. City of Berkeley*,
 928 F.3d 832 (9th Cir. 2019)..............................................................46

*Ctr. for Auto Safety v. Chrysler Grp., LLC*,
 809 F.3d 1092 (9th Cir. 2016) ...............................................................48

*CycleBar Franchising, LLC v. StarCycle Franchise, LLC,*
   No. CV 19-9911-DMG (KSX), 2020 WL 3840442 (C.D. Cal. Mar. 27, 2020) .44

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,*
   98 F.4th 1180 (9th Cir. 2024) .................................................... 23, 43

*Godoy v. Spearman,*
   861 F.3d 956 (9th Cir. 2017)...................................................... 41, 42

*Herb Reed Enter., LLC v. Fla. Entm't Mgmt., Inc.,*
   736 F.3d 1239 (9th Cir. 2013) ....................................... 23, 40, 43, 44

*Hooks v. Nexstar Broad. Inc.,*
   54 F.4th 1101 (9th Cir. 2022) .................................................... 39, 41

*Kiva Health Brands, LLC v. Kiva Brands, Inc.,*
   402 F.Supp.3d 877 (N.D. Cal. 2019) ................................................44

*Lerner & Rowe, P.C. v. Brown Engstrand & Shely, LLC,*
   119 F.4th 711 (9th Cir. 2024) ..............................................................30

*Lopez v. Brewer,*
   680 F.3d 1068 (9th Cir. 2012) ............................................................47

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,*
   634 F.2d 1197 (9th Cir. 1980) ..................................................... 24, 47

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997)..............................................................................39

*Multi Time Mach., Inc., v. Amazon.com, Inc.,*
   804 F.3d 930 (9th Cir. 2015)........................................ 26, 30, 31, 32

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,*
   638 F.3d 1137 (9th Cir. 2011). ....................... 21, 24, 26, 28, 32, 34, 38

*Newark Morning Ledger Co. v. U.S.,*
   507 U.S. 546 (1993)..............................................................................42

*Nichino Am. Inc. v. Valent U.S.A., LLC,*
   44 F.4th 180 (3d Cir. 2022)........................................ 23, 40, 41, 42, 43

*Playmakers, LLC v. ESPN, Inc.*,
    376 F.3d 894 (9th Cir. 2004) ........................................................... 24, 48

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014) ....................................... 21, 25, 30, 31

*Rearden LLC v. Rearden Commerce, Inc.*,
    683 F.3d 1190 (9th Cir. 2012) ........................................ 2, 21, 32, 33

*Shakey's Inc. v. Covalt*,
    704 F.2d 426 (9th Cir. 1983) ........................................................ 33

*Smith v. Chanel, Inc.*,
    402 F.2d 562 (9th Cir. 1968) ........................................................ 33

*SolarEdge Techs. Inc. v. Enphase Energy, Inc.*,
    No. 17-cv-04047-YGR, 2017 WL 3453378 (N.D. Cal. Aug. 11, 2017) ............ 44

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024) ............................................................... 24, 25

*Stonefire Grill, Inc. v. FGF Brands, Inc.*,
    987 F.Supp.2d 1023 (C.D. Ca. 2013) ........................................... 27

*The Scotts Co. v. United Indus. Corp.*,
    315 F.3d 264 (4th Cir. 2002) ...................................................... 47, 48

*Vidal v. Elster*,
    602 U.S. 286 (2024) ................................................................... 33

*Williams v. Green Valley RV, Inc.*,
    No. 815-CV-01010-ODW-MRW, 2015 WL 4694075 (C.D. Cal. Aug. 6, 2015)
    .............................................................................................. 44

*Winter v. Nat'l Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ................................................................... 38, 46

## Statutes

15 U.S.C. § 1116(a) ............................................... 3, 5, 23, 40

15 U.S.C. § 1121(a) .................................................................. 4

28 U.S.C. § 1292(a)(1) ........................................................4

28 U.S.C. § 1338(a) ...........................................................4

28 U.S.C. § 2107(a) ...........................................................4

28 U.S.C. § 2201(a) ...........................................................4

**Rules**

Fed. R. Evid. 201 .............................................................8

Fed. R. Evid. 301 ......................................................... 24, 42

Ninth Circuit Rule 28-2.7 ...............................................8

## I.    INTRODUCTION

This appeal is about the grant of a preliminary injunction – extraordinary relief – based upon a legal analysis that breaks with this Court's precedent to push trademark law beyond its established bounds, and is without evidentiary support.

The District Court's errors raise two important legal issues. The first is whether trademark law protects against generalized confusion regarding "affiliation" where the alleged confusion has no bearing on consumer decision-making. The second is the proper application of the Lanham Act's rebuttable presumption of irreparable harm.

Appellant Port of Oakland (the "Port") owns an airport that sits on the shores of the San Francisco Bay ("OAK"). Recently, the Port decided to modify OAK's full name by replacing the generic word "Metropolitan" with the Airport's geographic location on "San Francisco Bay." It adopted the new name the "San Francisco Bay Oakland International Airport" (the "SF Bay Name"), shown here with its logo:



Appellee the City and County of San Francisco (the "City") owns the San Francisco International Airport ("SFO"), which uses this logo:



1

The District Court enjoined the Port from using the SF Bay Name for its airport (OAK) by finding that although consumers know that OAK and SFO are two different airports, potential generalized confusion regarding who owns and operates OAK would support a finding of trademark infringement. The District Court described this as "affiliation" confusion.

The entire injunction is premised on an erroneous legal analysis that ignores whether consumers are likely to be confused about OAK's ownership when potentially or actually buying a flight. The District Court's finding is not connected to consumer decision-making in the relevant marketplace. Instead, it is completely divorced from any decision involving potentially or actually purchasing a flight. Finding trademark infringement on this basis directly contradicts this Court's instruction that "trademark law protects only against mistaken purchasing decisions and not confusion generally." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012) (internal quotations omitted).

The injunction is also based entirely upon a single erroneous finding of fact: that if an airport includes a city name in its full name this means it is owned by that city. It does not. And it was error for the District Court to make this finding based solely upon an unsupported, contradicted, and incorrect assertion by SFO's own marketing personnel. There is no evidence in the record that would otherwise support a finding of affiliation confusion. There is **<u>no</u>** evidence about any

2

consumer understanding or perception regarding airport names (let alone about the SF Bay Name); of any actual confusion regarding who owns OAK; of any survey evidence regarding consumer beliefs as to OAK's ownership or affiliation; or that consumer decision-making regarding which flight to purchase is influenced by who owns the airport. Finding affiliation confusion on this record was clear error.

The District Court then misapplied the rebuttable presumption of irreparable harm under 15 U.S.C. § 1116(a) by holding that the City was irreparably harmed *per se* because it had found the City is likely to succeed on the merits of its affiliation confusion claim. This is not how a statutory rebuttable presumption works under Ninth Circuit law. Instead, the presumption may be rebutted, and if it is, the burden shifts back to the moving party to meet its burden of proof to show irreparable harm. Here, the District Court never analyzed the Port's substantial rebuttal evidence, and the City wholly failed to provide the evidence required in this Circuit to prove irreparable harm absent a presumption.

Finally, the District Court erroneously balanced the equities as a result, and otherwise improperly failed to consider harm the Port would suffer as compared to the City's speculative and unsupported assertions.

The Port respectfully asks the Court to reverse the District Court's order and remand with instructions that the injunction must be denied.

3

## II.    JURISDICTIONAL STATEMENT

The District Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121(a), 28 U.S.C. § 1338(a), and 28 U.S.C. § 2201(a) because this action concerns trademarks, claims under the Lanham Act, and claims for declaratory relief. This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1). The District Court entered the Order on November 12, 2024, and the Port filed its Notice of Appeal on December 12, 2024, making the appeal timely under 28 U.S.C. § 2107(a).

## III.    STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Did the District Court err in granting the City's motion for a preliminary injunction by finding that the City is likely to succeed on the merits:

(a) where the District Court applied an erroneous legal standard by: (i) analyzing similarity of the SF Bay Name by focusing only on the lead words and ignoring both meaningful differences between the parties' marks and how they are encountered in the marketplace; (ii) focusing on the degree of care people may use when thinking about who owns an airport in the abstract rather than the degree of care a typical buyer would exercise when purchasing a flight; and (iii) conducting the entire analysis of whether consumers are likely to be confused about whether OAK is owned by the City and County of San Francisco without any connection to mistaken purchasing decisions; and

4

(b) where the District Court's finding is: (i) based upon a single, unsupported and speculative assertion by SFO's internal marketing personnel about other airports that is demonstrably wrong; and (ii) there is no record evidence of any kind showing that consumers are likely to be confused regarding OAK's affiliation?

2.    Did the District Court err in its application of the rebuttable presumption established by 15 U.S.C. § 1116(a), by finding irreparable harm *per se* rather than requiring the City to meet its burden of proof after the Port's evidence rebutted the presumption?

3.    Did the District Court err by finding the balance of harms favored an injunction where that finding was based upon the erroneous application of a *per se* finding of irreparable harm and erroneous findings regarding the absence of harm that would be suffered by the Port?

## IV.    STATEMENT OF THE CASE

### A.    Relevant Facts

#### 1.    Airports and the Marketplace for Airport Services

Airport services are used by airlines for flight departures and arrivals. Airports lease gates to airlines and other space to businesses who provide goods and services to the airlines' passengers. Airlines are airports' customers.

