No. 24-7532

# United States Court of Appeals
# for the Ninth Circuit

CITY AND COUNTY OF SAN FRANCISCO,

*Plaintiff-Appellee,*

*v.*

PORT OF OAKLAND,

*Defendant-Appellant,*

On Appeal from the United States District Court
for the Northern District of California (No. 3:24-cv-02311-TSH)

## ANSWERING BRIEF FOR PLAINTIFF-APPELLEE

DAVID CHIU
YVONNE R. MERÉ
JULIE VEIT
CHRISTOPHER STUART
SAN FRANCISCO CITY
ATTORNEY'S OFFICE
Fox Plaza
1390 Market Street
7th Floor
San Francisco, CA 94102

BOBBY GHAJAR
JUDD D. LAUTER
JESSICA WILLIAMS
COOLEY LLP
1333 2nd Street, Suite 400
Santa Monica, CA 90401
(310) 883-6400
bghajar@cooley.com

PATRICK J. HAYDEN
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000

*Counsel for Plaintiff-Appellee the City and County of San Francisco*

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................1

STATEMENT OF THE ISSUES ..............................................................5

STATEMENT OF THE CASE ..................................................................6

I.    Factual Background...........................................................................6

        A.    Over Decades, San Francisco Establishes the San Francisco International Airport as a World-Class Airport ..................................................................6

        B.    San Francisco Invests Millions of Dollars Each Year into the SF Airport Name and Brand..................9

        C.    The Port Operates the Oakland International Airport at a Smaller Scale .............................................11

        D.    The Port Copies the SF Mark and Adopts the Name "San Francisco Bay Oakland International Airport"...............................................13

        E.    The Port Begins Using Its New Name, Confusing Consumers and Harming San Francisco's Brand and Goodwill ..................................15

II.    Procedural History........................................................... 19

SUMMARY OF ARGUMENT....................................................22

STANDARD OF REVIEW ........................................................24

ARGUMENT ................................................................................25

I.    The District Court Correctly Determined that San Francisco Is Likely to Succeed on the Merits ................................26

        A.    The District Court Did Not Clearly Err in Finding that the Airports' Marks Are Highly Similar..........................................................................29

i

## TABLE OF CONTENTS
### (continued)

Page

B.  The District Court Did Not Clearly Err in
Analyzing the Type of Services and Degree of
Consumer Care ...............................................................41

C.  The District Court Did Not Clearly Err in
Finding that the Port's Mark Will Likely Cause
Confusion as to Affiliation ............................................46

D.  If Considered, the Remaining *Sleekcraft*
Factors Weigh in San Francisco's Favor...................54

II.  The District Court Correctly Found that San Francisco Will
Likely Suffer Irreparable Harm Absent a Preliminary
Injunction ................................................................................. 62

III.  The Public Interest and Balance of the Hardships Weigh
Strongly in San Francisco's Favor................................................ 69

CONCLUSION ...........................................................................73

ii

# TABLE OF AUTHORITIES

Page(s)

Cases

*adidas Am., Inc. v. Skechers USA, Inc.,*
  890 F.3d 747 (9th Cir. 2018).......................................................33

*AK Futures LLC v. Boyd St. Distro, LLC,*
  35 F.4th 682 (9th Cir. 2022) .............................................24, 62

*Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.,*
  616 F.2d 440 (9th Cir. 1980).......................................................40

*AMF, Inc. v. Sleekcraft Boats,*
  599 F.2d 341 (9th Cir. 1979)........................................... *passim*

*Ariel Invs., LLC v. Ariel Cap. Advisors LLC,*
  238 F. Supp. 3d 1009 (N.D. Ill. 2017)......................................45

*BGC Inc. v. Robinson,*
  2022 WL 2915703 (N.D. Cal. July 25, 2022)..........................37

*Boldface Licensing + Branding v. By Lee Tillett, Inc.,*
  940 F. Supp. 2d 1178 (C.D. Cal. 2013) ....................................59

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.,*
  174 F.3d 1036 (9th Cir. 1999)....................................27, 55, 60

*Car-Freshner Corp. v. American Covers, LLC,*
  980 F.3d 314 (2d Cir. 2020) .......................................................33

*Century 21 Real Est. Corp. v. Century Life of Am.,*
  970 F.2d 874 (Fed. Cir. 1992) ...................................................30

*Century 21 Real Estate Corp. v. Sandlin,*
  846 F.2d 1175 (9th Cir. 1988)....................................................56

*Champions Golf Club, Inc. v. Champions Golf Club, Inc.,*
  78 F.3d 1111 (6th Cir. 1996).......................................................44

iii

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Cohn v. Petsmart, Inc.,*
281 F.3d 837 (9th Cir. 2002) (per curiam) ................................................45

*CTIA – The Wireless Ass'n v. City of Berkeley,*
928 F.3d 832 (9th Cir. 2019) ...................................................................73

*Ctr. for Bio-Ethical Reform, Inc. v. City & Cnty. of Honolulu,*
455 F.3d 910 (9th Cir. 2006) ...................................................................51

*In re Detroit Athletic Co.,*
903 F.3d 1297 (Fed. Cir. 2018) ...............................................................31

*Doe v. Horne,*
115 F.4th 1083 (9th Cir. 2024) ...............................................................51

*E. & J. Gallo Winery v. Gallo Cattle Co.,*
967 F.2d 1280 (9th Cir. 1992) ...................................................34, 37, 40

*Entrepreneur Media, Inc. v. Smith,*
279 F.3d 1135 (9th Cir. 2002) ...................................................27, 47, 60

*Fleischmann Distilling Corp. v. Maier Brewing Co.,*
314 F.2d 149 (9th Cir. 1963) ...........................................................43, 46

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.,*
618 F.3d 1025 (9th Cir. 2010) .........................................................29, 33

*GoTo.com, Inc. v. Walt Disney Co.,*
202 F.3d 1199 (9th Cir. 2000) .................................................................30

*Greater Orlando Aviation Auth. v. Sanford Airport Auth.,*
2023 WL 2534970 (T.T.A.B. Mar. 14, 2023) .....................................34, 35

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.,*
736 F.3d 1239 (9th Cir. 2013) .................................................................67

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*HMH Publ'g Co. v. Brincat,*
　504 F.2d 713 (9th Cir. 1974)........................................................47

*JL Beverage Co., LLC v. Jim Beam Brands Co.,*
　828 F.3d 1098 (9th Cir. 2016)..............................................28, 29

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.,*
　762 F.3d 867 (9th Cir. 2014)................................................26, 30

*Lopez v. Brewer,*
　680 F.3d 1068 (9th Cir. 2012)....................................................71

*Multi Time Mach., Inc. v. Amazon.com, Inc.,*
　804 F.3d 930 (9th Cir. 2015)......................................................45

*N. Am. Aircoach Sys., Inc. v. N. Am. Aviation, Inc.,*
　231 F.2d 205 (9th Cir. 1955)......................................................31

*Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.,*
　23 F.3d 1508 (9th Cir. 1994)......................................................51

*Naterra International, Inc. v. Bensalem,*
　92 F.4th 1113 (Fed. Cir. 2024)............................................33, 34

*Nationstar Mortg. LLC v. Soria,*
　753 F. App'x 456 (9th Cir. 2019)................................................51

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,*
　638 F.3d 1137 (9th Cir. 2011)....................................................61

*Nichino America, Inc. v. Valent U.S.A. LLC,*
　44 F.4th 180 (3d Cir. 2022)................................................65, 66

*Nigro v. Sears, Roebuck & Co.,*
　784 F.3d 495 (9th Cir. 2015)......................................................49

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Off. Airline Guides, Inc. v. Goss*,
　6 F.3d 1385 (9th Cir. 1993)..........................................................57, 58, 61

*Perfumebay.com Inc. v. eBay Inc.*,
　506 F.3d 1165 (9th Cir. 2007).............................................................33, 58

*Playboy Enters., Inc. v. Baccarat Clothing Co.*,
　692 F.2d 1272 (9th Cir. 1982).....................................................................69

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
　354 F.3d 1020 (9th Cir. 2004).....................................................................41

*Playmakers, LLC v. ESPN, Inc.*,
　376 F.3d 894 (9th Cir. 2004).......................................................................72

*Pom Wonderful LLC v. Hubbard*,
　775 F.3d 1118 (9th Cir. 2014)........................................................ *passim*

*Ranza v. Nike, Inc.*,
　793 F.3d 1059 (9th Cir. 2015).....................................................................55

*Rearden LLC v. Rearden Com., Inc.*,
　683 F.3d 1190 (9th Cir. 2012).............................................................26, 60

*Scotts Co. v. United Indus. Corp.*,
　315 F.3d 264 (4th Cir. 2002).......................................................................73

*Sports Auth., Inc. v. Prime Hosp. Corp.*,
　89 F.3d 955 (2d Cir. 1996).........................................................................37

*Stonefire Grill, Inc. v. FGF Brands, Inc.*,
　987 F. Supp. 2d 1023 (C.D. Cal. 2013 )....................................................40

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
　240 F.3d 832 (9th Cir. 2001).............................................................65, 68

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
   846 F. Supp. 2d 1063 (N.D. Cal. 2012)................................67, 68

*Surfvivor Media, Inc. v. Survivor Prods.*,
   406 F.3d 625 (9th Cir. 2005)...................................................26

*Therma-Scan, Inc. v. Thermoscan, Inc.*,
   295 F.3d 623 (6th Cir. 2002)............................................44, 45

*Tillamook Country Smoker, Inc. v. Tillamook Cnty.*
   *Creamery Ass'n*,
   465 F.3d 1102 (9th Cir. 2006)...............................................35

*Vineyard House, LLC v. Constellation Brands U.S.*
   *Operations, Inc.*,
   515 F. Supp. 3d 1061 (N.D. Cal. 2021).................................62

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*,
   758 F.3d 1069 (9th Cir. 2014)...............................................58

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ..................................................................25

**Statutes**

15 U.S.C.
   § 1065..................................................................................11
   § 1114..................................................................................19
   § 1115(b).......................................................................11, 38
   § 1116(a).............................................................................62
   § 1125(a)(1)(A)..............................................................42, 47
   § 1215(a).............................................................................19

# TABLE OF AUTHORITIES
## (continued)

Page(s)

**Other Authorities**

Chicago Dep't of Aviation, *O'Hare History*,
  https://perma.cc/96UG-5CB2 (last visited June 23, 2025) ...................53

3 *McCarthy on Trademarks and Unfair Competition* § 23:12
  (5th ed. 2025) .......................................................................................58

3 *McCarthy on Trademarks and Unfair Competition*
  § 23:20.50 (5th ed. 2025) .........................................................................27

3 *McCarthy on Trademarks and Unfair Competition* § 24:6
  (5th ed. 2025) .......................................................................................47

4 *McCarthy on Trademarks and Unfair Competition* § 30:46
  (5th ed. 2025) .......................................................................................67

## INTRODUCTION

Hundreds of millions of travelers worldwide have frequented San Francisco International Airport (the "SF Airport")—an award-winning institution that is widely recognized for its industry-leading services. This success did not happen by chance. The City and County of San Francisco ("San Francisco") invested billions of dollars to build a world-class airport, as well as countless hours and tens of millions of dollars to advertise and promote a brand that is, today, instantly recognizable to international travelers: SAN FRANCISCO INTERNATIONAL AIRPORT® (the "SF Mark"). Every traveler through the airport has, in one way or another, encountered the SF Mark, whether online, in advertising or news articles, on signs abutting the highways of San Francisco, or at the airport itself. San Francisco thus holds extensive common-law rights to that trademark, bolstered by an incontestable federal trademark registration.