Commercial airline passengers use an airport because they bought a ticket for a flight that leaves from, connects through, or arrives at that airport – they use

the airport incidentally and temporarily because they have purchased a flight. Those consumers primarily search for and buy flights online, on airline websites, travel agent websites (such as Expedia or Booking.com) ("OTAs"), or flight aggregator websites (such as Kayak or Google Flights). (3-ER-0599 at ¶¶9-11; 5-ER-1120 at ¶12.)

The flight information displayed to consumers online typically shows the city or region in which the airport is located or primarily serves. (*See e.g.*, 3-ER-0383-0384; 3-ER-0405-0407; 3-ER-0409; 3-ER-0412; 3-ER-0485; 3-ER-0487; 4-ER-0611-0619 at ¶¶9-23; 4-ER-0623-0626 at ¶¶9-26; 6-ER-1352.) While airlines, OTAs, and flight aggregator sites may all display airport names slightly differently – they also all include the name of the city they are in or service. (*Id.*) This makes sense, as people buy flights for travel to and from other places. An airport itself is not the ultimate destination.

Relevant here, OAK is located in Oakland and the city shown to consumers as associated with OAK is Oakland, not San Francisco. (*See e.g.*, 3-ER-0383-0384; 3-ER-0405-0407; 3-ER-0409; 3-ER-0412; 3-ER-0485; 3-ER-0487; 4-ER-0611-0619 at ¶¶9-23; 4-ER-0623-0626 at ¶¶9-26; 6-ER-1352.) This marketplace context reinforces not only that SFO and OAK are different airports, but also that OAK is associated with Oakland – not the City. (*Id.* )

In addition, when consumers search for and book flights online, and a given airport is selected, the city in which that airport is located (or the main city nearby) is shown when identifying the airport. (3-ER-0383, 3-ER-0405, 3-ER-0409, 3-ER-0412, 3-ER-0485, 3-ER-0487; 4-ER-0611-0619 at ¶¶9-23; 4-ER-0623-0624 at ¶¶11-15; 6-ER-1352.) For example, these drop down menus reference Oakland in connection with OAK, not San Francisco (the City). (3-ER-0383; 4-ER-0613-0615 at ¶¶12-13; 4-ER-0623 ¶11; 6-ER-1352.) [1]

Finally, in this marketplace, it is not uncommon for more than one airport to serve the same metropolitan region. (3-ER-0602-0604 at ¶¶17-19; *see also* n. 2, below.) Multiple airports may all start with or include the name of the major metropolis they serve. (*Id.*) The inclusion of a city name in an airport's name is often an indicia of the location of an airport or the area it serves – but not necessarily its owner or operator. (*Id.*) For example, the following airports contain a city's name but are <u>not</u> owned or operated by that city: Chicago Rockford International Airport (RFD); Seattle-Tacoma International Airport (SEA); Seattle

---

[1] Airports are identified on flight booking websites by three-letter codes assigned by the International Airline Transport Association  ("IATA codes") (*e.g.*, OAK and SFO). (3-ER-0383-0384; 3-ER-0405-0407; 3-ER-0409, 3-ER-0412, 3-ER-0485; 3-ER-0487; 4-ER-0615 ¶¶14-15; 4-ER-0624 at ¶¶14-15; 6-ER-1352; 3-ER-602 at ¶¶12-13.) The IATA code identifies which airport the consumer has selected while booking a flight. (*Id.*) When consumers search for and book flights online, arrival and destination airport options are not shown to consumers without these codes, which help clearly identify the different airports that may serve the same or overlapping cities or regions. (*Id.*)

Paine Field International Airport (PAE); Baltimore/Washington International

Thurgood Marshall Airport (BWI); Boston Logan International Airport (BOS);

Minneapolis-St. Paul International Airport (MSP); Portland International Airport

(PDX); Ted Stevens Anchorage International Airport (ANC); and Detroit

Metropolitan Airport (DTW).[2]

---

[2] There are many airports with names that contain a city name, but which are owned or operated by a state, county, or other entity, rather than by the named city. Below is a partial list of such airports, including Chicago Rockford International Airport (RFD), Seattle-Tacoma International Airport (SEA), and Seattle Paine Field International Airport (PAE), which are discussed in the record (3-ER-0602-604 at ¶¶17-19.) Pursuant to Fed. R. Evid. 201 and Ninth Circuit Rule 28-2.7, the Port respectfully moves this Court to take judicial notice of the following official information publicly available on governmental websites. All of the following websites were last visited on February 6, 2025: **Chicago Rockford International Airport** (RFD) (website pages from the Greater Rockford Airport Authority**:** 1) "History – Camp Grant," https://flyrfd.com/history/ ("In 1946 the State of Illinois adopted the Airport Authorities Act and the Greater Rockford Airport Authority was created"), and 2) "Administration – Who We Are," https://flyrfd.com/who-we-are/ ("Formed in 1946, the Authority has four jurisdictions who appoint a seven-member Board of Commissioners. The Mayor of the City of Rockford appoints three members, the County Board Chairman of Winnebago County appoints two members, the Mayor of Loves Park appoints one member, and the Village President of Machesney Park appoints one member"); **Seattle-Tacoma International Airport** (SEA) (website pages from https://www.seatacwa.gov/government/city-departments/city-manager/airport ("Seattle-Tacoma International Airport (Airport) is owned and operated by the Port of Seattle (Port)."); **Seattle Paine Field International Airport** (PAE) (website pages from https://www.painefield.com; https://www.painefield.com/131/History-Corner ("At the end of WWII the airport reverted back to Snohomish County control and civilian use."); **Baltimore/Washington International Thurgood Marshall Airport** (BWI). "About BWI," https://bwiairport.com/flying-with-us/about-bwi/ ("The Maryland Aviation Administration (MAA) is the owner and operator of Baltimore/Washington International Thurgood Marshall Airport"); **Boston Logan International Airport** (BOS). "About Boston Logan,"

### 2. The Port's Airport on San Francisco Bay

Since 1927, the Port has owned and operated OAK, which sits on the shores of the San Francisco Bay. (3-ER-0521, 0522 at ¶7.) Given its geographic location, OAK is a convenient entry point into the Bay Area. (3-ER-0522 at ¶10.) Indeed, OAK's location on San Francisco Bay is one of the Airport's most important features, as this allows OAK to offer unique access to air travel for San Francisco Bay Area residents and visitors going into or out of downtown Oakland, downtown San Francisco, wine country, major universities, and beyond. (3-ER-0490 at ¶¶6-7; 3-ER-0522, 0523 at ¶¶8-9, 13; 3-ER-0549 at ¶11.)

---

https://www.massport.com/logan-airport/about-logan ("Boston Logan is owned and operated by the Massachusetts Port Authority"); **Minneapolis-St. Paul International Airport** (MSP). "About MSP," https://www.mspairport.com/about-msp ("The airport is managed and run by the Metropolitan Airports Commission (MAC), a public corporation established in 1943 by the Minnesota State legislature"); **Portland International Airport** (PDX). "PDX The Airport You Love -About," https://www.portofportland.com/About/PDX ("We proudly own and operate the award-winning PDX: Portland International Airport"). The Port was created by the *Oregon* State Legislature. https://cdn.portofportland.com/pdfs/Corporate_one_pager_october_2016.pdf ("The Oregon Legislature created the Port of Portland . . . the Port owns three airports (Portland International, Hillsboro, and Troutdale), four marine terminals and five industrial parks"); **Ted Stevens Anchorage International Airport** (ANC). "History" (The Great State of Alaska, Alaska Department of Transportation & Public Facilities), https://dot.alaska.gov/anc/about/history.shtml (Anchorage International Airport is owned by the State of Alaska upon a transfer of ownership from the U.S. in 1959 to the then-new state); **Detroit Metropolitan Airport** (DTW). "Facts & Figures," https://metroairport.com/business/about-wcaa/facts-figures ("Established in 2002 by Michigan Public Act 90 . . . the [Wayne County] Airport Authority is an independent agency responsible for the operation of Detroit Metropolitan Airport, Willow Run Airport and Crosswinds Marsh").

In addition to being ideally situated for entry into the San Francisco Bay Area, OAK focuses on providing an easier, more efficient experience for those traveling through an airport to their ultimate destination in the San Francisco Bay Area while promoting local Oakland and East Bay businesses. (3-ER-0490 at ¶¶6-7; 3-ER-0523, 0524 at ¶¶13, 15 and 0536-0542; 3-ER-0549-0550 at ¶14.)

The Port strives to set OAK apart as a different and recognizable option for air travel into and out of the San Francisco Bay Area. (3-ER-0490-0493 at ¶¶6-17; 3-ER-0523-0525 at ¶¶14-23; 3-ER-0549-0550 at ¶¶13-14.) Over the years, it has maintained OAK's identity and ties to the City of Oakland, and developed distinct branding while seeking to communicate the benefits of OAK's location on the Bay. (3-ER-0490-0494 at ¶¶6-21; 3-ER-0523-0525 at ¶¶13-16, 19-23; 3-ER-0549-0550 at ¶¶13-14.)