Nearby, the Oakland International Airport (the "Oakland Airport"), owned by the Port of Oakland (the "Port"), has consistently lagged behind the SF Airport by virtually every metric—the extent of its infrastructure, customer satisfaction, and its ability to maintain and

attract new airlines and support new routes. The Port knew it needed to boost its recognition and credibility. But rather than resolving its challenges fairly, the Port resorted to copycat tactics: in May 2024, notwithstanding vociferous objection from the City, Oakland residents, and those in the airline industry, the Port rebranded its airport "San Francisco Bay Oakland International Airport"—a name that looks and sounds just like the SF Mark. It did so with the obvious purpose of trading on the SF Airport's goodwill while providing the same services to many of the same customers just twenty miles away. To no one's surprise, consumers picked up on the brand similarity, and many voiced their frustration and confusion.

The District Court properly entered a preliminary injunction against the Port's new airport mark to stop confusion in the marketplace. It correctly recognized that the Port's use of a highly similar mark for identical, competitive services, targeting the same consumers via the same channels of trade, is textbook trademark infringement. On the merits, the District Court carefully applied the factors set forth in *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341 (9th Cir. 1979), correctly finding

2

that the most important factors here—the similarity of the marks, the relatedness of the services, and strength of San Francisco's trademark—all weighed strongly in San Francisco's favor. To be sure, the record below supported weighing the other factors in San Francisco's favor on issues such as actual confusion and the Port's intent, but as this Court has held repeatedly, a plaintiff need not prove these factors to establish a likelihood of confusion.

The Port's opening brief contests very few of the District Court's findings on the merits—indeed, it addresses only a handful of the *Sleekcraft* factors, and the limited challenges it does present are unavailing. The Port primarily argues that the court clearly erred in finding the two airport names similar because its airport's name includes two additional words ("Bay" and "Oakland") and because the marks purportedly appear differently in some online materials. But the names speak for themselves: the Port's mark incorporates San Francisco's mark in its entirety, leading with the same words and featuring the same prominent pairs of words in the same order. The District Court was also right to find that travelers would likely believe that two nearby airports

featuring the same city's name are affiliated—indeed, that is the case for nearly every U.S. city in which this naming convention has been adopted, irrespective of whether the airports are owned by a city, port authority, or other organization. The Port therefore provides no basis to disturb the District Court's conclusion that San Francisco is likely to succeed on the merits.

The District Court was also correct to find that San Francisco will likely suffer irreparable harm in the absence of a preliminary injunction. That harm is presumed under the Trademark Modernization Act because San Francisco is likely to succeed on the merits, and the Port's claims about that statutory presumption have no relevance in this case for the simple reason that the District Court found irreparable harm "wholly apart from the presumption." 1-ER-30. The District Court thus held San Francisco to the *higher* standard of demonstrating irreparable harm without the benefit of any presumption, and the District Court correctly found that San Francisco satisfied even that standard.

The remaining equitable factors point in the same direction. The public interest supports a preliminary injunction that promotes the

protection of valuable intellectual property rights and prevents confusion between two widely used airports. The balance of hardships weighs in San Francisco's favor as well: whereas San Francisco would suffer immediate harm, the Port has no history of using its new name, has already reverted to its old name, and can hardly claim any prejudice if prevented from using the infringing name now.

This Court should affirm.

## STATEMENT OF THE ISSUES

1.     Did the District Court clearly err in finding that San Francisco will likely succeed on the merits of its trademark infringement claim in light of the airports' nearly identical names, identical services, identical marketing channels, and the strength of the SF Mark?

2.     Did the District Court clearly err in finding that San Francisco will likely suffer irreparable harm in the absence of a preliminary injunction, in light of the statutory presumption to which it is entitled under the Trademark Modernization Act as well as substantial evidence of likely harm to its goodwill and brand?

3.    Did the District Court clearly err that the public interest and balance of the hardships weigh in favor of entering a preliminary injunction?

## STATEMENT OF THE CASE

I.    **Factual Background**

### A.    Over Decades, San Francisco Establishes the San Francisco International Airport as a World-Class Airport

In May 1927, San Francisco inaugurated the Mills Field Municipal Airport of San Francisco.  5-ER-1118 (¶ 3).  It rebranded the airport to the "San Francisco Airport" in 1931 and later to the "San Francisco International Airport" in 1954.  *Id.*  Since its establishment, the airport has served as a major West Coast hub for travelers to and from the Bay Area.  5-ER-1118 (¶ 4).  And for *71* years, the SF Airport has used the "San Francisco International Airport" mark to identify itself.  5-ER-1118 (¶ 3).

San Francisco owns the SF Airport and, acting through its Airport Commission, has complete authority to use, operate, maintain, manage, regulate, improve, and control the SF Airport.  5-ER-1026 (¶ 4).  As the owner and steward of the SF Airport, San Francisco has poured

6

significant amounts of time, energy, and money into the airport's infrastructure and facilities to attract and support airlines and to ensure travelers are comfortable and well-served throughout their journey. *Id.*

By any metric, San Francisco has succeeded. Each year, the SF Airport welcomes tens of millions of travelers from around the world—fifty million in 2023 alone—making it one of the top 12 busiest airports in the United States by passenger count. 5-ER-1118 (¶ 4). It receives more than twice as many passengers as the Bay Area airports in Oakland and San Jose combined. 5-ER-1118-1119 (¶ 5); 6-ER-1210-1211. All told, the SF Airport has had average annual operating revenue of approximately $1 billion over the five years preceding this action. 6-ER-1290 (¶ 2); 6-ER-1300-1302.

Over decades, San Francisco has invested in attractions and amenities to improve user experience and make the SF Airport a destination airport. Each traveler passing through the SF Airport can visit any number of its nearly seventy restaurants, high-end shopping options, prestigious club lounges, an award-winning on-airport Hyatt hotel, a first-of-its-kind fully accredited in-airport museum, as well as the

7

Bay Area Sports Hall of Fame. *See* 5-ER-1026-1027; 5-ER-1033-1034. These features have been curated with care: restaurants include quick versions of San Francisco staples like Boudin Bakery, and the shopping is as cosmopolitan as the airport's travelers, featuring Gucci, Hermès, and Burberry, among others. 5-ER-1026 (¶¶ 4-5).

The SF Airport has won many awards and received a significant amount of recognition for its efforts from passengers, press, and travel industry authorities alike. It was listed, for example, among the Top 10 Best Large U.S. Airports by the *Wall Street Journal* in 2022 and Top 10 Airports for Food and Drinks by *Food & Wine Magazine* in 2024. *See* 5-ER-1027-1028 (¶¶ 8-9); 5-ER-1036-1069. The SF Airport has set itself apart in many other respects, earning recognition for everything from offering the "fastest airport Wi-Fi" to being the "best airport in the US for kids." 5-ER-1027-1029 (¶¶ 8-9) (capitalization omitted). And beyond the travel industry, it has also received praise for its inclusion initiatives, high school curriculum, and climate leadership. *See* 5-ER-1027-1028 (¶ 8).

**B.    San Francisco Invests Millions of Dollars Each Year into the SF Airport Name and Brand**

As a result of its marketing efforts and the care with which San Francisco has operated and developed the SF Airport—as well as the accolades it has received—the SAN FRANCISCO INTERNATIONAL AIRPORT trademark is widely known among air travelers.  *See* 5-ER-1029 (¶ 10).  San Francisco invests millions of dollars each year—$30 million in the last ten years alone—to make sure that each interaction with the brand clearly communicates the promise of the SF Mark to travelers.  *See* 5-ER-1029 (¶ 12).  The fruits of this investment are evident in the in-airport, out-of-home, and digital marketing touchpoints that travelers encounter while purchasing a plane ticket—whether in person, online, or through a travel agent—reading that plane ticket or baggage claim sticker, or taking in the walls of the airport itself during their journey.  5-ER-1029 (¶ 11).

The SF Airport directly advertises and prominently uses the SF Mark on its website www.flysfo.com (which receives nearly 500,000 unique visitors per month), in commercial print, digital advertising, radio, connected television, on social media, and at public outreach events.  5-

9

ER-1030 (¶¶ 13-14). And beyond that, third parties indirectly promote the SF Mark when they reference it to facilitate their own services. 5-ER-1030 (¶ 15); 5-ER-1080-1094. For example, airlines and online travel agencies use the SF Mark when they display departures and destinations by airport name. *Id.* Likewise, car rental services, rideshare and navigation apps—and any other service that is part of the airport economy—display the SF Mark as part of their search features to make it easy for travelers to discern their relationship with the SF Airport. 5-ER-1030-1031 (¶ 16); 5-ER-1096-1101. This is all in addition to the countless news articles, travelogues, and blogs discussing the SF Airport. *See* 6-ER-1290 (¶¶ 3-5); 6-ER-1304-1327.

It follows, therefore, that the SF Mark is an asset of great value and embodies San Francisco's goodwill. It is only through San Francisco's tremendous investments that the SF Mark has become one of the strongest airport brands in the world, routinely ranked among the top 25 by Brand Finance, a respected independent evaluator of international brands. 5-ER-1031 (¶ 17); 5-ER-1103-1110.

To protect its brand beyond its extensive common-law rights, and to preserve the SF Mark for its exclusive use, San Francisco secured a trademark registration in 2012 for "San Francisco International Airport," covering "airport services" in Class 39. *See* 6-ER-1290-1291 (¶ 6); 6-ER-1329-1331. The registration became incontestable in 2017, after San Francisco submitted a Section 15 Declaration of Incontestability. 6-ER-1291 (¶ 7); 6-ER-1333.[1]

### C. The Port Operates the Oakland International Airport at a Smaller Scale

Although currently at odds, the SF Airport and the Oakland Airport have much in common. Like the SF Airport, the Oakland Airport was established in 1927. 6-ER-1291 (¶ 8); 6-ER-1335. Also like San Francisco, the Port has had decades to develop its mark's strength, having started using the "Oakland International Airport" trademark at

---

[1] Between the fifth- and sixth-year anniversary of registering a trademark, a trademark owner can file for "incontestable" status, after which a defendant wishing to challenge that trademark has limited defenses. 15 U.S.C. § 1065. Filing the affidavit of incontestability increases the evidentiary value of the registration to providing "conclusive evidence" of the trademark's validity and its registrant's exclusive right to use the mark. *Id.* § 1115(b).