OAK also enjoys a positive reputation among travelers familiar with OAK. A consumer survey found that when consumers were asked to say the three words that best describe OAK, the top responses were:  "Efficient, Good Service, Easy Access, Welcoming, Nice, Fast, Friendly" among other platitudes. (3-ER-0540). The same study found that 83% of consumers surveyed had a favorable opinion of OAK. (*Id.*)

### 3.    The Recommendation to Incorporate OAK's Geographic Location into its Name

Despite OAK's long history and prime location, it has faced difficulties attracting and maintaining nonstop routes due to insufficient in-bound demand, which is a necessary predicate for routes. (3-ER-0494-0495 at ¶ 23; 3-ER-0525 at ¶24; 3-ER-0550 at ¶15; 3-ER-0604 at ¶¶20-24.) The Port's Aviation Division spent several years researching, assessing, and working on this issue, including with the input of industry consultants. (3-ER-0494-0495 at ¶23; 3-ER-0525 at ¶25; 3-ER-0550 at ¶16; 3-ER-0604 at ¶¶20-24.) That work highlighted two main challenges.

First, many travelers are not familiar with OAK's geographic location on the San Francisco Bay nor did they understand that Oakland is part of the San Francisco Bay Area. (3-ER-0495 at ¶24; 3-ER-0525-0526 at ¶26; 3-ER-0605 at ¶25(a).) Without this awareness, many consumers would not search for flights to "OAK" or "Oakland" as an option for Bay Area travel. (*Id.*)

Second, although OAK sits on the San Francisco Bay, OAK flights are not routinely displayed when the terms "San Francisco Bay" or "San Francisco" are used in online searches because of various back-end codes and sorting rules used by OTAs and flight aggregator websites. (3-ER-0495 at ¶25; 3-ER-0525-0526 at ¶26; 3-ER-0605 at ¶25(b).) As a result, when consumers search for flights to the San Francisco Bay Area, they may be shown only route options to SFO and not alternatives to OAK. (*Id.*) These two issues combine to depress in-bound passenger

demand that market data suggests should otherwise support nonstop routes to OAK. (3-ER-0495 at ¶¶24-26; 3-ER-0526 at ¶27; 3-ER-0605 at ¶26.)

The Port sought to address this issue while maintaining OAK's distinct identity as Oakland's airport. (3-ER-0496 at ¶¶30-31; 3-ER-0525-0526, 0528 at ¶¶30, 37; 3-ER-0550 at ¶¶16-17.) Ultimately, on May 9, 2024 the Port adopted the name the SAN FRANCISCO BAY OAKLAND INTERNATIONAL AIRPORT. (3-ER-0495-0496 at ¶¶28-33; 3-ER-0526-0528 at ¶¶30-44; 3-ER-0552-0555 at ¶¶24-34.) This new name included the geographic identifier "San Francisco Bay" describing the airport's geographic location in the Bay Area, but also retained "Oakland International Airport" to link the new name to the former name and stay grounded in Oakland. The Airport's IATA code (OAK) would remain the same, as would OAK's branding and I Fly OAK logo. (3-ER-0496 at ¶¶31-33; 3-ER-0526, 0528 at ¶¶30, 37; 3-ER-0550 at ¶¶16-17.)

### 4.    The City's Opposition Campaign and Lawsuit

Even before the final adoption of the new name, in response to the Port's planned public discussion of the potential name change, the City launched a marketing campaign to spur opposition opinion, including by creating and pushing a narrative of purported "confusion." (3-ER-0355-0381.) The City's Aviation Director instructed staff to "get more aggressive on [social media] with the OAK confusion messaging[.]" (3-ER-0355-0363.)

The City then filed this lawsuit on April 18, 2024, alleging that the SF Bay Name for OAK infringes on the City's trademark: SAN FRANCISCO INTERNATIONAL AIRPORT. (7-ER-1519-1560.)

**B.     The District Court's Preliminary Injunction Order**

**1.     The City's Motion**

On September 17, 2024, the City filed a Motion for Preliminary Injunction asking the Court to enjoin the Port's use of the SF Bay Name and for other broad relief. (6-ER-1457-1489.) The City asserted it was likely to succeed on the merits arguing that consumers are likely to be confused by the SF Bay Name and think that OAK and SFO are the same airport (*i.e.*, **source confusion**). (*Id.*) The City's Motion focused on this purported source confusion (that consumers will book flights to the wrong airport thinking OAK is SFO or vice versa) – **not** affiliation confusion. (*Id.*)

To make this argument, the City applied the *Sleekcraft* factors in a rote, checklist manner, divorced from the marketplace context and without considering what is most informative for evaluating the likelihood of consumer confusion. (6-ER-1457-1489); *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979). The City also relied upon the false assertion that the name "San Francisco Bay Oakland International Airport" "centers on the City's name" to argue the Port "front-loaded" the City's name into the SF Bay Name despite the fact that the SF Bay Name uses the geographic term the "San Francisco Bay" and not the city name

"San Francisco." (6-ER-1457-1489.) The City then argued that consumers are likely to exercise a low degree of care when selecting an airport for their flight, and thus are likely to mix up OAK and SFO when purchasing an airline ticket. (*Id.*)

Although the City claimed that the views of airlines would be "particularly probative" regarding consumer confusion "as it's their business to know their customers," it offered zero testimony from any airline. (6-ER-1483 at 20:17-18.) In fact, the City offered zero testimony from any OTA or flight aggregator company, anyone who does business with SFO, any industry expert, or from any consumer. (6-ER-1457-1489.)

## 2. The Port's Opposition

In opposition, the Port argued the City was not likely to prevail on the merits of a trademark infringement claim regarding source confusion because the SF Bay Name is not likely to confuse consumers into believing that OAK and SFO are the same airport or otherwise confuse the two airports. (4-ER-0628-0660.)

Unlike the City's Motion which was not supported by any testimony from airlines (or any other third party), the Port's arguments were supported by testimony from multiple third parties in the industry. (3-ER-0599-0606; 4-ER-0609-0627.) For example, the Port submitted testimony from Southwest Airlines, which is the second largest domestic carrier in the United States, and which flies into and out of *both* SFO and OAK. (4-ER-0621-0627; 6-ER-1418-1419.) The Port also submitted testimony from Spirit Airlines, testimony from an aviation industry

veteran and consultant, screenshots showing dozens of other airlines' websites, OTAs (such as Expedia and Booking.com), and flight aggregator websites, and expert testimony critiquing the City's expert survey report. (3-ER-0382-0425; 3-ER-0599-0606; 4-ER-0609-0620.) This evidence all demonstrated the clear marketplace context that plainly shows consumers are not likely to be confused into believing that OAK is SFO or mixing up the airports (it also shows that OAK is associated with the City of Oakland, such that consumers are not likely to believe that the City and County of San Francisco owns or operates the Airport). (*Id.*; *see also* 3-ER-0383, 3-ER-0405, 3-ER-0409, 3-ER-0412, 3-ER-0485, 3-ER-0487.)

The Port also rebutted any presumption that the City is likely to suffer irreparable harm by offering evidence that SFO's reputation had not been impacted during the approximately five months that OAK's full name was the "San Francisco Bay Oakland International Airport." (3-ER-0299-310; 3-ER-0472, 0474.) In fact, the number of passengers who flew into or out of SFO *increased* as compared to the prior year, SFO secured new airline routes during this time, and the press continued to characterize SFO positively. (*Id.*)

Finally, contrary to the City's disparaging rhetoric about OAK in its briefing, the Port submitted evidence indicating OAK enjoyed a good reputation among consumers. (3-ER-0533-0535; 3-ER-0536-0542; 3-ER-0604 ¶22; 3-ER-

0522 ¶¶8,10.) This included the results of a consumer study showing that OAK had an 83% satisfaction rating and was described by consumers as "Efficient, Good Service, Easy Access, Welcoming, Nice, Fast, Friendly, [and] Convenient.'" (3-ER-0536-0542.)

### 3. The City's Reply

In reply, the City simply doubled down on the approach it took in its Motion. It applied the *Sleekcraft* factors as a mechanistic checklist and leaned into arguments about purported hypothetical generalized confusion. (2-ER-0212-0223.)

The City also newly raised in its Reply, although only in passing, an argument that the SF Bay Name for OAK is likely to cause confusion regarding OAK's **affiliation** – not just **source confusion**, which had been the focus of the City's Motion. (2-ER-0212-0213 at 2:22-3:3.)[3]

Finally, in response to the Port's evidence rebutting any presumption that the City would suffer irreparable harm without an immediate injunction, the City offered nothing. (2-ER-0224at 14:4-21.) Instead, the City pointed to the speculative and conclusory assertions by its own two marketing personnel that

---

[3] Notably, the word "affiliated" (or any of its variations) appears just once in the City's entire 25-page Motion. Most tellingly, purported "affiliation" confusion was not addressed at all by the City's flawed survey. (6-ER-1479 at 16:9; 4-ER-0662-0663.) Despite recognizing the need for "evidence reflect[ing] actual consumer perception," the City presented no such evidence regarding its new affiliation claim. (2-ER-0216 at 6:14-15.)

SFO's "award winning, world-class reputation" will be harmed because consumers will associate OAK's "lesser" services with SFO or the City. (*Id.*)

The Motion was fully briefed, and the District Court heard oral argument on November 7, 2024. (2-ER-0039-0112.) During argument, the City was, once again, unable to articulate any actual evidence of consumer confusion regarding OAK's "affiliation," consumer belief that the City owned and operated both SFO and OAK though they were separate airports, or evidence of harm that either had occurred or would occur if the Port was allowed to use the SF Bay Name. (2-ER-0039-0112.)