11

least as early as 1963. *See* 6-ER-1291 (¶ 9); 6-ER-1337. And finally, like San Francisco, the Port also sought to protect its "Oakland International Airport" name through trademark registration for its "airport services." 6-ER-1291-1292 (¶ 10); 6-ER-1339-1344.

Additionally, the Oakland Airport and the SF Airport share several airlines, including Alaska, Delta, Hawaiian, and Southwest, and service a number of the same travelers. *See* 5-ER-1120 (¶ 13). In fact, online travel agencies and airline ticketing features typically identify the Oakland Airport as a "nearby" alternative to the SF Airport, and vice versa, such that flights to each can be searched together and a traveler can consider one as an alternative to the other when traveling to the Bay Area. 5-ER-1120 (¶ 12).

Relative to the SF Airport, however, the Oakland Airport is much smaller, with fewer passengers and more limited infrastructure to support airlines. 5-ER-1119 (¶ 7); 6-ER-1210-1223. Indeed, whereas the SF Airport serviced 50 million travelers in 2023, the Oakland Airport serviced just 11.2 million. 5-ER-1118-1119 (¶¶ 4, 7); 6-ER-1210-1211. Despite lower customer volume, the Oakland Airport also scored below

12

the SF Airport in customer service in J.D. Power's September 2023 North American Satisfaction Study: while the SF Airport ranked 6th for Mega Airports, the Oakland Airport was 24th among large airports. 5-ER-1119 (¶ 8); 6-ER-1225-1228.

### D.    The Port Copies the SF Mark and Adopts the Name "San Francisco Bay Oakland International Airport"

For some time now—and through no fault of San Francisco—the Port has made clear that it views itself as locked in a rivalry with San Francisco over airlines and passengers. 5-ER-1120 (¶ 14). Over the years, and especially during the COVID-19 pandemic, the Oakland Airport has struggled to maintain and/or expand airline routes, with widely reported losses of the airlines British Airways, Norwegian Air, and JetBlue. 5-ER-1120 (¶ 15). Rather than resolve these challenges on its own, the Port has pointed the finger at the SF Airport and San Francisco. *See* 5-ER-1120-1121 (¶ 16); *see also* 5-ER-1121 (¶ 17) (noting instances in which the Port's marketing has denigrated the SF Airport).

On March 29, 2024, the Port escalated tensions with San Francisco by announcing that it would rebrand the Oakland Airport to "San Francisco Bay Oakland International Airport." This announcement was

13

met with widespread resistance: San Francisco, airlines, travel-industry and tour-operating companies, and regional stakeholders formally expressed opposition to, or serious concerns about, the Port's proposed name change. *See, e.g.*, 5-ER-962-965 (¶¶ 3-20); 5-ER-967-1012; 5-ER-1017-1018 (¶¶ 5, 7). For example, Japan Airlines, United Airlines, and Vietnam Airlines all issued letters opposing the name change. *See* 5-ER-964-965 (¶¶ 15-17); 5-ER-1001-1006. Each shared its concerns about harming domestic and international travelers (particularly those with connecting flights or who are unfamiliar with Bay Area geography). *See id.* Vietnam Airlines wrote that "[i]t is of great concern that the . . . Oakland International Airport is considering changing its name to San Francisco Bay Area Oakland International Airport, which will create huge confusions [sic], especially to our travelers." 5-ER-964-965 (¶ 17); 5-ER-1005. Travel agencies objected, too, offering alternate solutions to the Port and describing the likely negative effects for customers in planning routes and returning rental cars. *See* 5-ER-963-964 (¶¶ 11-14); 5-ER-990-999.

14

On May 9, 2024, after receiving public comments—many of which opposed the name change—the governing body of the Port, the Board of Port Commissioners, voted to approve the new name, which became effective the same day.  6-ER-1292-1293 (¶ 12).

### E.    The Port Begins Using Its New Name, Confusing Consumers and Harming San Francisco's Brand and Goodwill

As anticipated, the Port's attempt to free ride on San Francisco's name and success immediately created confusion.  In July 2024, for example, a Reddit user posted that they had "picked the wrong airport" due to the Port's name change and lamented, rhetorically, "Why would they do this"?  6-ER-1388.  To illustrate the point for users unfamiliar with the scenario the Port had created, the user showed the SF Mark next to the Port's new mark—much like how travelers would encounter them online, for example, on navigation websites, social media usernames, and online travel agencies.  *Id.*; *see* 6-ER-1294 (¶ 20).

15



**Figure 1 – Social Media Post from Traveler**

On other social media websites, visitors to the SF Airport mistakenly tagged the "San Francisco Bay Oakland International Airport," intending to tag the SF Airport. This error reflects the ease with which travelers mix up the airports' names, and leads viewers to believe that the photos depict the Oakland Airport when in fact, they depict San Francisco's. *See* 6-ER-1295 (¶ 23); 6-ER-1394-1398.



**Figure 2 – Social Media Posts Tagging the Wrong Airport**
**(San Francisco Bay Oakland Int'l Airport)**

On top of these mistaken social media tags, San Francisco is aware of over twenty individuals who were dropped off at the SF Airport intending to go to the "San Francisco Bay Oakland International Airport" or catch a flight on, for example, Spirit Airlines, which flies out of the Oakland Airport but not the SF Airport. 2-ER-195 (¶ 3); 2-ER-197; 5-ER-1112-1113 (¶ 6); 5-ER-1115. And that number reflects only those who were upset enough, and who took the time, to stop and speak with a service representative at the SF Airport.

When *SFGate*, a popular news website reporting on Bay Area news, published an article about the present dispute, it prompted many members of the public to share a broad array of experiences of trademark

17

confusion that had been previously unknown. One commenter on the *SFGate* article wrote about a highly educated couple who did not have a strong grasp of the English language booking tickets to the wrong airport for a wedding due to name confusion. *See* 6-ER-1295 (¶ 26); 6-ER-1411. Another recapped witnessing a Transportation Security Administration (TSA) agent at the SF Airport trying to explain over and over to a traveler that she was at the wrong airport. 6-ER-1295 (¶ 25); 6-ER-1407.



**Figure 3 -** *SFGate* **Post Summarizing Confusion in Line at SF Airport**

Taken as a whole the Port's adoption and use of its new name quickly had disruptive and far-reaching effects.[2]

## II. Procedural History

On April 18, 2024, San Francisco filed a complaint against the City of Oakland, of which the Port is a department, alleging trademark infringement under the Lanham Act, 15 U.S.C. § 1114; unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1215(a); and common-law trademark infringement under California law. *See* ECF No. 1.[3] On May 3, 2024, San Francisco filed an amended complaint, which asserted the same three claims and added the Port separately as a defendant. 7-ER-1519-1560. On September 17, 2024, San Francisco moved for a preliminary injunction. 6-ER-1457-1489.

On November 13, 2024, after extensive oral argument, *see* 2-ER-39-112, the District Court granted the motion and entered a preliminary

---

[2] The record also demonstrates that a search for "San Francisco Bay Airport" (that is, without the word "International") returns the new name of the Oakland airport and its associated branding. *See* 6-ER-1293 (¶ 16); 6-ER-1384.

[3] "ECF No." refers to docket entries in District Court proceedings, Case No. 3:24-cv-2311-TSH (N.D. Cal.).

injunction, 1-ER-3-36. The District Court found that "the new name for the Oakland airport strongly implies affiliation with San Francisco and the San Francisco International Airport," such that it "damages the goodwill and value of San Francisco's Mark and deprives San Francisco of control over its Mark." 1-ER-31.

Finding that San Francisco was likely to succeed on the merits of its trademark infringement claims, the District Court applied the traditional *Sleekcraft* factors. 1-ER-12-29. Assessing these factors, the District Court found: (1) San Francisco's mark is "commercially strong"; (2) the parties' services are "identical"; (3) the airports' marketing channels are "identical"; (4) "the near identity of the marks make them confusingly similar"; (5) San Francisco's showing of actual confusion was limited; (6) there is a "high degree of likelihood of confusion" due to implied affiliation, for which consumers would exercise a low degree of care, although the District Court expressed the view that confusion is less likely as to initial interest or point of sale; (7) the Port's intent was unclear, but "the Court [was] unable to conclude that the Port actually wanted to deceive anyone"; (8) because the parties already directly

competed, the likelihood of expansion factor was neutral.  *See* 1-ER-12-26.  Viewing these factors as a whole, the District Court thus found San Francisco likely to succeed on the merits.  1-ER-8-29.

Turning to irreparable harm, the District Court found that—"wholly apart from the presumption" of such harm to which San Francisco is entitled under the Trademark Modernization Act—San Francisco had demonstrated that "it will suffer irreparable harm" absent a preliminary injunction, as the Port's infringement "damages the goodwill and value of San Francisco's [m]ark and deprives San Francisco of control over its [m]ark."  1-ER-30-32.  Finally, the District Court found that both the public interest and the balance of the hardships favored San Francisco.  1-ER-32-33.[4]  On December 12, 2024, the Port filed a notice of appeal.  7-ER-1561.  The Port did not seek a bond, *see id.*, and it reverted back to its use of its prior name (Oakland International Airport) before filing its opening brief on appeal and has continued to use that name for the past seven months.

---

[4] The day after the preliminary injunction issued, the parties jointly stipulated to dismiss without prejudice the claims against the City of Oakland.  ECF No. 78.

## SUMMARY OF ARGUMENT

The District Court was well within its discretion to grant a preliminary injunction preventing the Port from using a new name confusingly similar to the SF Mark.

*First*, it was not an abuse of discretion for the District Court to find that San Francisco is likely to succeed on the merits of its infringement claim. The Port does not address, let alone contest, most of the applicable *Sleekcraft* factors, thus conceding that several of the most important factors—the strength of San Francisco's incontestable mark, the parties' identical services, and the parties' identical marketing channels—weigh strongly in San Francisco's favor. And the limited issues the Port chooses to take up on appeal provide no basis for reversal. To start, the District Court was right to find that the two marks are highly similar, with the Port's name entirely subsuming San Francisco's and the most prominent words featured in the same order and position. The District Court also committed no error in finding consumers and the public are more easily confused regarding the airports' affiliation, a factor that also weighs in San Francisco's favor. The District Court also properly evaluated the record in finding that confusion as to such affiliation was likely: among

22

other things, the record demonstrates that almost every pair of major U.S. airports featuring the same city's name in the same area *are* affiliated, just as consumers would assume here. And if considered, the remaining *Sleekcraft* factors—though unaddressed in the Port's brief—confirm that San Francisco will likely succeed on the merits.