### 4. The District Court's Order

The District Court granted in part and denied in part the City's request for injunctive relief. (1-ER-0003-0036.)

#### a. The Merits

In its Order, the District Court largely rejected the City's various assertions. It found that the City had <u>not</u> shown serious questions going to the merits of its trademark infringement claim for source confusion under either an initial interest or point-of-sale theory of consumer confusion – let alone shown that it is likely to prevail. (1-ER-0022 at 20-21:2, 1-ER-0025 at 26-28.) In reaching these conclusions, the District Court properly recognized this Court's instruction that "[t]he *Sleekcraft* factors are intended as an adaptable proxy for consumer

confusion, not a rote checklist" such that "the relative importance of each individual factor will be case-specific[.]" (1-ER-0009 at 20-8:4).

The District Court also properly recognized that the *Sleekcraft* factors are non-exhaustive, as "[o]ther variables may come into play depending upon the particular facts presented." (1-ER-0009 at 20-8:4). In applying its legal analysis regarding source confusion whether in the search for (initial interest) or purchase of (point-of-sale) airline tickets, the District Court was guided by this Court's precedent, and carefully reviewed the record evidence and arguments in the context of the relevant consumer and marketplace. (1-ER-0015-0018 at 13:22-16:11; 1-ER-0019-0028 at 17:25-26:26.)

However, the District Court then deviated from this Court's precedent and the record. (1-ER-0010-0011 at 8:6 – 9:9; 1-ER-0018-0019 at 16:17-17:24.) The District Court properly conducted a thorough analysis of the City's source confusion claim under both an initial interest theory and a point-of-sale theory and found that the SF Bay Name is not likely to confuse consumers regarding whether OAK and SFO are the same airport. (1-ER-0003-0036.) But it did no such analysis regarding whether the City had proven its belated claim for trademark infringement based upon "**affiliation**" confusion. (1-ER-0018-0019 at 16:17-17:24.)

Instead, the District Court simply concluded that consumers are likely to believe that even though OAK and SFO are two separate airports, OAK is

nonetheless owned by the City – the purported "affiliation" confusion. (*Id.*) Based upon a truncated analysis without any evidentiary support regarding consumer perceptions or beliefs as to airport ownership, the Court ruled that the City is therefore likely to prevail on the merits of a trademark infringement claim for this type of confusion. (1-ER-0018 at 18-20.)

### b.    Irreparable Harm

The District Court then found that the City is likely to suffer irreparable harm to its reputation and loss of goodwill if the Port continued to use the SF Bay Name for OAK because the SF Bay Name "strongly implies affiliation with San Francisco and the San Francisco International Airport" and this purportedly "damages the goodwill and value" of SFO's Mark and "deprives San Francisco of control over [it.]" (1-ER-0031 at 15-20.).  It found irreparable harm *per se* due to the rebuttable presumption under the Lanham Act, but did not analyze or address the Port's evidence that rebutted this presumption, nor did it evaluate whether the City's evidence was sufficient to demonstrate harm absent a presumption or if it had been rebutted. (1-ER-0030:10-0032:2.)

### c.    Balance of Harms and Public Interest

Finally, the District Court concluded that the balance of harms favored the City because it faced "irreparable damage to its valuable Mark" while the only hardship the Port faced was being "enjoined from breaking the law"; and, that the public interest is served "by not confusing customers." (1-ER-0032 at 30:3-10, 1-

ER-0032-0033 at 30:12-31:3.) Accordingly, it entered a preliminary injunction ordering the Port to immediately stop using the SF Bay Name for its Airport. (1-ER-0003-0036.) This appeal follows.

## V.    SUMMARY OF ARGUMENT

The District Court erred in granting an injunction by (1) erroneously concluding that the City is likely to prevail on the merits of a trademark infringement claim based upon "affiliation" confusion, (2) improperly applying the Lanham Act's rebuttable presumption of irreparable harm, and (3) improperly balancing the equities and harms. Each of these errors constitutes a separate and independent ground for reversal.

**First**, the District Court applied an erroneous legal standard in which it made several errors while evaluating the likelihood of consumer confusion regarding OAK's affiliation without any connection to potential or actual purchasing decisions.

In its similarity of the marks analysis, the District Court impermissibly focused on the "lead words" "San Francisco" and ignored the rest, failing to consider the name in its entirety (the "San Francisco Bay Oakland International Airport") as it appeared in the marketplace. (1-ER-0014-0015 at 12:28-13:21); *see Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc*., 616 F.2d 440, 444 (9th Cir. 1980). The District Court also failed to give any meaning to the fact that the SF

Bay Name contains the name of a distinct geographic feature (the **San Francisco Bay**) and a **different city – Oakland**. (1-ER-0014 at 15-21); *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1150 (9th Cir. 2011). This constitutes reversible error.

The District Court then opined on what people may assume about airport ownership in the abstract to find they are not likely to exercise care when thinking about who owns an airport. (1-ER-0019 at 6-12.) In doing so, the District Court misapplied the *Sleekcraft* factor regarding the degree of care a typical buyer will exercise, which is focused on the care they will use **when purchasing** the good or service at issue – not when thinking about something in the abstract. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1127 (9th Cir. 2014). This constitutes reversible error.

Indeed, the District Court's entire analysis regarding whether the SF Bay Name is likely to cause consumers to confusingly believe OAK is owned by the City and County of San Francisco is untethered from consumers making purchasing decisions in the marketplace. By finding infringement on this basis, the District Court expanded trademark law beyond its function and purpose, which is to "protect[] only against mistaken purchasing decisions and not confusion generally." *Rearden LLC*, 683 F.3d at 1214 (internal quotation omitted). This constitutes reversible error.

The District Court's Order also rests on a clearly erroneous finding of fact: that in the United States, if an airport's full name includes a city's name, this means the airport is owned by that city. This finding is based upon a single, unfounded and speculative assertion by SFO's internal marketing personnel about other airports that is not only unsupported by any evidence, but also incorrect. A diverse range of governmental bodies own and operate commercial airports throughout the country, and those containing the name of a city are in many instances not owned or operated by that city.[4] This constitutes reversible error.

The City otherwise fell far short of meeting its burden to make a clear showing based upon substantial evidence of this type of "affiliation" confusion. The City presented no evidence regarding consumer perceptions or beliefs as to airport names or ownership, no evidence of any actual confusion by any consumer regarding OAK's being affiliated with the City, no expert survey regarding such affiliation confusion, and no other evidence to support the Court's finding.

**Second**, even if the District Court's finding that the City is likely to prevail on the merits is upheld, the District Court erred in finding irreparable harm because it improperly applied the Lanham Act's presumption of irreparable harm, it failed to consider the Port's evidence rebutting the presumption, and the City did not provide record evidence of likely irreparable harm aside from its own speculation.

---

[4] *See e.g.*, n. 2. above.

Because the City cannot demonstrate a likelihood of success on the merits, the presumption does not apply. 15 U.S.C. § 1116(a). But even if the presumption applied, the Port rebutted this by providing sufficient evidence that the City's goodwill was not affected by the Port's use of the SF Bay Name to rebut the presumption. *Nichino Am. Inc. v. Valent U.S.A., LLC,* 44 F.4th 180 (3d Cir. 2022) (providing the only available Circuit Court guidance on how the presumption operates since its creation through the Trademark Modernization Act of 2020; Fed. R. Evid. 301; (3-ER0299-0310; 3-ER-0472, 0474.)

The burden then shifted back to the City, which provided zero evidence that irreparable harm is "not only possible, but likely." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,* 98 F.4th 1180, 1191 (9th Cir. 2024). The District Court improperly relied upon purported evidence of *confusion* as evidence of irreparable *harm*, conflating "confusion" and "harm," something this Court has found it cannot do. *Herb Reed Enter., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013). The City's speculation, unsupported by data or evidence, is precisely what this Court has found is insufficient to establish irreparable harm. *Id.* at 1250. Absent this evidence, injunctive relief is not appropriate.

**<u>Finally</u>**, because a finding of irreparable harm is a predicate to balancing the equities, the District Court further erred in finding that the balance of the harms

favored the City. *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980). The equities do not balance in favor of a party who cannot show irreparable harm. *Playmakers, LLC v. ESPN, Inc.*, 376 F.3d 894, 898 (9th Cir. 2004). Regardless, the District Court's rationale that the harms do not favor the Port because its harm is "self-inflicted" or limited to websites is contrary to the legal concept of injunctions. It is also unsupported by the record which establishes that the Port's burden of complying with the injunction exceeds the City's speculative, conclusory and generalized assertions of unspecific harm. (3-ER-0529 at ¶¶45-51, 3-ER-0530 at ¶¶55-56.)

## VI.    APPELLANT'S ARGUMENT

### A.    Standard of Review

Orders granting preliminary injunctions are reviewed for abuse of discretion. *Network Automation, Inc.*, 638 F.3d at 1144. "The district court should be reversed if it based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Id*.

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024) (internal quotations omitted). Its purpose is to "'preserve the relative position of the parties until a trial on the merits can be held.'" *Id.* at 346 (internal quotations omitted).