*Second*, the District Court committed no error in finding that San Francisco would likely suffer irreparable harm absent a preliminary injunction. Under the Trademark Modernization Act ("TMA"), San Francisco is entitled to a presumption of irreparable harm because it demonstrated that it would likely succeed on the merits, and whether that presumption is applied or not, the record demonstrates that San Francisco will indeed suffer harm to its goodwill and brand if the Port were to continue using its infringing mark on a competing airport. The Port's response about how the TMA's presumption should be applied is unavailing, but also has nothing to do with this case, as the District Court found irreparable harm "wholly apart from the presumption." 1-ER-30. The Port's remaining arguments consist of a few quibbles on the facts, none of which suggests clear error.

*Finally*, the District Court correctly recognized that the balance of the hardships and public interest weigh in favor of a preliminary injunction. Whereas San Francisco will suffer (and has already suffered) immediate harm with a nearby airport copying a valuable 70-year-old brand, the Port can claim no cognizable harm if prevented from using and expanding its new infringing name and instead reverting, as it already has, to the name it used for decades. And the public is best served by protecting established brands like SF Airport's and by preventing the obvious public confusion between two major airports that millions of consumers use every year.

This Court should affirm.

## STANDARD OF REVIEW

This Court "reviews the District Court's decision to grant a preliminary injunction for an abuse of discretion," and it "review[s] underlying legal conclusions *de novo* and factual findings for clear error." *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 687-88 (9th Cir. 2022). In reviewing factual findings, this Court finds "[c]lear error" only if a finding is "illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Pom Wonderful LLC v.*

*Hubbard*, 775 F.3d 1118, 1123 (9th Cir. 2014) (citation omitted). Thus, this Court "defer[s] to a district court's factual findings unless, 'based on the entire evidence,' [it is] left with 'a definite and firm conviction that a mistake has been committed.'" *Id.* at 1123 (citation omitted) (noting that "appl[ication] of *Sleekcraft* factors" and "individual *Sleekcraft*-factor findings" must be reviewed for clear error).

To obtain a preliminary injunction, a party "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

In a balanced and well-reasoned opinion, the District Court correctly found that all relevant factors weigh in San Francisco's favor in this case. The Port finds no abuse of discretion in the District Court's opinion—instead, it is reduced to fighting on the facts and disputing the settled proposition that confusion as to affiliation, which any traveler would perceive between the airports' names, supports an infringement claim. The Port's arguments should be rejected, and this Court should

25

affirm.

## I.   The District Court Correctly Determined that San Francisco Is Likely to Succeed on the Merits

"To show trademark infringement, a plaintiff must establish ownership of a trademark and a likelihood of consumer confusion." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 874 (9th Cir. 2014). In evaluating the likelihood of confusion, courts consider the following factors under *Sleekcraft*:

> (1) strength of the protected mark; (2) proximity and relatedness of the goods; (3) type of goods and the degree of consumer care; (4) similarity of the protected mark and the allegedly infringing mark; (5) marketing channel convergence; (6) evidence of actual consumer confusion; (7) defendant's intent in selecting the allegedly infringing mark; and (8) likelihood of product expansion.

*Pom Wonderful*, 775 F.3d at 1125 (citing *Sleekcraft*, 599 F.2d at 348-49). A "plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005). These factors are "illustrative rather than exhaustive," and they are "intended to function as a proxy or substitute for consumer confusion, not a rote checklist." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1209-10 (9th Cir. 2012) (citation

omitted). "The ultimate question of likelihood of confusion is predominantly factual in nature, as is each factor within the *Sleekcraft* likelihood of confusion test." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002) (cleaned up).

Importantly, the *Sleekcraft* factors are not all equal: "[s]ome factors are much more important than others." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999). In particular, "the similarity of the marks and whether the two companies are direct competitors" stand apart as uniquely important factors. *Id.*; *see also* 3 *McCarthy on Trademarks and Unfair Competition* § 23:20.50 (5th ed. 2025) ("In applying a multi-factor analysis for likelihood of confusion, it will often be the case that the similarity of the marks and the similarity of the goods and services will be the most determinative of the factors."). Indeed, San Francisco is aware of *no* case reversing a preliminary injunction where, as here, a district court found that the parties offered identical and competing goods or services, with trademark strength and similarity also demonstrating likely confusion.

Most of the *Sleekcraft* factors are undisputed or unaddressed in the Port's opening brief.  The Port does not challenge the ownership and validity of the SF Mark or its incontestable status.  Of the eight *Sleekcraft* factors, the Port does not dispute (i) the strength of the mark (Factor No. 1), which the District Court correctly found to be "commercially strong," 1-ER-12-14; (ii) the proximity or relatedness of the goods and services (Factor No. 2), which the District Court found to be "identical," 1-ER-14; or (iii) the marketing channels (Factor No. 5), which the District Court likewise found to be "identical," 1-ER-18.  The Port does not raise any argument regarding its intent (Factor No. 7) or the likelihood of expansion of product lines (Factor No. 8).  *See* 1-ER-26.

Ultimately, the Port only contests the (i) similarity of the marks (Factor No. 4) and (ii) type of services and degree of consumer care (Factor No. 3).  And then, eschewing the purpose of the *Sleekcraft* analysis, it contests likelihood of confusion as to the airports' affiliation or relationship.  *See* Opening Br. 25-39.  San Francisco accordingly focuses its discussion on these three issues.  *See JL Beverage Co., LLC v. Jim*

*Beam Brands Co.*, 828 F.3d 1098, 1106-12 (9th Cir. 2016) (focusing on disputed *Sleekcraft* factors).

The District Court committed no error in finding that these factors and confusion as to affiliation—and, if considered, the remaining *Sleekcraft* factors—demonstrate that San Francisco will likely prevail on the merits of its infringement claim.

## A.    The District Court Did Not Clearly Err in Finding that the Airports' Marks Are Highly Similar

The Port centers its discussion largely on the view that its new name ("San Francisco Bay Oakland International Airport") is not sufficiently similar to San Francisco's well-known trademark ("San Francisco International Airport") to cause confusion. *See* Opening Br. 25-30. That view is belied by common sense and the factual record, which the District Court correctly found to demonstrate similarity.

That finding is crucial, if not dispositive. "Although some of the *Sleekcraft* factors will not always be helpful in assessing the likelihood of confusion, 'the similarity of the marks . . . has always been considered a critical question in the likelihood-of-confusion analysis.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d

29

1025, 1031-32 (9th Cir. 2010) (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000)).  In evaluating similarity, "first, the marks must be considered in their entirety and as they appear in the marketplace; second, similarity is adjudged in terms of appearance, sound, and meaning; and third, similarities are weighed more heavily than differences." *GoTo.com*, 202 F.3d at 1206 (citations omitted).  "[A]s the similarities between two marks increase, so too does the likelihood of confusion." *Pom Wonderful*, 775 F.3d at 1127.

Because the identity of the parties' airport services and strength of the incontestable SF Mark are well-established and unchallenged on appeal, two additional considerations affect the instant analysis.  Here, because both parties in this case undisputedly offer "identical services" (airports), the "degree of similarity necessary to support a conclusion of likely confusion declines." *Century 21 Real Est. Corp. v. Century Life of Am.*, 970 F.2d 874, 877-78 (Fed. Cir. 1992) (affirming likelihood of confusion between "Century Life of America" and "Century 21"); *see also La Quinta*, 762 F.3d at 875-76 (same).  In the same vein, "a lesser degree of similarity is required when a trademark holder's mark is strong." *Pom*

*Wonderful*, 775 F.3d at 1130.

As the District Court correctly found, the similarity of the two airports' names is unmistakable. 1-ER-14-15. Both airport names begin with "San Francisco" and end with "International Airport," and the Port's mark entirely subsumes San Francisco's:

**SAN FRANCISCO INTERNATIONAL AIRPORT**
**SAN FRANCISCO** BAY OAKLAND **INTERNATIONAL AIRPORT**

The result is that the marks look alike, sound alike, and share similar meanings—all the more so in contexts where they appear in truncated form. 6-ER-1293-1294 (¶¶ 16-17). The fact that both marks begin with "San Francisco" is "particularly significant because consumers typically notice [the initial two words of a mark] first." *In re Detroit Athletic Co.*, 903 F.3d 1297, 1303 (Fed. Cir. 2018). And as the District Court recognized, the use of "San Francisco" at the beginning of the airport name is especially meaningful because "San Francisco" has been uniquely associated with San Francisco's airport services for nearly a century. The record contains no other example, aside from the SF mark and the Port's infringing mark, of any airport in the U.S. using the name "San Francisco." *See N. Am. Aircoach Sys., Inc. v. N. Am. Aviation, Inc.*, 231

31

F.2d 205, 209-10 (9th Cir. 1955) (affirming finding that "'North American' in connection with aviation means the plaintiff solely and exclusively"). Moreover, the overlapping words—"San Francisco" and "International Airport"—appear in an identical sequence in both marks, enhancing the likelihood that a consumer would read them the same way. The record before the District Court also contained marketplace examples where the infringing name was truncated—placing further emphasis on "San Francisco." *See infra* pp. 36-37. In this context, the District Court was right to find the marks similar.

None of the Port's attacks on that factual finding demonstrates clear error. *See* Opening Br. 25-30.

*First*, the Port points to minor distinctions between the two marks—namely, the inclusion of the words "Oakland" and "Bay" in its airport's name and its occasional use of the "I FLY OAK" logo and Oakland's International Air Transport Association ("IATA") code ("OAK"). *See* Opening Br. 27-29. The Port is correct that the marks are not *identical*, but that is not the test for demonstrating similarity— "[m]inor differences . . . do not negate the overall impression of

32

similarity." *adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 755 (9th Cir. 2018); *see also, e.g.*, *Perfumebay.com Inc. v. eBay Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007) (finding PerfumeBay "completely incorporate[s] eBay's strong mark" and confusion was likely, despite discrete differences between the marks and defendant's use of a distinctive logo); *Fortune Dynamic*, 618 F.3d at 1032 (finding marks substantially similar despite "markedly different appearances").

Indeed, courts have routinely found that marks consisting of several words, like the marks at issue here, remain similar despite the addition or variation of a word or two. In *Car-Freshner Corp. v. American Covers, LLC*, 980 F.3d 314 (2d Cir. 2020), for example, the Second Circuit explained that "Midnight Black Ice Storm" was highly similar to "Black Ice" in the context of automotive air fresheners, as the "allegedly infringing mark[] uses the same . . . words of the senior user's mark," even though it "adds a word in front of, and a word after, that mark." *Id.* at 318-19, 330-31. Likewise, in *Naterra International, Inc. v. Bensalem*, 92 F.4th 1113 (Fed. Cir. 2024), the Federal Circuit held that "Babies' Magic Tea" was confusingly similar to "Baby Magic," as "the

first two words of the BABIES' MAGIC mark and the entirety of the BABY MAGIC mark look and sound almost the same and have the same connotation and commercial impression." *Id.* at 1119 (cleaned up); *see also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291-92 (9th Cir. 1992) (affirming finding that "Gallo" and "Gallo Salame" are similar in the context of wine, cheese, and meat, despite district court conclusion that the marks "were not similar in appearance"). The same is true here: the Port wedged two words into the middle of a four-word trademark— keeping the most important segment ("San Francisco") at the front and the two pairs of words together—but that variation does not undermine the clear similarity of the two marks.