To obtain a preliminary injunction, the City had the burden to make a clear showing based upon substantial proof that (1) it is likely to succeed on the merits of its trademark infringement claim; (2) it is likely to suffer irreparable harm absent injunctive relief; (3) the balance of hardships favors the City; and (4) the public interest will be served by an injunction. *Id.* The "balance of hardships" must "tip[] sharply towards the plaintiff" to support a preliminary injunction where the plaintiff has only shown "serious questions going to the merits." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

**B.    The District Court Erred By Finding the City Is Likely to Prevail on a Trademark Infringement Claim for "Affiliation" Confusion**

The District Court abused its discretion by granting a preliminary injunction based upon an erroneous analysis of whether the SF Bay Name is likely to cause consumer confusion regarding OAK's affiliation, devoid of evidentiary support.

**1.    The District Court Erred in Its Legal Analysis of Affiliation Confusion**

Although this Court reviews a district court's factual findings of affiliation confusion for clear error, whether a district court properly applied the law is a legal question this Court reviews *de novo. Pom Wonderful LLC*, 775 F.3d at 1123.

**a.    The District Court's Affiliation Finding Is Based Upon an Erroneous Similarity of Mark Analysis**

The predicate for the District Court's analysis regarding the likelihood of affiliation confusion is that the SF Bay Name and SFO's Mark are confusingly

similar because the SF Bay Name contains the City's name. (1-ER-0018-0019 at 16:17-17:24.) The District Court arrived at this conclusion by misapplying the "similarity" analysis under *Sleekcraft* and its progeny.

The "*Sleekcraft* factors" are a "non-exhaustive" and "adaptable proxy" to be used as "helpful guideposts" for evaluating the likelihood of consumer confusion. *Multi Time Mach., Inc.*, *v. Amazon.com, Inc.,* 804 F.3d 930, 936 (9th Cir. 2015); *Network Automation*, 638 F.3d at 1149. One such factor concerns evaluating the similarity of the marks at issue. *Network Automation*, 638 F.3d at 1150.

When analyzing similarity, "marks must be considered in their entirety" and "as they appear in the marketplace." *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc*., 616 F.2d 440, 444 (9th Cir. 1980) (internal quotations omitted). "The comparison should be made in light of what occurs in the marketplace, taking into account the circumstances surrounding the purchase of the goods" or services at issue. *Id.* (internal quotations omitted.)

In *Alpha Industries*, this Court affirmed the district court's finding that defendant's name and marks ALPHA STEEL TUBE SHAPES, INC., ALPHA STEEL TUBE, and ALPHA STEEL were *not* confusingly similar to plaintiff's name and mark ALPHA INDUSTRIES, INC. and ALPHA. *Alpha Industries*, 616 F.2d t 444. This Court considered the marks and name "in their entirety" and found that the other words in defendant's "ALPHA" name and marks, including the terms

"tube," "steel" and "shapes," rendered the marks dissimilar from plaintiff's mark and name ALPHA and ALPHA INDUSTRIES, INC. *Id.* In doing so, this Court expressly rejected the argument that it should do what the District Court did here: find the marks are confusingly similar because they both "lead" with the same word or words. *Id.*

And in *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F.Supp.2d 1023, 1042 and 1053 (C.D. Ca. 2013), the court found that there was no similarity in appearance or meaning between plaintiff's STONEFIRE GRILL mark and defendant's marks STONEFIRE and STONEFIRE AUTHENTIC FLATBREADS with design. *Id.* at 1052-53. In so finding, the court compared the entire marks and stated that "[m]ultiple courts have found that the presence of a common word does not render two marks similar where additional words make the marks distinctive" and "[t]he Ninth Circuit's decision in [*Alpha Industries*] compels the Court's outcome here." *Id.* at 1052.

Similar to *Alpha Industries* and *Stonefire Grill*, the presence of "Oakland" or "Oakland International Airport" and use of the "I FLY OAK" term and logo with the SF Bay Name compels the outcome here. These additional terms serve to distinguish the name from SFO's Mark as to appearance, sound, and meaning. Moreover, OAK's name did not use "San Francisco" alone, but used the distinct

geographic term "San Francisco Bay" referring to the location or area, and not to the City and County of San Francisco itself.

But the District Court engaged in no such analysis. It did not consider the SF Bay Name – the San Francisco Bay Oakland International Airport – in its entirety or give weight to the significant differences in meaning between the SF Bay Name and SFO's Mark. (1-ER-0014-0015 at 12:15-13:19.) Instead, the District Court looked principally to the lead words "San Francisco" – an approach that this Court has expressly rejected. *See Alpha Industries, Inc.*, 616 F.2d at 444.

The meaning of the words also matters. *Network Automation*, 638 F.3d at 1150. But the District Court disregarding the meaningful difference between the geographic term the "San Francisco Bay" and the city name "San Francisco" to find that the Port simply "incorporated" the City's name into the SF Bay Name. (1-ER-0014-0015 at 12:28-13:21.) Importantly, the SF Bay Name (the San Francisco Bay Oakland International Airport) contains both the name of a recognized body of water that defines a region, the **San Francisco Bay**, followed by the name of a city, **Oakland**.[5] The "San Francisco Bay" means exactly that: the San Francisco

---

[5] OAK is of course located on the San Francisco Bay. There is nothing confusing or misleading about that. Also, as shown below, OAK's branding displayed "San Francisco Bay" as a three-word unitary term, and did not emphasize or focus solely on the term "San Francisco."



Bay – not the City. And the San Francisco Bay defines a unique and distinct metropolitan region that is different from the City itself. (3-ER-0321-0346.)

In adopting the SF Bay Name, the Port modified that prior name by replacing the generic word "**Metropolitan**" with OAK's actual geographic location, "**San Francisco Bay**." (3-ER-526-0528; 3-ER-0550 at ¶¶15-17; 3-ER-0554 at ¶27.) It did not "tag" the word Bay to the end of the City's name. (*Id.*)

Moreover, the fact that "San Francisco Bay" is followed by Oakland is another important, meaningful difference that the District Court acknowledged but then swept aside. (1-ER-0015 at 18-19.)

The District Court then failed to evaluate the SF Bay Name and SFO's Mark as they appear in the marketplace. (1-ER-0014-0015 at 12:15-13:19.) Instead, it did a side-by-side comparison in the abstract. (1-ER-0014-0015 at 12:15-13:19) In doing so, the District Court did not consider the context of what consumers see regarding the identification of airports when they search for and purchase flights online. (*Id.*) That context includes references to the city in which the airports are located or nearby – here, Oakland is associated with OAK, not the City and County of San Francisco. (*See e.g.*, 3-ER-0383-0384; 3-ER-0405-0407; 3-ER-0409; 3-ER-0412; 3-ER-0485; 3-ER-0487; 4-ER-0611-0619 at ¶¶9-23; 4-ER-0623-0626 at ¶¶9-26; 6-ER-1352.) When consumers are searching for and buying flights, or

visiting OAK or SFO's website or social media accounts, they plainly see that OAK is associated with Oakland – not the City and County of San Francisco. (*Id.*)

When properly analyzed, it is clear that the Port did not incorporate the City's name into the SF Bay Name for OAK and it is not confusingly similar to SFO's Mark. This alone warrants reversal.

### b.    The District Court Misapplied the Consumer Care Factor

The District Court then further erred by improperly analyzing the "degree of consumer care" wholly divorced from any potential or actual purchasing decision. (1-ER-0019 at 6-17). This *Sleekcraft* factor concerns the degree of care consumers will exercise when making a purchasing decision. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353-54 (9th Cir. 1979); *Multi Time Machine, Inc.*, 804 F.3d at 937; *Pom Wonderful LLC*, 775 F.3d at 1127.

When evaluating the likelihood of consumer confusion as to source, the District Court properly followed this Court's precedent to find that the typical buyer is likely to exercise a high degree of care when searching for and selecting an airport to use for a flight departure or arrival because internet shoppers are relatively sophisticated, commercial airline tickets are expensive, and booking a flight involves other considerations that increase the level of care they will use. (1-ER-0021 at 15-23, *citing Lerner & Rowe, P.C. v. Brown Engstrand & Shely, LLC*, 119 F.4th 711, 722 (9th Cir. 2024); 1-ER-25:18-26, *citing Multi Time Machine*, 804 F.3d at 937.)

However, when evaluating the likelihood of consumer confusion regarding OAK's affiliation, the District Court then found that these same consumers will exercise a "low degree" of care when "thinking about" whether OAK is owned by the City and County of San Francisco. (1-ER-0019 at 6-12.) This is a misapplication of the *Sleekcraft* factor regarding the degree of consumer care, which is about the level of care "the typical buyer" exercises **when making a purchasing decision**. *Sleekcraft*, 599 F.2d at 353-54; *Multi Time Machine, Inc.*, 804 F.3d at 937; *Pom Wonderful LLC*, 775 F.3d at 1127. It is not about whether someone thinks carefully about who owns an airport in the abstract.

No authority supports evaluating the degree of consumer care divorced entirely from the selection of the good or service in the marketplace. Instead, this approach is directly at odds with this Court's precedent. *Sleekcraft*, 599 F.2d at 353-54; *Multi Time Machine, Inc.*, 804 F.3d at 937; *Pom Wonderful LLC*, 775 F.3d at 1127. The Court does not suddenly evaluate consumer care in the abstract rather than as it relates to consumer decision making when considering or making a purchase when the claim is one of purported affiliation confusion. *See Cohn v. PetSmart, Inc.*, 281 F.3d 837, 843 (9th Cir. 2002) (evaluating the degree of care a reasonable pet owner will exercise when selecting veterinarian services in the context of a trademark infringement claim based upon purported "affiliation" confusion). This alone warrants reversal.