That conclusion finds further support in authorities considering these principles in the context of airports. For example, the U.S. Patent & Trademark Office Trademark Trial and Appeal Board (TTAB) recently held that a mark for "Orlando International Airport" was sufficiently similar to "Orlando Sanford International Airport" to block the application for that mark filed by the operator of the Sanford airport. *See Greater Orlando Aviation Auth. v. Sanford Airport Auth.*, 2023 WL

34

2534970, at *16-18 (T.T.A.B. Mar. 14, 2023).[5]  As the TTAB explained, "[b]ecause [Sanford's] mark encompasses the literal elements of [Orlando's] mark, the marks are similar in sight and sound, have generally the same meaning and make similar commercial impressions," and the "presence of the geographically descriptive term SANFORD does not distinguish the marks because Sanford is in such close proximity to Orlando, as the parties' airports are only thirty-one miles apart."  *Id.*  Likewise here, the Port and San Francisco share the same market, and their marks create similar commercial impressions—like the "Orlando" marks, the interspersed words "Bay" and "Oakland" do not distinguish the Port's infringing mark from the SF Mark.

The Port also overstates the significance of its occasional display of the Oakland Airport's IATA code or logo in proximity to the infringing mark.  Opening Br. 27-30.  To start, the display of a logo or the "OAK" IATA code is limited and inconsistent.  For instance, the Port's own radio

---

[5] The TTAB's "test for trademark registration uses the same 'likelihood of confusion' standard as the test for trademark infringement." *Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1111 (9th Cir. 2006) (citation omitted).

advertisements simply refer to "San Francisco Bay Oakland International Airport," without any mention of the "OAK" code. 2-ER-200 (¶ 10). The same is true on many third-party apps, text, or websites—indeed, Wikipedia, YouTube, Yelp, Mapquest, and Apple Maps all display the "San Francisco Bay Oakland International Airport" name without the IATA code. *See* 2-ER-190-192 (¶¶ 6-10).[6] The record further demonstrates that many other third parties do not display logos or use "OAK" in written content either, especially in articles, blogs, and other publications. *See* 6-ER-1348-1350 (collecting press releases in which IATA code is not displayed alongside airport name); 6-ER-1368-1382. And of course, the Port has no control over the way these third parties refer to the infringing mark.

This use of Oakland Airport's new name is also borne out in the practices of many online travel agency services and other online booking

---

[6] Although the District Court stated that some of these materials, including Oakland's YouTube, Yelp, Mapquest, and Apple Maps pages, are not relevant to the distinct issue of "initial interest confusion," 1-ER-20-21 n.5, the District Court did not dispute that the names these materials use for Oakland's airport demonstrate the *similarity* of the marks in context—with Oakland's mark omitting the IATA code—nor did it dispute that these materials are probative of affiliation-based confusion.

services, such as car rentals, which display Oakland's IATA code only *after* the airport name, where it is less likely to be seen, let alone make a commercial impression, and may be left out entirely. *See* 6-ER-1352-1366 (collecting examples). That includes, for example, popular online travel agencies like Expedia, Tripadvisor, and Google, *see* 6-ER-1352-1354, and leading car rental platforms like Enterprise and Budget, *see* 6-ER-1364-1366. Moreover, on smart phone browsers and mobile apps, because the infringing mark frontloads "San Francisco," the mark may be truncated or obscured—resulting in near-identical presentations of the marks. *See* 6-ER-1293-1294 (¶¶ 17-18); *E. & J. Gallo Winery*, 967 F.2d at 1291-92; *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 962-63 (2d Cir. 1996) (restaurant name "Sports Authority Food, Spirits & Sports" confusingly similar to retailer name "Sports Authority," in light of evidence that restaurant sometimes was identified only as "the sports authority"); *BGC Inc. v. Robinson*, 2022 WL 2915703, at *4 (N.D. Cal. July 25, 2022) (similar, where infringer's distinguishing logo was inconsistently used).

*Second*, the Port seeks to downplay the similarity of the marks by noting that "San Francisco Bay" is the "actual geographic location" of its

airport—claiming, in other words, that the similarity is not meaningful because overlapping terms are descriptive. Opening Br. 28-29 & n.5. That argument fails. Under the Lanham Act, "[d]escriptive" use is a defense to infringement only where a party uses a term "otherwise than as a mark." 15 U.S.C. § 1115(b)(4). Here, this defense does not apply because the Port is clearly using "San Francisco Bay Oakland International Airport" as a trademark. Indeed, this name is the *replacement* for, and is being used in the same manner as, the registered "Oakland International Airport" mark. Had the Port chosen to describe the "Oakland International Airport" as being "located on the San Francisco Bay," instead of renaming it with the infringing mark, this lawsuit could have been avoided. The Port is not merely "describing" a location, however, and its use of these terms as a trademark cannot be credibly disputed.[7]

*Finally*, the Port insists that, in "the context of what consumers see

---

[7] Since the Port does not contest that San Francisco's mark is strong and incontestable, the Port may not collaterally attack San Francisco's mark as descriptive simply by noting that the SF Airport is located near San Francisco Bay.

regarding the identification of airports when they search for and purchase flights online," the two marks are not similar. Opening Br. 29. The Port rests this argument, in large part, on websites for Southwest and Spirit Airlines—its closest partners—but this evidence gets the Port nowhere. *See id.* (citing 4-ER-611-619 (¶¶ 9-23) and 4-ER-623-626 (¶¶ 9-26)); *see also* 2-ER-190 (¶ 4) (noting that Southwest and Spirit account for roughly 89% of seat capacity for flights in and out of Oakland airport). To start, neither airline's website had yet been changed to display the Port's infringing mark—such that these snippets of websites say nothing about the "context" in which the infringing mark appears. And even if these websites were deemed relevant, they only highlight the confusion risk the Port's mark creates: a search for either party's airport on Southwest's website returns them both under the heading "San Francisco Area Airports," 4-ER-623 (¶ 11), while Spirit's returns "Oakland, CA / San Francisco, CA AREA," 4-ER-615-616 (¶ 17). For a consumer visiting these sites, these results (both which prominently feature references to "San Francisco") would only reinforce the mistaken impression that the Oakland Airport is SF Airport or affiliated with it. *See* 2-ER-201 (¶¶ 12-

13).

The cases the Port cites (at pp. 26-28) are not to the contrary. First, in *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440 (9th Cir. 1980), this Court held that a district court committed no clear error in finding that the trademark "Alpha" was not confusingly similar to "Alpha Steel Tube" or "Alpha Steel." *Id.* at 444. But that conclusion hinged on the panel's view that the marks appeared differently in the market: the owner for the first mark often used the word "alpha" "alone and in a distinctive logo," whereas the second mark was used "always in conjunction with another word or words (steel, tube, shapes)"—and, critically, the companies were "not competitors." *Id.* at 444-45[8]; *see also Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1051 (C.D. Cal. 2013 ) (cited at p. 27) (finding "Stonefire Grill" used for restaurant not confusingly similar to "Stonefire Atlantic Flatbreads" for a bread retailer because, "viewed in their entirety and as they appear in the

---

[8] As this Court has since noted, any reliance on *Alpha Industries* must reflect its procedural posture in reviewing a "district court findings of no similarity" and "the deferential standard of clear error." *E. & J. Gallo Winery*, 967 F.2d at 1292 (discussing *Alpha Industries*).

marketplace," the marks refer to entirely different products). These cases' rationale is inapplicable here—the airports' two names not only appear the same way in almost all instances, but they also refer to identical services (airports).

Accordingly, the District Court committed no clear error in finding the two marks highly similar.

### B. The District Court Did Not Clearly Err in Analyzing the Type of Services and Degree of Consumer Care

The Port next takes issue with the District Court's assessment of the third *Sleekcraft* factor—the "type of goods and the degree of care likely to be exercised by the purchaser." *Sleekcraft*, 599 F.2d at 348; *see* Opening Br. 30-31. This factor looks at the type of service offered and the degree of care one would expect from "the typical buyer exercising ordinary caution." *Sleekcraft*, 599 F.2d at 353. "Low consumer care . . . increases the likelihood of confusion." *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004).

The District Court, after parsing the potential forms of consumer confusion in this case, determined that "when it comes to affiliation, connection, or association, there is a low degree of consumer care and a

high degree of likelihood of confusion." 1-ER-19. That conclusion was premised on the common-sense reality that "customers rarely, if ever, do their own research to determine who owns or manages a particular airport, and whether that owner or manager is affiliated or associated with other airports." *Id.* And it is plainly grounded in the Lanham Act's prohibition against the use of "any word, term, name, symbol, or device [that] is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" with another. 15 U.S.C. § 1125(a)(1)(A). The District Court's analysis of the factor was correct, and the Port's contrary arguments lack merit.

*First*, the Port claims that the District Court's evaluation of consumer care as to the airports' implied affiliation was "wholly divorced from any potential or actual purchasing decision." Opening Br. 30. The Port seizes, in particular, on the District Court's use of the phrase "point of sale confusion" to suggest that it considered confusion in the abstract, unrelated to any purchasing decision. *See* 1-ER-23-26. But that is plainly untrue—the consideration of purchasing decisions is inherent in any analysis of affiliation confusion. Indeed, it is readily apparent from the

42

District Court's own analogy, in which it likened the Port's conduct to naming an amusement park in North Dakota "Disney North Dakota Amusement Park," explaining that "[c]ustomers who go to that park understand they are in North Dakota and therefore not at Disney World in Florida or at Disney Land in California," but they still "buy[] a ticket" because of "the implied association." 1-ER-11. Thus, confusion as to an airport's affiliation is no abstraction, but rather one necessarily linked to purchasing decisions—whether a consumer "buys a ticket" from an airport based on a mistaken belief that it is affiliated to another. *Id.*

*Second*, the District Court was right to recognize that consumers are more likely to make a mistake in evaluating whether two airports are affiliated than whether they are the *exact same airport*. 1-ER-19. This Court has explained, for example, that, in some circumstances, a consumer "would probably not concern himself about any such detail" regarding whether a product is "being produced under [the trademark owner's] supervision or pursuant to some other arrangement with them"—affiliation, in other words, might be less of a concern than whether two services are the same. *Fleischmann Distilling Corp. v. Maier*

43

*Brewing Co.*, 314 F.2d 149, 155 (9th Cir. 1963) (holding that use of "Black & White" on beer infringed "Black & White" mark used on Scotch whiskey by implying an affiliation between the producers). Likewise, in *Champions Golf Club, Inc. v. Champions Golf Club, Inc.*, 78 F.3d 1111 (6th Cir. 1996), the Sixth Circuit considered two similarly named golf establishments in different cities and explained that, although golfers "are sophisticated about the services in question and the services are expensive," the "relevant question" is whether "a golfer, albeit sophisticated, would likely be confused about the *affiliation* between the two clubs," and as to that issue, consumers may be less careful. *Id.* at 1120-21 (emphasis added) (acknowledging that a golf club member may understand that the "CHAMPIONS" golf club located in Texas is a different facility from the "CHAMPIONS" in Kentucky, but still mistakenly assume they are affiliated).