31

> **c.    The District Court's Analysis of Affiliation Confusion Contravenes the Bounds of Trademark Law**

The District Court further erred because its entire legal analysis regarding the likelihood of consumer confusion as to OAK's affiliation has no nexus to consumer decision making in the relevant marketplace. Instead, it is focused on purported **generalized confusion** regarding OAK's affiliation. (1-ER-0018-0019 at 16:17-17:24.) Generalized confusion is exactly what this Court has held **is not** actionable trademark infringement. *See Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1214 (9th Cir. 2012) ("We do not accept Appellants' open-ended and unsupported theory of 'non-purchasing consumers.'"); *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005).

This is because the "linchpin of trademark infringement is consumer confusion[.]" *Network Automation, Inc.*, 638 F.3d at 1154. Thus, the test for evaluating the likelihood of confusion is focused on the decision making of the relevant and reasonably prudent consumer in the applicable marketplace. *Multi Time Machine,* 804 F.3d at 935 (The test for evaluating the likelihood of consumer confusion is "whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks.") (quotation omitted, emphasis added).

The likelihood of confusion analysis is not to be applied in a vacuum or as a theoretical abstraction. Instead, it must be focused on (1) consumers (those making

purchasing decisions); and (2) "confusion in the marketplace, as opposed to generalized public confusion." *Accuride Intern., Inc. v. Accuride Corp.*, 871 F.2d 1531, 1535 & n. 5 (9th Cir. 1989) ("The critical focus of the likelihood of confusion inquiry" is "the effect of defendant's usage of the name on prospective purchasers in the marketplace."); *Network Automation, Inc.*, 638 F.3d 1137; *see also Shakey's Inc. v. Covalt*, 704 F.2d 426, 431 (9th Cir. 1983) ("We must approach the likelihood of confusion inquiry from the perspective of the marketplace.").

Because the District Court's reasoning centers on "general" confusion divorced from actual consumer decision-making, it does not satisfy the Lanham Act's requirement that the confusion alleged must plausibly influence a purchaser's selection of goods or services. *See Rearden LLC*, 683 F.2d at 1214-15. Again, as this Court has stated: "trademark law protects only against mistaken purchasing decisions and not against confusion generally." *Id.* at 1214; *Bosley Med. Inst.*, 403 F.3d at 677. This limitation makes sense, as trademark law developed to ensure that consumers have accurate information to make informed choices in a trustworthy marketplace. *See Vidal v. Elster*, 602 U.S. 286, 290-92 (2024); *Smith v. Chanel, Inc.*, 402 F.2d 562, 566 (9th Cir. 1968). It does not protect against people having thoughts in the abstract about a good or service that have no bearing on the mark holder. *Id.; Rearden LLC*, 683 F.3d at 1209-18.

**2.      The District Court's Affiliation Finding Is Based Upon an Erroneous Finding of Fact and Lacks Evidentiary Support**

The District Court's grant of a preliminary injunction was not only legally flawed, but it was also based upon a single, erroneous finding of fact: that airports in the United States that include a city name in the full airport name are owned by that city, such that the SF Bay Name is likely to cause consumers to confusingly believe that the City and County of San Francisco owns OAK. (1-ER-0018-0019 at 16:17-17:24.) It otherwise lacks any evidentiary support. Granting an injunction on this basis warrants reversal. *Network Automation, Inc.*, 638 F.3d at 1144 (a district court abuses its discretion if it grants a preliminary injunction based upon a clearly erroneous finding of fact).

**a.      The District Court Erroneously Relied Upon An Unsupported (And Incorrect) Assertion by SFO's Marketing Personnel About Airports Generally**

The District Court cites two sentences from SFO's own declarations to support its entire finding that an airport's name containing a city's name means it is owned by that city. (1-ER-0018-0019 at 16:17-17:24.) First, the District Court cites a statement by SFO employee Ms. Andretta, in which she claims that "it is extremely rare for a major U.S. airport to bear the name of a different city than the one that owns it[.]" (*Id.*) This assertion is made without providing any evidence or citing to any source whatsoever.

In fact, Ms. Andretta then claims that Chicago area airports provide one such example, stating that Chicago Midway International Airport and Chicago O'Hare International Airport are both owned by the City of Chicago. (5-ER-1122 at ¶ 24). Yet she **omits** Chicago Rockford International Airport from her declaration. (*Id.*) This is perhaps unsurprising, because "Chicago Rockford International Airport" starts with "Chicago" but it is **not** owned by the City of Chicago at all. (3-ER-0603 at ¶19.c.; *See also* n. 2, above.) [6]

The other evidence the District Court relied upon is a quote from another internal SFO marketing employee, who also asserted without support that "airport names often correspond to city names, and typically an airport named after a city is owned and operated by that city." (1-ER-0018 at 16:25-28; 2-ER-0201 at ¶ 12.) Yet this employee does not identify any such airport other than SFO and (erroneously) OAK, which is owned and operated by the Port. (*Id.*)

In relying wholly upon the above two assertions by SFO's employees, the District Court incorrectly overlooked the Port's evidence to the contrary. The Port submitted the Declaration of Dr. Sabine Reim (3-ER-0599-0606), an experienced airline consultant, in which Dr. Reim discussed how the Chicago area is actually served by **three** airports with "Chicago" in their names, as pointed out above:

---

[6] *See* n. 2, above.

Chicago O'Hare, Chicago Midway, and Chicago Rockford International Airport. (3-ER-0603 at ¶ 19c.).

Dr. Reim also pointed out that the Seattle area is served by two airports with "Seattle" in their names:  Seattle-Tacoma International Airport (SEA) and Seattle Paine Field International Airport (PAE). (*See* n. 2, above.) Neither airport is owned by the City of Seattle, likely why it was omitted from Ms. Andretta's declaration. (*Id.*) Instead, SEA is owned by the Port of Seattle, which is a port district established pursuant to Washington state law, and PAE is owned by Snohomish County.[7] In fact, there are many other airports that contain a city name but which are not owned by that city.[8] The District Court's finding that an airport's name containing a city's name means it is owned by that city is clearly erroneous, warranting reversal.

### b.    The City Presented No Evidence To Support a Finding of Affiliation Confusion

In addition to being factually incorrect, these two declarations from SFO's employees also fail to support the District Court's finding that consumers are therefore likely to believe that OAK is owned by SFO. The record contains no evidence to support that finding.

---

[7] *See* n. 2, above.

[8] *See id.*

Importantly, the two SFO declarations discussed above do not state anything about **consumers'** perception or confusion about the ownership of airports. (5-ER-1117-1123; 5-ER-1025-1031.) Neither declaration addresses whether consumers are likely to believe that if a city name is contained in an airport name, that the airport is owned and operated by that city, as opposed to some other agency or entity. (*Id.*) And in the case of a city that is served by multiple airports that bear the city name, like Chicago which is served by three airports (Chicago O'Hare International Airport, Chicago Midway International Airport, and Chicago Rockford International Airport) a consumer might reasonably conclude that these are owned by **different** entities, public or private, as the airport names also contain additional **different** terms, just like the SF Bay Name.[9]  *Alpha Indus., Inc. v. Alpha*

---

[9]  Indeed, Chicago Midway International Airport and Chicago O'Hare were owned by *different* entities, one of which was not the City of Chicago, for about 27 years Pursuant to Fed. R. Evid. 201 and Ninth Circuit Rule 28-2.7, OAK respectfully moves this Court to take judicial notice of Chicago Department of Aviation, "Midway History," https://www.flychicago.com/business/CDA/Pages/Midway.aspx (Midway Airport was originally owned by the Chicago Board of Education from 1927 until 1982, when it was purchased by the City of Chicago) (last visited Feb. 6, 2025) and Chicago Department of Aviation, "O'Hare History," https://www.flychicago.com/business/CDA/Pages/OHare.aspx (In contrast, Chicago O'Hare was first opened to commercial airlines in 1955.) (last visited Feb. 6, 2025).

Courts may take judicial notice of official information posted on governmental websites as such sources are reliable and not subject to reasonable dispute. See, e.g., *Arizona Libertarian Party v. Reagan*, 798 F.3d 723, 727 n. 3 (9th Cir. 2015) (taking judicial notice of information available at the Arizona Department of Transportation's service website since courts "may take judicial notice of 'official

*Steel Tube & Shapes, Inc*., 616 F.2d 440, 444 (9th Cir. 1980) (although both parties' marks started with "ALPHA", the inclusion of additional different terms in defendant's marks made confusion unlikely).

In fact, the City provided **zero** direct – or even indirect – evidence that the name the "San Francisco Bay Oakland International Airport" is likely to cause consumers to mistakenly believe that OAK is owned by the City. The City provided no evidence regarding **consumers'** perception or confusion about the ownership of airports at all, which is the "*sine qua non* of trademark infringement." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc*., 638 F.3d 1137, 1142 (9th Cir. 2011). There is no evidence that consumers purchasing airline tickets are aware of or consider who owns or operates the airport. The City also provided **no** expert survey regarding the type of purported 'affiliation" confusion that the District Court found, or any other circumstantial or direct evidence to show purported affiliation confusion.[10]

A preliminary injunction requires a "clear showing" based upon "substantial proof." *Winter v. Nat'l Resources Defense Council, Inc*., 555 U.S. 7, 22 (2008);

---

information posted on a governmental website, the accuracy of which [is] undisputed [citation].'" (Internal quotations omitted)).