Airport consumers may similarly exercise a lower degree of care as to affiliation. *See also, e.g.*, *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 638 (6th Cir. 2002) (holding that although medical providers are sophisticated and exercise a high degree of care in purchasing medical

44

equipment, they may nonetheless "mistakenly believe that the thermometers are somehow affiliated"); *Ariel Invs., LLC v. Ariel Cap. Advisors LLC*, 238 F. Supp. 3d 1009, 1026-27 (N.D. Ill. 2017) ("[E]ven assuming that consumers of [financial investment firms] are discerning in selecting their financial advisor, this does not mean that they are able to recognize that Ariel Capital has no affiliation with Ariel Investments."), *rev'd on other grounds*, 881 F.3d 520 (7th Cir. 2018).[9]

*Finally*, the record demonstrates that consumer care at point of sale (and setting aside the other scenarios in which airport consumers might experience confusion) varies. Airports like the SF Airport and the Oakland Airport serve consumers of varying levels of sophistication, and as several airlines have explained here, some passengers are first-time travelers, some are unfamiliar with the Bay Area, and some do not speak English. *See, e.g.*, 5-ER-1120-1121 (¶¶ 11-14, 19); 5-ER-1001-1012 (collecting statements of opposition from airlines). Some ticket

_____

[9] The cases the Port cites (at pp. 30-31) are not to the contrary. *See, e.g.*, *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 936-37 (9th Cir. 2015) (not addressing affiliation-based confusion); *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 843 (9th Cir. 2002) (per curiam) (considering consumers' attentiveness in "selecting a veterinarian for their family pet").

purchases, like those for a honeymoon, are made with significant planning or consideration, while others are arranged last-minute or in haste. *See* 5-ER-1121 (¶ 19). Consumer care in purchasing flights may also vary with cost—while some flights are of course expensive, some round-trip tickets to the Oakland Airport cost only $52. *See* 5-ER-1119 (¶ 9). Ultimately, this factor does not help the Port— "[t]he law is not made for the protection of experts, but for the public – that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearance and general impressions." *Fleischmann*, 314 F.2d at 156.

Thus, the District Court correctly found that the type of services and degree of consumer care factor weighs in San Francisco's favor.

### C.    The District Court Did Not Clearly Err in Finding that the Port's Mark Will Likely Cause Confusion as to Affiliation

As the District Court recognized, the Oakland Airport's new name is likely to confuse consumers into believing that its airport is affiliated or associated with the SF Airport. 1-ER-10-11; 1-ER-18-19.[10] Likelihood of

---

[10] At oral argument, the Port did not meaningfully contest the District Court's recognition of likely confusion as to affiliation. *See* 2-ER-77-81.

confusion or mistake as to the "affiliation, connection, or association" with another company, "or as to the origin, sponsorship, or approval of [its] . . . services" is explicitly actionable under the Lanham Act. 15 U.S.C. § 1125(a)(1)(A); *see HMH Publ'g Co. v. Brincat*, 504 F.2d 713, 716, 718 & n.8 (9th Cir. 1974) (recognizing "likelihood of confusion as to sponsorship may be a ground for a valid cause of action" for infringement under the Lanham Act, as the "appropriate inquiry" is "whether the average consumer would be likely to believe that the infringer's products 'had some connection' with those of the registrant" (citation omitted)); *see also, e.g.*, *Entrepreneur Media*, 279 F.3d at 1140, 1150 (addressing confusion as to affiliation). Indeed, "[t]oday, the test of 'likelihood of confusion' encompasses any type of confusion, including: confusion of source; confusion of sponsorship; confusion of affiliation; or confusion of connection." 3 *McCarthy on Trademarks and Unfair Competition* § 24:6 (5th ed. 2025).

Applying these principles, and rooted in the plain language Lanham Act, the District Court was correct to find that the Port's mark is "highly likely" to cause confusion regarding the Oakland Airport's affiliation or

47

association with the SF Airport.  1-ER-18.  Despite the Port's claim that this finding was supported by "no evidence," Opening Br. 36, the record in fact includes evidence supporting each of the important *Sleekcraft* factors, which demonstrates that the Port's use of its mark will "lead[] travelers to believe that [the] airports are the same or related to one another,"  5-ER-1122-1123 (¶ 25).  And since the Oakland Airport does not have the same infrastructure or provide the same level of services as the SF Airport, "travelers who mistakenly believe that SFO and Oakland airport are controlled by the same city or management are now associating Oakland's lesser services."  5-ER-1123 (¶ 27).

As the District Court recognized, this risk of confusion is obvious, as the two nearly identical names will imply a relationship or connection to any reasonable consumer or third party.  *See also, e.g.*, 5-ER-1003 (letter from United Airlines noting that renaming airport would "subsum[e] it under the umbrella of San Francisco"); 3-ER-571 (letter from San Francisco noting that "[g]iven SFO's stellar brand standing and associated name recognition in air transportation," the public will misunderstand "the airport's relationship to SFO").  And as discussed

48

*infra* § II, this confusion as to affiliation causes real-world damage, as travelers' experiences at the Oakland Airport—which does not bear SF Airport's accolades or rankings—will now be attributed to the SF Airport. *See* 5-ER-1123 (¶ 27).

The District Court was also correct to find that the risk of confusion is exacerbated because, as the record shows, nearly every pair of major U.S. airports featuring the same city's name are, in fact, affiliated. *See* 1-ER-18-19. Indeed, "it is extremely rare for a major U.S. airport to bear the name of a different city than the one that owns it," and in every major city identified in the record as featuring two major airports whose names bear the same city's name, the airports share the same owner. *See* 5-ER-1122 (¶ 24).[11] That is true for a number of the most prominent airports in some of the largest cities in the country—for example, Washington Dulles and Washington Reagan International Airport, Dallas Love and Dallas/Fort Worth, and Chicago Midway and Chicago O'Hare. *See* 5-ER-

---

[11] Despite the Port's apparent criticism, Opening Br. 34, there is nothing improper about the City's use of declarations from its own witnesses—indeed, that is exactly what the Port has done itself. *See Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (summary judgment).

1122 (¶ 24); *see also* 2-ER-201 (¶ 12) (similar). As a result, when consumers see "San Francisco" in the name of two large airports in the same area, they will naturally assume that the two airports are affiliated.

As the District Court explained, the Port submitted *no* evidence to the contrary below. *See* 1-ER-18-19. At most, the Port argued that Chicago Rockford International Airport is not owned by Chicago, *see* 3-ER-603 (¶ 19(c))—a point that it repeats several times in its opening brief, *see* Opening Br. 35-36. But that does not undermine the District Court's findings because the District Court referred only to "major" U.S. airports, which plainly does not include a small regional airport like Rockford, and because the District Court found only that "including the name of a city in the name of an airport is *normally* a reliable indicator" that the airport is owned by that city. 1-ER-19 (emphasis added). The District Court's finding that the use of a city's name in the names of two major, nearby airports implies affiliation was correct.

On appeal, the Port inappropriately seeks to introduce—through a footnote in the background section of its brief—alleged facts regarding other airports that it failed entirely to present below. *See* Opening Br. 8

n.2, 35-36 & nn. 6-8. "Facts not presented to the district court are not part of the record on appeal." *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1511 n.5 (9th Cir. 1994) (declining to consider "new evidence" introduced in appeal of order denying motion for preliminary injunction); *see also Nationstar Mortg. LLC v. Soria*, 753 F. App'x 456, 457 (9th Cir. 2019) (affirming order granting preliminary injunction, where appellant "improperly relie[d] on new evidence submitted for the first time on appeal"). The Port could have submitted this evidence and allowed the District Court to consider it (and for San Francisco to respond to it) below, but having failed to do so, the allegations it packs into a footnote on appeal are not part of the record, and the Port's related arguments have been forfeited. *See Doe v. Horne*, 115 F.4th 1083, 1112 (9th Cir. 2024) ("[W]e ordinarily will not consider arguments raised for the first time on appeal.").[12]

---

[12] The Port seeks to excuse its failure to present these facts and arguments to the District Court by requesting judicial notice, Opening Br. 8 n.2, but that request should be denied as an improper end-run around the ordinary rules of appellate preservation, *see Ctr. for Bio-Ethical Reform, Inc. v. City & Cnty. of Honolulu*, 455 F.3d 910, 919 n.3 (9th Cir. 2006) ("We deny the Center's request for judicial notice pursuant Federal Rule of Evidence 201 because these documents were not before

Even if this Court considers the new alleged evidence the Port provides about other airports, however, none of it moves the needle. Indeed, the Port identifies only one city—Seattle—in which two airports whose names feature the same city's name are *not* affiliated (and the recently renamed Paine Field can hardly be called a "major" airport). *See* Opening Br. 8 n.2. San Francisco already provided several contrary examples the District Court credited—meaning that the lone outlier the Port now identifies does not undermine the finding that the use of a city's name in two nearby airports "*normally*" indicates affiliation. 1-ER-19 (emphasis added). The Port's remaining examples merely suggest that some airports incorporating a city name may be owned by entities other than the city itself—for example, according to the Port, Portland International Airport is owned by the "Port of Portland." *See* Opening Br. 8 n.2. But that does not change the analysis: the relevant point is that when consumers encounter *two* nearby airports whose names feature the same city name, they will correctly infer that those two airports share the

---

the district court and their significance, if any, is not factored into the record on appeal.").

same owner or are otherwise affiliated.  The Port's last-ditch effort to expand the record thus does not suggest any clear error warranting reversal.

The Port also claims that San Francisco's evidence "do[es] not state anything about consumers' perception or confusion about the ownership of airports."  Opening Br. 37 (emphasis omitted).  That is wrong: as noted *supra* pp. 15-18, San Francisco repeatedly stated that consumers— "travelers"—would be confused into thinking the two airports are affiliated by the Port's use of the infringing mark.  5-ER-1122-1123 (¶ 25); 5-ER-1123 (¶ 27).  The Port otherwise supports this argument with the same forfeited arguments about other airports not presented below (or the Rockford airport) that are not part of the record and, in any event, are not persuasive if considered.  *See* Opening Br. 37.[13]

---

[13] The Port also includes a footnote about the two major Chicago airports (Chicago Midway International Airport and Chicago O'Hare), claiming that the two once had different owners—again, information that was not presented below and is not part of the record on appeal.  Opening Br. 37 n.9.  Even if that information were considered, it does not help the Port— in fact, although the airports may have previously had different owners, they also did *not* both include "Chicago" in their names, as Chicago O'Hare was apparently called "Orchard Field Airport" during that period.    *See* Chicago Dep't of Aviation, *O'Hare History*,

Accordingly, the District Court made no clear error in finding that San Francisco would likely demonstrate consumer confusion as to the affiliation of the two airports, which is a clear violation of the Lanham Act, and the Port provides no basis for reversal.