[10] The District Court properly found the City's expert survey that it did present – regarding **source confusion** – to be deficient in several respects and gave it no weight.  (1-ER-0028at 24-26.

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("the requirement for substantial proof in support of a preliminary injunction is 'much higher' than the proof necessary to overcome a summary judgment motion"). The City made no such showing here. Instead, the record lacks any evidence showing the SF Bay Name is likely to cause consumers to mistakenly believe that OAK is owned by the City and County of San Francisco when searching for or buying a flight.

Like its legal analysis of "affiliation" confusion, the District Court's factual analysis of such confusion exists in a vacuum, entirely divorced from the reality of consumer purchasing decisions and not supported by "substantial proof." (1- ER-0018-0019 at 16:17-17:24.)

## C.    The District Court Erred By Finding Irreparable Harm

The District Court erred in finding irreparable harm because it improperly applied the Lanham Act's presumption of irreparable harm, it failed to consider OAK's evidence rebutting the presumption, and the City did not provide record evidence of likely irreparable harm aside from its own speculation. The application of a statutory presumption is a mixed question of law and fact, with the district court's adherence to the proper procedure reviewed de novo as a matter of law, and its factual findings reviewed for an abuse of discretion. *See Hooks v. Nexstar Broad. Inc.,* 54 F. 4th 1101, 1116 (9th Cir. 2022).

Prior to 2020, irreparable harm was not presumed in the Ninth Circuit under the Lanham Act. *Herb Reed Enter., LLC v. Fla. Entm't Mgmt., Inc.,* 736 F.3d

1239, 1248-49 (9th Cir. 2013). The Trademark Modernization Act of 2020, however, created a rebuttable presumption of irreparable harm upon a showing of likelihood of success on the merits. 15 U.S.C. § 1116(a). The Third Circuit Court of Appeals is the only appellate court to address how the presumption operates since the amendment. *See Nichino Am. Inc. v. Valent U.S.A., LLC,* 44 F.4th 180, 184-85 (3d Cir. 2022).

The Lanham Act's rebuttable presumption of irreparable harm "does not mean that a trademark owner is automatically entitled to a preliminary injunction." *Nichino Am. Inc. v. Valent U.S.A., LLC,* 44 F.4th 180, 184-85 (3d Cir. 2022). The presumption only applies if the movant demonstrates a likelihood of success upon the merits. 15 U.S.C. § 1116(a). Absent this showing, the presumption does not apply and the movant must prove irreparable harm in the ordinary course. *Id.; Nichino,* 44 F.4th at 184-85. Because the District Court erred in finding a likelihood of success on the merits, it erred in applying the presumption.

Should this Court determine that District Court properly found a likelihood of success on the merits as to the type of "affiliation" confusion that was the sole basis for granting the injunction, the District Court nevertheless erred in its application of the presumption, warranting reversal. Even where a likelihood of success is found, the presumption may be rebutted. *Nichino Am., Inc.,* 44 F.4th at 184-86. Because the Lanham Act is silent as to the degree of proof required to

rebut the presumption, Federal Rule of Evidence Rule 301 governs. *Nichino Am., Inc.,* 44 F.4th at 185; *see also* Fed. R. Evid. 301 (stating that Rule 301 applies absent specific statutory language to the contrary); *Hooks,* 54 F.4th at 1116 (applying Rule 301 to a statutory presumption).

To rebut the presumption, the Port needed to provide evidence sufficient for a "reasonable factfinder to conclude that irreparable harm was unlikely." *Nichino Am.,* 44 F.4th at 185; *see also Godoy v. Spearman,* 861 F.3d 956, 965 (9th Cir. 2017) (holding that presumptions can be rebutted by "contrary evidence"). This evidentiary showing is "slight," as any higher standard would contravene Rule 301 by improperly shifting the burden of persuasion, rather than the burden of proof. *Nichino,* 44 F.4th at 185, 186; *see also* Fed. R. Evid. 301.

The District Court erred by failing to consider the Port's evidence rebutting the presumption. *Nichino Am.,* 44 F.4th at 185. Instead, the District Court merely generally found that harm to goodwill and reputation may constitute irreparable harm, and that the City's speculation this harm that will occur was sufficient. (1-ER-0030-0031.) But the Port provided evidence that the City's goodwill was not harmed by OAK's use of the SF Bay Name because the City's relationship with its customers had not been impacted.[11] (3-ER-0299-310; 3-ER-0472, 0474.) The

---

[11] *See Boe v. C.I.R.,* 307 F.2d 339, 343 (9th Cir. 1962) ("To us, the essence of good will is the expectancy of continued patronage, for whatever reason."); *see also*

record shows that SFO gained airline routes and that its passenger totals increased after OAK began using the SF Bay Name. (*Id.*) This strongly suggests that it was not harmed at all. The Port also presented evidence that use of the SF Bay Name as the legal name of OAK would not impact future customers because airlines and third party booking agencies display and book flights for passengers by the city and the IATA codes, and not the legal names of the airports in isolation. (4-ER-0623-0626 at ¶¶9-26; 4-ER-0611-0619 at ¶¶9-23; 3-ER-0383, 3-ER-0405, 3-ER-0409, 3-ER-0412, 3-ER-0485, 3-ER-0487.)

Additionally, the record showed that the City's reputation was not harmed as evidenced by positive press coverage about SFO and the City that were published after the Port began using the SF Bay Name for OAK. (3- ER-0467-ER-0475; 2-ER-0299- ER-0302-0310; 5-ER-1035- ER-1063.) This evidence was more than sufficient to fulfill OAK's slight evidentiary burden to rebut the presumption. *Nichino Am.,* 44 F.4th at 185; *Godoy,* 861 F.3d at 965.

The District Court's failure to consider the Port's evidence rebutting the presumption was not harmless error, as the City did not present sufficient evidence to support a finding of irreparable harm absent the presumption. Once the presumption was rebutted, the City had the burden to prove irreparable harm in the

_____

*Newark Morning Ledger Co. v. U.S.,* 507 U.S. 546, 444-46 (1993) (adopting this Court's definition of "good will").

ordinary course. *Nichino Am.,* 44 F.4th at 186. This requires the City to present more than mere speculation that harm may occur, as "speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Boardman v. Pac. Seafood Grp.,* 822 F.3d 1011, 1022 (9th Cir. 2016) (internal quotations omitted). Instead, the City must show that "irreparable harm is not only possible, but likely." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,* 98 F.4th 1180, 1191 (9th Cir. 2024).

The District Court improperly conflated its finding of likelihood of consumer affiliation confusion as evidence of irreparable harm. This improperly "collapse[d] the likelihood of success and the irreparable harm factors." *Herb Reed Enter., LLC v. Fla. Entm't Mgmt., Inc.,* 735 F.3d 1239, 1251 (9th Cir. 2013).[12]  The evidence that must be in the record for a finding of irreparable harm is not evidence of confusion, but evidence linking that confusion to harm of goodwill or reputation and demonstrating that such harm is likely.  *Id.* at 1250-51.

The City's "evidence" of irreparable harm was its unsupported speculation that consumers, while understanding that OAK and SFO are two different airports, are purportedly likely to believe that OAK is owned and operated by the City. (1-

---

[12] Although the Trademark Modernization Act amended the Lanham Act to allow for a rebuttable presumption of irreparable harm, this Court's precedent regarding the degree of proof required to prove irreparable harm absent a presumption remain good law. *See Herb Reed Enter., LLC v. Fla. Entm't Mgmt., Inc.,* 735 F.3d 1239, 1250-51 (9th Cir. 2013).

ER-0030:18 – 0032:2.) But the City's speculation about such confusion, unsupported by any data or evidence, is precisely what this Court found is insufficient to establish irreparable harm in *Herb Reed.* There, as here, the movant argued that evidence of consumer confusion constituted evidence of irreparable harm. 736 F.3d at 1250. This Court rejected the assertion that evidence of consumer confusion alone is sufficient to show harm to goodwill or reputation, because it misses a key link, *i.e.*, that the confusion had an actual or likely impact on the consumer's future course of action.[13] *See id.* at 1250-51.

Similarly, the City's statements of what might happen are purely speculative. Glaringly absent from the record is any evidence that the City's goodwill or reputation are likely to be harmed. What the City did offer is an article about a J.D. Power study regarding traveler satisfaction with airports. (6- ER-1224-

---

[13] Since *Herb Reed,* courts in this circuit routinely reject allegations in affidavits that are unsupported by data or evidence as sufficient to find irreparable harm. *See Kiva Health Brands, LLC v. Kiva Brands, Inc.,* 402 F. Supp. 3d 877, 896 (N.D. Cal. 2019) ("A conclusory and self-supporting declaration by the head of a plaintiff's company is, standing alone, weak evidence of irreparable harm."); *see also CycleBar Franchising, LLC v. StarCycle Franchise, LLC,* No. CV 19-9911-DMG (KSX), 2020 WL 3840442, at *5 (C.D. Cal. Mar. 27, 2020) (rejecting a declaration based upon "opinions" of what the declarant "predicts customers may do" without supporting proof); *SolarEdge Techs. Inc. v. Enphase Energy, Inc.,* No. 17-cv-04047-YGR, 2017 WL 3453378, at *6 (N.D. Cal. Aug. 11, 2017) (rejecting statements from an executive that were unsupported by record data); *Williams v. Green Valley RV, Inc.,* No. 815-CV-01010-ODW-MRW, 2015 WL 4694075, at *2-3 (C.D. Cal. Aug. 6, 2015) (holding that evidence of customer confusion is not sufficient to establish what "might" happen, absent proof of likely irreparable harm).