### D. If Considered, the Remaining *Sleekcraft* Factors Weigh in San Francisco's Favor

The District Court was correct to find that the above *Sleekcraft* factors—similarity (No. 4), type of goods and degree of consumer care (No. 3)—and the likelihood of confusion as to affiliation weigh in San Francisco's favor. While unmentioned in the Port's brief, the District Court also concluded that two additional factors favored San Francisco (strength (No. 1) and relatedness of services (No. 2)); two were neutral (marketing convergence (No. 5) and (expansion (No. 8)); and two less significant factors (intent (No. 7) and evidence actual confusion (No. 6)) did not favor San Francisco. *See* 1-ER-12-29. By addressing only a small number of relevant factors, however, the Port invites this Court to take

---

https://perma.cc/96UG-5CB2 (last visited June 23, 2025). And in any event, the two airports have had the same owner for over forty years, certainly long enough to set consumers' expectations today.

54

an incomplete view of the District Court's basis for finding a likelihood of confusion. The factors the Port chooses not to address provide important context for the District Court's ruling, and if considered by this Court, they confirm that San Francisco is likely to prevail on the merits. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1076 (9th Cir. 2015) ("We may affirm . . . on any ground raised below and fairly supported by the record." (cleaned up)).

*Strength of the SAN FRANCISCO INTERNATIONAL AIRPORT® Trademark (Factor No. 1).* As the District Court recognized, *see* 1-ER-12-14, the SF Mark is unquestionably strong and thus entitled to significant protection. "The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Brookfield*, 174 F.3d at 1058. Here, backed by many decades of prominent, exclusive use, the SF Mark is nationally recognized and unquestionably strong, with one publication routinely ranking it among the top 25 strongest airport brands in the world. 5-ER-1031 (¶ 17); *see also supra* p. 10; 5-ER-1027-1029 (¶¶ 8-9). The mark's strength is

reinforced by extensive direct and indirect advertising—San Francisco invests millions of dollars annually to market and promote the SF Airport, including over $5 million in 2023 and just over $30 million dollars over the last decade. 5-ER-1029-1030 (¶ 12). Over decades of use, billions in revenues, tens of millions in marketing, tens of millions of travelers, and extensive media exposure, the SF Mark symbolizes a brand associated with the go-to airport for travelers to and from the Bay Area, and it is unquestionably strong and entitled to significant protection.[14]

*Proximity or Relatedness of Services (Factor No. 2)*. There is also no question that the parties here offer "identical services"—airports. 1-ER-14. As the District Court observed, "[r]elated goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." 1-ER-14 (quoting *Brookfield*, 174 F.3d at 1055). The Port does not on appeal challenge that the parties' services are identical: they

---

[14] The District Court correctly found that the SF Mark is strong, even though it may be deemed "descriptive" in the sense that it refers to the airport's geographic location. 1-ER-12-13; *see Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988) (explaining that descriptive marks may accrue considerable strength through "extensive advertising, length of time in business, public recognition, and uniqueness").

offer competing airports just miles away from one another. This factor weighs heavily for San Francisco.

*Marketing Channels (Factor No. 5)*. As the District Court also found, the two airports use the same marketing channels, 1-ER-18, which further enhances the likelihood of confusion. "Convergent marketing channels increase the likelihood of confusion." *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993) (citation omitted). "In assessing marketing channel convergence, courts consider whether the parties' customer bases overlap and how the parties advertise and market their products." *Pom Wonderful*, 775 F.3d at 1130. Here, the parties' airport services are marketed and sold to the same consumers, namely, airline passengers traveling to and from the Bay Area—indeed, the airports are only twenty miles apart. They are marketed via the same mediums, *i.e.*, wherever airline tickets are sold, and accessed through online travel agencies, ride share apps and services, and the like. *See* 5-ER-1120 (¶ 12). And while the District Court concluded that this factor "favors neither party and carries no weight" because the parties both "advertise online," 1-ER-18, the record demonstrates that the two airports market in several

57

ways beyond their websites—including in the same publications, third-party websites, and apps, and on the same local radio station, *see* 2-ER-200 (¶ 10). They also appear in similar airport rankings. This complete overlap in the parties' marketing and trade channels also weighs in San Francisco's favor.

*Actual Confusion (Factor No. 6)*. "Evidence of actual confusion is strong evidence that future confusion is likely," *Off. Airline Guides*, 6 F.3d at 1393, but given the usual "difficulties in gathering [such] evidence," trademark infringement does *not* require proof of actual confusion, and its absence at the preliminary injunction stage is of especially minimal importance. *Perfumebay.com*, 506 F.3d at 1176 (citation omitted); *see also, e.g.*, *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072-73 (9th Cir. 2014) (same); 3 *McCarthy on Trademarks and Unfair Competition* § 23:12 (5th ed. 2025) ("Persons who are truly confused will often never be aware of the deception. Others who were confused and later learned of their deception will often not bother to report the fact."). Thus, even when "evidence of actual confusion is not overwhelming," because it "is hard to come by at this stage," it "favor[s]

finding likely confusion." *Boldface Licensing + Branding v. By Lee Tillett, Inc.*, 940 F. Supp. 2d 1178, 1193-94 (C.D. Cal. 2013).

Here, although the District Court ultimately determined that San Francisco's evidence of actual confusion was de minimis, 1-ER-17, the record reveals considerable evidence of such confusion, notwithstanding that the Port's new mark was in effect for only a short period of time. *See supra* pp. 15-18. In June 2024, for example, the SF Airport began keeping a travel log of individuals who showed up to the SF Airport and shared with an airport representative that they intended to depart from the Oakland Airport, identifying over twenty instances of confusion before the parties' briefing was complete. 2-ER-195 (¶ 3); 2-ER-197.

The District Court credited this evidence, and also rightly recognized that several other examples of statements of confusion— including from consumers who unintentionally booked flights to the SF Airport intending to travel to the Oakland Airport, and vice versa. *See, e.g.*, 6-ER-1388 ("I accidentally picked the wrong airport just now even though I live here and have flown through both airports many times."); 6-ER-1394-1398 (social media posts showing travelers confused about the

airports they were visiting); 6-ER-1407 (noting TSA agent advising traveler "[y]ou're at the wrong airport"); 6-ER-1411 (noting "extremely confused" passengers who "don't speak English very well"); 2-ER-118-129. While the District Court may not have found this evidence of actual confusion overwhelming, *see* 1-ER-16-17, the existence of at least some real-world confusion during the brief period in which the Port used its infringing mark bolsters its finding that the record demonstrates a likelihood of confusion. *See, e.g.*, *Entrepreneur Media*, 279 F.3d at 1150 (holding that factor weighed in favor of likely confusion given "one instance of actual confusion"); *Rearden*, 683 F.3d at 1217-18 (finding "two incidents" of actual consumer confusion, along with confusion in the press, sufficient at summary judgment); *see also Pom Wonderful*, 775 F.3d at 1131 (preliminary injunction warranted although plaintiff "failed to adduce evidence of actual past confusion").

*Intent (Factor No. 7)*.  A defendant's bad faith intent is not necessary to demonstrate likelihood of confusion, and its absence is "largely irrelevant." *Brookfield*, 174 F.3d at 1059.  However, "[w]hen an alleged infringer knowingly adopts a mark similar to another's, courts will

60

presume an intent to deceive the public." *Off. Airline Guides*, 6 F.3d at 1394. Here, although the District Court found that the Port had rebutted the presumption of deceptive intent, the record demonstrates (and the Port has not disputed) that the Port adopted the new name for the Oakland Airport with actual and constructive knowledge of San Francisco's mark. *See, e.g.*, 6-ER-1290-1291 (¶ 6); 5-ER-1120-1121 (¶¶ 14-17). Indeed, when told to stop by San Francisco and major airlines, among others, 5-ER-962 (¶ 3), the Port pressed forward. This Court may also infer bad faith from the Port's decision to rebrand yet forgo a trademark application.

*Expansion (Factor No. 8).*    Finally, as the District Court recognized, the expansion of product lines factor carries little weight in this case because the parties already directly compete. 1-ER-26; *see Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1153 (9th Cir. 2011) (finding expansion factor "unimportant" because parties already directly competed).

* * *

As the District Court recognized, the Port's use of a nearly identical

61

mark, for the exact same services covered by San Francisco's strong and incontestable trademark, is highly likely to cause consumer confusion. The Port's attempts to nitpick the District Court's analysis fail to demonstrate any clear error, and the District Court was right to find San Francisco likely to succeed on the merits.

## II.   The District Court Correctly Found that San Francisco Will Likely Suffer Irreparable Harm Absent a Preliminary Injunction

Under the Trademark Modernization Act, 15 U.S.C. § 1116(a), trademark holders who have established a likelihood of success on the merits are entitled to a presumption of irreparable harm. Because San Francisco has shown a likelihood of success on the merits, *supra* § I, irreparable injury is presumed, 15 U.S.C. § 1116(a). *See, e.g.*, *AK Futures*, 35 F.4th at 694 (addressing TMA presumption and finding irreparable harm demonstrated by declarations regarding damage to reputation and loss of consumer goodwill); *Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*, 515 F. Supp. 3d 1061, 1081 n.16 (N.D. Cal. 2021) (similar). Whether or not this presumption is applied here, San Francisco has satisfied the requirements for demonstrating irreparable harm.

62

After reviewing numerous sworn declarations with dozens of supporting exhibits, the District Court correctly held that San Francisco would be irreparably harmed in the absence of a preliminary injunction because its loss of control over its trademarks, reputation, and goodwill is "quintessentially irreparable injury." 1-ER-30. As the District Court recognized, for many decades and until the Port adopted the infringing mark, the SF Airport has been the only airport in the world with a name that incorporates the words "San Francisco International Airport." Over that time, San Francisco has invested tens of millions of dollars—$30 million in the last ten years alone—to develop its well-known trademark. 5-ER-1029-1030 (¶ 12); *see* 1-ER-31. San Francisco has also invested enormous amounts of time, energy, and money into the SF Airport's infrastructure and facilities—all to attract and support airlines and to ensure that travelers are comfortable throughout their journey. 5-ER-1026 (¶ 4).

And as the District Court explained, those investments have paid off—the SF Airport welcomes tens of millions of passengers every year and offers nearly seventy restaurants, high-end shopping, prestigious

club lounges, an award-winning hotel, a first-of-its-kind in-airport museum, and even the Bay Area Sports Hall of Fame. 5-ER-1026-1027 (¶¶ 4-7); 5-ER-1033; *see* 1-ER-31. These features have helped the SF Airport earn a long list of awards, leading U.S. airports in many respects, 5-ER-1027-1029 (¶¶ 8-9); 5-ER-1036-1069, and praise from both the travel industry and the public at large, *see* 1-ER-31.