ER-1228.) That article, however, does not support the position that SFO's reputation will suffer because of an alleged association with OAK. *Id.* In fact, it actually shows that both SFO and OAK had comparable scores in the study's customer satisfaction index: SFO scored 781 out of 1,000, while OAK scored 768.[14] This 13-point differential out of 1,000 points does not constitute "substantial proof" that SFO's reputation will be harmed due to an alleged association with OAK.[15]

This is especially so given the record evidence indicating OAK is viewed positively. (3-ER-0533-0535; ER-05353-ER-0536-0542; 3-ER-0604 ¶22; 3-ER-0522 ¶¶8, 10.) For example, a consumer survey found that when consumers were asked to say the three words that best describe OAK, the top responses were: "Efficient, Good Service, Easy Access, Welcoming, Nice, Fast, Friendly" among other platitudes. (3-ER-0540.) The same study found that 83% of consumers surveyed had a favorable opinion of OAK. (*Id.*)

Further, the City does not provide evidence of any negative press reviews of the City since OAK's use of the mark. In short, there is no evidence of consumers having an unfavorable opinion of OAK particularly when the SF Bay Name was in

---

[14] The scores reported in the article range from 732 to 843 for the airports identified in the article. The more legible view of the article can be found online here: https://www.jdpower.com/business/press-releases/2023-north-america-airport-satisfaction-study/.

use, which opinion could somehow be "transferred" to the City because OAK's name was the San Francisco Bay Oakland International Airport. There is simply nothing in the record to link the City's alleged consumer confusion as to an "affiliation" between OAK and the City with a likely threat to the City's goodwill or reputation.

Absent this evidence, injunctive relief is not appropriate. The District Court's rationale amounts to nothing more than a finding of a possibility of irreparable harm, but the "possibility" standard has been rejected by the Supreme Court. *Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008). As the Supreme Court stated "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* The City has not made such a "clear showing," and the District Court's order should be reversed.

## D.    The Balance of Equities Did Not Support an Injunction

The District Court further erred when it found that balance of the harms favors the City. *CTIA – the Wireless Ass'n v. City of Berkeley,* 928 F.3d 832, 852 (9th Cir. 2019) (the court must balance the interests of all parties and weigh the competing harms). The District Court reasoned that the balance of the harms favors the City because the Port's harm is "self-inflicted." (1-ER-0032:15-16.) As an

initial matter, this requires that infringement be found as a predicate, which it has not been.

Moreover, as other courts have cautioned, this rationale of self-inflicted harm will transform "a preliminary injunction from an extraordinary remedy into a routine occurrence," because, as applied by the District Court here, the balance of the harms will always favor the plaintiff in a trademark case. *The Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284-85 (4th Cir. 2002).

The District Court's rationale runs afoul of both this Court's and the Supreme Court's long-settled precedent that preliminary injunctions are an "extraordinary remedy never awarded as of right." *Winter,* 555 U.S. at 24; *see also Lopez v. Brewer,* 680 F.3d 1068, 1072 (9th Cir. 2012) ("A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (internal quotations omitted)). When balancing the hardships, courts must be "mindful of the moving party's burden to show the possibility of irreparable injury to itself and the probability of success on the merits." *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1203 (9th Cir. 1980). This requires that "some balance of the hardships favoring that party be established by the record." *Id.*

Because the City cannot show probability of success or irreparable harm, the hardships do not tip in the City's favor. There is simply no record evidence that customers have stopped going to SFO and/or have a negative opinion of the City or SFO following the Port's use of the SF Bay Name. As this Court has previously found, the equities do not balance in favor of a party who cannot show irreparable harm. *Playmakers, LLC v. ESPN, Inc.*, 376 F.3d 894, 898 (9th Cir. 2004) (holding that the equities did not favor granting an injunction where there was a "lack of proof quantifying the harm that [the plaintiff] would suffer").

Furthermore, the District Court failed to analyze the true harm to the Port, *i.e.*, the harm of an improperly granted injunction. For certain cases, injunctions can, "as a practical matter, determine the outcome of a case." *Ctr. for Auto Safety v. Chrysler Grp., LLC,* 809 F.3d 1092, 1099 (9th Cir. 2016); *see also Barbaria v. Blinken,* 87 F.4th 963, 976 (9th Cir. 2023) (explaining that injunctions can effectively decide the merits of a case). This is significant, and a reason that injunction orders are afforded interlocutory appellate review. *Ctr. for Auto Safety,* 809 F.3d at 1099. Consequently, the balance of the harms inquiry requires a court to balance the harm in being mistaken. *The Scotts Co.,* 315 F.3d at 284; *see also Am. Hosp. Supply Co. v. Hosp. Prods. Ltd.,* 780 F.2d 589, 593 (7th Cir. 1986).

Here, the City has effectively obtained the entirety of the relief it seeks in this lawsuit by enjoining the Port from using the SF Bay Name, despite not

presenting any evidence that the Port's use of that name has harmed the City's or SFO's goodwill or reputation. The District Court failed to consider, however, the cost to the Port's and OAK's goodwill and reputation by having to cease its use of the mark.

The District Court also improperly overlooked the evidence that the Port presented of harm, including the resources it has invested with the FAA in its approval process, and working with third party providers to ensure a smooth travel experience for travelers. (3-ER-00529 at ¶¶45-51.) The harm is not, as the District Court found, limited to a few websites. (*Id.*) When these hardships are compared to the City's conclusory, speculative and generalized assertions of possible harm, the balance of the equities tips sharply in the Port's favor, and against the issuance of an injunction. The District Court's order should be reversed.

## VII.   CONCLUSION

The District Court abused its discretion by entering the extraordinary relief of a preliminary injunction based upon a legal analysis devoid of evidentiary support, which directly contravenes this Court's precedent, which improperly found irreparable harm *per se*, and which improperly balanced the equities. The Port respectfully asks the Court to reverse the Order with instructions that therefore the injunction must be denied.

DATED: February 6, 2025.

**FENNEMORE CRAIG, P.C.**

By _s/Brandi B. Balanda_

Stephen C. Willey (Bar No. 209164)
Brandi B. Balanda (Pro Hac Vice)
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
Telephone: 206.749.0500
Facsimile: 206.749.0600
Email: swilley@fennemorelaw.com
Email: bbalanda@fennemorelaw.com

**FENNEMORE LLP**

Eugene M. Pak (Bar No. 168699)
Angela Han (Bar No. 317137)
1111 Broadway, 24th Floor
Oakland, California  94607
Telephone: (510) 834-6600
Facsimile: (510) 834-1928
Email:epak@fennemorelaw.com

**FENNEMORE CRAIG, P.C.**

Timothy J. Berg
2394 E. Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: (602) 916-5000
Facsimile: (602) 916-5999
Email: tberg@fennemorelaw.com

**FENNEMORE LLP**

Therese Shanks
7800 Rancharrah Parkway
Reno, NV 89511
Telephone:  (775) 788-2200
Facsimile: (775) 786-1177
Email: tshanks@fennemorelaw.com

*Attorneys for Defendant-Appellant Port of Oakland*

## CERTIFICATE OF COMPLIANCE (FORM 8)

### 9th Cir. Case Number: 24-7532

I am the attorney representing Defendant-Appellant Port of Oakland. **This brief contains 11,548 words,** including 21 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6). I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

DATED: February 6, 2025.

**FENNEMORE CRAIG, P.C.**

By   *s/Brandi B. Balanda*
       Stephen C. Willey (Bar No. 209164)
       Brandi B. Balanda (Pro Hac Vice)
       1425 Fourth Avenue Suite 800
       Seattle, Washington 98101-2272
       Telephone: 206.749.0500
       Facsimile: 206.749.0600
       Email: swilley@fennemorelaw.com
       Email: bbalanda@fennemorelaw.com

**FENNEMORE LLP**
Eugene M. Pak (Bar No. 168699)
Angela Han (Bar No. 317137)
1111 Broadway, 24th Floor
Oakland, California 94607
Telephone: (510) 834-6600
Facsimile: (510) 834-1928
Email:epak@fennemorelaw.com

**FENNEMORE CRAIG, P.C.**
Timothy J. Berg
2394 E. Camelback Road, Suite 600
Phoenix, AZ 85016
Telephone: (602) 916-5000
Facsimile: (602) 916-5999
Email: tberg@fennemorelaw.com

**FENNEMORE LLP**

Therese Shanks
7800 Rancharrah Parkway
Reno, NV 89511
Telephone:  (775) 788-2200
Facsimile: (775) 786-1177
Email: tshanks@fennemorelaw.com

*Attorneys for Defendant-Appellant Port of Oakland*

**CERTIFICATE OF SERVICE**

I certify that, on this date, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served with notification of this filing by the appellate CM/ECF system.

I hereby certify, under penalty of perjury under the laws of the State of Washington, that the foregoing is true and correct.

DATED this 6th day of February, 2024 at Seattle, Washington.

_____
Amanda Saeteurn