But as the District Court recognized, the Port's attempts to capitalize on the SF Airport's goodwill by applying a confusingly similar mark to its own "smaller, less successful, and lower rated airport" will irreparably harm the SF Airport's brand and goodwill. 1-ER-31. The Port's arguments to the contrary are unpersuasive. *See* Opening Br. 39-46.

*First*, the Port devotes most of its argument to the misguided claim that the District Court improperly applied the TMA's "presumption of irreparable harm" in light of San Francisco's likelihood of success on the merits. *See* Opening Br. 39-41. That is a red herring. Although the presumption was warranted, and unrebutted, the District Court expressly determined that the record supported a finding of irreparable

64

harm even without the presumption, stating that, "*wholly apart from the presumption*, San Francisco has shown that it will suffer irreparable harm if a preliminary injunction is denied." 1-ER-30 (emphasis added). The District Court thus held San Francisco to a higher standard of demonstrating irreparable harm than the TMA now permits—indeed, the District Court cited pre-TMA cases that did not offer trademark holders any presumption of harm at all. *See* 1-ER-30-31 (citing *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)). The Port can hardly complain that the District Court chose to evaluate whether San Francisco had satisfied the irreparable harm requirement "wholly apart from the presumption." 1-ER-30.

For that reason, the Port's arguments about the Third Circuit's decision *Nichino America, Inc. v. Valent U.S.A. LLC*, 44 F.4th 180 (3d Cir. 2022), which *did* apply the TMA's presumption, simply have no bearing on this case. *See* Opening Br. 40-41. In *Nichino*, the Third Circuit outlined three steps for applying this presumption—(1) assessing "whether the infringement claim is likely to succeed," in which case the

TMA is triggered and harm is presumed, (2) shifting the burden to the defendant to rebut the presumption by "introduc[ing] evidence sufficient for a reasonable factfinder to conclude that the consumer confusion is unlikely to cause irreparable harm," then (3) if the defendant has rebutted the presumption, returning the burden of production to the plaintiff "to point to evidence that irreparable harm is likely absent an injunction." *Nichino*, 44 F.4th at 185-86. But here, since the District Court assessed harm without assuming any presumption at all, it skipped all the way to step three—asking whether San Francisco had demonstrated that irreparable harm was likely, without affording San Francisco the leg up that the TMA provides. *See* 1-ER-30-31. If anything, San Francisco's case is even stronger under *Nichino*, which thus offers no help to the Port.

*Second*, the Port complains about the District Court's factual finding that San Francisco would likely suffer irreparable harm. For example, the Port argues that "the City's statements of what might happen are purely speculative" and that "speculation about such confusion, unsupported by and data or evidence" is insufficient. Opening Br. 43-44. But as the District Court recognized, the record is replete with

evidence that the Port's use of its confusingly similar new name would force San Francisco to lose control of a mark that it had spent decades building and would erode the SF Airport's goodwill and the value of its mark. 1-ER-31; *see supra* pp. 62-64. This injury plainly qualifies as irreparable harm. *See* 4 *McCarthy on Trademarks and Unfair Competition* § 30:46 (5th ed. 2025) ("A likelihood of damage to reputation is by its nature 'irreparable' in the legal sense. Like trying to un-ring a bell, trying to 'compensate' after the fact for damage to business goodwill and reputation cannot constitute a just or full compensation.").[15]

Nor must San Francisco wait until all the damage resulting from its loss of control has been fully realized, as "the potential loss of good will or the loss of ability to control one's reputation may constitute irreparable harm." *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063, 1083 (N.D. Cal. 2012) (finding irreparable harm where Plaintiff has invested significant time in building up a strong reputation and "ha[d] no

_____

[15] The Port cites *Herb Reed* at length, but that is of limited relevance because it predated the TMA—its central holding that, at that time (in 2013) there was no presumption of irreparable harm when a plaintiff shows a likelihood of success on the merits, is no longer true. *See Herb Reed*, 736 F.3d at 1242; Opening Br. 43-44.

67

control over Defendants [infringing] products and the quality thereof");
*see also Stuhlbarg Int'l Sales*, 240 F.3d at 841 ("Evidence of threatened loss of . . . goodwill certainly supports a finding of the possibility of irreparable harm.").

*Finally*, the Port quibbles with the District Court's consideration of the Port's own proffered rebuttal evidence and again fails to show any clear error.  *See* Opening Br. 41-42.  For example, the Port points to a survey it prepared purporting to find that "83% of consumers surveyed had a favorable opinion of OAK."  Opening Br. 45 (citing 3-ER-540).  But even if accepted, that lone statistic not help the Port:  it says nothing about relative consumer perception of the *SF Airport*—thus providing no perspective on how consumers view the airports in relation to one another and avoids altogether that SF Airport is highly ranked across many metrics on which Oakland Airport does not register.  *See supra* pp. 7-8, 10.  Similarly deficient is the Port's barebones claim that San Francisco "does not provide evidence of any negative press reviews of [San Francisco] since OAK's use of the mark."  Opening Br. 45.  The absence of "negative press reviews" to date is no surprise thanks to San

Francisco's swift action in obtaining this preliminary injunction; and, moreover, does not address San Francisco's concerns about *consumer* perceptions. It is likewise no answer for the Port to note (at p. 42) that the SF Airport continued to receive "positive press coverage" after the Port began copying its mark—the SF Airport had received such coverage for years, and this claim says nothing about how the SF Airport's goodwill and consumer perception *changed*, if at all, after the Port's infringement began. The District Court was right to find the Port's evidence insufficient.

## III. The Public Interest and Balance of the Hardships Weigh Strongly in San Francisco's Favor

The District Court was also correct to find that the remaining equitable factors—the public interest and balance of the hardships—weigh in San Francisco's favor. *See* 1-ER-32-33. This Court has long recognized that the public is disserved when courts fail to prevent infringement: "[T]he consuming public is equally injured by an inadequate judicial response to trademark infringement." *Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982). And beyond protecting the value of registered trademarks, the public

69

interest is particularly well-served by avoiding confusion among the millions of travelers who visit the San Francisco and Oakland airports every year, counting on an accurate understanding of the airports in their area.

The Port seemed to agree before the District Court—acknowledging that avoiding consumer confusion serves the public interest. *See* 4-ER-659. In its opening brief, the Port does not appear to address the public interest in any meaningful sense—only claiming that the public interest does not support an injunction when a party is not likely to succeed on the merits. *See* Opening Br. 47-49. But since San Francisco has shown that it will succeed, the Port's undeveloped reference to the public interest fails.

The District Court was also right in balancing the hardships. *See* 1-ER-32-33. Far from simply concluding that the Port's injury was "self-inflicted," as the Port suggests (at pp. 47-48), the District Court carefully weighed all of evidence about the harm each party would suffer if the preliminary injunction were improperly granted or denied. It first referenced the potential irreparable harm to San Francisco's goodwill if

70

the injunction were improperly denied, then spent the majority of its analysis on the possible hardships to the Port if the injunction were improperly granted. 1-ER-32-33; *see Lopez v. Brewer*, 680 F.3d 1068, 1072-73 (9th Cir. 2012) ("Although the court's discussion of irreparable harm, the balance of equities, and the public interest is brief, the court did engage with each of these three factors, and thus did not apply an incorrect legal standard."). For example, the District Court noted that most of the Port's use of the infringing mark "comes from websites" and considered airport signage, most of which "have been ordered [but] have not yet been installed." 1-ER-32. In this respect, the District Court properly considered the scope of relief an injunction would afford—since the requested injunction would only be temporary, it "doesn't mean that the Port has to return the new signs—just that it can't put them up." *Id.*[16] Therefore, the District Court committed no clear error in considering (and finding insufficient) potential harm to the Port.

The Port also argues that the District Court overlooked evidence

---

[16] The Port is therefore wrong to claim that the preliminary injunction would "determine the outcome of a case." Opening Br. 48 (citation omitted).

by improperly focusing on "a few websites," Opening Br. 49, but the Port's other proffered evidence was threadbare. The Port points primarily to its declaration as evidencing the nature of the harm it might suffer, such as the potential loss of "resources it has invested with the FAA in its approval process" and "work[] with third party providers" on its new name, none of which it substantiated. *Id.* (citing 3-ER-529 (¶¶ 45-51)). But the District Court referenced precisely this portion of the record when it explained that "[m]ost of the evidence" it received from the Port was about use of the mark in digital media. 1-ER-32. And the only harm not explicitly named in the District Court's analysis was the "several months" allegedly required for the FAA to approve and implement the Port's new name for its airport. 3-ER-529 (¶¶ 49-51). That purported cost does not change the analysis—the Port fails to specify what exactly approval might have entailed or the cost it represents, even as the Port has reverted back to its prior name for several months.[17]

---

[17] The cases the Port cites, *see* Opening Br. 46, 48-49, are inapposite—unlike in these cases, San Francisco is likely to succeed on the merits and has demonstrated the harm it will face absent a preliminary injunction. *Supra* §§ I-II; *see, e.g.*, *Playmakers, LLC v. ESPN, Inc.*, 376 F.3d 894, 897-98 (9th Cir. 2004) (no likelihood of success and lack of proof

The public interest and balance of the hardships thus weigh in San Francisco's favor, confirming that the District Court was well within its discretion to grant San Francisco's motion for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's preliminary injunction.

---

concerning harm for equities); *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 852 (9th Cir. 2019) (no evidence of harm on record); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284-85 (4th Cir. 2002) (minimal harm to defendants).

Dated: June 24, 2025                    Respectfully submitted,

                                        */s/ Bobby Ghajar*

DAVID CHIU                              BOBBY GHAJAR
YVONNE R. MERÉ                          JUDD D. LAUTER
JULIE VEIT                              JESSICA WILLIAMS
CHRISTOPHER STUART                      COOLEY LLP
City Hall                               1333 2nd Street, Suite 400
Fox Plaza                               Santa Monica, CA 90401
1390 Market Street                      (310) 883-6400
7th Floor                               bghajar@cooley.com
San Francisco, CA 94102                 jlauter@cooley.com
cityattorney@sfcityatty.org             jwilliams@cooley.com
yvonne.mere@sfcityatty.org
julie.veit@sfcityatty.org               PATRICK J. HAYDEN
christopher.stuart@sfcityatty.org       COOLEY LLP
                                        55 Hudson Yards
                                        New York, NY 10001
                                        (212) 479-6000
                                        phayden@cooley.com


*Counsel for Plaintiff-Appellee the City and County of San Francisco*

74

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-7532

I am the attorney or self-represented party.

**This brief contains** | 13,995 | **words,** including | 142 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated |     |.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Bobby Ghajar | **Date** | June 24, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                                          *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2025, I electronically filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Bobby Ghajar*
Bobby Ghajar
*Counsel for Plaintiff-Appellee*
June 24, 2025